ACCEPTED
13-14-00381-CV
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
1/15/2015 3:58:21 PM
DORIAN RAMIREZ
CLERK

## No. 13-14-00381-CV

_____

IN THE THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
1/15/2015 3:58:21 PM
DORIAN E. RAMIREZ
Clerk

_____

## ENBRIDGE PIPELINES (EAST TEXAS) L.P.
### Appellant

### v.

## SARATOGA TIMBER CO., LTD., BATSON CORRIDOR, L.P., AND TIMBERVEST PARTNERS TEXAS, L.P.
### Appellees

_____

### Appeal from the 88th District Court of Hardin County, Texas

_____

### APPELLANT'S REPLY BRIEF

_____

**FLOWERS DAVIS, P.L.L.C.**
**1021 ESE South Loop 323**
**Suite 200**
**Tyler, Texas 75701**
**(903) 534-8063**
**(903) 534-1650 Facsimile**
**JULIE P. WRIGHT**
**State Bar No. 00794883**
**jpw@flowersdavis.com**
**THOMAS H. BUCHANAN**
**State Bar No. 03290500**
**ATTORNEYS FOR APPELLANT**


**ORAL ARGUMENTS REQUESTED**

Table of Contents ............................................................................................... ii

Index of Authorities ..................................................................................... iv-v

Reply Points Presented.....................................................................................2

**REPLY POINT NO. 1:** Saratoga Timber's arguments fail to defeat jurisdiction, particularly when those arguments and evidence are properly placed into the underlying chronology of filings and events occurring between the parties.

**REPLY POINT NO. 2.** Saratoga Timber's position that Timbervest holds no interest in the purported Batson Corridor easement and never acquired the same, and thus has no interest in this proceeding is contrary to longstanding real property law pertaining to conveyances, and is legally and factually incorrect.

**REPLY POINT NO. 3:** Saratoga Timber's claim—that Timbervest's waiver of defective service was moot as well as untimely because it was filed after the trial court granted the plea to the jurisdiction—is untimely raised for the first time on appeal, and is legally and factually incorrect.

**REPLY POINT NO. 4:** Upon Enbridge's joinder of Batson Corridor as an additional interested party, the trial court acquired administrative jurisdiction only over Batson Corridor. The trial court's consideration and grant of Batson Corridor's prematurely filed plea to the jurisdiction exceeded the scope of the trial court's administrative condemnation jurisdiction, and must be reversed.

**REPLY POINT NO. 5** Appellees' claim of collusion or conspiracy between Enbridge and Appellee Timbervest is unfounded, unsupported by the record, and urged solely in an effort to cloud the issues and portray Enbridge in a less than candid light.

Summary of Reply Argument................................................................................3

Argument and Authorities..................................................................................4

Prayer ........................................................................................................20

Appendix ...................................................................................................23

# INDEX OF AUTHORITIES

*Blake v. Blake*, 725 S.W.2d 797
(Tex. App.—Houston [1st Dist.] 1987, no writ)......................................................8

*Color Tile, Inc. v. Ramsey*, 905 S.W.2d 620
(Tex. App.—Houston [14th Dist.] 1995, no writ) ....................................................8

*Energo Int'l Corp. v. Modern Indus. Heating, Inc.*,
722 S.W.2d 149 (Tex. App.—Dallas 1986, no writ)..............................................15

*Faulkner v. Culver*, 851 S.W.2d 187 (Tex. 1993) ....................................................15

*Flynt v. Garcia*, 587 S.W.2d 109 (Tex. 1979)............................................................8

*Guyot v. Guyot*, 3 S.W.3d 243 (Tex. App.—Fort Worth 1999, no pet.) .................15

*Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172 (Tex.2004)........18

*Klein v. Humble Oil & Refining Co.*, 67 S.W.2d 911
(Tex. Civ. App.—Beaumont 1934)
(*reversed on other grounds*, 86 S.W.2d 1077 (Tex. 1935)) ..................................12

*Marcus Cable Associates, L.P. v. Krohn*, 90 S.W.3d 697 (Tex. 2002)...................10

*Metropolitan Transit Authority of Harris County, Texas v. Graham*,
105 S.W.3d 754 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)...................18

*Patrick Media Group, Inc. v. Dallas Area Rapid Transit*,
879 S.W.2d 375 (Tex. App.—Eastland 1994, writ denied)....................................18

*Pich v. Lankford*, 302 S.W.2d 645 (Tex. 1957)........................................................12

*Smith v. McCorkle*, 895 S.W.2d 692 (Tex. 1995)....................................................15

*State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638 (Tex. 2001)...................................7

*State Farm Ins. Co. v. Pults*, 850 S.W.2d 691
(Tex. App.—Corpus Christi 1993, no writ)............................................................15

*Taack v. McFall*, 661 S.W.2d 923 (Tex. 1983) ........................................................16

*Till v. Thomas*, 10 S.W.3d 730
(Tex. App.—Houston [1st Dist.] 1999, no pet.) ........................................................9

*Wright v. E. P. Operating Ltd. Partnership*,
978 S.W.2d 684 (Tex. App.—Eastland 1998, pet. denied) ................................ 12-13

**STATUTES AND RULES:**

TEX. PROP. CODE ANN. § 21.016 (Vernon 2004) ............................................... 5, 7, 8

TEX. PROP. CODE ANN. § 21.016(d) (Vernon 2004)...................................................7

TEX. PROP. CODE ANN. § 21.016(d)(1) (Vernon 2004) ................................................7

TEX. R. APP. P. 9.4(i)(1) ........................................................................................21

TEX. R. APP. P. 9.4(i)(2)(B)....................................................................................21

TEX. R. APP. P. 33.1...............................................................................................11

TEX. R. APP. P. 33.1(a)(2) ......................................................................................15

TEX. R. APP. P. 43.2...............................................................................................21

TEX. R. APP. P. 43.3...............................................................................................21

TEX. R. APP. P. 43.4...............................................................................................21

No. 13-14-00381-CV

_____

IN THE THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS

_____

ENBRIDGE PIPELINES (EAST TEXAS) L.P.
Appellant

v.

SARATOGA TIMBER CO., LTD., BATSON CORRIDOR, L.P., AND
TIMBERVEST PARTNERS TEXAS, L.P.
Appellees

_____

Appeal from the 88th District Court of Hardin County, Texas

_____

APPELLANT'S REPLY BRIEF

_____

TO THE HONORABLE THIRTEENTH COURT OF APPEALS AT CORPUS CHRISTI:

COMES NOW ENBRIDGE PIPELINES (EAST TEXAS) L.P., Appellant herein (hereinafter "Enbridge"), and submits this Appellant's Reply Brief, and would respectfully show the Court that, as addressed at length in Appellant's Brief and as discussed herein in response to specific issues raised in Appellees' Brief, this matter must be remanded to the trial court with instructions to reinstate the condemnation matter as to all parties, appoint special commissioners, and allow the

1

parties to proceed with the condemnation. Appellees have cited no case authority in their Brief which would allow this Court to uphold the trial court's erroneous ruling in dismissing the condemnation. In support thereof, Enbridge would show the Court as follows:

## II. REPLY POINTS PRESENTED

**REPLY POINT NO. 1:** Saratoga Timber's arguments fail to defeat jurisdiction, particularly when those arguments and evidence are properly placed into the underlying chronology of filings and events occurring between the parties.

**REPLY POINT NO. 2.** Saratoga Timber's position that Timbervest holds no interest in the purported Batson Corridor easement and never acquired the same, and thus has no interest in this proceeding is contrary to longstanding real property law pertaining to conveyances, and is legally and factually incorrect.

**REPLY POINT NO. 3:** Saratoga Timber's claim—that Timbervest's waiver of defective service was moot as well as untimely because it was filed after the trial court granted the plea to the jurisdiction—is untimely raised for the first time on appeal, and is legally and factually incorrect.

**REPLY POINT NO. 4:** Upon Enbridge's joinder of Batson Corridor as an additional interested party, the trial court acquired administrative jurisdiction only over Batson Corridor. The trial court's consideration and grant of Batson Corridor's prematurely filed plea to the jurisdiction exceeded the scope of the trial court's administrative condemnation jurisdiction, and must be reversed.

**REPLY POINT NO. 5** Appellees' claim of collusion or conspiracy between Enbridge and Appellee Timbervest is unfounded, unsupported by the record, and urged solely in an effort to cloud the issues and portray Enbridge in a less than candid light.

### III. SUMMARY OF REPLY ARGUMENT

Appellees, Batson Corridor and Saratoga Timber overly simplify facts, misrepresent facts, and ignore other pertinent facts, as well as make unfounded accusations of some sort of conspiracy between Enbridge and Appellee Timbervest, in an apparent effort to cloud the legal issues pending before this Court. However, none of the issues raised support the trial court's erroneous dismissal of the underlying condemnation as to either Saratoga Timber or Batson Corridor.

Saratoga Timber's arguments fail to defeat jurisdiction, particularly when those arguments and evidence are properly placed into the underlying chronology of filings and events occurring between the parties. Its' position that Timbervest holds no interest in the Batson Corridor easement and never acquired the same, and thus has no interest in this proceeding is contrary to longstanding real property law pertaining to conveyances, and is legally and factually incorrect. And, Saratoga Timber's claim, that Timbervest's waiver of defective service was moot as well as untimely because it was filed after the trial court granted the plea to the jurisdiction, is untimely raised for the first time on appeal, and is also legally and factually incorrect.

3

Batson Corridor's arguments likewise fail to defeat jurisdiction. Upon Enbridge's joinder of Batson Corridor as an additional interested party, the trial court acquired administrative jurisdiction only over Batson Corridor. The trial court's consideration and grant of Batson Corridor's prematurely filed plea to the jurisdiction exceeded the scope of the trial court's administrative condemnation jurisdiction, and must be reversed.

Finally, Appellees' claim of collusion or conspiracy between Enbridge and Appellee Timbervest is unfounded, unsupported by the record, and urged solely in an effort to cloud the issues and portray Enbridge in a less than candid light. The two parties share a common interest in resolving the underlying condemnation and the companion declaratory judgment action correctly and efficiently.

In addition to the matters addressed in Appellant's Brief, Enbridge would respond specifically to the following issues raised by Batson Corridor and Saratoga Timber in Appellees' Brief.

## IV. ARGUMENT AND AUTHORITIES

**REPLY POINT NO. 1:** Saratoga Timber's arguments fail to defeat jurisdiction, particularly when those arguments and evidence are properly placed into the underlying chronology of filings and events occurring between the parties.

Saratoga Timber makes two arguments in support of its position that jurisdiction was never acquired over Saratoga Timber. Its' primary legal argument

4

is that the handwritten language in the return of service, that the notice was served "**at the offices of**" Saratoga Timber, establishes on its face a lack of compliance with Texas Property Code §21.016, and defeats jurisdiction. Saratoga's second evidentiary attack is based upon the two affidavits it filed with the trial court in an effort to raise a fact issue regarding whether Enbridge complied with §21.016. Neither of Saratoga Timber's arguments defeat jurisdiction, particularly when those arguments and evidence are properly placed into the underlying chronology of filings and events occurring between the parties.

A. Pertinent Factual Chronology

As the record demonstrates (along with the extensive briefing of the issue in Appellant's Brief):

Initially, Saratoga Timber did not properly raise the issue in its original Plea to the Jurisdiction filed on March 12, 2007, in which it only claimed that it was not the owner of the property and therefore not a proper party. (CR, 52-56).

Saratoga Timber failed to offer any proof sufficient to raise a fact issue as to proper service of the notice when it filed its First Supplement to Plea to the Jurisdiction on December 27, 2007, in which it attached the affidavit of Tricia Chambers. (CR, 489-493).

Saratoga Timber conveyed all of its remaining right, title, and interest, in the subject property to Timbervest effective January 16, 2008, (CR, 928-974), and lost any justiciable interest in this lawsuit or standing to seek further redress.

All parties acknowledged that Saratoga Timber was not a proper party to this suit or to the companion declaratory judgment action, on the record on April 9, 2014, and Saratoga Timber was dismissed from that suit. (CR, 975-82).

Saratoga Timber's dismissal from that suit was brought to the attention of this trial court by Timbervest on May 8, 2014. (CR, 924-27, 975-82).

On May 8, 2014, Timbervest, as the successor-in-interest to Saratoga Timber formally waived any defects or irregularities in service of the notice. (CR, 924-982).

Saratoga Timber untimely and erroneously filed its Second Supplement to its Plea to the Jurisdiction on May 20, 2014 (over seven years after it filed its original plea and over six years after it conveyed its interest to Timbervest), **and for the first time** argued that the return was defective and offered an affidavit of Rufus Ducan on behalf of Saratoga Timber in an effort to raise a fact issue regarding proper service. (CR, 985-1010).

B.    Analysis

6

Saratoga's attempt to defeat jurisdiction is moot/a nullity because Saratoga Timber lost standing in this matter in January of 2008, and none of the actions taken by Saratoga Timber prior to that date ever properly challenged jurisdiction or raised a fact issue as to proper service.

Texas Property Code §21.016(d) provides that notice of the special commissioners hearing may be served "by delivering a copy of the notice to the party or to the party's agent or attorney." Tex.Prop.Code §21.016(d)(1). This return of notice recites that it was executed by serving "the Notice of Hearing, together with a copy of the Petition for Condemnation filed in this case on Saratoga Timber Co., Ltd, by delivering a true copy of said Notice and Petition to the office of said Defendant…" (CR, 25). According to our Supreme Court in *State v. Bristol Hotel Asset Company*, "a return of service of notice of a commissioners hearing that strictly complies with section 21.016 of the Property Code is prima facie evidence that the condemnee has been served with notice in compliance with the statute. When the [condemnor] introduces such a return, the condemnee must offer evidence that it was not served to raise a fact issue." *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 642 (Tex. 2001).

Here, the return of service was filed of record before the special commissioners hearing (CR, 22-25), constituting prima facie evidence that

Saratoga Timber had been served with notice in compliance with statute. Saratoga Timber's original plea to the jurisdiction did not assert any defect in the manner of service upon Saratoga Timber, but rather claimed that Saratoga Timber was not the owner of the property and not a proper party. And the first supplemental plea included the affidavit of Tricia Chambers, which wholly failed to raise a fact issue regarding service upon Saratoga Timber.

Likewise, none of the actions attempted by Saratoga Timber after it conveyed its interest in the property to Timbervest were of any consequence. Specifically, after Timbervest submitted itself to the jurisdiction of the trial court as the successor-in-interest to Saratoga Timber (CR, 651-652), and after Timbervest formally waived any defects or irregularities in service (CR, 924-984), Saratoga Timber could not take any action which would divest the trial court of jurisdiction. *See Flynt v. Garcia*, 587 S.W.2d 109, 109-10 (Tex.1979) ("where jurisdiction is once lawfully and properly acquired, no subsequent fact or event in the particular case serves to defeat jurisdiction."); *Color Tile, Inc. v. Ramsey*, 905 S.W.2d 620, 623 (Tex.App.—Houston [14th Dist.] 1995, no writ); *Blake v. Blake*, 725 S.W.2d 797, 799 (Tex.App.—Houston [1st Dist.] 1987, no writ).

In sum, Enbridge established prima facie proof of service upon Saratoga Timber in accordance with Texas Property Code §21.016, by filing the return of

service with the court.  For the next seven years, that proof stood in the record unrefuted.   During that interim, Saratoga Timber conveyed all of its remaining interest in the subject property to Timbervest in January of 2008, and Timbervest, as the successor-in-interest to Saratoga Timber waived any defects or irregularities in service.  The subsequent and untimely filing by Saratoga Timber of the affidavit of Rufus Duncan in May of 2014 (CR, 985-1010) was of no consequence – as it was filed by a party who no longer had any standing to participate in the condemnation and after the only party with standing to urge those alleged jurisdictional defects had both submitted itself to the court's jurisdiction and had formally waived any such defects on the record.

**REPLY POINT NO. 2.**   Saratoga Timber's position that Timbervest holds no interest in the purported Batson Corridor easement and never acquired the same, and thus has no interest in this proceeding is contrary to longstanding real property law pertaining to conveyances, and is legally and factually incorrect.

Saratoga Timber contends on appeal that Timbervest holds no interest in the purported Batson Corridor easement[1] and never acquired the same, and thus has no

---

[1] The validity of the attempted conveyance from Saratoga Timber to Batson Corridor remains disputed, and is the subject of a pending separate declaratory judgment action. A partial summary judgment has been granted in favor of Batson Corridor, but the matter has not been finally resolved.  Additionally, once a final judgment has been rendered in that declaratory judgment action, such judgment will also be subject to appeal.  Therefore, it is improper for Appellees' to attempt to rely upon that trial court's ruling (which is not of record in this case), or attempt supplement this record on appeal with documents which were not of record before the trial court below.  *See Till v. Thomas*, 10 S.W.3d 730, 733 (Tex.App.—Houston [1st Dist.] 1999, no pet.).

interest in this proceeding. (Appellees' Brief, pp. 20-21) Saratoga Timber claims, as its legal basis for this position, that its "conveyance to Timbervest dated January 16, 2008, clearly provides that it was made and accepted by Timbervest subject to the Batson Corridor Easement. The Batson Corridor Easement was an exception to Timbervest's title and Cause No. 47,333 (this action) was an exception to Timbervest's title." (*Id.*)

Saratoga Timber appears to have a fundamental misunderstanding of real property law regarding conveyances. Contrary to Saratoga Timber's belief (as expressly stated to the trial court and implicitly represented to this court) Saratoga Timber did not convey all of its interest in the subject property to Batson Corridor when it attempted to grant **an easement** and **surface use agreement** to Batson Corridor. The purported conveyance from Saratoga Timber to Batson Corridor was not a sale of the property in fee simple; it was for a pipeline corridor easement and surface use agreement.

An easement is a non-possessory interest in another's property that authorizes its holder to use that property for a particular purpose. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002). Such easement does not convey title to property, but implies a grant of unlimited reasonable use insofar as that use is reasonably necessary and convenient; the owner of land subject to an

easement otherwise retains title to the land and all that is ordinarily considered part of that land. *See id.* Despite its belief to the contrary, Saratoga Timber continued to own the property, subject to the outstanding corridor easement[2], until it sold the property to Timbervest in 2008.

It is likewise error for Saratoga Timber to state that Timbervest never acquired any interest in the property for two reasons. First, Saratoga Timber never challenged Timbervest's ownership before the trial court and cannot raise the issue for the first time on appeal. Tex. R. App. P. 33.1. And in fact, such was discussed among counsel and the parties on the record at a hearing in the companion declaratory judgment action, the transcript of which is included in the record before this court – in which counsel for Appellees acknowledged that Saratoga Timber sold all of its' interest in the subject property to Timbervest and had no further interest in the property or in litigation involving the property. Upon the agreement, and at the request of all counsel, Saratoga Timber was dismissed from that suit. To claim otherwise before this Court is therefore disingenuous.

Second, Saratoga Timber's untimely challenge raised before this Court is both legally and factually incorrect. Saratoga Timber seems to be taking the position that because the Batson Corridor Easement and the underlying

---

[2] (the validity of which is the subject of a separate pending declaratory judgment action).

condemnation lawsuit were noted as exceptions on the "Exceptions to Title" exhibit to the conveyance, they were somehow excluded from the conveyance and never conveyed to Timbervest. Saratoga Timber's position is legally incorrect.

Generally a 'reservation' in a deed is a clause whereby the grantor reserves to himself some new thing, either issuing out of or incident to the thing granted, while an 'exception' in a deed is a clause exempting from the operation of the deed and retaining in the grantor the title to some part of the thing granted, or else [as here] *excepting from the operation of the deed some part of the thing granted the title of which is at the time in another. Klein v. Humble Oil*, 67 S.W.2d 911, 915 (Tex. Civ. App.—Beaumont 1934)(*reversed on other grounds*, 86 S.W.2d 1077 (Tex. 1935)), but specifically approving the holdings of the Court of Civil Appeals on the meaning and effect of the reservations and exceptions; *Pich v. Lankford*, 302 S.W.2d 645 (Tex. 1957).

Language in the deed stating that the conveyance is made **subject to** an easement, lease, prior reservation, etc. does not reserve anything for the Grantor, but rather simply recognizes that reservations, conveyances, easements, and /or other burdens upon the land have been made in the past and are in the chain of title. *See Wright v. E.P. Operating Ltd. Partnership*, 978 S.W.2d 684, 688

12

(Tex.App.—Eastland 1998, pet. denied). Those are to be excluded from the warranty of title, not excluded from the conveyance.

By General Warranty Deed (CR 928-974), Saratoga Timber conveyed all of its right, title and interest into certain property, approximately 2,069 acres in Hardin County, Texas, to Timbervest. Nothing was **reserved** by Saratoga Timber unto itself in the General Warranty Deed. In fact, per the specific language of the deed, all of its right, title, and interest in and to the acreage (including the subject property) together with "all standing and fallen timber, timber products and by-products, all improvements located thereon and **all of Grantor's right, title and interest in and to all easements, tenements, hereditaments, privileges** and appurtenances in any way belonging thereto, **including without limitation**, …. **all easements, rights-of-way, rights of ingress and/or egress and reversionary interests**…" were conveyed to Timbervest. (CR, 928). The entire conveyance was made only subject to the matters listed on Exhibit "C," where the Batson Corridor easement and condemnation lawsuit were noted, along with other easements of record, oil and gas leases, etc. (CR, 967-973). And, Saratoga Timber bound itself and its successors and assigns to warrant and forever defend all and singular the property unto Timbervest and its successors and assigns, subject only to those matters referenced in Exhibit "C". (CR, 928).

It is clear from the above language, that in 2008, when Saratoga Timber sold all of its right title and interest in and to property (which included the purported Batson Corridor Easement), the entirety of Saratoga Timber's interest in the subject property was conveyed **without any reservations** to Timbervest, expressly **subject to** various easements, rights-of-way, and other encumbrances – including the Batson Corridor easement and the underlying condemnation lawsuit. Those **subject to** "exceptions to title" were not reservations which were excluded from the conveyance, they were simply notations of all encumbrances and burdens on the property to which title would not be warranted. Thus they can be found on the exhibit to the conveyance document entitled "Exceptions to Title." The language upon which Saratoga Timber is attempting to rely in an effort to somehow retroactively defeat Timbervest's title to the property, is nothing more than the language utilized routinely in warranty deeds to note exceptions to warranties of title.

As of January 16, 2008, (the date of the conveyance to Tinbervest), Saratoga Timber ceased to have any ownership interest in the subject property, and ceased to be a proper party in this matter or to have any standing to seek court intervention.

**REPLY POINT NO. 3:** Saratoga Timber's claim—that Timbervest's waiver of defective service was moot as well as untimely because it was filed after the trial granted the plea to the jurisdiction—is untimely raised for the first time on appeal, and is legally and factually incorrect.

Appellees also claim that Timbervest's filing of its waiver on May 8, 2014, was untimely because the trial court had already indicated that it was granting the plea to the jurisdiction by notation on its docket sheet from the meeting in chambers held on April 17, 2014 (at which no court reporter was present). However, Appellees position finds no support in case authority.

To be effective, a ruling must be made on the record, either in writing or in open court transcribed by a court reporter. TEX. R. APP. P. 33.1(a)(2); *State Farm Ins. Co. v. Pults*, 850 S.W.2d 691, 693 (Tex.App.—Corpus Christi 1993, no writ). A party cannot rely on a docket entry as a ruling on a motion as docket entries are inherently unreliable. *Guyot v. Guyot*, 3 S.W.3d 243, 246 (Tex.App.—Fort Worth 1999, no pet.); *Energo Int'l Corp. v. Modern Indus. Heating, Inc.*, 722 S.W.2d 149, 151 n.2 (Tex.App.—Dallas 1986, no writ). The function of the docket sheet is limited to correcting clerical mistakes. *State Farm*, 850 S.W.2d at 693; *Energo*, 722 S.W.2d at 151 n.2. Further, a docket entry cannot take the place of a written order or judgment, and it does not preserve error. *Smith v. McCorkle*, 895 S.W.2d 692, 692 (Tex. 1995); *Faulkner v. Culver*, 851 S.W.2d 187, 188 (Tex. 1993);

15

*Taack v. McFall*, 661 S.W.2d 923, 924 (Tex. 1983). The case law is clear and well settled. A docket entry is neither a ruling nor an order.

Timbervest as the successor-in-interest to Saratoga Timber, stood in Saratoga Timber's shoes, had the absolute right to waive any defects of service, and did so at a time when the trial court still retained its plenary power and **<u>before</u>** the trial court issued its May 29, 2014 dismissal order.

Interestingly, the only document filed by Saratoga Timber in the entire record before this Court which could have conceivably raised a fact issue regarding proper service upon Saratoga Timber, was the affidavit of Rufus Duncan, which was filed by Saratoga Timber on May 20, 2014. Per the argument made by Saratoga Timber here, if we were to assume (wrongly) that the docket entry of April 17, 2014 was the date the plea was granted, then Saratoga's May 20, 2014 filing (made more than 30 days later) would not only have been filed post-dismissal, but also filed after the court lost its plenary jurisdiction as well.

Similar to matters addressed to both trial courts below, Saratoga Timber appears to continue to take inconsistent positions in its arguments before this Court. Nevertheless, the affidavit of Duncan carries no weight in light of Timbervest's unequivocal waiver of any defects of service (and even without the

waiver, such affidavit at most would have only raised a fact issue requiring a remand for a full evidentiary hearing on the record regarding the service issue).

For this reason, and the reasons already urged in Appellant's Brief, it was error for the trial court to dismiss this matter upon the request of Saratoga Timber, based upon its' plea to the jurisdiction.

**REPLY POINT NO. 4:** Upon Enbridge's joinder of Batson Corridor as an additional interested party, the trial court acquired administrative jurisdiction only over Batson Corridor. The trial court's consideration and grant of Batson Corridor's prematurely filed plea to the jurisdiction exceeded the scope of the trial court's administrative condemnation jurisdiction, and must be reversed.

Appellees' statement that Enbridge failed to make Batson Corridor a party to the administrative proceeding is contradicted by the record, and the trial court separately erred when it dismissed the condemnation matter as to Batson Corridor based upon a plea to the jurisdiction.

Enbridge filed its First Amended Statement and Petition for Condemnation on December 18, 2007 against both Saratoga Timber and Batson Corridor, alleging that Batson Corridor, L.P. was an additional interested party and requesting that the trial court appoint special commissioners, that notice be served in compliance with the statute, and that the condemnation matter proceed. (CR, 469-486). The trial court did not appoint special commissioners or move the condemnation matter forward; however, Batson Corridor nevertheless filed its own answer and plea to

17

the jurisdiction. (CR, 494-504). In its answer and in a portion of its plea to the jurisdiction, it urged that Enbridge did not engage in negotiations with Batson Corridor prior to adding Batson Corridor as a party to the condemnation. (CR, 495, 501). However, our Texas Supreme Court in *Hubenak* has clearly held that such prerequisites to suit are mandatory but not jurisdictional, and that the proper remedy is abatement for such period of time to cure the defect/issue. *Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 180-84 (Tex. 2004).

Batson also erroneously argued that the trial court was without jurisdiction over Batson Corridor based upon the alleged defects of notice relied upon by Saratoga Timber. However, such position is without merit. In condemnation proceedings, the trial court has appellate jurisdiction limited to the parties and issues involved in the administrative proceeding before the special commissioners. *Patrick Media Group, Inc. v. Dallas Area Rapid Transit*, 879 S.W.2d 375, 377 (Tex. App.—Eastland 1994, writ denied). However, condemnors are not required to join all property owners in one proceeding at one time, but may proceed with less than all parties so long as the interest of the unserved party is not adjudicated. *Metropolitan Transit Authority of Harris County, Texas v. Graham*, 105 S.W.3d 754, 757-61 (Tex.App.—Houston [14th Dist.] 2003, pet. denied).

18

Here, after the special commissioners hearing was held as to Saratoga Timber, upon learning of Batson Corridor's potential interest in the property, Enbridge joined Batson Corridor as an interested party and requested that the trial court proceed with its administrative condemnation obligations. Batson Corridor was not a party to the special commissioners hearing or award. The proceeding was administrative as to Batson Corridor, and would remain administrative until a special commissioners hearing was held, an award made, and objections filed (or not filed). Without those events occurring, the trial court could not exercise its appellate/judicial jurisdiction over Batson Corridor to consider or grant its plea to the jurisdiction, and it was reversible error for the trial court to do so.

**REPLY POINT NO. 5** Appellees' claim of collusion or conspiracy between Enbridge and Appellee Timbervest is unfounded, unsupported by the record, and urged solely in an effort to cloud the issues and portray Enbridge in a less than candid light.

Finally, the assertion that Enbridge and Timbervest are somehow colluding or plotting against Saratoga Timber and Batson Corridor is unfounded, is not supported by any document contained in the record before this Court, and is a thinly veiled attempt to cast Enbridge (and perhaps Timbervest) in a less than candid position before this Court. Such is not the case. Enbridge is motivated to efficiently and correctly resolve this matter (and the accompanying declaratory

judgment action) so that Enbridge obtains an easement for its pipeline from the correct property owner(s).

What has gone unacknowledged by Appellees is that at every turn, after Saratoga Timber first raised the defective service issue (claiming that it did not own the subject proper, was not a proper party, and that the property party was Batson Corridor), and again after Saratoga Timber sold its interest to Timbervest, Enbridge joined each alleged additional necessary party and requested the trial court to appoint special commissioners and to proceed with the administrative portion of the condemnation matter. At every turn, the request was ignored.

The jurisdictional dismissals were erroneous, and ultimately served no purpose but to prolong litigation, costing all parties' time and unnecessary expense.

## V. PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Enbridge respectfully requests that this Court sustain the issues raised in Appellant's Brief and further addressed herein above, reverse the trial court's judgment of dismissal for lack of jurisdiction, remand this matter to the trial court with instructions to reinstate the condemnation matter, appoint special commissioners, and allow the parties to

proceed with the condemnation, and award Appellant its costs of court and appellate costs. TEX. R. APP. P. 43.2, 43.3, and 43.4.

Respectfully submitted,

**FLOWERS DAVIS, P.L.L.C.**
1021 ESE Loop 323, Suite 200
Tyler, Texas 75701
(903) 534-8063
(903) 534-1650 Facsimile

 /s/ Julie P. Wright
JULIE P. WRIGHT
State Bar No. 00794883
THOMAS H. BUCHANAN
State Bar No. 03290500
ATTORNEYS FOR APPELLANT
ENBRIDGE G & P (EAST TEXAS) L.P,

## CERTIFICATE OF COMPLIANCE

I certify that this Appellant's Reply Brief complies with the limitation of TEX. R. APP. 9.4(i)(2)(B) because it contains 4,082 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4 (i)(1).

 /s/ Julie P. Wright
JULIE P. WRIGHT

21

**CERTIFICATE OF SERVICE**

I hereby certify and state that a true and correct copy of this document has been provided to and served on the following via EFSP, electronic mail, and certified mail, return receipt requested, on this the 15th day of January, 2015:

Robert Keith Wade
Law Offices of Robert Keith Wade
650 North Ninth Street at McFaddin
Beaumont, Texas 77702-1614
Email:  rwade-law@sbcglobal.net

Brian D. Sutton
SUTTON & JACOBS, LLP
850 Park Street
Beaumont, Texas 77701
Email:  brians@sutton-jacobs.com

R. Kyle Hawes, Esq.
Chamblerlain, Hrdlicka, White,
 Williams & Martin
1200 Smith Street, Suite 1400
Houston, Texas 77002
Email:  kyle.hawes@chamberlainlaw.com

     /s/ Julie P. Wright
JULIE P. WRIGHT

# APPENDIX

Case Authorities..........................................................................................Tab A

*Blake v. Blake*
*Color Tile, Inc. v. Ramsey*
*Energo Intern. Corp. v. Modern Indus. Heating, Inc.*
*Faulkner v. Culver*
*Flynt v. Garcia*
*Guyot v. Guyot*
*Hubenak v. San Jacinto Gas Transmission Co.*
*Klein v. Humble Oil & Refining Co.*
*Marcus Cable Associates, L.P. v. Krohn*
*Metropolitan Transit Authority of Harris County, Texas v. Graham*
*Patrick Media Group, Inc. v. Dallas Area Rapid Transit*
*Pich v. Lankford*
*Smith v. McCorkle*
*State v. Bristol Hotel Asset Co.*
*State Farm Ins. Co. v. Pults*
*Taack v. McFall*
*Till v. Thomas*
*Wright v. E. P. Operating Ltd. Partnership*

# TAB A


725 S.W.2d 797
**(Cite as: 725 S.W.2d 797)**



Court of Appeals of Texas,
Houston (1st Dist.).

Johnnie L. BLAKE, Individually and as Trustee for
John William Blake and Jeremy Louis Blake,
Minors, Appellant,
v.
Rebecca L. BLAKE, Appellee.

No. 01–85–0934–CV.
Feb. 12, 1987.

Suit was instituted by husband in a dispute with wife over personal property following divorce. The County Court No. 2, Galveston County, Ronald L. Wilson, J., entered order dismissing suit for want of jurisdiction, and husband appealed. The Court of Appeals, Duggan, J., held that trial court was bound by its determination that it had jurisdiction based on pleading of an unspecified amount in husband's original petition and, viewing claims of husband and two children individually, was vested with jurisdiction to award husband $2,568.20 and each child $9,802.29, representing savings account funds and value of destroyed property, notwithstanding that limit on amount of trial court's jurisdiction under statute in effect at that time was from $500 to $10,000.

Judgment dismissing suit set aside, order setting aside default judgment affirmed, and cause remanded.

West Headnotes

**[1] Courts 106 ☞168**

106 Courts
   106IV Courts of Limited or Inferior Jurisdiction
     106k167 Limitations as to Amount or Value in Controversy
      106k168 k. In general. Most Cited Cases
Fact that damages later exceed jurisdiction does not prevent court from rendering judgment as long as suit is correctly filed and court is one of proper jurisdiction at time of filing.

**[2] Courts 106 ☞168**

106 Courts
   106IV Courts of Limited or Inferior Jurisdiction
     106k167 Limitations as to Amount or Value in Controversy
      106k168 k. In general. Most Cited Cases
Trial court was bound by its determination that it had jurisdiction based on pleading of an unspecified amount in husband's original petition in dispute with wife over personal property following divorce and, viewing claims of wife and two children individually, was vested with jurisdiction to award wife $2,568.20 and each child $9,802.29, representing savings account funds and value of destroyed property, notwithstanding that limit on amount of trial court's jurisdiction under statute in effect at that time was from $500 to $10,000. Vernon's Ann.Texas Civ.St. art. 1970–342b.

**[3] Courts 106 ☞472.1**

106 Courts
   106VII Concurrent and Conflicting Jurisdiction
     106VII(A) Courts of Same State
      106VII(A)1 In General
       106k472 Exclusive or Concurrent Jurisdiction
        106k472.1 k. In general. Most Cited Cases
Husband, not having benefit of subsequently enacted provision of Family Code governing enforcement of matters pertaining to property in divorce decrees, had right to enforce terms of divorce decree with respect to property division in a court other than that which granted divorce and was not required to resort exclusively to family law court. V.T.C.A., Family Code § 3.70.

**[4] Judgment 228 ☞140**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
         228k140 k. Judgments which may be opened or set aside. Most Cited Cases

**Judgment 228 &#9750;143(2)**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
        228k143 Excuses for Default
         228k143(2) k. Necessity for excuse.
Most Cited Cases

**Judgment 228 &#9750;146**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
        228k146 k. Prejudice from judgment.
Most Cited Cases

A defendant is entitled to have a postanswer default judgment against it vacated and a new trial ordered if defendant establishes that failure to attend trial was not due to conscious indifference on its part, but accident or mistake, proves a meritorious defense, and demonstrates that granting of a new trial would occasion no delay or otherwise injure plaintiff.

**[5] Judgment 228 &#9750;151**

228 Judgment
   228IV By Default
      228IV(B) Opening or Setting Aside Default
        228k151 k. Form and requisites of application in general. Most Cited Cases

Response of defendant to postanswer default judgment, allegedly insufficient for failure to satisfy *Craddock* factors for filing an unverified motion for new trial, did not preclude trial court from vacating postanswer default judgment and ordering a new trial.

**\*798** Kenneth C. Kaye, League City, for plaintiff.

James Sean Healey, Galveston, for defendant.

Before EVANS, C.J., and WARREN and DUGGAN, JJ.

OPINION

DUGGAN, Justice.

This is an appeal from an order dismissing appellant's suit in County Court No. 2 of Galveston County for want of jurisdiction on the grounds that plaintiffs' aggregate damages exceeded the court's jurisdiction, and that the family district court would have exclusive jurisdiction over the suit.

Appellant's suit involved a dispute over personal property following divorce. The divorce decree awarded custody of the parties' two children to the appellant father and ordered the appellee mother to deliver to appellant individually, and as trustee for the children's benefit, appellant's coin collection, other personal property (including a dining room set, bunk beds, and a television set), and money from savings accounts. Appellant alleged that appellee rendered the property largely unusable and sold appellant's coin collection.

Appellant filed the present suit in County Court No. 2 of Galveston County, a legislatively created court of special jurisdiction. In his original petition, the appellant did not allege a specific amount of damages, but stated that the damages were within the court's jurisdiction. The parties' divorce had been granted less than a month before in the 306th Family District Court in Galveston. Under enforcement provisions of the Texas Family Code, Sections 3.70–3.76 (Vernon 1987), such suits are now brought in the same court that decreed the divorce; however, these provisions did not become effective until September 1, 1983, four months after this suit was filed in the county court. Acts 1983, 68th Leg., p. 2350, ch. 424, sec. 2, eff. Sept. 1, 1983. In a post-answer default judgment, the trial court awarded appellant $2,568.20 individually, and awarded judgment for each child in the amount of $9,802.29,

725 S.W.2d 797
**(Cite as: 725 S.W.2d 797)**

representing **\*799** savings account funds and the value of destroyed property.

Thereafter, the appellee filed her unverified motion for new trial. The trial court granted the motion for new trial and entered its order dismissing appellant's suit for want of jurisdiction.

In its order of dismissal for want of jurisdiction, the trial court ruled that: (1) the amount in controversy exceeded the maximum jurisdiction of the trial court, and (2) the exclusive jurisdiction belonged to the 306th Family District Court of Galveston County.

Appellant's first point of error contends that the trial court erred in dismissing his suit for want of jurisdiction on the ground that it did not have monetary jurisdiction in the case. He urges that jurisdiction attaches when a case is filed, and that once attached, jurisdiction is not destroyed when damages exceed the jurisdictional authority of the court, absent bad faith on the part of plaintiff in the original pleadings.

[1] When a suit is correctly filed in a court of proper jurisdiction at the time of filing, the fact that damages later exceed the jurisdiction does not prevent the court from rendering judgment. *Standard Fire Insurance Co. v. Stigger,* 635 S.W.2d 667 (Tex.App.—Dallas 1982, no writ).

In his original petition, appellant alleged unspecified damages within the jurisdiction of the court. The court's jurisdiction at the time was from $500 to $10,000 under Tex.Rev.Civ.Stat.Ann. art. 1970–342b (Vernon 1979). The maximum jurisdiction of the court is now $50,000 ( *Tex.Rev.Civ.Stat.Ann.* art. 1970–342b; amended acts 1985, 69th Leg., p. 2133, ch. 247, section 3, effective August 26, 1985). Appellee filed special exceptions to the jurisdiction at the time suit was filed, and a hearing was held. One month after hearing appellee's special exception, the trial court ruled that it had jurisdiction over the matter and ordered that appellant amend to plead damages more partic-

ularly. Plaintiff's amended petition was filed September 11, 1984, 16 months after the trial court ruled that it had jurisdiction, and set out total damages of $21,935.53.

The amended pleading set out each of the items referred to in plaintiff's original petition, but placed a value on each item. Under "L. All certificates of deposit and United States Savings Bonds belonging to, in the name of, or owned by the children," plaintiff designated a value of $18,145.90. But for the fact that the sum stated was for a dual claim, the amount sought was on its face over the $10,000 jurisdiction of the court at the times of filing both the suit and the amended petition. Tex.Rev.Civ.Stat.Ann. art. 1970 –3426 (Vernon 1979). There was no further contest to jurisdiction until this appeal.

In the judgment entered June 3, 1985, damages were awarded to appellant in the sum of $2,568.20, and to each of the two children in an amount of $9,802.29.

Appellant relies on the holdings in *Standard Fire Insurance Co.* and *Flynt v. Garcia,* 587 S.W.2d 109 (Tex.1979), to protect the earlier judgment entered in his favor. In *Standard Fire Insurance Co. v. Stigger,* the carrier filed in the county court to appeal an Industrial Accident Board award, an amount within the court's jurisdictional limits. Stigger filed a counterclaim and ultimately recovered a sum greater than the court's jurisdiction. The court held that the amount of the unspecified counterclaim did not destroy the court's jurisdiction since the amount in controversy in a worker's compensation suit is the amount of the board's award, unless a different amount of the worker's claim can be determined in dollars and cents. Since Stigger's counterclaim was not ascertainable, but was an unspecified amount within the jurisdictional limits of the court, jurisdiction was not defeated.

In *Flynt,* the Supreme Court considered subsequent trial amendments following an original stated amount in controversy which was within the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

court's jurisdictional limits. The court noted the general rule that "where jurisdiction is once lawfully and properly acquired, no subsequent fact or event in the particular case serves to defeat that jurisdiction," 587 S.W.2d at 109–110. Subsequent amendments, therefore, do not destroy jurisdiction. The court **\*800** noted: "This is especially so where there is no allegation of bad faith or fraud in invoking the jurisdiction of the court." 587 S.W.2d at 109–110.

Plaintiff's claims, like Stigger's, "sought benefits in an unspecified amount within the jurisdictional limits of the court." *Standard Fire Insurance Co.,* 635 S.W.2d at 669.

[2] We hold that the trial court was bound by its determination that it had jurisdiction based on the pleading of an unspecified amount in plaintiffs' original petition. There were three parties and, viewing their claims as individual claims, even under the judgment rendered, each came within the jurisdiction of the court.

Appellant's first point of error is sustained.

Appellant's second point of error urges that Texas law does not require exclusive jurisdiction in the family law court to enforce the terms of a divorce decree except for contempt, child custody, and visitation.

The trial court relied upon Tex.Fam.Code Ann. sec. 3.70 (Vernon 1987), which was adopted after the suit was filed. The divorce was alleged to have been granted one month before this suit was filed in June 1983, and those sections of the Family Code concerning enforcement of matters pertaining to property in divorce decrees did not become effective until September 1, 1983.

[3] Appellant, not yet having the benefit of Family Code section 3.70 to enforce property provisions, had the right to enforce his judgment in a court other than that which granted the divorce.

Appellant's lawsuit was filed before the enforcement sections relating to property were enacted; he was, therefore, free to select the forum.

Appellant's second point of error is sustained.

In response to the "post-answer default judgment," *Stoner v. Thompson,* 578 S.W.2d 679, 682 (Tex.1979), the appellee filed an unverified motion for new trial. Appellant contends in his third point of error that this response was inadequate and that the court erred in granting a new trial.

[4][5] Post-answer defaults and non-appearance default judgments are treated similarly. *Farley v. Clark Equipment Co.,* 484 S.W.2d 142, (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.). It is well settled that it is an abuse of discretion to *deny* a new trial where the guidelines of *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124 (Tex.1939) have been met. A defendant is entitled to have a post-answer default judgment against it vacated and a new trial ordered if the defendant: (1) establishes that failure to attend trial was not due to conscious indifference on its part, but accident or mistake; (2) proves a meritorious defense; and (3) demonstrates that the granting of a new trial would occasion no delay or otherwise injure plaintiff. *Stone Resources, Inc. v. Barnett,* 661 S.W.2d 148 (Tex.App.—Houston [1st Dist.] 1983, no writ). However, the appellant has not cited any cases, nor have we found any cases, which hold that a trial court may not *grant* a new trial unless these factors are satisfied. The complete absence of authority for the proposition that it is error for a court to set aside a default judgment when the *Craddock* factors have not been met is partially explained by the fact that orders setting aside default judgments are generally not subject to review. *Warren v. Walter,* 409 S.W.2d 887 (Tex.Civ.App.—Tyler 1966, writ ref'd n.r.e.) *per curiam,* 414 S.W.2d 423 (Tex.1967). We decline to find error in the trial court's action setting aside the post-answer default judgment.

The third point of error is overruled.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

725 S.W.2d 797
**(Cite as: 725 S.W.2d 797)**

The judgment dismissing appellant's suit is set aside. The order setting aside the default judgment is affirmed and the cause is remanded to County Court No. 2 of Galveston County for a new trial. We note as well that the trial court, should it choose to do so, may transfer the suit to the Family District Court with the consent of the judge of the latter court. Tex.Rev.Civ.Stat.Ann. art. 1970–342, sec. 3a , and art. 1970–342b, sec. 2(c) (Vernon 1987).

Tex.App.–Hous. [1 Dist.],1987.
Blake v. Blake
725 S.W.2d 797

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


905 S.W.2d 620
**(Cite as: 905 S.W.2d 620)**

Court of Appeals of Texas,
Houston (14th Dist.).

COLOR TILE, INC., Appellant,
v.
Ron RAMSEY, Appellee.

No. 14–94–00285–CV.
June 15, 1995.
Rehearing Overruled Aug. 24, 1995.

Store brought breach of contract action against customer for failure to pay. The Justice Court entered judgment for store. Customer appealed judgment to County Court and amended his pleadings to assert counterclaims for breach of contract, Deceptive Trade Practice Act (DTPA) violations, fraud and breach of warranty. The County Civil Court at Law No. 2, Harris County, Kenneth Pacetti, J., entered judgment awarding customer damages for breach of warranty, attorney fees plus attorney fees for appeal but did not award store damages on breach of contract claim. Store appealed. The Court of Appeals, Fowler, J., held that: (1) county court lacked subject matter jurisdiction over counterclaim alleging breach of contract, and (2) appellate sanctions for delay were inappropriate.

Affirmed in part, reversed in part and counterclaims dismissed.

West Headnotes

**[1] Courts 106 4**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction in General
      106I(A) In General
         106k3 Jurisdiction of Cause of Action
            106k4 k. In general. Most Cited Cases
Subject matter jurisdiction is essential to au-

thority of court to decide case.

**[2] Appeal and Error 30 185(1)**

30 Appeal and Error
   30V Presentation and Reservation in Lower Court of Grounds of Review
      30V(B) Objections and Motions, and Rulings Thereon
         30k185 Organization and Jurisdiction of Lower Court
            30k185(1) k. In general. Most Cited Cases

**Courts 106 37(1)**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction in General
      106I(A) In General
         106k37 Waiver of Objections
            106k37(1) k. In general. Most Cited Cases
Subject matter jurisdiction may not be waived by parties, and may be raised for first time on appeal.

**[3] Appeal and Error 30 782**

30 Appeal and Error
   30XIII Dismissal, Withdrawal, or Abandonment
      30k779 Grounds for Dismissal
         30k782 k. Want of jurisdiction. Most Cited Cases
If trial court lacks subject matter jurisdiction, appellate court must reverse judgment of trial court, and dismiss cause of action entirely.

**[4] Justices of the Peace 231 141(2)**

231 Justices of the Peace
   231V Review of Proceedings
      231V(A) Appeal and Error
         231k141 Appellate Jurisdiction
            231k141(2) k. Jurisdiction dependent

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

905 S.W.2d 620
**(Cite as: 905 S.W.2d 620)**

on jurisdiction of lower court in general. Most Cited Cases

Appellate jurisdiction of county court is confined to jurisdictional limits of justice court, and county court has no jurisdiction over appeal unless justice court originally had jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 574b.

**[5] Courts 106 ⚷30**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106I(A) In General
            106k30 k. Loss or divestiture of jurisdiction. Most Cited Cases

Once jurisdiction is lawfully and properly acquired, no subsequent fact or event in particular case serves to defeat jurisdiction.

**[6] Courts 106 ⚷26(1)**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106I(A) In General
            106k26 Scope and Extent of Jurisdiction in General
                106k26(1) k. In general. Most Cited Cases
    (Formerly 106k26)

Trial court has no jurisdiction to hear claim brought by either plaintiff or defendant that is not within its subject matter jurisdiction.

**[7] Courts 106 ⚷121(7)**

106 Courts
    106III Courts of General Original Jurisdiction
        106III(A) Grounds of Jurisdiction in General
            106k119 Amount or Value in Controversy
                106k121 Matter in Dispute, or Amount or Value Claimed or Involved
                106k121(7) k. Amount as affected by set-off or counterclaim. Most Cited Cases

Counterclaims are judged on their own merits

and must independently comport with court's jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 97.

**[8] Courts 106 ⚷121(7)**

106 Courts
    106III Courts of General Original Jurisdiction
        106III(A) Grounds of Jurisdiction in General
            106k119 Amount or Value in Controversy
                106k121 Matter in Dispute, or Amount or Value Claimed or Involved
                106k121(7) k. Amount as affected by set-off or counterclaim. Most Cited Cases

Although customer's original breach of contract counterclaim was within jurisdictional limits of justice court, customer pleaded himself out of court when he filed counterclaim on appeal in county court demanding relief of $5,000 which was clearly in excess of $2,500 jurisdictional limit of justice court; therefore, county court lacked subject matter jurisdiction over counterclaim. V.T.C.A., Government Code § 27.031, Vernon's Ann.Texas Rules Civ.Proc., Rule 97.

**[9] Costs 102 ⚷260(4)**

102 Costs
    102X On Appeal or Error
        102k259 Damages and Penalties for Frivolous Appeal and Delay
            102k260 Right and Grounds
                102k260(4) k. What constitutes frivolous appeal or delay. Most Cited Cases

Appellate courts only assess sanctions when an appeal could have been taken only for purposes of delay and where no reasonable hope of reversal exists. Rules App.Proc., Rule 84.

**[10] Costs 102 ⚷260(1)**

102 Costs
    102X On Appeal or Error
        102k259 Damages and Penalties for Frivolous Appeal and Delay
            102k260 Right and Grounds

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

905 S.W.2d 620
**(Cite as: 905 S.W.2d 620)**

102k260(1) k. In general. Most Cited Cases

In determining whether sanctions for delay are appropriate, Court of Appeals views record from point of view of advocate at time appeal was taken to determine whether reasonable grounds existed to believe case should be reversed. Rules App.Proc., Rule 84.

**[11] Costs 102 ☞260(4)**

102 Costs
   102X On Appeal or Error
      102k259 Damages and Penalties for Frivolous Appeal and Delay
         102k260 Right and Grounds
         102k260(4) k. What constitutes frivolous appeal or delay. Most Cited Cases

Sanctions for delay because no reasonable hope of reversal existed were inappropriate where court sustained point of error and reversed trial court's judgment. Rules App.Proc., Rule 84.

**\*621** Quentin D. Brogdon, Houston, for appellant.

Stephen Schechter, Houston, for appellee.

Before YATES, FOWLER and DRAUGHN,FN* JJ.

FN* The Honorable Joe L. Draughn sitting by assignment.

### OPINION

FOWLER, Justice.

This breach of contract suit comes to us on appeal from county court, which heard an appeal from justice court. We find the county court lacked subject matter jurisdiction over appellee's counterclaims and reverse the trial court's judgment in his favor and dismiss his causes of action. However, we affirm the take-nothing judgment against appellant, because appellant did not bring a point of error challenging the verdict on its breach of contract ac-

tion.

### PRIOR POSTURE AND BRIEF FACTS

Ron Ramsey contracted with Color Tile to install a tile floor in his home. Ramsey was unhappy with Color Tile's work, and refused to pay the balance owed on his contract. Color Tile filed suit against him in justice court for the balance owed—about $2000. Ramsey answered, asserting the defenses of failure of consideration and fraud. Ramsey also counterclaimed for breach of warranty and misrepresentation. Color Tile obtained a $1179.50 judgment in the justice court.

Ramsey appealed the judgment to county court and amended his pleadings to assert counterclaims for: (1) breach of contract, (2) DTPA, (3) fraud, and (4) breach of warranty. In his answer and counterclaim, Ramsey pled for damages of $5000 for the breach of contract,**\*622** or alternatively for DTPA damages including triple damages, or alternatively for fraud damages. In county court, the parties were realigned so that Ramsey was styled the plaintiff, and Color Tile the defendant. The jury awarded Ramsey $7756.94 in damages for breach of warranty, of which the first $1000 was trebled under the DTPA. The jury also found Color Tile breached the warranty "knowingly," and that Ramsey was entitled to $1000 in additional damages. Further, the jury awarded Ramsey $20,000 in attorney's fees, plus attorney's fees for appeals. The jury awarded Color Tile no damages on its breach of contract action.

Color Tile brings five points of error, alleging that (1) the county court lacked subject matter jurisdiction over the appeal; (2) the trial court erred in allowing Ramsey to call a surprise fact witness; (3) the trial court erred in submitting DTPA questions to the jury because Ramsey did not follow the DTPA's notice provisions; and (4) the evidence is insufficient to support the amount of attorney's fees awarded.FN1 Ramsey brings two cross points, alleging that the trial court erred in allowing certain photographs into evidence, and that this Court should sanction Color Tile under TEX.R.APP.P. 84

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

for bringing a frivolous appeal.

> FN1. Under the fifth point of error, Color Tile requests a remittitur of the attorney's fees.

## SUBJECT MATTER JURISDICTION

Color Tile contends in its first point of error that the county court lacked subject matter jurisdiction over Ramsey's claims, because the amount in controversy exceeded the jurisdictional limits of the justice court, where the suit was originally filed. Ramsey counters that the jurisdiction of the justice court is determined by the plaintiff's petition at the time the suit is filed, and later events cannot serve to divest the court of jurisdiction.

[1][2][3] Subject matter jurisdiction is essential to the authority of a court to decide a case. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 443 (Tex.1993). Subject matter jurisdiction may not be waived by the parties, and may be raised for the first time on appeal. *Id.* at 445; *Gorman v. Life Ins. Co. of N. Am.,* 811 S.W.2d 542, 547 (Tex.), *cert. denied* 502 U.S. 824, 112 S.Ct. 88, 116 L.Ed.2d 60 (1991). If a trial court lacks subject matter jurisdiction, the appellate court must reverse the judgment of the trial court, and dismiss the cause of action entirely. *City of Garland v. Louton,* 691 S.W.2d 603, 605 (Tex.1985). *See also Montgomery Elevator Co. v. Tarrant County,* 604 S.W.2d 363, 365 (Tex.Civ.App.—Fort Worth 1980, no writ) (dismissing cause of action when counterclaim exceeded jurisdictional limits of county court).

[4] An appeal from a justice court judgment is tried *de novo* in the county or district court. TEX.R.CIV.P. 574b. However, the appellate jurisdiction of the county court is confined to the jurisdictional limits of the justice court, and the county court has no jurisdiction over the appeal unless the justice court had jurisdiction. *Goggins v. Leo,* 849 S.W.2d 373, 375 (Tex.App.—Houston [14th Dist.] 1993, no writ). As creatures of statute, justice courts are governed by a legislative grant of juris-

diction. At the time this suit was filed, justice courts had jurisdiction in cases where the amount in controversy was not more than $2500, excluding interest. TEX.GOV'T CODE ANN. § 27.031 (Vernon 1988).[FN2]

> FN2. Amended by Acts 1991, 72nd Leg., ch. 776, § 2, effective September 1, 1991 (current version at TEX.GOV'T CODE ANN. § 27.031 (Vernon Supp.1995), providing justice court has jurisdiction over matters where amount in controversy is not more than $5000).

[5][6][7] Ramsey claims that the county court had jurisdiction over the entire suit between Color Tile and Ramsey, including Ramsey's counterclaims, because Color Tile's original petition was within the jurisdictional limits of the justice court. We agree with the general proposition Ramsey asserts—that the plaintiff's original petition determines the jurisdiction of the court over the claims before it. "Where jurisdiction is once lawfully and properly acquired, no subsequent fact or event in the particular case serves to defeat jurisdiction." *Flynt v. Garcia,* 587 S.W.2d 109, 109–110 (Tex.1979); **\*623** *Blake v. Blake,* 725 S.W.2d 797, 799 (Tex.App.—Houston [1st Dist.] 1987, no writ). In spite of this general rule, however, a trial court has no jurisdiction to hear a claim brought by either a plaintiff or a defendant that is not within its subject matter jurisdiction. As stated in Rule 97(c) of the Texas Rules of Civil Procedure, a counterclaim may exceed the amount of relief sought by the opposing party, *so long as the subject matter is within the jurisdiction of the court.* TEX.R.CIV.P. 97 (emphasis added). Clearly, then, counterclaims are judged on their own merits and must independently comport with a court's jurisdiction. *Clary Corp. v. Smith,* 886 S.W.2d 570, 572–73 (Tex.App.—Fort Worth 1994, writ filed).

[8] Here, while Color Tile's original breach of contract suit was within the jurisdictional limits of the justice court, Ramsey "pleaded himself out of court" when he filed a counterclaim on appeal in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the county court demanding relief clearly in excess of the jurisdictional limits of the justice court. *See Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989) (citing *Richardson v. First Nat'l Life Ins. Co.,* 419 S.W.2d 836, 839 (Tex.1967)). As succinctly stated by the Galveston Court of Appeals:

It thus clearly appears that the amount sought by appellee in his cross-action ... is in excess of the maximum jurisdictional limits of the justice court, and, as the jurisdiction of said county court at law to which this suit was carried by appeal was appellate and not original, the court acquired no jurisdiction to render the judgment from which this appeal was prosecuted.

*United Finance Corp. v. Quinn,* 149 S.W.2d 148, 149 (Tex.Civ.App.—Galveston 1941, writ dism'd). *See also Kitchen Designs, Inc. v. Wood,* 584 S.W.2d 305, 307 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.), a case factually identical to the case before us, except that the original suit in that appeal was filed in county court.

Ramsey contends that the only reason his claim exceeded the jurisdictional limits of the justice court was due to the passage of time, because the ceramic tile die lot that matched Ramsey's tile was no longer available and it therefore became necessary to sue for the replacement cost of the entire floor, rather than just the damaged individual tiles. Citing *Flynt v. Garcia,* 587 S.W.2d 109, 110 (Tex.1979), he points out that when the original suit is within the jurisdictional limits of the court, subsequent amendments that seek additional damages accruing because of the passage of time will not defeat the jurisdiction of the court. This case does not fall within the *Flynt* exception. When the suit in *Flynt* was brought originally, the damages requested were within the court's jurisdiction. While the suit was still pending, however, additional note payments became due and interest accrued, together pushing the damages over the county court's jurisdictional limit. Ramsey's damages, on the other hand, were over the county court's jurisdictional limit from the outset because he was having to re-

place his entire tile floor, not because of the passage of time. Furthermore, unlike the plaintiff in *Flynt,* who originally pled for damages within the county court's jurisdiction, Ramsey never filed a pleading requesting damages within the justice court's jurisdiction. The first pleading he filed requested damages in excess of the justice court's jurisdiction.

Finally, we find no merit in Ramsey's argument that he initially did not expect his claim to exceed $2500, but because of the unavailability of matching tile, he had to sue to replace the entire floor at an increased cost. Ramsey's focus on his own expectations is misplaced. As noted earlier, the purpose of the pleadings is to invoke the jurisdiction of the court. The invocation of jurisdiction occurs not as a result of the intent of the parties, but because of what is contained on the face of the pleadings. Ramsey's original written pleading in this case, by requesting $5000 in damages, showed on its face that it was not within the subject matter jurisdiction of the justice court.

We therefore sustain appellant's first point of error and reverse the judgment of the county court as to Ramsey and dismiss Ramsey's causes of action, because the county court lacked the power to adjudicate his claims. *City of Garland,* 691 S.W.2d at 605; *Kitchen Designs,* 584 S.W.2d at 307.

**\*624** Color Tile did not specifically appeal the take-nothing judgment rendered against it by the county court on its breach of contract action. We therefore affirm the take-nothing judgment against Color Tile. *Id.*

Because of our disposition of Color Tile's first point of error, it is unnecessary to address Color Tile's remaining points and Ramsey's first cross point, which alleged error by the trial court in admitting photographs during the trial. We shall, however, briefly discuss Ramsey's second cross point.

**RAMSEY'S CROSS POINT FOR SANCTIONS**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

905 S.W.2d 620
**(Cite as: 905 S.W.2d 620)**

### UNDER TEXAS RULE OF APPELLATE PRO-CEDURE 84

[9][10] In his second cross point, Ramsey asks this Court to award him sanctions pursuant to TEX.R.APP.P. 84. Rule 84 provides that the appellate court may award damages when the appellant takes an appeal for delay and without sufficient cause. However, appellate courts only assess sanctions where an appeal could have been taken only for purposes of delay and where no reasonable hope of reversal exists. *Valenzuela v. St. Paul Ins. Co.,* 878 S.W.2d 667, 671 (Tex.App.—San Antonio 1994, no writ). In determining whether sanctions for delay are appropriate, we view the record from the point of view of the advocate at the time the appeal was taken to determine whether reasonable grounds existed to believe the case should be reversed. *Olmos v. Pecan Grove Mun. Util. Dist.,* 857 S.W.2d 734, 742 (Tex.App.—Houston [14th Dist.] 1993, no writ) (quoting *Ambrose v. Mack,* 800 S.W.2d 380, 383 (Tex.App.—Corpus Christi 1990, writ denied)). We apply Rule 84 only with prudence, caution, and after careful deliberation. *Francis v. Marshall,* 841 S.W.2d 51, 54 (Tex.App.—Houston [14th Dist.] 1992, no writ).

[11] Appellate courts are reluctant to sanction parties except in truly egregious circumstances. Clearly, sanctions are inappropriate in this case, as we are sustaining Color Tile's point of error and reversing the trial court's judgment. We therefore deny sanctions under Rule 84 and overrule Ramsey's second cross point.

The judgment of the trial court in favor of appellee is REVERSED and his causes of action are ordered DISMISSED. The judgment of the trial court that appellant take nothing is AFFIRMED.

Tex.App.–Houston [14 Dist.,1995.
Color Tile, Inc. v. Ramsey
905 S.W.2d 620

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


722 S.W.2d 149
**(Cite as: 722 S.W.2d 149)**

C

Court of Appeals of Texas,
Dallas.

ENERGO INTERNATIONAL CORPORATION,
Appellant,
v.
MODERN INDUSTRIAL HEATING, INC., Appellee.

No. 05–85–01289–CV.
Oct. 30, 1986.

Seller brought action against buyer to collect amount due in connection with sale of goods. The 296th District Court, Collin County, Verla Sue Holland, J., granted seller's motion for summary judgment. Buyer appealed. The Court of Appeals, Scales, J., held that: (1) buyer's amended answer was not properly before the trial court; (2) it was not abuse of discretion for trial court to fail to consider buyer's amended answer; (3) affirmative defense of offset, which was contained in amended answer, was not properly before trial court; and (4) whether third party owed buyer reimbursement for sales tax paid was irrelevant to buyer's liability under contract with seller.

Affirmed.

Akin, J., dissented and filed opinion.

West Headnotes

**[1] Sales 343 ⬚354(11)**

343 Sales
  343VII Remedies of Seller
    343VII(E) Actions for Price or Value
      343k352 Pleading
        343k354 Plea or Answer, and Subsequent Pleadings
          343k354(11) k. Amendment. Most Cited Cases

Summary judgment hearing, in seller's action to collect amount due under contract for sale of goods, was "trial," for purposes of rule which required that no amended pleadings be filed within seven days of "trial," except on leave of court. Vernon's Ann.Texas Rules Civ.Proc., Rule 63.

**[2] Judgment 228 ⬚186**

228 Judgment
  228V On Motion or Summary Proceeding
    228k182 Motion or Other Application
      228k186 k. Hearing and Determination.
Most Cited Cases

Amended answer, which was filed on day of summary judgment hearing without leave of court, was not properly on file at time of summary judgment hearing, in seller's action to collect amount due under contract for sale of goods; therefore, trial court was not required to consider amended answer in summary judgment hearing. Vernon's Ann.Texas Rules Civ.Proc., Rules 63, 166–A.

**[3] Sales 343 ⬚354(11)**

343 Sales
  343VII Remedies of Seller
    343VII(E) Actions for Price or Value
      343k352 Pleading
        343k354 Plea or Answer, and Subsequent Pleadings
          343k354(11) k. Amendment. Most Cited Cases

Docket entry could not be used to supply fact that trial court gave buyer permission to file amended answer after summary judgment hearing, in seller's action to collect amount due under contract for sale of goods. Vernon's Ann.Texas Rules Civ.Proc., Rule 166–A.

**[4] Sales 343 ⬚354(11)**

343 Sales
  343VII Remedies of Seller
    343VII(E) Actions for Price or Value

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343k352 Pleading

343k354 Plea or Answer, and Subsequent Pleadings

343k354(11) k. Amendment. Most Cited Cases

Even if docket entry could be used to supply fact that trial court gave buyer permission to file amended answer after summary judgment hearing, in seller's action to collect amount due under contract for sale of goods, docket entry did not indicate that trial court accepted and considered amended answer, for purposes of placing amended answer properly before court. Vernon's Ann.Texas Rules Civ.Proc., Rule 166–A.

**[5] Sales 343 ⬦354(11)**

343 Sales

   343VII Remedies of Seller

     343VII(E) Actions for Price or Value

      343k352 Pleading

       343k354 Plea or Answer, and Subsequent Pleadings

        343k354(11) k. Amendment. Most Cited Cases

It was not abuse of discretion for trial court to fail to consider buyer's amended answer, which was filed, without leave of court, on day of summary judgment hearing, in seller's action to collect amount due under contract for sale of goods, where there was no indication that trial court gave permission to file amended pleading after summary judgment hearing. Vernon's Ann.Texas Rules Civ.Proc., Rule 166–A.

**[6] Sales 343 ⬦354(11)**

343 Sales

   343VII Remedies of Seller

     343VII(E) Actions for Price or Value

      343k352 Pleading

       343k354 Plea or Answer, and Subsequent Pleadings

        343k354(11) k. Amendment. Most Cited Cases

Buyer's affirmative defense of offset was not properly pled and thus not properly before court in summary judgment hearing, in seller's action to collect amount due under contract for sale of goods, where defense was contained in amended answer, which was filed on day of summary judgment hearing without leave of the court. Vernon's Ann.Texas Rules Civ.Proc., Rule 166–A.

**[7] Taxation 371 ⬦3707**

371 Taxation

   371IX Sales, Use, Service, and Gross Receipts Taxes

     371IX(I) Collection and Enforcement

      371k3706 Collection by Sellers or Others

       371k3707 k. In General. Most Cited Cases

(Formerly 371k1338.1, 371k1338)

Even if third party owed buyer reimbursement for sales tax due on goods sold to buyer, that fact would not affect buyer's liability to seller for sales tax, where record indicated that buyer had agreed to assume liability for payment of any tax due on sale of goods, if such sales were not exempt from sales tax under buyer's exemption permit, where the comptroller of public accounts determined that such sales were not exempt, and where seller paid taxes due on sale of such goods to comptroller.

**\*150** Richard Parker, Michael C. Prior, Houston, for appellant.

J. Michael Weston, Leonard J. McDonald, Jr., Dallas, for appellee.

Before AKIN, SCALES and CARVER <sup>FN1</sup>, JJ.

> FN1. The Honorable Spencer Carver, Justice, retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

SCALES, Justice.

Energo International Corporation (Energo) ap-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

peals from a summary judgment rendered in favor of Modern Industrial Heating, Inc. (Modern). Energo contends that the trial court erred in granting Modern's motion for summary judgment because Energo's amended answer with supporting affidavits raised a material fact issue on Energo's claim of offset, and because a material fact issue was raised regarding Energo's liability to Modern on sales taxes due to the State of Texas on goods Energo purchased from Modern. We affirm.

Modern brought suit against Energo seeking to recover $3,801.99 due on an account and for $12,300 in sales taxes due on goods sold to Energo. After Energo answered generally denying Modern's claim, Modern filed a motion for summary judgment. Energo answered and filed supporting affidavits. In its answer to Modern's motion, Energo denied that it owed Modern $3,801.99, alleged that Modern owed Energo $63,750.00, and alleged that any account which showed that Energo owed Modern $3,801.99 had not taken into account the $63,750.00 that Modern owed Energo. On the day of the hearing on Modern's summary judgment motion, Energo filed an amended answer to Modern's petition generally denying Modern's claim and alleging offset of $63,750.00. The trial court subsequently granted Modern's motion and entered judgment in favor of Modern.

In its first point of error, Energo contends that the trial court erred in granting Modern's motion for summary judgment because Energo's amended original answer and supporting affidavit raised a material fact issue concerning offset. Modern argues that the affirmative defense of offset was not properly before the court because Energo's amended answer was not on file at the time of the hearing and Energo did not obtain the trial court's permission to file the amended answer, and because Energo's affidavit was insufficient to "raise a contest" to Modern's motion for summary judgment.

[1][2] Rule 166–A of the Texas Rules of Civil Procedure provides:

The judgment sought shall be rendered forthwith if the *pleadings,* depositions, answers to interrogatories, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, *on file at the time of the hearing, or filed thereafter and before judgment with permission of the court,* **\*151** show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response.

TEX.R.CIV.P. 166–A (emphasis added). Thus, we first determine if Energo's amended answer was "on file at the time of the hearing." Rule 63 provides that no amended pleadings shall be filed within seven days of trial, except on leave of court. *See* TEX.R.CIV.P. 63. A summary judgment hearing is a "trial" under Rule 63. *See Claude Regis Vargo Enterprises, Inc. v. Bacarisse,* 578 S.W.2d 524, 529 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). The record shows that Energo's amended answer was filed on the day of the summary judgment hearing. The parties disagree as to exactly when the answer was filed on that day. However, there is no question that Energo did not obtain leave of court before the summary judgment hearing. Consequently, under Rule 63, even if the answer was filed before the summary judgment hearing as Energo contends, it was not properly "on file at the time of the hearing" as required by Rule 166–A.

[3] We next determine whether, under Rule 166–A, the amended answer was filed "with permission of the court" after the summary judgment hearing. Energo argues that the docket sheet entry, which reads, "Pltfs MSJ. Argued, under advisement to 6/30/85 for all pleadings to be amended (trial judge's initials)," indicates that the trial court accepted Energo's amended answer. We disagree.

A docket entry forms no part of the record which may be considered; it is a memorandum made for the trial court and clerk's convenience.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Azopardi v. Hollebeke,* 428 S.W.2d 167, 168 (Tex.Civ.App.—Waco 1968, no writ); *Restelle v. Williford,* 364 S.W.2d 444, 445 (Tex.Civ.App.—Beaumont 1963, writ ref'd n.r.e.). FN2 Consequently, there is no indication in the record that permission of the court was requested or **\*152** obtained to file the amended answer and that the amended answer was properly before the court.

> FN2. The dissent cites *N–S–W Corp. v. Snell,* 561 S.W.2d 798 (Tex.1977), as overruling the above-cited cases by holding that "a docket entry may be considered to supply facts in certain situations." *N–S–W Corp.* involved a side-by-side comparison of a docket sheet entry and a final judicial order. The court held that the docket entry must yield to the final judicial order because a "docket entry may supply facts in certain situations, *but* it cannot be used to contradict or prevail over a final judicial order." *N–S–W Corp.,* 561 S.W.2d at 799.
>
> The dissent argues that we have one of the "certain situations" before us so that the docket entry may be used to supply the fact that the trial judge gave Energo permission to file an amended pleading after the summary judgment hearing. The dissent apparently interprets the holding in *N–S–W Corp.* that a docket entry cannot be used to prevail over a final judicial order as applying only where a litigant, in a side-by-side comparison of the docket entry and the final judgment, attempts to defeat or alter the express terms of the judgment. The dissent urges that in other situations, such as in the present case, facts shown by the docket entry may be used, even if the result is to defeat the final judgment, so long as the docket entry, in a side-by-side comparison, does not *directly* defeat the final judgment.

We disagree with the dissent's reasoning for two reasons. First, we do not believe that this is one of the "certain situations" envisioned by the supreme court when it announced in *N–S–W Corp.* that a "docket entry may supply facts in certain situations." The supreme court was merely recognizing a limited exception to the holding in *Azopardi* and *Restelle*—that docket entries may be used to correct clerical errors in judgments or orders. In fact, the cases cited by the dissent for the proposition that a docket entry is part of the record and can be considered on appeal are cases where facts supplied by docket sheet entries were used to correct clerical error in a judgment or to determine the meaning of words used in a judgment. We do not have a case of clerical error before us.

Second, and more importantly, docket entries are inherently unreliable. For purposes of defeating the final summary judgment for Modern under the dissent's analysis, Energo's amended pleading would rest entirely upon a fact supplied from an unclear docket entry. Implicit in the *N–S–W Corp.* holding is an awareness of the dangers in using an informal docket entry to defeat a formal court order. The dangers of unreliability are equally apparent here; Energo attempts to defeat a final summary judgment by relying on a docket entry which purportedly gave it permission to file untimely amended pleadings, and in light of those pleadings, then argues that summary judgment was improperly granted.

[4][5][6] Further, even if the docket sheet were considered, we hold that the entry does not indicate that the trial court accepted and considered Energo's amended answer. The consideration of pleadings filed in the interim between hearing and judg-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

722 S.W.2d 149
**(Cite as: 722 S.W.2d 149)**

ment is within the trial court's discretion. *Brown v. Prairie View A & M University,* 630 S.W.2d 405, 411 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). Energo has not attempted to show that the trial court abused its discretion in not considering the amended answer. The trial court is charged with the duty only of considering the record as it properly appears before it when the summary judgment motion is heard. *Id.* Accordingly, we hold that the amended answer was not properly before the court, that there is no showing of an abuse of discretion by the trial court in not considering the amended answer, and that the affirmative defense of offset was not properly pled, and therefore, was not before the trial court. The point of error is overruled.

[7] Energo next contends the trial court erred in granting Modern's motion for summary judgment because Energo presented evidence which raised a material fact issue concerning Energo's liability on certain sales tax due the State of Texas. We disagree.

The record indicates that Energo agreed with Modern that Energo would assume liability for payment of any tax due on sales of goods from Modern to Energo, if such sales were not exempt from such taxes under Energo's exemption permit. The record further indicates that the Texas Comptroller of Public Accounts determined that such sales between Modern and Energo were not exempt, that taxes in the amount of $12,348.50 were due, and that Modern paid the taxes to the State Comptroller of Public Accounts.

Energo contends that its summary-judgment evidence showed that another corporation owed and paid the sales tax in question. The affidavit of Energo's president, attached to Energo's response to Modern's summary judgment motion, states that "[s]uch sales taxes are the liability of Texas Upsetting and Finishing, Inc. and Continental Bank of Illinois and Ferrotherm Corp., not Energo Interogational [sic] Corporation," and that "[t]o the best of my knowledge, Ferrotherm Corp. has paid the sales

taxes claimed due." The affidavit of the president of Ferrotherm Corporation states "[t]hat the sales taxes due on material purchased from Energo International Corporation which had been purchased by [Energo] from [Modern] are being paid directly to the State of Texas by Ferrotherm Corporation pursuant to an agreement between the State of Texas and Ferrotherm Corporation."

Even assuming that these conclusory statements are competent summary-judgment proof, they clearly do not raise a fact issue as to Energo's liability for sales taxes under the contract between Energo and Modern. Whether a third party owes Energo reimbursement of the taxes paid is irrelevant to Energo's liability under the Energo-Modern contract. We hold that the trial court properly granted summary judgment to Modern. Energo's second point of error is overruled.

The judgment of the trial court is affirmed.

AKIN, J., files a dissenting opinion.

AKIN, Justice, dissenting.

I cannot agree that appellant's amended answer was not properly before the trial court where the docket sheet contains an initialed notation by the trial judge granting an extension for the filing of amended pleadings. Neither can I agree that the record on review is to be construed in a light favorable to the trial court's judgment in a summary-judgment proceeding. Consequently, I would hold that the plaintiff's right to recover on its amended petition was not precluded as a matter of law by Modern's summary-judgment evidence. Accordingly, I would reverse the judgment **\*153** and remand this cause. Thus I must dissent.

Energo International Corporation (Energo) contends that the trial court erred in granting appellee's motion for summary judgment when appellant had on file an amended answer with supporting affidavits alleging offsets to appellee's claim, which amended-petition allegations were not precluded as a matter of law by movant's summary-judgment

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

722 S.W.2d 149
**(Cite as: 722 S.W.2d 149)**

evidence. I agree. The docket sheet of the trial court contains the following written entry:

"6/17/85 Plaintiff's MSJ. Argued. Under advisement to 6/30/85 for all pleadings filed to be amended." (Judge's initials).

This notation establishes that the trial judge extended the time for the filing of amended pleadings until June 30, 1985. Energo filed the amended answer on June 17, 1985, and the file mark on the amended answer reflects this date. The majority disregards this evidence on the ground that "a docket entry forms no part of the record which may be considered; it is a memorandum made for the trial court and clerk's convenience." I disagree with this statement. The cases cited by the majority as supporting this proposition ignore the Texas Supreme Court's opinion in *N–S–W Corporation v. Snell,* 561 S.W.2d 798 (Tex.1977), which holds that a docket entry may be considered to supply facts in certain situations. *See also Mathews v. Looney,* 132 Tex. 313, 123 S.W.2d 871 (1939); *Ford v. Ireland,* 699 S.W.2d 587, 588 (Tex.App.—Texarkana 1985, no writ); *Whitexintl Corporation v. Justin Companies,* 669 S.W.2d 875, 877 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); *Courtlandt Corporation v. Trico Service Corporation,* 600 S.W.2d 883 (Tex.Civ.App.—Houston 1980, writ ref'd n.r.e.). Furthermore, it is well settled that the docket entry is a part of the court record and need not have been tendered into evidence to be considered either by the trial court or by the appellate court. *Petroleum Equipment Financial Corporation v. First National Bank of Fort Worth,* 622 S.W.2d 152, 154 (Tex.Civ.App.—Ft. Worth 1981, writ ref'd n.r.e.), citing *Port Huron Engine & Thrasher Co. v. McGregor,* 131 S.W. 398 (Tex.1910), and *Bockemehl v. Bockemehl,* 604 S.W.2d 466 (Tex.Civ.App.—Dallas 1980, no writ). *See also Kluck v. Spitzer,* 54 S.W.2d 1063, 1065 (Tex.Civ.App.—Waco 1932, writ refused); *Pruet v. Coastal States Trading, Inc.,* 715 S.W.2d 702, 705 (Tex.App.—Houston [1st Dist.] 1986); *Wood v. Griffin & Brand of McAllen,* 671 S.W.2d 125, 130 (Tex.App.—Corpus Christi 1984, no writ); *Davis v. Davis,* 647 S.W.2d 781, 783 (Tex.App.—Austin 1983, no writ); *City of San Antonio v. Terrill,* 501 S.W.2d 394, 396 (Tex.Civ.App.—San Antonio 1973, writ ref'd n.r.e.); *Hillhouse v. Allumbaugh,* 258 S.W.2d 826, 828 (Tex.Civ.App.—Eastland 1953, writ ref'd n.r.e.); *Perry v. Perry,* 122 S.W.2d 726, 728 (Tex.Civ.App.—El Paso 1938, no writ); and *Acosta v. Realty Trust Co.,* 111 S.W.2d 777, 779 (Tex.Civ.App.—Austin 1937, no writ). Accordingly, I would hold that the trial judge's docket sheet may be considered in determining whether the amended answer was properly before the court in a summary-judgment proceeding.[FN2]

FN2. Contrary to footnote 2 to the majority opinion, my proposed holding would not permit a docket entry to defeat a written judgment. The majority misunderstands the holding in *N–S–W Corporation v. Snell* that a docket entry may not be used to defeat a final judgment. The rule properly interpreted, means that a docket entry of what the judgment purports to be cannot override or cast doubt upon the written judgment, where the two are different. That rule does not apply as here where the docket sheet in no way contradicts the written judgment. If the majority's understanding of the rule was correct, that the "docket entry may not be used to defeat the final summary judgment for Modern," then an exception to the rule could never exist because in all cases the docket-sheet entry has been used to support a ground for reversal of a judgment. Indeed, the majority's statement is contrary to all cases in which the docket sheet entry has been used to support judgment nunc pro tunc. *E.g., City of San Antonio v. Terrill,* 501 S.W.2d 394, 396 (Tex.Civ.App.—San Antonio 1973, writ ref'd n.r.e.).

Neither can I countenance the majority's misdirected adherence to the rule of review that the re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cord be construed in a light favorable to supporting the trial court's **\*154** judgment. This rule does not apply in summary-judgment proceedings. The granting of a summary judgment should be affirmed on appeal only if the record established a right to the summary judgment as a matter of law. *McNaab v. Kentucky Central Life Insurance,* 631 S.W.2d 253 (Tex.Civ.App.—Fort Worth 1982, no writ). Consequently, there is a "heavy, horrendous burden placed upon the movant" for summary judgment. *Lee v. McCormick,* 647 S.W.2d 735, 737 (Tex.App.—Beaumont 1983, no writ). Because of this burden on the movant in summary-judgment cases, where all matters considered by the trial court are in the record, the appellate court will not indulge any presumptions in favor of the judgment. *Kenney v. Porter,* 557 S.W.2d 589, 592 (Tex.Civ.App.—Corpus Christi 1977, no writ); *Hungate v. Hungate,* 531 S.W.2d 650 (Tex.Civ.App.—El Paso 1975, no writ). *See also Board of Adjustment v. Leon,* 621 S.W.2d 431 (Tex.Civ.App.—San Antonio 1981, no writ), which held "In a summary judgment case an appellate court will not indulge presumptions in favor of the judgment." *Id.* at 435. Furthermore, where there is no indication that evidence was introduced before and considered by the trial court which is not brought forward in the record, no presumptions are to be made in favor of a summary judgment. *Box v. Bates,* 162 Tex. 184, 346 S.W.2d 317, 319 (1961). The case the majority relies upon, *Keller v. Nevel,* 699 S.W.2d 211 (Tex.1985) is distinguishable in that it was not a summary-judgment proceeding, nor did it state that that rule is applicable to summary-judgment proceedings. Consequently, no presumptions can be made in favor of the trial court's judgment for Modern Industrial Heating, Inc.

Accordingly, I would hold that the trial court erred in granting summary judgment for Modern Industrial Heating, Inc. because Energo's amended answer with supporting affidavits raised a material fact issue with respect to Energo's claim of offset. The docket sheet reveals that the trial judge permitted the filing of Energo's amended answer, and no

presumptions favorable to the judgment can be made otherwise. Accordingly, I would reverse the judgment of the trial court and remand for trial.

Tex.App.–Dallas,1986.
Energo Intern. Corp. v. Modern Indus. Heating, Inc.
722 S.W.2d 149

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

851 S.W.2d 187
**(Cite as: 851 S.W.2d 187)**



Supreme Court of Texas.
Dale A. FAULKNER, M.D., Relator,
v.
The Honorable Thomas R. CULVER, III, Judge,
Respondent.

No. D–3108.
March 24, 1993.
Rehearing Overruled May 19, 1993.

Physician in medical malpractice suit sought writ of mandamus directing District Court, Fort Bend County, Thomas R. Culver, III, J., to vacate written order and purporting to vacate a take-nothing summary judgment approximately 11 months after judgment was entered. The Supreme Court held that trial court lost jurisdiction over case when judgment became final 30 days after entry.

Writ conditionally granted.

West Headnotes

**[1] Judgment 228 ⚷297**

228 Judgment
  228VIII Amendment, Correction, and Review in Same Court
      228k296 Authority of Court, Judge, or Judicial Officer
        228k297 k. In General. Most Cited Cases
  When party moves for new trial or to modify, correct, or reform judgment, trial court has plenary power for 30 days after motion for new trial is overruled. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b.

**[2] Judgment 228 ⚷328**

228 Judgment
  228VIII Amendment, Correction, and Review in Same Court
      228k328 k. Order. Most Cited Cases

**New Trial 275 ⚷163(1)**

275 New Trial
  275III Proceedings to Procure New Trial
      275k163 Order Granting or Refusing New Trial
        275k163(1) k. In General. Most Cited Cases
  Order granting new trial or modifying, correcting, or reforming judgment must be written and signed. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b(c).

**[3] Judgment 228 ⚷328**

228 Judgment
  228VIII Amendment, Correction, and Review in Same Court
      228k328 k. Order. Most Cited Cases

**New Trial 275 ⚷163(1)**

275 New Trial
  275III Proceedings to Procure New Trial
      275k163 Order Granting or Refusing New Trial
        275k163(1) k. In General. Most Cited Cases
  Trial judge's oral pronouncement granting motion for new trial or motion to modify, reform, or correct judgment and docket entry indicating that such motion was granted cannot substitute for required written order. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b.

**[4] Judgment 228 ⚷186**

228 Judgment
  228V On Motion or Summary Proceeding
      228k182 Motion or Other Application
        228k186 k. Hearing and Determination. Most Cited Cases
  Trial court lacked jurisdiction over motion for rehearing summary judgment when court failed to enter written order within 30 days of granting sum-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

851 S.W.2d 187
**(Cite as: 851 S.W.2d 187)**

mary judgment, even though timely oral pronouncement and docket entry were made which purported to vacate summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b.

**\*188** David A. Livingston, Dion C. Raymos, Houston, for relator.

Valorie W. Davenport, Houston, for respondent.

PER CURIAM.

In this original proceeding, Relator Dale Faulkner, M.D. (Faulkner) seeks a writ of mandamus directing the trial judge to vacate an order entered November 8, 1990 vacating summary judgment for Faulkner. Pursuant to Rule 170 of the Texas Rules of Appellate Procedure, a majority of this court conditionally grants the application for writ of mandamus.

In February 1988, Betty and Dan Krock (Krock) sued Dale Faulkner, M.D. (Faulkner) for medical malpractice. On December 15, 1989, Judge Charles Dickerson granted a take-nothing summary judgment. On January 15, 1990, Krock filed a motion for rehearing of the summary judgment and, in the alternative, motion for new trial. Judge Dickerson orally vacated the summary judgment at a hearing on March 1, 1990 and made a entry on the docket sheet to this effect. While Krock's attorney apparently tried to ascertain whether Judge Dickerson signed a written order to this effect, both a clerk in the Fort Bend County District Clerk's office and Judge Dickerson's secretary indicated that the order vacating the summary judgment had been signed but the case file was in the Judge's chambers and could not be retrieved. Judge Dickerson did not vacate the summary judgment by written order until November 8, 1990.

In December 1990, Judge Dickerson resigned and was replaced by Thomas Culver. Faulkner moved to vacate Judge Dickerson's November 8, 1990, order vacating the summary judgment. On April 1, 1992, Judge Culver ruled that Judge Dick-

erson's order was effective and the case would proceed to trial.

Faulkner argues that Judge Dickerson did not have plenary power when he signed the November 8, 1990 order vacating the summary judgment. We agree.

[1][2][3] If a party moves for a new trial or to modify, correct, or reform a judgment [FN1], the trial judge has plenary power for thirty days after the motion for new trial is overruled. TEX.R.CIV.P. 329b. A motion for new trial or motion to modify, correct, or reform the judgment is overruled by operation of law seventy-five days after the judgment was signed. TEX.R.CIV.P. 329b(c). An order granting a new trial or modifying, correcting, or reforming a judgment must be written and signed. TEX.R.CIV.P. 329b(c); *McCormack v. Guillot,* 597 S.W.2d 345, 346 (Tex.1980). A trial judge's oral pronouncement granting a motion for new trial or motion to modify, reform, or correct a judgment and a docket entry indicating that such motion was granted cannot substitute for a written order required by Rule 329b. *Clark & Co. v. Giles,* 639 S.W.2d 449, 450 (Tex.1982).

> FN1. Krock's motion for rehearing of the summary judgment was in substance a motion to modify, correct, or reform a judgment. *See* TEX.R.CIV.P. 329b.

[4] Judge Dickerson's oral pronouncement and docket entry vacating the summary judgment could not be substituted for a written order required by Rule 329b. *See Clark & Co. v. Giles,* 639 S.W.2d at 450. Since no written order was signed by Judge Dickerson within the required time, Krock's alternative motions were overruled by operation of law on February 28, 1990. The judgment became final 30 days later and the trial judge lost jurisdiction over the case. Therefore, the order of November 8, 1990, purporting to vacate the summary judgment is a nullity.[FN2]

> FN2. However, our disposition of this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

851 S.W.2d 187
**(Cite as: 851 S.W.2d 187)**

cause does not necessarily foreclose other remedies available to the parties. *See Hanks v. Rosser,* 378 S.W.2d 31, 35 (Tex.1964); *Rund v. Trans East, Inc.,* 824 S.W.2d 713, 717 (Tex.App.—Houston [1st Dist.] 1992, writ denied).

**\*189** Pursuant to Rule 170 of the Texas Rules of Appellate Procedure, a majority of this court, without hearing oral argument, conditionally grants Faulkner's petition for writ of mandamus. The mandamus will only issue if the trial judge refuses to act in accordance with this opinion.

Tex.,1993.
Faulkner v. Culver
851 S.W.2d 187

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



587 S.W.2d 109
**(Cite as: 587 S.W.2d 109)**



Supreme Court of Texas.
Sue Ann FLYNT
v.
Julian GARCIA.

No. B-8131.
June 6, 1979.

Appeal was taken from a judgment of the County Civil Court at Law No. 1, Harris County, Charles G. Castles, J., awarding delinquent payments due under property settlement agreement. The Court of Civil Appeals, Cire, J., held, 574 S.W.2d 587, that trial court was without jurisdiction and reversed and remanded, and plaintiff appealed. The Supreme Court held that where original suit was within jurisdictional limits of court and subsequent amendment sought only additional damages that were accruing because of passage of time, county court had power to entertain suit for delinquent payments due under property settlement agreement even after trial amendment which raised amount in controversy over maximum jurisdictional limit.

Court of Civil Appeals reversed.

West Headnotes

**[1] Courts 106 ⚷30**

106 Courts
   106I Nature, Extent, and Exercise of Jurisdiction in General
      106I(A) In General
         106k30 k. Loss or divestiture of jurisdiction. Most Cited Cases
   Where jurisdiction is once lawfully and properly acquired, no subsequent fact or event in particular case serves to defeat that jurisdiction.

**[2] Courts 106 ⚷170**

106 Courts
   106IV Courts of Limited or Inferior Jurisdiction
      106k167 Limitations as to Amount or Value in Controversy
         106k170 k. Allegations and prayers in pleadings. Most Cited Cases
   Where original suit was within jurisdictional limits of court and subsequent amendment sought only additional damages that were accruing because of passage of time, and where there was no allegation of bad faith or fraud in invoking jurisdiction of court, jurisdiction of county court at law to entertain suit for delinquent payments due under property settlement agreement was not defeated by trial amendment which raised amount in controversy over maximum jurisdictional limit of $5,000.

**\*109** Fred Riepen, Houston, for petitioner.

Milton Schwartz, Houston, for respondent.

PER CURIAM.

This case involves the jurisdiction of a county court at law to entertain suit and render judgment after a trial amendment raised the amount in controversy over the maximum jurisdictional limit of $5,000.

We will recite only those facts necessary for our disposition of the case and will not repeat the full statement made by the court of civil appeals at 574 S.W.2d 587.

The record before us does not contain pleadings prior to the fourth amended original petition filed April 18, 1977. By that pleading, Sue Ann Flynt sought to recover $1,778.40 plus interest under a fully matured obligation, and $3,100 plus interest in monthly payments accrued through August, 1976, under another obligation not yet fully matured. The total sought at that time was $4,778.40 plus interest. By trial amendment, she increased her demand to $6,242.40 by including accrued payments on the second obligation through

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

the end of trial.

The court of civil appeals has held that the county court at law retained jurisdiction to "entertain the suit", citing this Court's opinions in Isbell v. Kenyon-Warner Dredging Co., 113 Tex. 528, 261 S.W. 762 (1924); and Haginas v. Malbis Memorial Foundation, 163 Tex. 274, 354 S.W.2d 368 (1962). However, the court further held that the trial court had no "jurisdiction to enter a judgment in excess of the jurisdictional amount."

We think the opinion of the court of civil appeals is in conflict with the general rule announced in Isbell, supra and Haginas, supra ; and, therefore pursuant to Tex.R.Civ. P. 483, we grant the application of Sue Ann Flynt, and without hearing oral argument, reverse the judgment of the court of civil appeals.

[1][2] The general rule stated in the two prior opinions is that "where jurisdiction is **\*110** once lawfully and properly acquired, no subsequent fact or event in the particular case serves to defeat that jurisdiction." We see no reason why that general rule should not apply to a case where the original suit is within the jurisdictional limits of the court and subsequent amendments seek only additional damages that are accruing because of the passage of time. This is especially so where there is no allegation of bad faith or fraud in invoking the jurisdiction of the court.

The rule applied here will serve the purposes of judicial economy. The opinion of the court of civil appeals would reverse the judgment and remand the cause for another trial in the county court at law while allowing only a partial recovery of the amount due. If another suit is required to recover the balance, three lawsuits will result from this single claim.

The judgment of the court of civil appeals is reversed and the judgment of the trial court is affirmed.

Tex., 1979.
Flynt v. Garcia
587 S.W.2d 109

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 S.W.3d 243
**(Cite as: 3 S.W.3d 243)**



Court of Appeals of Texas,
Fort Worth.
Alvin Chester GUYOT, Jr. Appellant,
v.
Martha Marie GUYOT, Appellee.

No. 2–98–354–CV.
Oct. 7, 1999.

The 324th District Court, Tarrant County, Brian A. Carper, J., entered divorce decree, even though docket sheet notation indicated that husband wished to withdraw his consent to divorce agreement. Husband appealed. The Court of Appeals, Holman, J., held that: (1) trial court's docket sheet notation did not preserve error on appeal; (2) husband did not preserve error for appeal on his objection to wife's motion to sign final divorce decree and proposed judgment; and (3) argument that trial court erred in denying husband's motion for a new trial would not be considered.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⚷499(1)**

30 Appeal and Error
    30X Record
        30X(A) Matters to Be Shown
            30k498 Presentation and Reservation of Grounds of Review
                30k499 Questions and Objections in General
                    30k499(1) k. In General. Most Cited Cases

**Appeal and Error 30 ⚷500(1)**

30 Appeal and Error
    30X Record
        30X(A) Matters to Be Shown
            30k498 Presentation and Reservation of Grounds of Review
                30k500 Rulings by Lower Court
                    30k500(1) k. In General. Most Cited Cases

A point on appeal based on a trial court's ruling on a motion, request, or objection must be supported by a showing in the record that the motion, request, or objection was presented to and acted upon by the trial court. Rules App.Proc., Rule 33.1(a)

**[2] Appeal and Error 30 ⚷516**

30 Appeal and Error
    30X Record
        30X(B) Scope and Contents
            30k516 k. Proceedings Included in General. Most Cited Cases

In general, a docket entry forms no part of the record which may be considered; it is a memorandum made for the clerk's and trial court's convenience.

**[3] Appeal and Error 30 ⚷837(1)**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k837 Matters or Evidence Considered in Determining Question
                30k837(1) k. In General. Most Cited Cases

Docket entries on appeal are inherently unreliable.

**[4] Appeal and Error 30 ⚷837(1)**

30 Appeal and Error
    30XVI Review
        30XVI(A) Scope, Standards, and Extent, in General
            30k837 Matters or Evidence Considered in Determining Question
                30k837(1) k. In General. Most Cited

3 S.W.3d 243
**(Cite as: 3 S.W.3d 243)**

Cases

Docket entries on appeal may be examined to correct clerical errors in judgments or orders or to determine the meaning of words used in a judgment or order.

**[5] Appeal and Error 30 ⚷837(1)**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General
         30k837 Matters or Evidence Considered in Determining Question
            30k837(1) k. In General. Most Cited Cases

Where the only evidence of a trial court's order or judgment is found in the docket sheet or where the movant seeks to use the docket sheet to impeach an order or judgment, the docket sheet cannot be used to show the existence of an order or judgment or to impeach an order or judgment.

**[6] Divorce 134 ⚷179**

134 Divorce
   134IV Proceedings
      134IV(O) Appeal
         134k179 k. Presentation and Reservation in Lower Court of Grounds of Review. Most Cited Cases

Argument that trial court erred in entering divorce decree since docket sheet notation indicated that husband's attorney withdrew consent to divorce agreement before decree was signed would not be considered, where notation was merely a memorandum made for the convenience of the trial court and court clerk, and was not reliable for the purpose of preserving error on appeal.

**[7] Appeal and Error 30 ⚷497(1)**

30 Appeal and Error
   30X Record
      30X(A) Matters to Be Shown
         30k497 Grounds of Review

            30k497(1) k. In General. Most Cited Cases

It is the appellant's responsibility to preserve error for appeal by taking affirmative steps to ensure that all matters he may wish to appeal are timely and properly entered into the court record.

**[8] Divorce 134 ⚷179**

134 Divorce
   134IV Proceedings
      134IV(O) Appeal
         134k179 k. Presentation and Reservation in Lower Court of Grounds of Review. Most Cited Cases

Husband did not preserve error for appeal on his objection to wife's motion to sign final divorce decree and proposed judgment, where there was no evidence anywhere in the record that husband or his attorney made such an objection. Rules App.Proc., Rule 33.1(a).

**[9] Divorce 134 ⚷179**

134 Divorce
   134IV Proceedings
      134IV(O) Appeal
         134k179 k. Presentation and Reservation in Lower Court of Grounds of Review. Most Cited Cases

Argument that trial court in dissolution proceedings erred in denying husband's motion for a new trial would not be considered, where husband's motion was so vague that trial court could not make a determination as to the grounds for the request for new trial

**\*244** Jeffery D. Gooch, Fort Worth, for Appellant.

Panel F: CAYCE, C.J.; HOLMAN and DAY, JJ.

**OPINION**

DIXON W. HOLMAN, Justice.

This appeal presents the issue of whether a party to a Rule 11 agreement, which was entered on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 S.W.3d 243
**(Cite as: 3 S.W.3d 243)**

the court reporter's record and agreed to by both parties under oath, can withdraw his consent to that agreement before the trial court renders a final written decree of divorce pursuant to the terms of the agreement. Appellant Alvin Chester Guyot, Jr. relies on a trial court docket entry notation as evidence that he timely and properly informed the trial court of his desire to withdraw his consent to the divorce agreement. The trial court noted on the docket sheet that Appellant's attorney informed the trial court at a hearing on Appellee's Motion to Sign Final Decree of Divorce that Appellant wished to withdraw his consent to the divorce agreement. There is no other evidence in the record that Appellant made a complaint by a timely objection, request, or motion putting the court on notice of Appellant's desire to withdraw from the agreement. Because we hold that a trial court docket sheet notation cannot be relied on to preserve error on appeal, we do not reach the issue presented by Appellant and affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 11, 1996, Appellant filed his petition for divorce and application for temporary restraining order in which Appellant sought a divorce from his wife, Appellee Martha Marie Guyot, custody of their minor child, a temporary restraining order, and property division. On October 21, 1996, Appellee filed her answer and counter-petition seeking divorce from Appellant, custody of their minor child, a temporary restraining order, and property division. On July 16, 1998, Appellant and Appellee appeared before the trial court with their attorneys of record and announced in open court that they had reached stipulations and agreements regarding the divorce and division of personal and real property (hereinafter the "Agreement"). Appellee's attorney recited the terms of the Agreement. Both Appellant **\*245** and Appellee testified under oath that they agreed and consented to the terms and conditions of the Agreement and requested that the trial court approve the Agreement. Neither Appellant nor Appellee stated that they had any objections to the terms of the Agreement as dictated into the court record.

On August 19, 1998, Appellant filed a motion for new trial on the following grounds:

1. On July 16, 1998, the court granted a divorce in the above cause.

2. A judgment has not yet been signed by this Court in the above cause.

3. The trial court erred in granting the divorce without hearing any testimony from the parties.

4. Movant has a meritorious defense to the cause of action alleged in this cause.

5. The granting of a new trial would not do injury to MARTHA MARIE GUYOT.

6. Justice will not be properly served unless a new trial is granted.

On August 25, 1998, Appellee filed a response to Appellant's motion for new trial. The record does not reflect that a hearing was held on Appellant's motion. On August 25, 1998, Appellee filed a Motion to Sign Final Decree of Divorce. At the September 4, 1998 hearing on Appellee's motion, Appellee presented the trial court with a proposed Final Decree of Divorce that encompassed the terms of the Agreement. The trial court signed the proposed Final Decree of Divorce on September 4, 1998.

Appellant claims that at the hearing on September 4, 1998, his attorney informed the trial court that Appellant was withdrawing his consent to the Agreement. Appellant also states that his attorney objected to Appellee's Motion to Sign Final Decree of Divorce and the proposed judgment. Appellant was not present at the hearing, and no court reporter's record was made of this hearing. The only evidence in the appellate record that Appellant's attorney actually informed the trial court that Appellant wished to withdraw his consent to the Agreement is

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

found in the trial court's docket sheet. On the docket sheet, the presiding judge made a hand-written notation:

> 9/4/98 Hearing on M/Final Decree. Attys present + atty for Pet. Alvin Guyot, Jr. w/o client says client w/drawing Ruling 11 agreement client not present. W/drawal of Rule 11 agreement not accepted since client not present. No other w/drawal appears on record. W/drawal not allowed + judgment entered. BB Thornton.

Further, there is no evidence in the record that Appellant or his attorney ever objected to Appellee's Motion to Sign Final Decree of Divorce or to the proposed judgment.

Appellant claims that the trial court's judgment should be reversed because the trial court was aware that Appellant withdrew his consent to the terms of the Agreement before the trial court entered a final written judgment. Appellant claims that the notation on the docket sheet and the lack of his attorney's signature on the divorce decree show that there is evidence in the record that the trial court had timely and proper notice of his intent to withdraw consent to the Agreement.

## II. PRESERVATION OF ERROR

Before this court can make a determination as to whether Appellant timely and properly withdrew his consent to the Agreement, we must determine whether Appellant properly preserved error in the trial court.

### A. The Docket Sheet

Appellant states in his brief that there is evidence in the record of his desire to withdraw consent to the Agreement and his objection to Appellee's Motion to Sign **\*246** Final Decree of Divorce and the proposed judgment. Our review of the record, however, indicates that there is no evidence anywhere in the record that Appellant or his attorney objected to Appellee's motion or the proposed judgment, and the only evidence that Appellant refers us to or that can be found in the record evidencing his

desire to withdraw his consent to the Agreement is the judge's handwritten notation on the trial court's docket sheet.[FN1] While the docket entry notation might show that the trial court was on notice of Appellant's desire to withdraw his consent to the Agreement, there is no evidence in the record showing that Appellant preserved error on the issue of whether the trial court erred in entering the divorce decree because Appellant withdrew his consent to the Agreement before the decree was signed. The trial court docket entry cannot be relied on to preserve error.

> FN1. Appellant also claims that the record shows that he withdrew his consent to the Agreement based on the fact that the signature of his attorney is not on the Final Decree of Divorce signed by the trial court. We cannot assume, however, that Appellant withdrew his consent to the Agreement simply because his attorney's signature is not on it, especially in light of the fact that Appellee's attorney did not sign the decree either.

[1] Under Texas Rule of Appellate Procedure 33.1(a), before a party can present a complaint for appellate review, the record must show that:

(1) the complaint was made to the trial court by a timely request, objection, or motion that:

(A) stated that grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and

(B) complied with the requirements of the Texas Rules of Civil or Criminal Evidence or the Texas Rules of Civil or Appellate Procedure; and

(2) the trial court:

(A) ruled on the request, objection, or motion, either expressly or implicitly; or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal.

TEX.R.APP. P. 33.1(a). In other words, a point on appeal based on a trial court's ruling on a motion, request, or objection must be supported by a showing in the record that the motion, request, or objection was presented to and acted upon by the trial court. *See, e.g., Ballard v. King,* 652 S.W.2d 767, 769 (Tex.1983); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.,* 848 S.W.2d 724, 736 (Tex.App.—Dallas 1992, writ denied) (interpreting TEX.R.APP. P. 52(a) (Vernon Pamph.1997, revised 1997)); *Anderson v. Higdon,* 695 S.W.2d 320, 326 (Tex.App.—Waco 1985, writ ref'd n.r.e.).

[2][3][4] In general, a docket entry forms no part of the record which may be considered; it is a memorandum made for the clerk's and trial court's convenience. *See Jauregui Partners, Ltd. v. Grubb & Ellis Commercial Real Estate Servs.,* 960 S.W.2d 334, 336 (Tex.App.—Corpus Christi 1997, pet. denied); *In re Fuentes,* 960 S.W.2d 261, 264 (Tex.App.—Corpus Christi 1997, orig. proceeding); *First Nat'l Bank of Giddings, Tex. v. Birnbaum,* 826 S.W.2d 189, 190–91 (Tex.App.—Austin 1992, no writ) (op. on reh'g); *Energo Int'l Corp. v. Modern Indus. Heating, Inc.,* 722 S.W.2d 149, 151 (Tex.App.—Dallas 1986, no writ). One reason for not considering docket entries on appeal is that they are inherently unreliable. *See, e.g., Energo,* 722 S.W.2d at 151 n. 2. An exception to this rule is that docket entries may be examined to correct clerical errors in judgments or orders or to determine the meaning of words used in a judgment or order. *See N–S–W Corp. v. Snell,* 561 S.W.2d 798, 799 (Tex.1977) (stating that "[a] docket entry may supply facts in certain situations"); *Energo,* 722 S.W.2d at 151 n. 2 **\*247** (interpreting the "certain situations" referred to in *Snell* to be limited to clerical errors in judgments or orders); *see also Frazier v. Yu,* 987 S.W.2d 607, 611 (Tex.App.—Fort Worth 1999, pet. denied) (discussing *Snell* and *Energo* ).

[5] Typically, the cases that have discussed the use of a docket sheet on appeal involve situations where the only evidence of a trial court's order or judgment is found in the docket sheet or where the movant seeks to use the docket sheet to impeach an order or judgment. Under these circumstances, the docket sheet cannot be used to show the existence of an order or judgment or to impeach an order or judgment. *See, e.g., Frazier,* 987 S.W.2d at 608 & 611 (holding that docket sheet, which stated that plaintiff did not submit any evidence to contest elements of defendant's motion for summary judgment, when, in fact, plaintiff had timely filed two affidavits to contest motion, could not be used to impeach judgment entered by trial court that stated that court had reviewed "competent summary judgment evidence on file"); *Pickell v. Guaranty Nat'l Life Ins. Co.,* 917 S.W.2d 439, 441 (Tex.App.—Houston [14 th Dist.] 1996, no writ) (holding that appellant failed to preserve error for appeal where only indication that trial court ruled on a motion to transfer venue was a docket sheet notation); *First Nat'l Bank of Giddings, Tex.,* 826 S.W.2d at 190 (holding that court lacked jurisdiction for appeal where only evidence of application for turnover relief was in the trial court's docket sheet).

Some courts, however, have also denied review when the docket sheet was relied on by the movant for other purposes. *See Frommer v. Frommer,* 981 S.W.2d 811, 813 n. 3 (Tex.App.—Houston [1 st Dist.] 1998, no pet.) (refusing to examine a docket entry to support the movant's point of error where movant failed to request findings of fact and conclusions of law); *Roever v. Roever,* 824 S.W.2d 674, 676 (Tex.App.—Dallas 1992, no writ) (refusing to examine docket entry when movant claimed that docket entry supported his claim that community property estate was of no or nominal value because neither party alleged clerical error); *Energo,* 722 S.W.2d at 151 (holding that docket entry could not be used to show that appellant's untimely amended answer was filed with permission of the trial court in order to defeat summary judg-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 S.W.3d 243
**(Cite as: 3 S.W.3d 243)**

ment). Finally, in *Elite Towing, Inc. v. LSI Fin. Group,* the court held that the appellant did not preserve error for appeal on a motion to transfer venue even though the trial court had noted in its docket sheet that the motion had been filed and ruled on. 985 S.W.2d 635, 645 (Tex.App.—Austin 1999, no pet.). The *Elite* court stated:

> The record before us does not contain either a motion to transfer venue or the district court's ruling on same. The docket sheet included in the court's record *reflects such a motion was filed* and denied. However, we find no request by Elite to include either the motion or order in the court's record brought forward to this Court. Therefore, any objection to venue has been waived.

> *Id.*(Emphasis added).[FN2]

> > FN2. We recognize that there are courts that have examined docket sheets to determine the absence or presence of a motion or discovery on the trial court's docket without addressing whether it is proper to do so. *See Tubb v. Vinson Exploration, Inc.,* 892 S.W.2d 183, 185 (Tex.App.—El Paso 1994, writ denied) (examining record to determine whether appellee preserved error in the judgment and noting that "the computerized docket sheet of the trial court reflects no such motion [for judgment on the verdict]"); *Prowse v. Schellhase,* 838 S.W.2d 787, 790 (Tex.App.—Corpus Christi 1992, no writ) (stating that docket sheet does not reflect whether discovery evidence was filed with the trial court before hearings on motions for summary judgment). Due to the inherent unreliability of docket sheets, we believe that the better approach is not to examine docket sheets on appeal other than to clarify clerical errors. *See Energo,* 722 S.W.2d at 151. We also note that the court in *Ross v. Arkwright Mut. Ins. Co.,* 892 S.W.2d 119, 129 (Tex.App.—Houston [14th Dist.] 1994, no writ), held that properly

authenticated docket sheets served with affidavits were proper summary judgment proof where affidavits relied in part on the docket sheets to show that no extraordinary writs or other process had been issued. The *Ross* court also noted, however, that the affidavits by themselves could have probably established the same facts without reference to the docket sheets. *See id.* (stating that while the affidavits do refer to the docket sheets and rely on them in part, the affidavits also contain statements that based on the affiants' personal knowledge no extraordinary writ or process was issued; these statements were independent and did not rely on the docket sheets).

[6][7] The docket notation in this case was merely a memorandum made for the **\*248** convenience of the trial court and court clerk, and it is not reliable for the purpose of preserving error on appeal. *See, e.g., First Nat'l Bank of Giddings, Tex.,* 826 S.W.2d at 191 (stating that docket entries are inherently unreliable because they lack the formality of orders and judgments); *Energo,* 722 S.W.2d at 151 n. 2 ("docket entries are inherently unreliable"). Moreover, it is the Appellant's responsibility to preserve error for appeal by taking affirmative steps to ensure that all matters he may wish to appeal are timely and properly entered into the court record. *See, e.g, Temple EasTex, Inc.,* 848 S.W.2d at 736 (stating that in order to preserve error for appeal, the *movant must present* to the trial court a timely request stating the specific grounds for the ruling desired, if the grounds are not obvious from the context, *and the movant must obtain* a ruling on the requested relief); *Anderson,* 695 S.W.2d at 326 (stating that record must show that *Appellant requested relief* in the trial court). To permit Appellant to rely on a court's docket entry for preserving error would relieve him of his responsibility to ensure that error is preserved and would encourage others in the future to trust in the trial judge's ability to take diligent notes. We hold the trial judge's notation on the docket sheet that Appellant's attor-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 S.W.3d 243
**(Cite as: 3 S.W.3d 243)**

ney notified the court of Appellant's desire to withdraw his consent to the Agreement did not preserve error for appeal on the issue of whether the trial court erred in entering the divorce decree.

[8] Further, we hold Appellant did not preserve error for appeal on his objection to Appellee's Motion to Sign Final Decree of Divorce and the proposed judgment. There is no evidence anywhere in the record that Appellant or his attorney made such an objection. *See* TEX.R.APP. P. 33.1(a).

### B. The Motion for New Trial

[9] Appellant also complains that the trial court erred in denying his motion for new trial. Appellant failed, however, to state the grounds "for the ruling [he] sought from the trial court with sufficient specificity to make the trial court aware of the complaint." *Id*. Appellant's motion for new trial was so vague that the trial court could not make a determination as to the grounds for the request for the new trial. First, contrary to Appellant's claim, the court did hear testimony of the parties before entering the divorce decree. At the hearing on July 16, 1998, both Appellant and Appellee testified that they consented to the terms of the Agreement. Second, Appellant's mere recitation that he has a meritorious defense to the cause of action alleged and that the trial court erred in granting the divorce does not sufficiently specify the grounds for Appellant's complaint under rule 33.1(a). *See id.* Finally, the grounds for Appellant's motion cannot also be said to be apparent from the context. Thus, Appellant failed to preserve error for appeal in his motion for new trial.

Appellant's sole point on appeal is overruled, and the trial court's judgment is affirmed.

Tex.App.–Fort Worth,1999.
Guyot v. Guyot
3 S.W.3d 243

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**



Supreme Court of Texas.
Thelma Blahuta HUBENAK, Petitioner,
v.
SAN JACINTO GAS TRANSMISSION COMPANY,
Respondent.
Thelma Blahuta Hubenak and Emil Blahuta, Petitioners,
v.
San Jacinto Gas Transmission Company, Respondent.
Rosie Wenzel, Wilma McAndrew, Betty McCleney, and
Tilford Sulak, Petitioners,
v.
San Jacinto Gas Transmission Company, Respondent.
Kutach Family Trust, Darryl Wayne Kutach, Trustee,
Petitioner,
v.
San Jacinto Gas Transmission Company, Respondent.
Cusack Ranch Corporation, Petitioner,
v.
MidTexas Pipeline Company, Respondent.
MidTexas Pipeline Company, Petitioner,
v.
Wilbert O. Dernehl, Jr. and The First National Bank of
Bellville, Respondents.
MidTexas Pipeline Company, Petitioner,
v.
Walter Roy Wright, Jr. and Robbie V. Wright, Re-
spondents.
MidTexas Pipeline Company, Petitioner,
v.
Walter Roy Wright, III, Respondent.
Michael F. Cusack, Trustee of the Michael F. Cusack
Special Trust No. One, Petitioner,
v.
MidTexas Pipeline Company, Respondent.

Nos. 02–0213 to 02–0217, 02–0320, 02–0321, 02–0326,
02–0359.
Argued Feb. 19, 2003.
Decided July 2, 2004.

**Background:** In nine separate actions, utilities brought
condemnation actions against landowners to acquire
easements for gas pipelines. In three of the actions,
landowners filed counterclaims. In first four actions, the
County Court at Law, Fort Bend County, Walter S.
McMeans, J., granted easements and awarded compens-
ation to landowners, and the Houston Court of Appeals,
First District, 65 S.W.3d 791,Terry Jennings, J., af-
firmed. In fifth action, the 25th District Court, Gonzales
County, Gus J. Strauss, Jr., J., granted summary judg-
ment for utility, and the Corpus Christi Court of Ap-
peals, 71 S.W.3d 395,Dorsey, J., affirmed. The sixth ac-
tion was dismissed by the 25th District Court, Colorado
County, Gus J. Strauss, Jr., J., dismissed, and the Tex-
arkana Court of Appeals, 71 S.W.3d 852, Grant, J., af-
firmed. Seventh action was dismissed by the 25th Dis-
trict Court, Colorado County and the Texarkana Court
of Appeals, 141 S.W.3d 208, 2002 WL 264833,Ross, J.,
affirmed. In eighth action the Court of Appeals, 141
S.W.3d 211, 2002 WL 32626070, Grant, J., affirmed
dismissal of the action. Ninth action was dismissed by
the 25th District Court, Gonzales County, and the Cor-
pus Christi Court of Appeals, 141 S.W.3d 215, 2002
WL 368639,Yanez, J., reversed.

**Holdings:** On consolidated appeals, the Supreme Court,
Owen, J., held that
(1) any failure to satisfy requirement that utilities plead
that the parties were unable to agree on damages did not
deprive courts of jurisdiction, and
(2) utilities satisfied requirement that the parties were
unable to agree on damages.

Judgments of Courts of Appeals affirmed in part,
affirmed and remanded in part, and reversed and re-
manded in part.

Jefferson, J., filed concurring opinion.

West Headnotes

**[1] Eminent Domain 148 191(5)**

148 Eminent Domain
   148III Proceedings to Take Property and Assess
Compensation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

148k189 Pleading
148k191 Petition or Complaint
148k191(5) k. Showing inability to agree with owner. Most Cited Cases

Statutory provision requiring that condemnor, in a condemnation proceeding, plead that the parties were unable to agree on the damages, was mandatory, but failure to satisfy it did not deprive courts of subject matter jurisdiction. V.T.C.A., Property Code § 21.012.

**[2] Courts 106 ⚷37(1)**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106I(A) In General
106k37 Waiver of Objections
106k37(1) k. In general. Most Cited Cases
Subject matter jurisdiction cannot be waived.

**[3] Eminent Domain 148 ⚷178.5**

148 Eminent Domain
148III Proceedings to Take Property and Assess Compensation
148k178.5 k. Abatement and revival of proceedings. Most Cited Cases

Abatement for a reasonable period of time, in order to allow condemnor to satisfy the "unable to agree" requirement, is proper remedy, in a condemnation proceeding in which landowner objects that there has been no offer and trial court finds that statutory requirement, that the parties be unable to agree on the damages, has not been met. V.T.C.A., Property Code § 21.012.

**[4] Eminent Domain 148 ⚷170**

148 Eminent Domain
148III Proceedings to Take Property and Assess Compensation
148k170 k. Negotiations, offer to purchase, and inability to agree with owner. Most Cited Cases

Condemnors who established that they made offers to landowners before filing condemnation proceedings seeking easements for gas pipeline construction, and that those offers were rejected or ignored by the landowners, satisfied statutory requirement that the parties were unable to agree on the damages. V.T.C.A., Property Code § 21.012.

**[5] Eminent Domain 148 ⚷170**

148 Eminent Domain
148III Proceedings to Take Property and Assess Compensation
148k170 k. Negotiations, offer to purchase, and inability to agree with owner. Most Cited Cases

Gas pipeline utilities' offers to landowners in condemnation proceedings, which were refused, satisfied requirement that utilities and landowners were unable to agree, despite fact that offers included the right to transport oil and other products, the right to assign the easements, and a warranty of title to the easement, which were not explicitly included in the condemnation petitions; those rights were not at issue during pre-condemnation negotiations, were not material to the negotiations, and did not play any part in the parties' inability to agree. V.T.C.A., Property Code § 21.012.

**[6] Eminent Domain 148 ⚷170**

148 Eminent Domain
148III Proceedings to Take Property and Assess Compensation
148k170 k. Negotiations, offer to purchase, and inability to agree with owner. Most Cited Cases

Generally, in determination, in a condemnation proceeding, of whether the parties were unable to agree, it is sufficient that the parties negotiated for the same physical property and same general use that became the subject of the later eminent domain proceeding, even if more intangible rights were sought in the purchase negotiations which did not exactly mirror those sought or obtainable by condemnation. V.T.C.A., Property Code § 21.012.

**\*174** Stephen I. Adler, Austin, for Amicus Curiae Olin Corporation.

Richard L. McElya, Angleton, William D. Noel, for Thelma Blahuta Hubenak, Cusack Ranch Corporation, Walter Roy Wright, III.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

Thomas E. Sheffield, Houston, for San Jacinto Gas Transmission Company.

Richard L. McElya, Angleton, for Emil Blahuta, Wilma McAndrew, Betty McCleney, Tilford Sulak, Darryl Wayne Kutach, Trustee, The First National Bank of Bellville, Robbie V. Wright, Michael Cusack Special Trust No. One.

William D. Noel, for Rosie Wenzel, Kutach Family Trust, Wilbert O. Dernehl, Jr., Walter Roy Wright, Jr., Michael F. Cusack, Trustee.

Kenneth C. Raney Jr., Dallas, Thomas E. Sheffield, Houston, for MidTexas Pipeline Company.

Stephen K. Carroll, Houston, for Amicus Curiae BP Pipelines Inc.

Justice OWEN delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice SMITH, Justice WAINWRIGHT and Justice BRISTER joined, and in which Justice JEFFERSON joined as to Parts I, II and III.

In these nine consolidated condemnation cases, we must determine whether (1) provisions in Texas Property Code section 21.012 permitting a condemning authority to begin condemnation proceedings if it is "unable to agree with the owner of the property on the amount of damages" and requiring a condemnation petition to contain a statement that it has been unable to agree are jurisdictional;[FN1] and (2) the condemning entities in these cases satisfied **\*175** section 21.012's requirements. We hold that the "unable to agree" requirement is not jurisdictional and that the condemning entities have satisfied their burden to show that they and the landowners were unable to agree on the damages for the properties described in the underlying condemnation petitions. Accordingly, we (1) affirm the courts of appeals' judgments in *Hubenak v. San Jacinto Gas Transmission Co.* (*Hubenak 1* ),[FN2] *Hubenak v. San Jacinto Gas Transmission Co.* (*Hubenak 2* ),[FN3] *Wenzel v. San Jacinto Gas Transmission Co.,*[FN4] *Kutach Family Trust v. San Jacinto Gas Transmission Co.,*[FN5] and *Cusack Ranch Corp. v. MidTexas Pipeline Co.;*[FN6] (2) af-

firm the court of appeals' judgment in *MidTexas Pipeline Co. v. Cusack*[FN7] and remand that case to the trial court for further proceedings consistent with this opinion; and (3) reverse the court of appeals' judgments in *MidTexas Pipeline Co. v. Dernehl,*[FN8] *MidTexas Pipeline Co. v. Wright* (*Wright 1* ),[FN9] and *MidTexas Pipeline Co. v. Wright* (*Wright 2* )[FN10] and remand those cases to their respective trial courts for further proceedings consistent with this opinion.

FN1. TEX. PROP.CODE § 21.012(a), (b).

FN2. 65 S.W.3d 791 (Cause No. 02–0213 in this Court).

FN3. *Id.* (Cause No. 02–0214 in this Court).

FN4. *Id.* (Cause No. 02–0215 in this Court).

FN5. *Id.* (Cause No. 02–0216 in this Court).

FN6. 71 S.W.3d 395 (Cause No. 02–0217 in this Court).

FN7. 141 S.W.3d 215, 2002 WL 368639 (Cause No. 02–0359 in this Court).

FN8. 71 S.W.3d 852 (Cause No. 02–0320 in this Court).

FN9. 141 S.W.3d 208, 2002 WL 264833 (Cause No. 02–0321 in this Court).

FN10. 141 S.W.3d 211, 2002 WL 32626070 (Cause No. 02–0326 in this Court).

## I

San Jacinto Gas Transmission Co. and MidTexas Pipeline Co. are unrelated gas utility companies possessing eminent domain power.[FN11] Their respective boards of directors authorized them to construct natural gas pipelines. Some of the landowners across whose property a pipeline was to be built[FN12] challenged the validity of the condemnation proceedings. The affected properties are located in several Texas counties, including Fort Bend, Colorado, and Gonzales counties. Because the issues in each of the cases are the same, we will refer to the landowners collectively and to the gas

Page 4

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

utility companies as the "condemnors."

> FN11. TEX. UTIL.CODE §§ 181.004, .008.

> FN12. Thelma Blahuta Hubenak, Darryl Wayne Kutach, Emil Blahuta, Rosie Wenzel, Wilma McAndrew, Betty McCleney, Tilford Sulak, the Kutach Family Trust, Michael F. Cusack, Cusack Ranch Corp., Walter Roy Wright, Jr., Robbie V. Wright, Walter Roy Wright, III, and Wilbert O. Dernehl, Jr.

Before instituting condemnation proceedings, the condemnors hired certified real estate appraisers to appraise the proposed easements across the landowners' properties. In each case, the condemnors made at least two offers to the landowners to purchase their property. Each offer exceeded the appraised value of the easements, including a final offer that contained the following statement: "If you elect to reject this offer, [the condemnor] may institute a condemnation suit in [a designated court], to acquire the rights described in the Right of Way Agreement." The right-of-way agreements attached to all of the final offers included the following terms:

> (1) the condemnor would receive the right to transport "gas, oil, petroleum **\*176** products, or any other liquids, gases or substances which can be transported through a pipeline";

> (2) the condemnor would receive the right to assign the easement to any person or entity; and

> (3) the landowners would be obligated to warrant and defend title to the easement.

The landowners repeatedly informed the condemnors during negotiations that they simply did not want a pipeline located on their properties, and in many cases, the landowners stated they would agree to sell the easements only at prices far above the appraised values, if at all. Ultimately, the landowners in each case either rejected or ignored the condemnors' final offers. The condemnors then sought condemnation in the appropriate trial courts.

Section 21.012 of the Texas Property Code provides:

> (a) If the United States, this state, a political subdivision of this state, a corporation with eminent domain authority, or an irrigation, water improvement, or water power control district created by law wants to acquire real property for public use but is unable to agree with the owner of the property on the amount of damages, the condemning entity may begin a condemnation proceeding by filing a petition in the proper court.

> (b) The petition must:

> > (1) describe the property to be condemned;

> > (2) state the purpose for which the entity intends to use the property;

> > (3) state the name of the owner of the property if the owner is known; and

> > (4) state that the entity and the property owner are unable to agree on the damages.FN13

> > FN13. TEX. PROP.CODE § 21.012.

The condemnation petitions filed in the trial courts contained all the foregoing statutory allegations, including a statement that the condemnors and the landowners were unable to agree on the damages for the properties to be condemned. The petitions, however, did not expressly seek to condemn or otherwise address the three matters contained in the right-of-way agreements regarding the transportation of oil and other substances, the right to assign the easement, and the landowners' obligations to warrant title.

In each case, the trial court appointed special commissioners to assess damages, and the special commissioners awarded the landowners less than the condemnors had offered for the easements, with the exception of the awards in *Cusack* and *Cusack Ranch.*FN14 The landowners timely filed their objections to the commissioners' awards, and in *Dernehl, Wright 1,* and *Wright 2,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

the landowners also filed counterclaims for possession of their land and damages for wrongful taking. In all of the cases, the condemnors responded by filing **\*177** motions for partial summary judgment, asserting that they had satisfied all prerequisites to bringing the condemnation actions and that the amount of damages was the only issue pending before the court. In support of their motions, the condemnors attached affidavits from David M. Dunwoody on the issue of inability to agree. Dunwoody oversaw the negotiations between the condemnors and landowners in each of the nine cases. His affidavits recount obtaining independent appraisals, the of-

fers made to the landowners, and the parties' failure to agree. In most of the cases, Dunwoody's affidavit also authenticates correspondence that passed between the condemnors and the landowners, including the condemnors' final offers, and the right-of-way agents' notes about landowner contacts.

> FN14. The condemnors highest offers and commissioners awards were:

| | | |
|---|---|---|
| Hubenak 1 (02-0213): | offer-$ 6,089.80 | award-$ 2,918.00 |
| Hubenak 2 (02-0214): | offer-$24,602.65 | award-$ 8,843.00 |
| Wenzel (02-0215): | offer-$14,620.38 | award-$ 4,606.00 |
| Kutach (02-0216): | offer-$ 6,360.00 | award-$ 2,670.00 |
| Cusack Ranch (02-0217): | offer-$25,000.00 | award-$25,836.24 |
| Dernehl (02-0320): | offer-$13,331.00 | award-$ 6,000.00 |
| Wright 1 (02-0321): | offer-$17,000.00 | award-$10,000.00 |
| Wright 2 (02-0326): | offer-$18,000.00 | award-$12,500.00 |
| Cusack (02-0359): | offer-$13,941.00 | award-$15,328.56 |

In all the cases, the landowners filed cross-motions for partial summary judgment and pleas to the jurisdiction, arguing that the trial courts lacked jurisdiction over the condemnation proceedings because the condemnors failed to comply with section 21.012's "unable to agree" requirement. The landowners argued that the condemnors could not satisfy the "unable to agree" requirement unless they established that they had engaged in "good faith" negotiations with the landowners before initiating condemnation proceedings. The landowners asserted that the condemnors' offers were not "bona fide" or made in good faith because the offers were subject to the landowners' executing the right-of-way agreements attached to the final offer letters, which included the three additional matters that the condemnors had not explicitly sought to condemn and that the landowners maintained the condemnors could not legally condemn. The landowners also objected to Dunwoody's affidavits as hearsay, conclusory, and incomplete. The landowners' summary judgment evidence

consisted primarily of the condemnors' admissions that the landowners had to sign the proposed right-of-way agreements in order to accept the offers.

The trial court in each of the cases initially granted the condemnors' motions for partial summary judgment and overruled the objections to Dunwoody's affidavits. Five of the cases— *Hubenak 1, Hubenak 2, Wenzel, Kutach,* and *Cusack Ranch*—then went to trial on the amount of damages. The juries in *Hubenak 2* and *Kutach* awarded damages to the landowners that were less than what the condemnors had offered them,[FN15] and the juries in *Hubenak 1, Wenzel,* and *Cusack Ranch* awarded more than what the condemnors had offered for the easements.[FN16] The landowners in the other four cases, however, filed supplemental pleas to the jurisdiction based on *Hubenak v. San Jacinto Gas Transmission Co.,*[FN17] in which the First Court of Appeals in Houston reversed the trial courts' judgments in *Hubenak 1, Hubenak 2, Wenzel,* and *Kutach* and held that the trial courts lacked jurisdiction because the con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

demnor did not negotiate for the same rights it sought to condemn.[FN18] As a result, the trial courts in *Cusack, Dernehl, Wright 1,* and *Wright 2* granted the landowners' jurisdictional pleas and dismissed the proceedings for want of jurisdiction.**\*178** The Houston court of appeals, however, thereafter withdrew its original opinion in *Hubenak v. San Jacinto* on rehearing and held that

the "unable to agree" requirement had been satisfied.[FN19]

FN15. The jury awards were:

| | |
|---|---|
| Hubenak 2 (02-0213): | $4,331.00 |
| Kutach (02-0216): | $1,247.00 |

FN16. The jury awards were:

| | |
|---|---|
| Hubenak 1 (02-0213): | $ 9,395.00 |
| Wenzel (02-0215): | $15,879.00 |
| Cusack Ranch(02-0217): | $30,000.00 |

FN17. 2000 WL 1056416 (Tex.App.-Houston [1st Dist.] 2000), *opinion withdrawn on rehg,* 65 S.W.3d 791 (Tex.App.-Houston [1st Dist.] 2001, pet. granted).

FN18. *Id.* at \*5.

FN19. *Hubenak,* 65 S.W.3d at 794.

Accordingly, in the five cases that proceeded to trial, the courts of appeals ultimately affirmed the summary judgments in favor of the condemnors.[FN20] Although the courts applied different standards of review,[FN21] the courts agreed that section 21.012's requirements are jurisdictional and that there is legally sufficient evidence to support the trial courts' implied findings that the condemnors satisfied the "unable to agree" requirement by negotiating in good faith and making bona fide offers to purchase the easements before instituting the underlying condemnation proceedings.[FN22] These courts also held that including the three additional matters in the final offers did not negate good faith because there was no evidence that inclusion of the additional matters was an impediment to the parties' ability to agree on damages.[FN23] Rather, the courts noted, the landowners simply did not want a pipeline located on their properties.[FN24] Both courts further stated that futility is an exception to the requirement of good faith negotiations, and in *Hubenak 1, Hubenak 2, Wenzel,*

and *Kutach,* the court reasoned that further negotiations with the landowners were futile because they objected to the construction of a pipeline on their properties under any circumstances.[FN25]

FN20. *Cusack Ranch,* 71 S.W.3d at 396; *Hubenak,* 65 S.W.3d at 794.

FN21. *Cusack Ranch,* 71 S.W.3d at 398 (applying a *de novo* standard of review to the trial courts application of the law to the undisputed facts); *Hubenak,* 65 S.W.3d at 798 (applying a no evidence standard of review).

FN22. *Cusack Ranch,* 71 S.W.3d at 400 ("We find the evidence, as a whole, establishes that MidTexas engaged in good faith negotiations sufficient to satisfy the requirement that it was unable to agree with Cusack on the amount of damages prior to instituting the condemnation proceeding."); *Hubenak,* 65 S.W.3d at 801 (holding that the evidence was sufficient to show that the condemnor satisfied section 21.012's requirements "not only because negotiations with the Landowners were in fact futile, but also because San Jacinto made bona fide offers to them").

FN23. *Cusack Ranch,* 71 S.W.3d at 400; *Hubenak,* 65 S.W.3d at 800–01.

Page 7

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

FN24. *Cusack Ranch,* 71 S.W.3d at 399; *Hubenak,* 65 S.W.3d at 799.

FN25. *Hubenak,* 65 S.W.3d at 799.

The results on appeal differed with regard to the four cases dismissed for want of jurisdiction. The court of appeals in *Cusack* reversed the trial court's dismissal for want of jurisdiction, holding that the condemnor's offer was virtually identical to the offer in *Cusack Ranch* and that the offer was legitimate and showed that the parties were unable to agree despite having participated in good faith negotiations.[FN26] The court of appeals in *Dernehl, Wright 1,* and *Wright 2,* however, affirmed the dismissals, applying a legal sufficiency standard of review and holding in each case that the condemnor did not conclusively establish that the parties were "unable to agree."[FN27] The court said that in each case there was some evidence to support the trial court's dismissal because the condemnor's only offers to the landowners included property rights that the condemnor did not ultimately seek to condemn.[FN28] **\*179** None of the courts of appeals considered whether the condemnors could legally have sought to condemn the three additional matters, and none considered the landowners' objections to Dunwoody's affidavits.

FN26. 141 S.W.3d at 215, 2002 WL 368639.

FN27. *Dernehl,* 71 S.W.3d at 858; *Wright 1,* 141 S.W.3d at 208, 2002 WL 264833 at \*2; *Wright 2,* 141 S.W.3d. at 211, 2002 WL 32626070 at \*2.

FN28. *Dernehl,* 71 S.W.3d at 858; *Wright 1,* 141 S.W.3d at 208, 2002 WL 264833 at \*2; *Wright 2,* 141 S.W.3d. at 211, 2002 WL 32626070 at \*2.

We granted the petitions for review in all nine cases and consolidated them because they involve substantially similar facts, arguments, and briefing.

## II

Before we consider whether the "unable to agree" requirement contained in section 21.012 of the Texas Property Code [FN29] implicates subject matter jurisdiction, or the other issues in these consolidated cases, it is helpful to understand the procedural steps in a condemnation proceeding. The filing of the petition required by section 21.012 in either a district court or county court at law [FN30] is the first step. When a petition is filed, the judge of the court appoints "three disinterested freeholders who reside in the county as special commissioners to assess the damages."[FN31] These commissioners convene a hearing and determine the value of the property condemned and any damage to the remainder.[FN32] Any party may object to the special commissioners' findings, and if there are objections, "the court shall cite the adverse party and try the case in the same manner as other civil causes."[FN33]

FN29. TEX. PROP.CODE § 21.012.

FN30. *Id.* § 21.001.

FN31. *Id.* § 21.014.

FN32. *Id.* §§ 21.015, .016.

FN33. *Id.* § 21.018.

Over the years, the courts have interpreted these Property Code provisions and their statutory predecessors. This Court has described the initial filing of the petition and the commissioners' hearing as an "administrative proceeding" that "converts into a normal pending cause" when objections to the commissioners' award are filed.[FN34] We have also said that filing objections " 'vacate[s] the award of the special Commissioners.' "[FN35] A number of courts of appeals have held that objections that the condemnor did not make an effort to agree cannot be raised during the administrative phase before the special commissioners, but must be raised in the trial court after the commissioners' award has issued.[FN36] This Court, as well as courts of appeals, have further held that if a landowner participates in the hearing before the special commissioners, the landowner waives the right to complain that the condemnor did not make an effort to agree.[FN37]

FN34. *Amason v. Natural Gas Pipeline Co.,* 682 S.W.2d 240, 242 (Tex.1984).

Page 8

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

FN35. *Id.* at 243 (quoting *Denton County v. Brammer,* 361 S.W.2d 198, 200 (Tex.1962)).

FN36. *See, e.g., Seiler v. Intrastate Gathering Corp.,* 730 S.W.2d 133, 137–38 (Tex.App.-San Antonio 1987, no writ), *overruled on other grounds by Schumann v. City of Schertz,* 100 S.W.3d 361 (Tex.App.-San Antonio 2002, no pet.); *City of Houston v. Plantation Land Co.,* 440 S.W.2d 691, 694–95 (Tex.Civ.App.-Houston [14th Dist.] 1969, writ ref'd n.r.e.); *City of Dallas v. Crawford,* 222 S.W. 305, 307 (Tex.Civ.App.-Amarillo 1920, writ dism'd); *Rabb v. La Feria Mut. Canal Co.,* 62 Tex.Civ.App. 24, 130 S.W. 916, 918 (1910, writ ref'd).

FN37. *See, e.g., Jones v. City of Mineola,* 203 S.W.2d 1020, 1023 (Tex.Civ.App.-Texarkana 1947, writ ref'd); *Brown v. Lower Colo. River Auth.,* 485 S.W.2d 369, 371 (Tex.Civ.App.-Austin 1972, no writ); *City of Austin v. Hall,* 446 S.W.2d 330, 336 (Tex.Civ.App.-Austin 1969), *rev'd on other grounds,* 450 S.W.2d 836 (Tex.1970); *Lohmann v. Natural Gas Pipeline Co. of Am.,* 434 S.W.2d 879, 882 (Tex.Civ.App.-Beaumont 1968, writ ref'd n.r.e.); *Aronoff v. City of Dallas,* 316 S.W.2d 302, 306 (Tex.Civ.App.-Texarkana 1958, writ ref'd n.r.e.).

**\*180** None of the landowners in the cases before us today participated in the hearings held by the special commissioners. They first raised their respective contentions that there were no good faith negotiations in the trial court, after the commissioners' awards were issued.

### III

[1] Section 21.012(a) states that a condemning entity "may begin a condemnation proceeding" if it is "unable to agree with the owner of the property on the amount of damages." FN38 Section 21.012(b) also states that a petition commencing a condemnation proceeding "must":

FN38. TEX. PROP.CODE § 21.012(a).

(1) describe the property to be condemned;

(2) state the purpose for which the entity intends to use the property;

(3) state the name of the owner of the property if the owner is known; and

(4) state that the entity and the property owner are unable to agree on the damages. FN39

FN39. *Id.* § 21.012(b).

We note at the outset that the condemnation petitions in these cases all include affirmative statements that there has been compliance with these requirements, including the "unable to agree" requirement. The landowners contend, however, that beyond merely "stat[ing]" that the parties were unable to agree, the condemnors were required to plead and prove that the parties were unable to agree after having engaged in "good faith" negotiations. The landowners argue—and the courts of appeals agreed—that failure to both plead and prove compliance with section 21.012's requirements deprives the trial court of jurisdiction over the condemnation proceedings. The condemnors respond that the "unable to agree" requirement is not jurisdictional. For the reasons considered below, we conclude that this statutory requirement is mandatory, but failure to satisfy it does not deprive courts of subject matter jurisdiction.

There is no language in section 21.012 indicating that the "unable to agree" requirement is jurisdictional. Nor did section 21.012's statutory predecessors indicate by the language used that the "unable to agree" requirement was jurisdictional. FN40 Nevertheless, in 1943, *Brinton v. Houston Lighting & Power Co.* held that the "provisions for the condemnation of private property for public use are special and summary in character, hence must be strictly complied with by the condemning authority, any ignoring thereof rendering the proceedings wholly void." FN41 That decision concluded that the "statute seems to be explicit in its requirement that there

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

must have been in advance of condemnation proceedings at least a bona fide effort on the part of the condemnor to agree with its adversary, the land owner, in advance 'upon the value of the land or the damages.' " FN42 Five years later, the court of appeals in *City of Houston v. Derby* said in dicta that for the condemnor "to vest the county court with *jurisdiction* to condemn appellees' land, it had to first allege, and **\*181** then during the proceedings prove, that it had failed to agree with the appellees on the value of their land to be taken." FN43 This Court refused the application for writ of error in *Derby,* giving that opinion the same force and effect as an opinion of this Court. A number of other courts of appeals have similarly held or said in dicta that the "unable [or failure] to agree" provision is jurisdictional or that failure to comply renders the condemnation proceeding void. FN44

> FN40. *See* Act of Aug. 28, 1961, 57th Leg., R.S., ch. 105, § 1, 1961 Tex. Gen. Laws 203, 203; Act of Mar. 7, 1934, 43d Leg., 2d C.S., ch. 37, § 1, 1934 Tex. Gen. Laws 89, 89; Act. of Apr. 22, 1905, 29th Leg., ch. 73, §§ 2–13, 1905 Tex. Gen. Laws 101, 101–02; Act of Apr. 28, 1903, 28th Leg., 1st C.S., ch. V, §§ 2–3, 1903 Tex. Gen. Laws 10, 10–11; Act of Mar. 26, 1885, ch. 56, 1885 Tex. Gen. Laws 54, 54; TEX.REV.CIV. STAT. arts. 4182–92, p. 603 (1879); Paschals Ann. Digest, 5th ed., art. 4922 (Laws of Tex. Vol. 1, p. 822).

> FN41. 175 S.W.2d 707, 709 (Tex.Civ.App.-Galveston 1943, writ ref'd w.o.m.).

> FN42. *Id.* at 710.

> FN43. 215 S.W.2d 690, 692 (Tex.Civ.App.-Galveston 1948, writ ref'd) (emphasis added).

> FN44. *ExxonMobil Pipeline Co. v. Harrison Interests, Ltd.,* 93 S.W.3d 188, 192 (Tex.App.-Houston [14th Dist.] 2002, pet. filed); *McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.,* 83 S.W.3d 205, 208

(Tex.App.-Dallas 2002, no pet.); *Mercier v. MidTexas Pipeline Co.,* 28 S.W.3d 712, 720 (Tex.App.-Corpus Christi 2000, pet. denied); *Marburger v. Seminole Pipeline Co.,* 957 S.W.2d 82, 89 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Precast Structures, Inc. v. City of Houston,* 942 S.W.2d 632, 636 (Tex.App.-Houston [14th Dist.] 1996, no writ); *State v. Schmidt,* 894 S.W.2d 543, 545 n. 1 (Tex.App.-Austin 1995, no writ); *Tex.–N.M. Power Co. v. Hogan,* 824 S.W.2d 252, 254 (Tex.App.-Waco 1992, writ denied); *Schlottman v. Wharton County,* 259 S.W.2d 325, 330 (Tex.Civ.App.-Fort Worth 1953, writ dism'd); *Gill v. Falls County,* 243 S.W.2d 277, 280 (Tex.Civ.App.-Waco 1951, no writ); *Doughty v. Defee,* 152 S.W.2d 404, 410 (Tex.Civ.App.-Amarillo 1941, writ ref'd w.o.m.); *Cook v. Ochiltree County,* 64 S.W.2d 1018, 1020 (Tex.Civ.App.-Amarillo 1933, no writ); *Watt v. Studer,* 22 S.W.2d 709, 711 (Tex.Civ.App.-Amarillo 1929, no writ); *Clements v. Fort Worth & D.S.P. Ry. Co.,* 7 S.W.2d 895, 897 (Tex.Civ.App.-Amarillo 1928, no writ); *Porter v. City of Abilene,* 16 S.W. 107, 107 (Tex.Ct.App.1890, no writ); *see also Jenkins v. Jefferson County,* 507 S.W.2d 296, 298 (Tex.Civ.App.-Beaumont 1974, writ ref'd n.r.e.) (stating that courts have "no authority to enter a decree of condemnation" unless the condemnor has made a "bona fide attempt" to agree with the landowner); *Isaac v. City of Houston,* 60 S.W.2d 543, 545 (Tex.Civ.App.-Galveston 1933, writ dism'd) (holding that court was "without authority" to render a judgment in a condemnation proceeding when there was no proof that parties were unable to agree on damages).

[2] Other decisions of this Court, however, are inconsistent with the proposition that compliance with the "unable to agree" provision is necessary to bestow subject matter jurisdiction. Subject matter jurisdiction cannot be waived. FN45 But we have indicated that a landowner can waive any right to complain that there

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

was no effort to agree. We have said that if the owner has accepted the commissioners' award and withdrawn the money from the registry of the court, the court has jurisdiction to adjudicate either the landowner's or the State's contest of the commissioners' award,[FN46] even though there was no proof of an effort to agree with the owner.[FN47] Another decision, in which we refused the application for writ of error, said that if "the owner of the land sought to be condemned makes his appearance before the special commissioners and resists the condemnation proceedings upon the merits, he thereby waives whatever lack of efforts to reach a settlement there might have been."[FN48] Several other courts of appeals **\*182** have likewise said that a landowner can waive the right to complain about the existence or adequacy of an effort to agree by appearing before the commissioners and resisting condemnation or contesting the amount of damages,[FN49] or by withdrawing the Commission's award from the court's registry.[FN50] In those cases, the only issue to be tried was the owner's complaint that the damages were inadequate.[FN51] At least two decisions have also held that any complaint about efforts to agree is a matter that must be plead by the owner or it is waived,[FN52] even if the evidence establishes as a matter of law that there was no effort to agree.[FN53]

> FN45. *Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 76 (Tex.2000); *Fed. Underwriters Exch. v. Pugh,* 141 Tex. 539, 174 S.W.2d 598, 600 (1943).

> FN46. *Amason v. Natural Gas Pipeline Co.,* 682 S.W.2d 240, 242 (Tex.1984); *State v. Jackson,* 388 S.W.2d 924, 925 (Tex.1965); *see also Coastal Indus. Water Auth. v. Celanese Corp. of Am.,* 592 S.W.2d 597, 599 (Tex.1979) (landowner who withdrew the special commissioners' award from the court's registry waived its challenge to the condemnor's right to take the subject property but could continue to litigate the issue of compensation).

> FN47. *Jackson,* 388 S.W.2d at 925.

> FN48. *Jones v. City of Mineola,* 203 S.W.2d

1020, 1023 (Tex.Civ.App.-Texarkana 1947, writ ref'd).

> FN49. *Brown v. Lower Colo. River Auth.,* 485 S.W.2d 369, 371 (Tex.Civ.App.-Austin 1972, no writ); *City of Austin v. Hall,* 446 S.W.2d 330, 336 (Tex.Civ.App.-Austin 1969), *rev'd on other grounds,* 450 S.W.2d 836 (Tex.1970); *Lohmann v. Natural Gas Pipeline Co. of Am.,* 434 S.W.2d 879, 882 (Tex.Civ.App.-Beaumont 1968, writ ref'd n.r.e.); *Aronoff v. City of Dallas,* 316 S.W.2d 302, 306 (Tex.Civ.App.-Texarkana 1958, writ ref'd n.r.e.).

> FN50. *McConnico v. Tex. Power & Light Co.,* 335 S.W.2d 397, 400 (Tex.Civ.App.-Beaumont 1960, writ ref'd n.r.e.).

> FN51. *See supra* notes 49–50; *see also Coastal Indus. Water Auth.,* 592 S.W.2d at 599.

> FN52. *Jenkins v. Jefferson County,* 507 S.W.2d 296, 298 (Tex.Civ.App.-Beaumont 1974, writ ref'd n.r.e.); *Dyer v. State,* 388 S.W.2d 226, 230 (Tex.Civ.App.-El Paso 1965, no writ).

> FN53. *Dyer,* 388 S.W.2d at 230. *But see County of Nueces v. Rankin,* 303 S.W.2d 455, 457 (Tex.Civ.App.-Eastland 1957, no writ) (holding that it was incumbent on the condemnor to plead that the owner waived lack of efforts to agree).

The inconsistency between decisions saying that the "unable to agree" provision implicates subject matter jurisdiction and those saying failure to comply can be waived may have led this Court to note in *State v. Dowd,*[FN54] forty-five years after the decision in *Derby,*[FN55] that "[w]e express no opinion on whether the trial court would have lacked jurisdiction of the action had the State failed to negotiate in good faith."[FN56] In *Dowd,* the court of appeals had concluded that, absent pleading and proof that the parties were "unable to agree," the trial court lacked jurisdiction, and that a fact question existed that should be resolved by the trial

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

judge.[FN57] The trial court had dismissed the proceedings. This Court held that there was no fact question and that the trial court should not have dismissed the proceedings.[FN58]

> FN54. 867 S.W.2d 781 (Tex.1993).
>
> FN55. 215 S.W.2d 690, 692 (Tex.Civ.App.-Galveston 1948, writ ref'd).
>
> FN56. 867 S.W.2d at 783 n. 1.
>
> FN57. *State v. Hipp,* 832 S.W.2d 71, 75 (Tex.App.-Austin 1992), *rev'd in part sub. nom., State v. Dowd,* 867 S.W.2d 781 (Tex.1993).
>
> FN58. *Dowd,* 867 S.W.2d at 783.

If the "unable to agree" requirement were necessary to confer subject matter jurisdiction, then judgments in condemnation proceedings would be subject to collateral attack.[FN59] In construing other mandatory statutory provisions, we have observed that " 'the modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction.' "[FN60] We thus held in *Dubai Petroleum Co. v. Kazi* that section 71.031(a) of the Texas Civil Practice and Remedies Code, which permits foreign plaintiffs to sue in Texas courts for personal**\*183** injuries or wrongful death occurring in a foreign state or country if the decedent or injured party's country of citizenship has "equal treaty rights" with the United States,[FN61] was not jurisdictional, but was a requirement that should be met before a trial court proceeds.[FN62]

> FN59. *See Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 76 (Tex.2000); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 12 cmt. b (1982).
>
> FN60. *Dubai,* 12 S.W.3d at 76 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 11 cmt. e (1982)).
>
> FN61. *Id.* at 73–74 (citing TEX. CIV. PRAC.

> & REM.CODE § 71.031(a)).
>
> FN62. *Id.* at 76–77.

In so holding, we acknowledged that some of the Court's earlier opinions, including *Mingus v. Wadley,*[FN63] differentiated between common-law claims and statutory claims when considering whether a trial court had jurisdiction over a particular matter:

> FN63. 115 Tex. 551, 285 S.W. 1084 (1926), *overruled by Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71 (Tex.2000).

"The general rule is where the cause of action and remedy for its enforcement are derived not from the common law but from the statute, the statutory provisions are mandatory and exclusive, and must be complied with in all respects or the action is not maintainable." ... " '[T]here is no presumption of jurisdiction where a court, although it is one of general jurisdiction, exercises special statutory powers in a special statutory manner or otherwise than according to the courts of the common law, since under such circumstances the court stands with reference to the special power exercised on the same footing with courts of limited and inferior jurisdiction.' "[FN64]

> FN64. *Kazi,* 12 S.W.3d at 75–76 (quoting *Mingus,* 285 S.W. at 1087, 1089 (Tex.1926) (quoting 15 CORPUS JURIS *Courts,* § 148(c), at 831–32)).

We determined, however, that this dichotomy between common-law and statutory actions was antiquated and problematic, stating: "When, as here, it is difficult to tell whether or not the parties have satisfied the requisites of a particular statute, it seems perverse to treat a judgment as perpetually void merely because the court or the parties made a good-faith mistake in interpreting the law."[FN65] We overruled *Mingus* "to the extent that it characterized the plaintiff's failure to establish a statutory prerequisite as jurisdictional."[FN66]

> FN65. *Id.* at 76.
>
> FN66. *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

We see no substantive distinction between the nature of the statutory requirement at issue in *Dubai* and section 21.012's "unable to agree" requirement. As at least one other court has recognized, in construing a statutory requirement that a condemning authority make reasonable, good faith efforts to negotiate as a prerequisite to commencing condemnation proceedings, " 'jurisdiction' has proven to be a 'word of elastic, diverse, and disparate meanings.' " [FN67] That court likewise concluded that a requirement for negotiations "is not a restriction on the court's subject matter jurisdiction." [FN68] Thus, although section 21.012's requirements are mandatory, the trial courts in these consolidated cases had jurisdiction over the condemnation proceedings regardless of whether the condemnors satisfied the requirement that the parties "are unable to agree on the damages." We therefore disapprove of those court of appeals decisions that have held or suggested that these statutory requirements are jurisdictional. [FN69]

> FN67. *Minto v. Lambert,* 870 P.2d 572, 575 (Colo.Ct.App.1994, cert.denied).
>
> FN68. *Id.* at 576.
>
> FN69. *See* cases cited *supra* note 44.

**\*184** [3] Having determined that section 21.012's requirements are not jurisdictional, we must determine the appropriate remedy when a condemnor fails to meet those requirements and a landowner has timely objected. Because the statute is silent as to the consequences for noncompliance, we look to the statute's purpose in determining the proper remedy. [FN70] The purpose of section 21.012's "unable to agree" requirement is to " 'forestall litigation and to prevent needless appeals to the courts when the matter may have been settled by negotiations between the parties.' " [FN71] In considering the remedy for noncompliance with the requirements of statutes with similar purposes, we have repeatedly held that dismissal is not necessary to achieve such a purpose. [FN72] Rather, the statute's goal—avoidance of protracted litigation—can be accomplished by requiring an abatement of the proceeding until the requirement that the parties "are unable to agree" has been satisfied. [FN73] While the condemnation proceedings are abated,

the parties can engage in negotiations for the land to be condemned, just as they would have done before the proceedings were initiated. We therefore conclude that if a landowner objects in a pleading that there has been no offer, and a trial court finds that the requirement that the parties are "unable to agree on the damages" [FN74] has not been met, the trial court should abate the proceedings for a reasonable period of time to allow the condemnor to satisfy the "unable to agree" requirement. If at the end of a reasonable period of time, the condemnor has not made an offer, the condemnation proceeding should be dismissed.

> FN70. *Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999) (citing *Hines v. Hash,* 843 S.W.2d 464, 467 (Tex.1992), and *Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 938 (Tex.1983)).
>
> FN71. *County of Nueces v. Rankin,* 303 S.W.2d 455, 457 (Tex.Civ.App.-Eastland 1957, no writ) (citing *Fort Worth Indep. Sch. Dist. v. Hodge,* 96 S.W.2d 1113 (Tex.Civ.App.-Fort Worth 1936, no writ)); *see also Schlottman v. Wharton County,* 259 S.W.2d 325, 330 (Tex.Civ.App.-Fort Worth 1953, writ dism'd) (purpose of requirement is to save time and expense when agreement is possible); *Clements v. Fort Worth & D.S.P. Ry. Co.,* 7 S.W.2d 895, 897 (Tex.Civ.App.-Amarillo 1928, no writ).
>
> FN72. *See, e.g., Hines,* 843 S.W.2d at 468–69 (purpose of Deceptive Trade Practices Act's notice requirement is "to discourage litigation and encourage settlements of consumer complaints"); *Schepps,* 652 S.W.2d at 938 (purpose of the Medical Liability and Insurance Improvement Act's pre-suit notice requirement is "to encourage pre-suit negotiations so as to avoid excessive cost of litigation").
>
> FN73. *Sinclair,* 984 S.W.2d at 961–62 (holding that failure to comply with statutory requirement that a petition for judicial review of a workers' compensation decision be filed simultaneously with the court and the Workers'

Page 13

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

Compensation Commission warrants abatement, not dismissal, of the action); *Hines, 843 S.W.2d at 469* (holding that abatement is the appropriate remedy for plaintiff's failure to comply with the Deceptive Trade Practices Act's pre-suit notice provision); *State v. $435,000.00,* 842 S.W.2d 642, 645 (Tex.1992) (holding that compliance with the statutory requirement that a hearing be conducted within 30 days of the filing of an answer in a forfeiture action was mandatory, but noncompliance did not necessitate dismissal of the action); *Schepps,* 652 S.W.2d at 938 (holding that abatement is the appropriate remedy for a plaintiff's failure to comply with the Medical Liability and Insurance Improvement Act's pre-suit notice requirement).

> FN74. TEX. PROP.CODE § 21.012.

## IV

[4] The procedural vehicle chosen by the condemnors to determine whether they were "unable to agree" with the landowners in the cases before us was a motion for partial summary judgment. Trial courts **\*185** can, however, resolve "unable to agree" issues through other procedural vehicles, as they resolve many threshold pretrial matters, including ruling on a plea in abatement. FN75 Because the issue was raised in the present cases in motions for partial summary judgment asserting that the condemnors established as a matter of law that they were "unable to agree" with the landowners, we must determine whether there are any questions of fact.

> FN75. *See, e.g., Anderson v. Clajon Gas Co.,* 677 S.W.2d 702, 706 (Tex.App.-Houston [1st Dist.] 1984, no writ).

The landowners contend that there is a fact question in each case about whether the condemnors made a "good faith" effort to agree on the damages. Some cases have used the terms "good faith" negotiation FN76 and "bona fide" effort FN77 in conjunction with the "unable to agree" requirement. However, with some exceptions, FN78 the case law has required minimal evidence to satisfy the "unable to agree" requirement. For example,

in *Schlottman v. Wharton County,* the court held that an offer by the condemnor that is rejected or ignored is enough:

> FN76. *See, e.g., Lapsley v. State,* 405 S.W.2d 406, 411 (Tex.Civ.App.-Texarkana 1966, writ ref'd n.r.e.).

> FN77. *See, e.g., Mercier v. MidTexas Pipeline Co.,* 28 S.W.3d 712, 720 (Tex.App.-Corpus Christi 2000, pet. denied); *State v. Hipp,* 832 S.W.2d 71, 78 (Tex.App.-Austin 1992), *rev'd on other grounds sub. nom., State v. Dowd,* 867 S.W.2d 781 (Tex.1993); *Jenkins v. Jefferson County,* 507 S.W.2d 296, 298 (Tex.Civ.App.-Beaumont 1974, writ ref'd n.r.e.); *Curfman v. State,* 240 S.W.2d 482, 484 (Tex.Civ.App.-Dallas 1951, writ ref'd n.r.e.).

> FN78. In dicta, the court in *Lapsley v. State* said: "This statute contemplates good faith negotiation. Such negotiation would require an effort by the condemnor to investigate all aspects of value and prepare work sheets and recapitulation sheets when necessary or convenient in furtherance of the statutory settlement objective." 405 S.W.2d at 411; *see also Precast Structures, Inc. v. City of Houston,* 942 S.W.2d 632, 635–36 (Tex.App.-Houston [14th Dist.] 1996, no writ) (examining validity of condemnor's legal theory regarding damages and evidence consistent with that theory in determining if a "bona fide" offer was made by the condemnor); *Hipp,* 832 S.W.2d at 78–79 (same).

[A]ll that is required to comply with the statute is the making of an offer by a county, and ... nothing affirmative is required to be done by the landowner. In other words, in a case where the landowner "stands mute" and neither accepts nor rejects the offer so made to him by or in behalf of a county, the law will construe his silence [as] a rejection of the offer, and that such a showing constitutes "a failure to agree" on the part of the parties. FN79

> FN79. 259 S.W.2d 325, 330

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

(Tex.Civ.App.-Fort Worth 1953, writ dism'd); *see also Pete–Rae Dev. Co. v. State,* 353 S.W.2d 324, 325 (Tex.Civ.App.-Eastland 1962, writ ref'd n.r.e.); *Curfman,* 240 S.W.2d at 484.

Similarly, the court in *Malone v. City of Madisonville* held:

If the law required that both the landowner and the party desiring to condemn should make an effort to agree on the amount of damages, before such condemnation proceedings could be instituted, then all the landowner would have to do to avoid condemnation would be to refuse to make any effort to agree with the party desiring to condemn on the damages. FN80

> FN80. 24 S.W.2d 483, 485 (Tex.Civ.App.-Waco 1929, no writ); *see also W.T. Waggoner Estate v. Townsend,* 24 S.W.2d 83, 86 (Tex.Civ.App.-Amarillo 1929, no writ) (holding that when owner was asked "what he was willing to settle the matter for" and the price was more than the condemnor would pay, this satisfied statutory requirement).

**\*186** In *McKinney Independent School District v. Carlisle Grace, Ltd.,* the court held that the fact that a condemning authority did not wait for a counteroffer from the landowner is "no evidence to support the trial court's non-finding on the unable-to-agree requirement." FN81 That court also held, "We likewise reject [landowners'] contention that [condemnor's] failure to provide them with the appraisal ... supports a negative finding on the unable-to-agree requirement." FN82 The landowners in the current proceedings argue that there is at least an inference that they were willing to continue to negotiate, even though they either rejected or ignored offers that the condemnors made. But we, like the court in *McKinney,* reject such a contention. FN83

> FN81. 83 S.W.3d 205, 209 (Tex.App.-Dallas 2002, no pet.).

> FN82. *Id.*

> FN83. *Id.* (rejecting argument that because landowners "continued to express an interest in negotiating," the parties were not unable to agree).

We are also persuaded that the dollar amount of the offer generally should not be scrutinized. The decisions that have implicitly or explicitly concluded that the dollar amount of the condemnor's offer should not be compared with other indications of value are consistent with the statutory scheme, which does not contemplate such an examination. FN84 Nor does the statute contemplate a subjective inquiry into "good faith." As discussed earlier, the purpose of the statute is "to forestall litigation and to prevent needless appeals." FN85 An inquiry into the subjective "good faith" of a condemnor's offer would be antithetical to this purpose. First, independent commissioners will have reached a determination of damages before the landowner may even raise the "unable to agree" objection. If the landowner accepts the commissioners' assessment, the matter is at an end. It is only after the landowner has rejected any offer by the condemnor, and after independent commissioners reach a conclusion and it is clear that litigation is going to proceed, that the landowners can raise the "unable to agree" issue. FN86 Second, whether an offer by a condemning authority was made in "good faith" would, in most cases, be determined in large measure by the reasonable market value of the property sought to be condemned or the amount of inverse condemnation damages, or both. The inquiry in the trial court's condemnation proceeding—to determine the reasonable market value of the property sought to be condemned and any inverse condemnation damages—would thus be largely duplicative. The purpose of section 21.012's requirement that the parties be "unable to agree" is not to require a trial on reasonable market value before the condemnation trial may begin. The condemnation trial will determine the property's value and any damage to the remainder. No purpose would be served by delaying that determination to first decide whether the condemning authority's offer was so low and made under such circumstances that it **\*187** could not have been made in "good faith." At the end of the day, the result would be the same if two trials rather than just one were

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

held. The landowner will receive no more and no less than the amount awarded as a result of the condemnation proceedings, even if the condemnor's pre-suit offer was not made in "good faith." It is not necessary to have two trials to reach the ultimate and only determination contemplated by the statute, which is a determination of the value of the property condemned.

> FN84. *See, e.g., City of Houston v. Derby,* 215 S.W.2d 690, 693 (Tex.Civ.App.-Galveston 1948, writ ref'd) ("The only purpose for which the sums offered during negotiations can be looked to is to determine how the costs shall be cast."). *But see Mercier v. MidTexas Pipeline Co.,* 28 S.W.3d 712, 720 (Tex.App.-Corpus Christi 2000, pet. denied) (finding that because condemnor's offer was twice the Appraisal District's appraisal, the offer was "bona-fide").

> FN85. *Hubenak,* 65 S.W.3d at 797 (quoting *County of Nueces v. Rankin,* 303 S.W.2d 455, 457 (Tex.Civ.App.-Eastland 1957, no writ)).

> FN86. *See* cases cited *supra* note 36.

The condemnors have established that they made offers to each of the landowners before filing condemnation proceedings. Those offers were rejected or ignored by the landowners. That is enough to satisfy section 21.012's requirement that the parties were "unable to agree." For the reasons to which we now turn, we find no merit in the landowners' remaining bases for contending that the condemnors have not established as a matter of law the "unable to agree" requirement.

## V

[5] The landowners do not contend that the condemnors' final offers included land or physical property in addition to or different from that described in the condemnation petition. But the landowners have consistently pointed to the fact that the condemnors' final offers all included three matters that were not explicitly included in the condemnation petitions and have argued that the condemnors could not legally acquire them by condemnation. Thus, the landowners contend, the condemnors never made offers for what they actually

sought to condemn or could legally condemn, and therefore, have not met section 21.012's "unable to agree" requirement. The three matters at issue are the right to transport oil and other products, the right to assign the easements, and a warranty of title to the easement.

We have found only one Texas decision that bears directly on the question raised by the landowners, and that case was decided after, and relies on, some of the court of appeals decisions under review here.[FN87] However, decisions from other jurisdictions are instructive. The Illinois Supreme Court held that a condemnor had shown "a good faith attempt to negotiate" in spite of the fact that the condemnor had sought greater rights through negotiations than it condemned.[FN88] That court said:

> FN87. *ExxonMobil Pipeline Co. v. Harrison Interests, Ltd.,* 93 S.W.3d 188, 196–97 (Tex.App.-Houston [14th Dist.] 2002, pet. filed).

> FN88. *Peoples Gas Light & Coke Co. v. Buckles,* 24 Ill.2d 520, 182 N.E.2d 169, 174 (1962).

It is true that the instrument which the plaintiff first sought the defendants to execute was broader than the ultimate right condemned, in that it involved possible damage to, and entry upon the surface of defendants' land. Nevertheless, on this record, we think plaintiff has shown a good faith attempt to negotiate. The wide spread between the offering price of the plaintiff and the demand of the defendants, based on their differing theories of value for the storage rights, shows that no practical solution could have been reached through further negotiation.[FN89]

> FN89. *Id.*

The Oregon Supreme Court held that an "unable to agree" requirement was met even though the condemnor offered to pay for easements that only permitted the owner to cross and recross the road, but in the condemnation proceedings, the owner was permitted to use the road through a **\*188** reservation.[FN90] The Oregon

Page 16

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

court concluded that it was evident from the litigation itself that the parties could not agree, and the court also noted that the owner had demanded $70,000 while the condemnor offered $4,000, concluding, "it is hard for us to believe that there is any chance that the parties could reach an agreement outside of court."[FN91]

> FN90. *Moore Mill & Lumber Co. v. Foster,* 216 Or. 204, 336 P.2d 39, 60 (1959).
>
> FN91. *Id.*

The New Jersey Supreme Court held that a challenge to the "bona fides of the offer to purchase" had no merit even though the pre-condemnation offer was to purchase a fee simple interest and the law did not allow a fee simple estate to be acquired by condemnation.[FN92]

> FN92. *Camden Forge Co. v. County Park Commn. of Camden County,* 14 N.J. Misc. 626, 186 A. 519, 520–21 (1936).

An Indiana court has held that statutory requirements were met even though the condemnor's offer would have required an express merger of a former easement, with all rights under it to be governed by the new easement.[FN93] The landowners argued that the condemnor was attempting to "winkle [sic] ... away" the landowners' rights in "old litigation."[FN94] The court said that the "obvious purpose of the language [in the pre-condemnation offer] was to clear up title problems growing out of the previous easements," which could be accepted or rejected by the landowners, and that this additional matter did not render the offer "inadequate."[FN95]

> FN93. *Oxendine v. Pub. Serv. Co. of Ind.,* 423 N.E.2d 612, 621–22 (Ind.Ct.App.1980).
>
> FN94. *Id.* at 622.
>
> FN95. *Id.*

That same Indiana court held that a condemnor had met statutory requirements even though the condemnation complaint was specific that there would be four towers, while the pre-litigation offer was not specific as to the number of towers and required certain rights of ingress and egress and removal of endangering obstructions, none of which were part of the condemnation proceedings.[FN96]

> FN96. *Blaize v. Pub. Serv. Co. of Ind.,* 158 Ind.App. 204, 301 N.E.2d 863, 865–66 (1973).

The concurring opinion in the instant case cites another Indiana case, *Dzur v. Northern Indiana Public Service Co.,*[FN97] and another New Jersey Supreme Court case, *Central R. Co. of New Jersey v. The Hudson Terminal Railway Co.,*[FN98] for the proposition that a pre-condemnation offer must mirror the rights described in the condemnation petition before it can be said that the parties were unable to agree on the damages for the property to be condemned.[FN99] Those cases, however, are distinguishable because the condemnors sought to purchase more land than they were legally entitled to condemn. In *Dzur,* the condemnor offered to purchase a 200–foot–wide utility easement and later sought to condemn the same property. The Indiana Supreme Court determined that the condemnor was only entitled to a 150–foot–wide easement and held that the condemnation proceedings could not recommence until the condemnor made a separate offer for a 150–foot–wide easement.[FN100] In *Hudson Terminal,* the New Jersey court determined that a statute only authorized a railroad to condemn land **\*189** up to 100 feet in width, but the condemnor had sought to condemn much more land. The court said that the condemnation proceedings could not commence until the condemnor made an offer for only a 100–foot strip of land.[FN101] Unlike *Dzur* and *Hudson Terminal,* the tracts of land subject to condemnation in the cases before us today are the same tracts of land identified in the condemnors' final offers to the landowners.

> FN97. 257 Ind. 674, 278 N.E.2d 563 (1972).
>
> FN98. 46 N.J.L. 289 (1884).
>
> FN99. 141 S.W.3d at 194 (JEFFERSON, J., concurring).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

FN100. 278 N.E.2d at 566.

FN101. 46 N.J.L. at 294.

In the consolidated cases before us, the condemnors offered summary judgment evidence of their contacts with and offers to the landowners, counter-offers by the landowners in some cases, and the fact that none of the landowners accepted any offer.[FN102] None of the three matters in the proposed right-of way agreements that are at issue in this appeal were at issue when the pre-condemnation negotiations took place. The condemnors thus met their burden of submitting evidence that the parties were unable to agree. The landowners did not respond with any contention or evidence of the value of the three matters about which they now complain or evidence that the owners would have accepted the offers if those matters had been omitted from the offers. This lack of controverting evidence was noted by the courts of appeals in *Cusack Ranch*[FN103] and the consolidated *Hubenak* cases ( *Hubenak 1, Hubenak 2, Wenzel,* and *Kutach* ).[FN104]

FN102. In the interest of brevity, the offers in each case are summarized:

*Hubenak 1* (02–0213): Condemnor's highest combined offer was $6,089.80. The landowners indicated they *might* sell for significantly more.

*Hubenak 2* (02–0214): Condemnor's highest combined offer was $24,602.65. The landowners indicated they *might* sell for significantly more.

*Wenzel* (02–0215): Condemnor's highest offer was $14,620.38. The landowners refused to sell regardless of any offer.

*Kutach* (02–0216): The landowner said it would sell for $500.00 per foot. The condemnor countered with $6,360.00 and then offered to re-route the pipeline and pay $4,632.00.

*Cusack Ranch* (02–0217): Condemnor offered the landowner $17,655.00, but the landowner objected to the amount offered and demanded a re-routing of the pipeline. Condemnor would not agree to re-route, but increased its offer to $25,000.00, which the landowner did not accept.

*Dernehl* (02–0320): Condemnor offered $11,333.00, landowners countered with $120,000.00, and condemnor countered with $13,331.00.

*Wright 1* (02–0321): Condemnor offered $16,228.80 and $17,000.00. The landowners refused to sell despite the offers.

*Wright 2* (02–0326): Condemnor's highest offer in this case was $18,000.00. The landowners refused to sell despite the offer.

*Cusack* (02–0359): Condemnor's highest offer was $13,941.00. The landowners countered that they wanted approximately $35,000.00 and the line buried 48 inches deep.

FN103. 71 S.W.3d at 400.

FN104. 65 S.W.3d at 799, 801.

The concurrence suggests that our holding today would allow a condemnor to offer to buy 500 acres and then condemn " 'only a small strip in the corner of the property.' "[FN105] We disagree. It is the law in this state that the offer must be for the same tract of land described in the condemnation petition.[FN106] In the cases before us **\*190** today, the parcels of land sought in the pre-condemnation negotiations were the same parcels that were the subject of the subsequent condemnation proceedings. The only difference between the offers and the condemnation petitions was that the three matters identified in the proposed right-of-way agreements were not expressly included in the latter. There is, however, no indication that these three matters were material to the negotiations or played any part in the parties' inability to agree "on the amount of damages."[FN107]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

FN105. 141 S.W.3d at 195 (JEFFERSON, J., concurring) (quoting *Dernehl,* 71 S.W.3d at 861).

FN106. *See, e.g., Brinton v. Houston Lighting & Power Co.,* 175 S.W.2d 707, 709–10 (Tex.Civ.App.-Galveston 1943, writ ref'd w.o.m.) (holding that an offer to purchase an easement that did not mention any width but merely was for sixty cents per rod did not establish the inability to agree on damages for an eighty-foot wide easement); *see also Blaize v. Pub. Serv. Co. of Ind.,* 158 Ind.App. 204, 301 N.E.2d 863, 865 (1973) (indicating that before instituting condemnation proceedings, there must be negotiations for the property to be condemned, which requires a "meeting of the minds" as to the physical property "and not necessarily upon any of the more incorporeal rights").

FN107. TEX. PROP.CODE § 21.012(a).

The condemnors' proposed right-of-way agreements would have given the condemnors the right to transport "gas, oil, petroleum, products, or any other liquids, gases or substances which can be transported through a pipeline." The condemnors sought to condemn only a natural gas pipeline. We note, however, that a common carrier who owns, operates, or manages a pipeline for the transportation of crude oil has the right of eminent domain,[FN108] and the transportation of natural gas as opposed to oil was not at issue in the negotiations. The concurrence implies that the condemnors could have utilized the pipeline to transport radioactive material even though the landowner might not have consented to a pipeline carrying such a substance.[FN109] The concurrence provides no authority that would support such a broad construction of the right to transport "gas, oil, petroleum, products, or any other liquids, gases or substances which can be transported through a pipeline." Indeed, the authority and general principles of contract interpretation applicable to the construction of private easements suggest the contrary.[FN110]

FN108. TEX. NAT. RES.CODE §§ 111.002(1)

, (2), (3), .019(a).

FN109. 141 S.W.3d at 195 (JEFFERSON, J., concurring).

FN110. *See Marcus Cable Assocs., L.P. v. Krohn,* 90 S.W.3d 697, 701–02, 706 (Tex.2002) (outlining the basic principles for construing and interpreting a private easement and holding that an easement permitting its holder to use private property to construct and maintain "an electric transmission or distribution line or system" did not allow the easement to be used for cable-television lines); *Right of Way Oil Co. v. Gladys City Oil, Gas & Mfg. Co.,* 106 Tex. 94, 157 S.W. 737, 739–40 (1913) (applying the *ejusdem generis* rule of construction to conclude that the phrase "all the timber, earth, stone and mineral existing or that may be found within the right of way" in a private deed did not include oil where the purpose of the grant was "constructing, operating and maintaining" a railroad and the general words "and mineral" were preceded by the more specific terms "timber, earth, stone"); *cf. Hilco Elec. Coop. v. Midlothian Butane Gas Co., Inc.,* 111 S.W.3d 75, 81 (Tex.2003) (observing that the rule of "ejusdem generis" "provides that when words of a general nature are used in connection with the designation of particular objects or classes of persons or things, the meaning of the general words will be restricted to the particular designation").

The concurrence would nevertheless hold that a condemnor cannot establish that it was "unable to agree" with the landowner on damages unless the physical property and intangible property rights the condemnor sought to purchase mirror the exact physical property and intangible property rights explicitly included in a subsequent condemnation proceeding. The concurrence says "[t]his requirement is neither burdensome nor complex."[FN111] We disagree.

FN111. 141 S.W.3d at 196 (JEFFERSON, J., concurring).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 19

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

**\*191** [6] While it is a simple matter to describe with precision the physical property that would be subject to the condemnation proceeding, inclusion of intangible property rights in a condemnation petition does not easily lend itself to the "bright-line rule" proposed by the concurrence. The intangible rights a condemnor could obtain by an agreement with the landowner may not always parallel the rights the condemnor would obtain by virtue of a judgment (and vice versa) because a contract and a judgment are different animals. For example, although one might not be able to obtain a landowner's obligation to warranty and defend title by condemnation (which we do not decide), a final judgment is in and of itself a degree of warranty,[FN112] and a condemnor could not precisely capture that type of warranty in a private agreement. With regard to assignments of easements, an easement for a pipeline obtained by a common carrier in an eminent domain proceeding could, at a minimum, be transferred, sold, or conveyed to another common carrier to operate a pipeline as a common carrier without an explicit request for such a right in the condemnation petition.[FN113] Thus, to require exact symmetry between the purchase offer and the property rights to be condemned could create an impediment to the condemnation process that is not contemplated by the purpose of the "unable to agree" requirement. Generally, it is sufficient that the parties negotiated for the same physical property and same general use that became the subject of the later eminent domain proceeding, even if the more intangible rights sought in the purchase negotiations did not exactly mirror those sought or obtainable by condemnation.

> FN112. *See* TEX. PROP.CODE § 21.065 ("A judgment of a court under this chapter vests a right granted to a condemnor.").

> FN113. *See* TEX. NAT. RES.CODE § 111.0194(a) (describing presumption applicable to certain grants or condemnation judgments pertaining to easements held by a "common carrier pipeline, or a successor in interest to the common carrier pipeline"); TEX. PROP.CODE § 12.014 (governing transfer of a judgment or cause of action); *see also Valero*

*Eastex Pipeline Co. v. Jarvis,* 990 S.W.2d 852, 855 (Tex.App.-Tyler 1999, pet. denied) (stating that "pipeline easements are assignable in Texas" and holding that condemnor could assign its interest in a condemnation proceeding or judgment pursuant to TEX. PROP.CODE § 12.014).

## VI

For the foregoing reasons, we conclude that section 21.012's requirements are not jurisdictional. But, if a condemning entity files a condemnation petition without meeting section 21.012's requirements, and a landowner opposing condemnation timely requests abatement, the trial court should abate the proceedings for a reasonable time to permit the condemnor to satisfy the statutory requirements. We conclude, however, that the condemnors in the cases before us today complied with section 21.012's requirement that the parties be "unable to agree on damages." Accordingly, we (1) affirm the judgments of the courts of appeals in *Hubenak 1, Hubenak 2, Wenzel, Kutach,* and *Cusack Ranch;* (2) affirm the court of appeals' judgment in *Cusack* and remand that case to the trial court for further proceedings; and (3) reverse the court of appeals' judgments in *Dernehl, Wright 1,* and *Wright 2* and remand those cases to their respective trial courts for further proceedings.

Justice JEFFERSON filed a concurring opinion.
Justice O'NEILL and Justice SCHNEIDER did not participate in the decision.

**\*192** Justice Jefferson, concurring.

In each of these cases, the landowners have asserted that the condemnors failed to satisfy the unable-to-agree requirement prior to filing suit. I agree with them. I also agree with the Court that the requirement is not jurisdictional and that, when the condemnor has not shown an inability to agree, the case should be abated for a reasonable time until the condemnor makes an offer to purchase the property. Under the unique circumstances of these cases, however, abatement would serve no purpose. Accordingly, I join parts I through III of the Court's opinion and its judgments.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

# I

## The "Unable to Agree" Requirement

The Property Code provides that, before a condemnation suit is filed, the condemnor must be "unable to agree with the owner of the property on the amount of damages," and the condemnor must specifically plead that inability in its petition. TEX. PROP.CODE § 21.012. This requirement was intended "to forestall litigation and to prevent needless appeals to the courts when the matter may have been settled by negotiations between the parties." *County of Nueces v. Rankin,* 303 S.W.2d 455, 457 (Tex.Civ.App.—Eastland 1957, no writ).

In each of the cases we review today, the condemnors' pre-suit offers included a "FINAL OFFER RIGHT OF WAY AGREEMENT" for "a Natural Gas Pipeline." The offers, made "in an effort to avoid further expense or litigation," concluded: "If you elect to reject this offer, [the condemnor] may institute a condemnation suit in [a designated court], *to acquire the rights described in the Right of Way Agreement.*" (Emphasis added.) The landowners were told that, unless they executed the Right of Way Agreements, the condemnors would petition to condemn the rights those agreements described. But the rights described in the Agreements included provisions that, in fact, the condemnors did not seek to condemn. The Right of Way Agreements sought, for example, the right to transport not just natural gas, but "any other liquids, gases or substances which can be transported through a pipeline." They also sought to obligate the landowners "to warrant and defend title to the easement."

In one of the cases before us, *Hubenak v. San Jacinto Gas Transmission Co.,* 65 S.W.3d 791, the court of appeals initially held that San Jacinto failed to satisfy the unable-to-agree requirement before filing a condemnation petition. In an opinion by Justice O'Connor,[FN1] the court wrote:

> FN1. After Justice O'Connor's retirement, the court granted the motion for rehearing and withdrew this opinion, deciding that the condemnors had satisfied the unable-to-agree requirement. 65 S.W.3d at 801.

San Jacinto should have first made an offer only for the rights that were outlined in the board of directors resolution. That offer would have been bona fide. If San Jacinto wanted additional rights, it could have then offered more money for those rights. San Jacinto skipped the first step. It never negotiated for the rights it ultimately sought to condemn. Accordingly, San Jacinto presented no evidence that its offer was in good faith or that negotiations would have been futile. *Hubenak v. San Jacinto Gas Transmission Co.,* Nos. 1–99–691–CV, 1–99–959–CV, 1–99–1359–CV, 1–99–1360–CV, 2000 WL 1056416 (Tex.App.—Houston [14th Dist.] July 27, 2000) (opinion withdrawn Dec. 13, 2001); *see also* **\*193***Cusack Ranch Corp. v. MidTexas Pipeline Co.,* 71 S.W.3d 395, 399 (agreeing that method outlined in initial *Hubenak* decision is the "better approach for the condemnor," although declining to require such an approach).

Similarly, in *MidTexas Pipeline Co. v. Dernehl,* the court of appeals held—correctly, in my opinion—that MidTexas failed to satisfy the unable-to-agree requirement because it did not make an offer encompassing only those rights it could seek to condemn:

> [T]he legislative intent for [the bona fide attempt to agree] requirement was to avoid the necessity of litigation if the parties could reach an agreement on the purchase price of the property to be condemned.... We believe that the Legislature, by making this requirement as a prerequisite to condemnation, intended bona fide negotiations for the property to be condemned, not a negotiation that included other properties or rights beyond the condemnation. At no point does the evidence show in the present case that MidTexas made an offer including only those rights that it was authorized to acquire through a condemnation proceeding. Offers to purchase property that included the property to be condemned but going beyond that in acquiring additional rights or properties is not enough to satisfy a good faith negotiation.

71 S.W.3d at 858. On rehearing, the court added: This opinion does not say and does not imply the condemnor cannot make offers for and purchase property

Page 21

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

and rights which it cannot acquire by condemnation proceedings. However, such an offer should be made separate and apart from the offer made as a prerequisite by law to condemnation. This does not mean the property to be condemned cannot be a part of the separate offer, as long as the owner is given the opportunity to sell at a specific price only that property subject to condemnation.

Furthermore, a threat or pretense of condemnation made by the condemnor on land or for rights not subject to condemnation and made in order to obtain additional property or rights constitutes a wrongful act and an abuse of the right of eminent domain.

*Id.* at 861. The court of appeals adopted this same approach in *Wright I* and *Wright II.* 141 S.W.3d 208, 2002 WL 264833 (No. 02–0321 in this Court); 141 S.W.3d 211, 2002 WL 32626070 (No. 02–0326 in this Court).

The initial *Hubenak* decision, *Dernehl, Wright I,* and *Wright II* comport with earlier caselaw suggesting that condemnors must make offers only for property rights they intend to or are able to condemn. In *City of Houston v. Derby,* the court noted that the condemnor "had to first allege, and then during the proceedings prove, that it had failed to agree with the appellees *on the value of their land to be taken.*" 215 S.W.2d 690, 692 (Tex.Civ.App.-Galveston 1948, writ ref'd) (emphasis added). This Court, by assigning *City of Houston* a "writ refused" notation, adopted the court of civil appeals' judgment and reasoning as its own. *See Texas Utils. Elec. Co. v. Timmons, 947 S.W.2d 191, 199 (Tex.1997).* In *State v. Hipp & Dowd,* the court of appeals noted that "[i]n the context of eminent domain proceedings, the offer must not be arbitrary and capricious; rather, it must be based on a reasonably thorough investigation and honest assessment of the amount of just compensation due the landowner *as a result of the taking.*" 832 S.W.2d 71, 78 (Tex.App.—Austin 1992) (emphasis added), *writ denied as to Hipp and rev'd sub nom. on other grounds as to Dowd, State v. Dowd,* 867 S.W.2d 781, 783 (Tex.1993). In **\*194** *Ryan v. State,* the court required precondemnation negotiations "as to the amount of damages which would be sustained by him *as a result of the condemnation.* " 21 S.W.2d 597, 598 (Tex.Civ.App.—Waco 1929, no writ) (emphasis added).

Other jurisdictions have adopted a similar approach. The Indiana Supreme Court has held that, before a condemnor can assert "inability to agree," it must have made an offer only for the property sought to be condemned. *See Dzur v. N. Ind. Pub. Serv. Co.,* 257 Ind. 674, 278 N.E.2d 563 (Ind.1972) (holding that landowner's rejection of offer to purchase 200 foot easement did not demonstrate inability to agree, because 150 foot easement was the largest that could be condemned). The court held:

"An effort to purchase the property sought to be acquired is a condition precedent to the right to maintain an action to condemn. There can be no compliance with this requirement unless the subject of negotiation is clear to both parties, since a meeting of the minds is essential to the existence of a valid contract. If a [condemnor] makes an offer to acquire a particular property, or a specific part thereof, which offer is rejected by the owner of the utility, and if the [condemnor] then undertakes to condemn other or different property than that which it has offered to purchase, it cannot be said that an effort was made to purchase that which it sought to condemn.

...

It is conceivable that if the offer to purchase had related to the property which is the subject of the condemnation proceeding, the offer might have been accepted, in which event this litigation would not have been necessary."

*Id.* at 566 (quoting *Ind. Serv. Corp. v. Town of Flora,* 218 Ind. 208, 31 N.E.2d 1015, 1017 (Ind.1941)) (citations omitted); *see also* 6 Julius L. Sackman, Nichols on Eminent Domain, § 24.14[1], at 24–234–35 (3d ed. 2004) ("If the condemnor, after making an offer to acquire a particular property or a specific part thereof, undertook to condemn other and different property or a quantum thereof than it offered to purchase, there was no effort to purchase for the land taken to satisfy the negotiation requirement. Similarly, if the condemnor's of-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

fer includes additional properties that it cannot acquire through condemnation proceedings, it has not satisfied the good faith negotiation requirement.").

Likewise, the New Jersey Supreme Court held that a railroad's offer to purchase three parcels of land, when the railroad could legally condemn only a smaller, one-hundred-foot strip of land, was not an offer sufficient to satisfy the requirements for instituting a condemnation proceeding:

> If, then, the petitioner has not power to condemn all the land described in the petition, can these proceedings be maintained for so much as is within the hundred-feet strip? A single consideration shows that the proceedings must stand or fall *in toto.* Before applying to the justice for commissioners, the company must have been unable to agree with the owner for the purchase of the land required. The petition avers that the company could not agree with the owners as to the price of all the lands demanded; but it by no means follows that a bargain could not have been made for the sale of the hundred-feet strip. The owners are entitled to have an opportunity for such a contract presented before their land can be taken by condemnation. Hence the entire proceeding is illegal.

*State v. The Hudson Terminal Ry. Co.,* 46 N.J.L. 289, 294 (N.J.1884); *see also* **\*195**  *Prairie View Tel. Co. v. Cherry County,* 179 Neb. 382, 138 N.W.2d 468, 470 (Neb.1965) (holding that county did not make good faith attempt to agree because the landowners "were never offered a definite proposal as to the exact right-of-way to be acquired, and consequently were never in a position to make an absolute acceptance thereof").

The Court today concludes that the condemnors satisfied the unable-to-agree requirement, pointing to "the fact that none of the landowners accepted any offer." But it is improper to equate rejection of an offer that comprehends rights greater than those sought to be condemned with refusal to sell only those property rights that could be or were sought to be condemned. Indeed, the Court pays little heed to the Legislature's requirement that the parties be unable to agree on the amount of damages, holding that "[t]he condemnors have estab-

lished that they made offers to each of the landowners before filing condemnation proceedings. Those offers were rejected or ignored by the landowners. That is enough to satisfy section 21.012's requirements that the parties were 'unable to agree.' " 141 S.W.3d at 191.

Under the standard adopted by the Court today, a condemnor's offer for *any* property rights—including, as in this case, those it does not seek to condemn—would satisfy the unable-to-agree requirement. Rather than discouraging litigation, the Court's standard may foment it. In these cases, despite the fact that the condemnor was authorized and sought to condemn only a natural gas pipeline, all of the final offers provided that the condemnor would receive the right to transport "oil, petroleum products, or any other liquids, gases or substances which can be transported through a pipeline." It is not difficult to imagine a scenario in which a landowner would have accepted an offer for a natural gas pipeline but would not consent to a pipeline carrying some other substance (say, for example, radioactive material—a practice that is not unheard of). *See, e.g., Tribe Opposes Utah Pipeline for Uranium Tailings Slurry,* Reno Gazette–Journal, Apr. 1, 2002 (detailing the Utes' opposition to construction of a pipeline to carry radioactive uranium tailings).

The Court contends that I "provide[ ] no authority" for "such a broad construction" and suggests preemptively (though the issue is not before us) that the language would in fact be construed more narrowly. But the condemnors' words could hardly be clearer; it is difficult to imagine language broader than "*any other liquids, gases or substances which can be transported through a pipeline.*" (Emphasis added.). Moreover, I disagree that, because a natural gas pipeline was included within the offer for a pipeline to transport any substance, the condemnors have satisfied the statutory requirements. One court of appeals has rejected this "greater includes the lesser theory":

> [I]f this were the law, it would allow the condemnor to make an offer on a 500–acre tract of land that had been in the landowner's family for five generations, that contained the home of the landowner, numerous improvements made by the landowner, and other

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

properties unconnected with the condemnation when the area sought to be condemned involved only a small strip in the corner of the property. The condemnor could then, under that theory, say that the negotiated offer required under the statute had been made. Such an offer would in no way have any connection with the property to be condemned, and certainly the Legislature could not have intended for such an offer, even though the greater included the lesser, to be considered a good faith negotiation in an attempt to purchase the property to be condemned.

**\*196** Eminent domain proceeding [sic] can be simplified by simply following the statute and the legislative intent by making an offer only for the property to be condemned.

> *Dernehl,* 71 S.W.3d at 861.

I agree with the *Dernehl* court. I would hold that, under the statute, the condemnors must make a single pre-suit offer encompassing only those property rights they will seek to acquire through condemnation. This requirement is neither burdensome nor complex. It comports with the statutory mandate that condemnors demonstrate inability-to-agree and with our obligation to construe the statute in favor of the landowner and against the condemnor.[FN2] *Burch v. City of San Antonio,* 518 S.W.2d 540, 545 (Tex.1975). Absent this minimal showing, the condemnors cannot show at the time the condemnation petition is filed that the parties are unable to agree on the amount of damages or that further negotiations would be futile. Moreover, this approach provides a bright-line rule that gives landowners a chance to assess the value of rights the condemnor is entitled to condemn. Of course, condemnors would not be precluded from negotiating for additional rights. If these additional rights were combined with the rights to be condemned in a single offer for a lump sum payment, however, the condemnors would not be in compliance with the statute because they could not demonstrate, at the time the petition is filed, an inability to agree on the amount of damages.

> FN2. In fact, the Court seems to apply a contrary presumption, placing the burden on the

condemnors to produce "evidence of the value of the three matters about which they now complain or evidence that the owners would have accepted the offers if those matters had been omitted from the offers." 141 S.W.3d at 189.

I disagree with the proposition that "inclusion of intangible property rights" makes such a requirement impracticable. 141 S.W.3d 191. To begin with, the condemnor controls its pleading and is uniquely suited to include the same items it sought pre-suit. In addition, the Court's statement that a condemnor "might not" be able to compel a landowner to warrant title implies that the opposite "might" be true. I simply do not see how a condemning authority could ever force the landowner "to warrant and defend title to the easement." Defense of title, a valuable commodity in itself, was intermixed with the physical property interest in the condemnors' offers. For that reason, the landowners were never given a pre-suit standalone offer on damages for property the condemnor ultimately sought to condemn.

## II
### Disposition

Given my approach in these cases, it is fair to ask why I concur rather than dissent. Today, the Court correctly observes that nothing in the statute makes compliance a jurisdictional predicate to suit, and the Legislature has not imposed a specific penalty when condemnors do not make separate offers for only those rights they will seek to condemn. Instead, the Court concludes that abatement is an appropriate remedy if a condemnor has not satisfied the unable-to-agree requirement prior to filing suit. In the cases before us, however, remanding the cases so that they could be abated until the unable-to-agree requirement is satisfied would be futile. At this stage of the proceedings, it is clear that the parties are unable to agree on damages for the property sought to be condemned. It would be pointless to invalidate the condemnations on technical **\*197** grounds and remand these cases for abatement so that the condemnors could prove an inability to agree on damages.

Examining the condemnation procedure may clarify matters. The condemnor must file a petition, "stat[ing]

Page 24

141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768
**(Cite as: 141 S.W.3d 172)**

that the entity and the property owner are unable to agree on the damages." Tex. Prop.Code 21.012. If a condemnor alleges an "inability to agree" without ever having made an offer, the condemnor and its attorney could face sanctions. *See* Tex.R. Civ. P. 13. After the petition is filed, the judge appoints three disinterested commissioners to hear the case. Tex. Prop.Code § 21.014(a). Notice of the hearing is sent to the landowner, and the hearing is set for "the earliest practical time." *Id.* § 21.015–16. If the landowner wishes to appear and present evidence, he or she may do so. If that occurs, it is clear that the parties are unable to agree on damages for the property sought to be condemned. Alternatively, the landowner can do nothing, and the commissioners will hear the case and enter their findings. At that point, if the landowner agrees with the commissioners' decision, he or she can accept the award, and the landowner is appropriately compensated for the taking. If the landowner or the condemnor is dissatisfied, either can file objections. *Id.* § 21.018. At that time, the landowner may assert that the condemnor has not engaged in negotiations designed to obtain an agreement as to damages. In that event, the trial court must abate the case and require the condemnor to make an offer for the property it seeks to condemn.

In these cases, even though the condemnors' presuit offers were improper, it was apparent that the parties were unable to agree on damages for the property to be condemned after the commissioners entered their award. The landowners objected and the condemnors did not. Remanding the case at this stage, so that the trial court can abate the proceedings until a proper offer is made, would serve no purpose. *See, e.g., Hill v. State,* 90 S.W.3d 308, 310 (Tex.Crim.App.2002) (declining to order abatement when doing so would be "a futile act"); *Moore Landry L.L.P. v. Hirsch & Westheimer, P.C.,* 126 S.W.3d 536, 542 (Tex.App.—Houston [1st Dist.] 2003, no pet.).* Accordingly, under the unique circumstances of these cases, and in light of the rule announced by the Court today, the Court's disposition of these cases is proper.

### Conclusion

I would hold, contrary to the Court's opinion, that

the condemnors in these consolidated cases did not establish an inability to agree before they filed suit. It is clear, however, that the landowners and condemnors came to a point of disagreement before true litigation commenced because the condemnors "accepted," and the landowners rejected, the commissioners' awards. Under these circumstances, the statutory requirement was met, albeit at a date later than that contemplated by the Legislature. I reiterate, however, that the simplest and cheapest solution to this problem is for the condemnor to comply with the statute and make an offer for the property it seeks to condemn, before filing a condemnation petition.

Accordingly, I join parts I through III of the Court's opinion and the Court's judgments.

Tex.,2004.
Hubenak v. San Jacinto Gas Transmission Co.
141 S.W.3d 172, 159 Oil & Gas Rep. 380, Util. L. Rep. P 26,893, 47 Tex. Sup. Ct. J. 767, 47 Tex. Sup. Ct. J. 768

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Court of Civil Appeals of Texas, Beaumont.
KLEIN ET AL.
v.
HUMBLE OIL & REFINING CO.

No. 2333.
Jan. 6, 1934.
Rehearing Denied Feb. 7, 1934.

Appeal from District Court, Guadalupe County; Lester Holt, Judge.

Suit by F. F. Klein and others against the Humble Oil & Refining Company, which impleaded D. D. Baker and others as cross-defendants. From the judgment, plaintiffs and cross-defendant Baker appeal.

Affirmed in part and reversed and rendered in part.

West Headnotes

**[1] Mines and Minerals 260 55(5)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(B) Conveyances in General
            260k55 Grants and Reservations of Minerals and Mining Rights
                260k55(5) k. Kind, quantity, and location of minerals granted or reserved. Most Cited Cases

Warranty deed excepting from conveyance 1/8 th of mineral rights, in part of land conveyed, and identifying property conveyed with that described in prior deed in chain of title, *held* to except from conveyance only 1/8 th of minerals reserved in prior deed, and not to reserve an additional 1/8 th, where it was not recited that exception was for grantors' benefit. Vernon's Ann.Civ.St. art. 1291.

**[2] Deeds 120 93**

120 Deeds

120 Deeds
    120III Construction and Operation
        120III(A) General Rules of Construction
            120k93 k. Intention of parties. Most Cited Cases

Cardinal rule for construction of deeds is to ascertain intention of parties as expressed therein.

**[3] Deeds 120 93**

120 Deeds
    120III Construction and Operation
        120III(A) General Rules of Construction
            120k93 k. Intention of parties. Most Cited Cases

All provisions of deed must be considered in ascertaining intention of parties.

**[4] Deeds 120 90**

120 Deeds
    120III Construction and Operation
        120III(A) General Rules of Construction
            120k90 k. Application to deeds in general. Most Cited Cases

In case of doubt language of deed should be construed against grantor and in favor of grantee.

**[5] Deeds 120 138**

120 Deeds
    120III Construction and Operation
        120III(D) Exceptions
            120k138 k. Exceptions and reservations distinguished. Most Cited Cases

Primary distinction between "reservation" and "exception" in deed is that reservation must always be in favor of and for benefit of grantor, whereas exception is mere exclusion from grant, of some interest which may be vested in grantor or outstanding in another.

**[6] Deeds 120 112(1)**

120 Deeds

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

120III Construction and Operation

120III(B) Property Conveyed

120k112 References to Maps, Plats, Other Instruments, or Records

120k112(1) k. Reference to other instruments or records in general. Most Cited Cases

Deed identifying property conveyed as the same conveyed by prior deed in chain of title incorporated prior deed to extent necessary to clarify provisions of subsequent deed, and prior deed was admissible in evidence for that purpose.

**[7] Mines and Minerals 260 ⬩55(8)**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(B) Conveyances in General

260k55 Grants and Reservations of Minerals and Mining Rights

260k55(8) k. Remedies. Most Cited Cases

In suit by grantor against assignee of mineral lease given by grantee, to recover value of mineral right excepted by deed, defendant could introduce prior deed in chain of title to show mineral right excepted was outstanding in another.

**[8] Mines and Minerals 260 ⬩73**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k73 k. In general; general rules of construction. Most Cited Cases

Oil lease describing land by reference to record of deed to lessor *held* to charge lessee and lessee's assignee with notice of provisions in deed referred to, and of earlier deed which it incorporated by reference, whereby lessor and his grantor received only 7/8ths interest in minerals.

**[9] Mines and Minerals 260 ⬩79.3**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k79 Rent or Royalties

260k79.3 k. Amount and time of payment. Most Cited Cases

(Formerly 260k79(1))

Provision in mineral lease reserving 1/8 th royalty to lessor *held* to reserve such portion of minerals in addition of 1/8 th reserved in deeds to lessor and his predecessor, which were incorporated in lease by reference.

**[10] Mines and Minerals 260 ⬩73**

260 Mines and Minerals

260II Title, Conveyances, and Contracts

260II(C) Leases, Licenses, and Contracts

260II(C)3 Construction and Operation of Oil and Gas Leases

260k73 k. In general; general rules of construction. Most Cited Cases

Reference in mineral lease to deed as conveying land leased, incorporates deed into lease, and into description of property conveyed, and puts lessee and his assignee on notice of extent thereof.

**\*912** Lewright & Lewright and Gaines, Gaines & Roberts, all of San Antonio, Phillips & Phillips, of Dallas, and J. B. Dibrell, H. M. Wurzbach, and P. E. Campbell, all of Seguin, for appellants.

J. Q. Weatherly and K. W. Gilmore, both of Houston, and Wirtz & Weinert, of Seguin, for appellee.

O'QUINN, Justice.

May 29, 1928, Robert Stein and wife were the owners of a certain 60 acres of land, a part of the Jacob Darst survey, in Guadalupe county, Tex. On that date they conveyed said 60 acres of land to F. F. Klein by warranty deed. The deed, after describing the 60 acres by metes and bounds, contained the following special provision:

"Grantors herein, however, reserve for them-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

selves, their heirs and assigns, one-eighth (1/8) of all mineral rights in and under Ten (10) acres of land, running north and south, on the east end of the 60 acres herein conveyed, and it is understood and agreed that if no production of oil is had on said Ten (10) acres within a period of Twenty (20) years, this reservation shall terminate and become null and void, and it is further understood that grantors herein are not to participate in any oil lease or rental bonuses that may be paid on any lease on said above described land, and hereby waive any rights they may have or be entitled to in any future oil or gas lease."

July 16, 1928, F. F. Klein and wife, by general warranty deed, conveyed the said 60 acres of land to D. D. Baker, describing same by metes and bounds, as in the deed from Stein and wife to Klein, which deed contained the following special provision:

"There is however excepted from this conveyance 1/8 of all mineral rights in and under Ten acres of land running north and south on the east end of said 60 acres, and it is understood that if no production of oil is had on said 10 acres within a period of Twenty years from May 29, 1928, then this reservation shall lapse. Also understood that the owner of said rights is not to participate in any oil lease or rental bonuses that may be paid for any lease, and have no interest in any future oil and gas lease."

"The property herein conveyed is the same conveyed to us by Robert Stein and wife by deed dated May 29, 1928, and recorded in Guadalupe County, Deed Record Book 97, p. 398."

July 24, 1928, D. D. Baker executed and delivered to H. H. Weinert an oil and gas lease covering the 60 acres of land describing same by metes and bounds as described in the deed from Stein to Klein, and Klein to Baker, said lease being on the regular 88 form, and containing a general warranty clause. February 6, 1929, Weinert assigned this lease to the Humble Oil & Refining Company, which will hereinafter be referred to as Humble Company.

Thereafter, Stein by deeds conveyed to Baker 13/16ths of the 1/8th of the minerals reserved in the deed from himself to Klein. Stein also sold small interests in said 1/8th to others, and Baker made a number of conveyances.

The Humble Company took possession of said 60 acres of land and made developments **\*913** on the east 10 acres, discovering oil in paying quantities. After oil was discovered, Klein claiming to have reserved for himself 1/8th of the mineral rights in said east 10 acres, executed conveyances to the other plaintiffs who join him in the suit.

The Humble Company refused to recognize Klein's claim to any interest in the mineral rights in said 10 acres, and Klein and the other parties plaintiff, to whom he had executed conveyances of portions of the interest claimed by him, brought this suit against the Humble Company to recover the value of 1/8th of all the oil said company had produced from the said 10 acres, and 1/8th of the value of all oil thereafter produced therefrom.

The Humble Company answered by plea of not guilty, general denial, and specially denied that the plaintiffs had any interest in the mineral rights in the east 10 acres of said 60-acre tract of land. By bill of interpleader said company brought into the suit as cross-defendants, D. D. Baker, Robert Stein, and all the record owners of any interest in the minerals in the entire 60 acres of land, alleging them to be necessary parties, and asked that all their respective rights be determined by the suit. Baker, Stein, and the other defendants impleaded by the Humble Company filed appropriate answers. Supplemental pleadings were filed by all parties.

The case was tried to the court without a jury, and judgment rendered denying any recovery to plaintiffs F. F. Klein et al., and decreeing to the Humble Company all of the leasehold rights, title, and interest in and to all of the minerals in the en-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tire 60 acres of land, subject only to the payment of a 1/8th royalty to the parties in the various interests set out in the judgment. The judgment awarded to Baker a 2/64ths interest in the minerals in the 10 acres in question, and denied him any recovery by his cross-action against the Humble Company. From this judgment, the plaintiffs H. H. Klein, Roy Campbell, Jake K. Harmon, C. L. Witherspoon, and C. M. Gaines, and the cross-defendant D. D. Baker have appealed.

It will be observed from the judgment that the ownership of the minerals in the whole 60-acre tract was involved in this suit, and was determined by the judgment. However, there is no controversy in regard to the findings and holdings of the trial court with respect to any of the acreage except the east 10 acres of the tract; so the judgment as it relates to the remaining 50 acres is of no importance on this appeal. The whole contest here is as to the ownership of the mineral rights in the east 10 acres of said 60-acre tract.

That Stein and wife reserved to themselves and were the owners of 1/8th of the minerals in the east 10 acres of the 60-acre tract, is admitted by all the other parties.

Klein insists that in his deed to Baker he excepted for himself 1/8th of all the minerals in the east 10 acres of land described in the conveyance, and that the deed and said exception are without ambiguity, and that judgment should have been for him for said 1/8th of the minerals in said 10 acres.

The deed from Klein and wife to Baker reads:

"The State of Texas, County of Guadalupe

"Know all men by these presents: That we, F. F. Klein and wife Mrs. Della Klein of the County of Guadalupe State of Texas, for and in consideration of the sum of Ten Dollars and other valuable considerations to us in hand paid by D. D. Baker in cash or its equivalent, the receipt of which is hereby acknowledged, have Granted, Sold and Conveyed,

and by these presents do Grant, Sell and Convey unto the said D. D. Baker of the County of Guadalupe State of Texas all that certain tract and parcel of land situated in Guadalupe County, Texas, containing 60 acres of land, out of the Jacob Darst 24 Labor Survey, particularly described as beginning at the S. E. corner of 400 acres conveyed to Houston Wilson by Henry Campbell, a stone set in the ground from which a hickory 12" in dia. brs S. 29 1/2 w. 13-1/3 vrs. Thence with the East line of said 400 acres, N. 5 deg. E. 476 varas to stake from which a P. O. 12" dia. brs. S. 11 w 11 vrs; Thence N. 85 W. on a line parallel with the south line of said 400 acres, 711 1/2 vrs. to stone in ground for corner; Thence S. 5 deg. W. 476 varas to stone in S. line of said 400 acres; Thence S. 85 E. 711 1/2 vs. to the place of beginning, containing 60 acres.

"There is however excepted from this conveyance 1/8th of all mineral rights in and under ten acres of land running north and south on the east end of said 60 acres, and it is understood that if no production of oil is had on said 10 acres within a period of twenty years from May 29, 1928, then this reservation shall lapse. Also understood that the owner of said rights is not to participate in any oil lease or rental bonuses that may be paid for any lease, and have no interest in any future oil and gas lease.

"The property herein conveyed is the same conveyed to us by Robt. Stein and wife by **\*914** deed dated May 29th, 1928, and recorded in Guadalupe County deed record book 97 p. 398.

"Taxes for the year 1928 are to be paid by grantors hereof.

"To have and to hold the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said D. D. Baker, and his heirs and assigns forever and we do hereby bind ourselves and our heirs, executors and administrators, to Warrant and Forever Defend, all and singular the said premises unto the said D. D. Baker and his heirs and assigns,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

"Witness our hands at Seguin, Texas, this 16th day of July, 1928.

"F. F. Klein

"Della Klein."

Appellants say that by this deed Klein and wife reserved unto themselves 1/8th of the minerals in the east 10 acres, and this without regard to what interest they may have owned at the time the deed was executed or what interest may have been owned by others. The effect of this contention is that as Stein and wife reserved 1/8th, and Klein reserved 1/8th, the deed from Klein to Baker conveyed only 6/8ths of the minerals in said 10 acres.

The Humble Company denies this contention and says that the deed from Klein and wife to Baker, construed alone and without reference to any other deed, upon its face bassed to Baker a fee-simple estate in the 60-acre tract, less 1/8th of the minerals in the east 10 acres. That the exception in the deed merely excluded from the grant and from Klein's warranty 1/8th of the mineral rights in the east 10 acres. In other words, that the deed from Klein and wife to Baker conveyed to Baker all the interest they had in the property, and that the exception was to exclude from the conveyance only the 1/8th of the minerals reserved by Stein and wife in their deed to Klein, and that Klein's exception was to protect only his warranty as against the Stein 1/8th reservation.

[1][2][3][4] The trial court sustained this contention, and we think this holding is correct. The Klein deed, upon its face, we think, unquestionably passed title to Baker to all the minerals in the west 50 acres of the land described, and 7/8ths of the minerals in the east 10 acres. The correctness of this holding depends upon the construction of the Klein deed. The cardinal rule for the construction of deeds is to ascertain the intention of the parties as expressed in the deed. 14 Tex. Jur. 910, § 132, and authorities cited. In ascertaining this intention all the provisions of the deed are to be considered. The intention is not to be gotten from an isolated clause or paragraph, but must be gathered from a fair construction of the entire instrument. Each clause or paragraph must be construed with reference to every other paragraph, and the effect of one paragraph upon the other determined. 14 Tex. Jur., § 140, p. 919, and cases cited. In case of doubt the language of the deed, being the language of the grantor, is to be construed against the grantor and in favor of the grantee. 14 Tex. Jur. p. 916, § 138, and cases cited. And a deed will be construed as passing a fee-simple estate, if a less estate be not expressly limited by express words. Article 1291, R. S. 1925; 14 Tex. Jur. § 151, p. 930; also section 155, p. 933.

In the Klein deed to Baker, the granting clause described the property conveyed as "*all* that certain tract and parcel of land situated in Guadalupe County, Texas, *containing 60-acres of land,*" and then described same by metes and bounds. Considered alone and without reference to the exception, it cannot be said that the granting clause purports to convey less than a fee-simple title to the 60-acre tract. The exception clause recites:

"There is however excepted from this conveyance 1/8th of all mineral rights in and under Ten acres of land running north and south on the east end of said 60 acres."

The words "this conveyance" can refer only to the granting clause for that is the only clause conveying or purporting to convey anything. Since the granting clause purports to convey "all that certain tract of land," the described 60 acres, it follows that the exception is to be deducted from the whole, and the exception being 1/8th of the minerals in the east 10 acres, deducting this the deed passed a fee-simple estate in all of the 60 acres except 1/8th of the minerals in the east 10 acres. The deed being a general warranty deed, it follows that the warranty covered all of the 60 acres except the 1/8th of the minerals in the east 10 acres, as to which there was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

67 S.W.2d 911
**(Cite as: 67 S.W.2d 911)**

no warranty. This construction, we think, must result from a consideration of the express terms of the deed, as well as from the application of the statutory rule that a fee-simple estate passes by a deed if a less estate be not limited by express words.

**\*915** [5] Moreover, Klein's deed does not recite that the exception of 1/8th of the minerals in the east 10 acres is for *his benefit.* It does not recite that there is reserved *unto himself* 1/8th of the minerals in the east 10 acres. The deed does not say for *whose* benefit the exception is made. He merely says that there "is excepted" from the conveyance and warranty the 1/8th interest. While the words "exception" and "reservation" are often used indiscriminately, each has its own separate meaning, and in the construction of deeds containing such terms courts will not look upon the terms as synonymous, or attribute to the one the meaning of the other, unless from the face of the instrument it is apparent that by the use of one word the other was intended. 14 Tex. Jur. 958-960; Donnell v. Otts (Tex. Civ. App.) 230 S. W. 864. The primary distinction between a reservation and exception is that *a reservation must always be in favor of and for the benefit of the grantor,* whereas, an exception is a mere exclusion from the grant, in favor of the grantor only to the extent that such interest as is excepted may then be vested in the grantor, *and not outstanding in another.* Allen v. Henson, 186 Ky. 201, 217 S. W. 120; Arnett v. Elkhorn Coal Corp., 191 Ky. 706, 231 S. W. 219, 220; Reynolds v. McMan Oil & Gas Co. (Tex. Com. App.) 11 S.W.(2d) 778.

In Allen v. Henson, supra, the court said:

"Generally a 'reservation' in a deed is a clause whereby the grantor reserves to himself some new thing, either issuing out of or incident to the thing granted, while an 'exception' in a deed is a clause exempting from the operation of the deed and retaining in the grantor the title to some part of the thing granted, *or else excepting from the operation of the deed some part of the thing granted the title of which is at the time in another.*" (Italics ours.)

In the case of Arnett v. Elkhorn Coal Corp., supra, Lewis Hoskins and wife executed in favor of Arnett a general warranty deed to a tract of land, one paragraph of the deed providing:

"It is understood that there is an oil and gas lease on this land, and the same is excepted from this conveyance."

In discussing the effect of this exception, the court said:

"It will be observed that Hoskins does not indicate by the language of the deed that he held any interest whatever in the lease, as would be inferred, if it was a reservation instead of an exception. An exception in a deed is intended to describe some part of the thing granted, which the grantor retains title to and does not convey, *or something to which another holds title already and which is not intended to be conveyed,* and the exception may be for the benefit of the grantor himself, or *it may be for the benefit of another who already has acquired title to the portion of the thing, which is affected by the exception.* The exception may be a description of a portion of the thing granted, *which previously to the grant had been conveyed to another,* and not necessarily so conveyed by the grantor, *but by a prior grantor.* * * * (Italics ours.)

"The exception, in the deed from Hoskins to the Northern Coal & Coke Company, of a lease relating to oil and gas upon the property, being an exception of the rights under the lease of the lessor and lessee, without anything indicating that Hoskins had any interest therein, and there being no way of determining from the deed or the pleading whether the exception was made because Hoskins desired to retain the benefit of a lessor in the lease for himself, or to protect himself against the consequences of his conveyance of the oils and gases, with a warranty of title, to the vendee, because another was then the owner of the benefits, which might accrue to a lessor of the lease, and the petition failing to assert any right or interest in the lease, on the part of the plaintiff, it cannot be as-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

sumed that he had any interest therein. * * *"

We agree with appellants Klein et al., that the deed from Klein and wife to Baker and its exception, is clear and unambiguous, hence our holding above. We think that said instrument plainly shows that it was not the intention of Klein to reserve or except for himself an interest of 1/8th of the mineral rights in the east 10 acres of the land. The deed clearly purports to convey the whole 60 acres excepting only 1/8th of the minerals in the east 10 acres. The exception does not say that the 1/8th was for himself, or for any one--just a general exception from the "conveyance." Unquestionably the "conveyance" referred to was the deed Klein was then executing to Baker. This deed conveyed "all" of the 60 acres except 1/8th of the minerals in the east 10 acres. The 60-acre tract was described by metes and bounds, and this was followed, after the exception, by the statement that "the property herein conveyed is the same property conveyed to us by Robt. Stein and wife by deed dated May 29. 1928, and recorded in Guadalupe County deed records, book 97, p. 398." The property conveyed **\*916** by Stein and wife to Klein was all of the 60 acres, less 1/8th of the minerals in the east 10 acres of the 60-acre tract. The deed from Klein and wife to Baker conveyed "all" of the 60 acres, less 1/8th of the minerals in the east 10 acres of the 60-acre tract--the identical property conveyed by Stein to Klein, and so stated in the Klein deed to Baker.

Nothing was said in the Klein deed to Baker about the 1/8th that Stein had reserved, but we think other statements in the Klein exception show that Klein was by his exception protecting and intended to protect only the Stein 1/8th. Compare the provisions of the Stein reservation and the Klein exception.

The Stein reservation:

"Grantors herein however, *reserve for themselves,* their heirs and assigns, one-eighth (1/8) of all mineral rights in and under Ten (10) acres of land, running north and south, on the east end of the

60 acres herein conveyed, and it is understood and agreed that if no production of oil is had on said 10 acres within a period of *Twenty years,* this reservation shall terminate and become null and void, and it is further understood that *grantors herein* are not to participate in any oil lease or rental bonuses that may be paid on any lease on said above described land, and hereby waive any rights they may have or be entitled to in any future oil and gas lease." (Italics ours.)

The Klein exception:

"There is however excepted from this conveyance 1/8th of all mineral rights in and under ten acres of land running north and south on the east end of said 60 acres, and it is understood that if no production of oil is had on said 10 acres within a period of Twenty years from May 29, 1928, then this reservation shall lapse. Also understood that the *owner of said rights* is not to participate in any oil lease or rental bonuses that may be paid for any lease, and have no interest in any future oil and gas lease." (Italics ours.)

The Stein reservation was 1/8th for themselves. The Klein exception was not in favor of any named one--merely that 1/8th of the minerals in the east 10 acres was excepted from "this conveyance," meaning Klein's deed to Baker. But as further showing that the exception in Klein's deed was to protect Stein's reservation and Klein's warranty, the exception says that it was "understood that if no oil is had on said 10 acres within a period of Twenty years from May 29, 1928, then this reservation shall lapse." Klein's deed to Baker was dated July 16, 1928, but Stein's deed to Klein was dated May 29, 1928. The twenty years in which oil must be developed on the 10 acres was dated from the date of the Stein deed to Klein, not from the date of his, Klein's, deed to Baker.

The Stein deed to Klein recited that it was also understood that "grantors herein" (the Steins) were not to participate in any oil lease or rental bonuses that might be paid for any lease on the land. Klein's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

exception recites that it was understood that "*the owner of said rights*" was not to participate in any oil lease or rental bonuses that might be paid for any lease. Is it not reasonable to say that the exception of 1/8th of the minerals in the east 10 acres, and the reference to May 29, 1928, the date of the Stein deed to Klein, and the expression "*the owner of said rights*" in the Klein deed were intended to and had reference to the Stein reservation and for the protection of same, and of Klein's warranty to Baker? The wording of reservations and exceptions in conveyances is not difficult. If Klein was in fact excepting 1/8th of the minerals in the said 10 acres, why did he now say that the exception was for himself? If the Kleins were waiving the right to participate in any oil lease or bonuses paid for a lease on the grant, why not use the words "grantors herein," as did the Steins, instead of referring to the "owner of said rights" who was in no way designated?

That the exception was for the benefit of the grantors, Klein and wife, and was to create an independent 1/8th interest in the minerals in the east 10 acres to which they retained the title, is bound, at best, to rest only in implication. This must be true, since the provision nowhere in terms purports to say that the "exception" was for them or that the interest excepted was to be theirs. There is nothing in the language of the exception itself which requires that construction. Under the language of the provision it is, at most, only a possible construction. And under the language itself it is just as possible to fairly construe the "exception" as referring to the Stein interest, which was not being conveyed. With this being true, if there is doubt as to the making of the exception, this doubt must be resolved against the grantors, and in favor of the grantee Baker, that the exception was but to preserve and protect the Stein reservation and Klein's warranty. Baker v. McDowell, 3 Watts & S. (Pa.) 358; Harris v. Cobb, 49 W. Va. 350, 38 S. E. 559; **\*917**Hill v. Roberts (Tex. Civ. App.) 284 S. W. 246; Hooks v. Neill (Tex. Civ. App.) 21 S.W.(2d) 532.

The case of Harris v. Cobb, cited supra, was very similar to the instant case both as to the facts and questions of law involved. Appellee says that it is not authority for the holding for which it is cited, because, it says, it has been overruled by the court that rendered it (the Supreme Court of West Virginia), in the case of Kilcoyne v. Southern Oil Company, 61 W. Va. 538, 56 S. E. 888. It is a sufficient answer to say that the principles it announced are the law in Texas. Long after the Kilcoyne decision, in discussing the very question involved, the Galveston Court of Civil Appeals, in the case of Hooks v. Neill, 21 S.W.(2d) 532, cited and quoted from the Harris v. Cobb Case, approving its holding, and the Supreme Court approved that holding by refusing a writ of error. Furthermore, we think that, if any possible question can be said to exist as to the true construction to be given to the exception provision, as tested by the language of the exception itself, it is set at rest by the very next clause following the exception. It identifies the property conveyed by the deed as "the same conveyed to us (Klein and wife) by Robert Stein and wife by deed dated May 29, 1928, and recorded in Guadalupe County, deed record, book 97, page 398." The mentioned deed with reference to the record of it, under which the Kleins acquired their title and which identified as the property conveyed thereby to them, the land and every interest in the land, save and except only the 1/8th mineral estate in the east 10 acres reserved by the Steins for themselves. This clause cannot be written out of the deed. It is an essential part of it, as much so as the exception provision itself. It identifies just what the Kleins were conveying to Baker. It may and should be looked to in ascertaining the intention of the instrument.

Under the purchase from Stein the Kleins owned the surface rights in the whole of the 60-acre tract, and all of the mineral estate in the west 50 acres, and 7/8ths of the mineral estate in the east 10 acres. They had the right in their conveyance to Baker to reserve for themselves any part of their estate in the east 10 acres, or even the whole of it. The fact that the Kleins had this right emphasizes the failure by any apt language in their deed to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Baker to express or indicate its exercise. If their purpose had been to reserve a 1/8th of the minerals that they owned in the east 10 acres for themselves, we think they would have made such intent an express feature of the reservation provision. The deed, we think, in apt words, excepted from its effect only the 1/8th reserved by Stein.

Without discussing them, we will say that we have carefully examined each of the cases cited to us by appellants as sustaining their contention that Klein reserved for himself 1/8th of all the minerals in the east 10 acres in controversy, and that we do not think any of them have application to the facts of the instant case. The facts in the cases cited by appellants materially differ from the facts in the instant case in that in each of the cited cases the reservation was expressly in favor of the grantors, and there was no general warranty of title. The exception here was not in favor of the grantors, and the deed contained a general warranty.

[6][7] We overrule appellants' contention that the deed from Stein and wife to Klein was not admissible in evidence, and that its admittance was reversible error. We think that what we have said relative to the exception in the Klein deed to Baker disposes of this contention, but if it can be said that the meaning of said exception is doubtful, then the Stein deed was admissible because it was referred to in the Klein deed and thus became a part thereof to the extent necessary to clarify the provisions of the Klein deed. That one instrument may by reference incorporate another, and that the Stein deed was in such manner incorporated in the Klein deed to the extent necessary to clarify the latter, we think beyond cavil. 8 R. C. L. 1078 et seq; 18 C. J. 281, 282; Devlin on Real Estate (3d Ed.) vol. 2, § 1020, p. 1952 et seq. We think, too, that the Stein deed was admissible because the pleadings and the evidence show that Stein, the grantor therein, was the common source of title and appellee was entitled to introduce such deed for the purpose of connecting itself with the common source of title, and for the purpose of showing that there was an outstanding title in another than appellants to the 1/8th of the minerals in the east 10 acres excepted in the Klein deed.

[8][9][10] We come now to the contest between appellee and appellant Baker. As before stated appellant Baker executed to H. H. Weinert an oil and gas lease on the 60 acres of land in question which Weinert assigned to the Humble Company. Tersely stated these are the contentions: It is contended by Baker that in said lease *he reserved for himself* a 1/8th interest in all the minerals *that he owned* in the entire 60 acres. He owned all the minerals in the west 50 acres, and 7/8ths of the minerals in the east 10 acres. So, he **\*918** says, he reserved for himself 1/8th of the minerals in the west 50 acres, and 1/8th of 7/8ths, or 7/64ths, of the minerals in the east 10 acres. This appellee denies and insists that under the terms of the lease a royalty of only 1/8th was to be paid as to the east 10 acres, and that 1/8th was reserved by Stein. In other words that it was liable to pay only 1/8th royalty in the minerals in the east 10 acres--that neither Klein nor Baker had reserved for themselves any portion of the minerals in the said 10 acres.

Baker's lease to Weinert, assigned by Weinert to the Humble Company, was on the regular 88 form. Among its other provisions were:

"1. Lessor, in consideration of the sum of Ninety and no one hundred dollars ($90.00) in hand, of the royalties herein provided and the agreements of lessee herein contained, hereby grants, leases and lets exclusively unto lessee for the purpose of prospecting and drilling for and producing oil and gas, laying pipelines, building tanks, storing oil and building power stations, telephone lines and other structures thereon, to produce, save, take care of, treat and transport said products, the following described land in Guadalupe County, State of Texas, to-wit: all of a tract of 60 acres out of the Jacob Darst 24 Labor Survey, beginning (then follows the field notes). Excepting 8/10ths of an acre conveyed by Frank Wilson and wife to Guadalupe County by a deed of record in deed

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

book 48, pages 114-5, this being the same land conveyed to me by F. F. Klein by a deed of record in deed book 98, page 401-2.”

"3. The *royalties reserved by lessor,* and which shall be paid by lessee, are (a) on oil one-eighth of that produced and saved from the land, the same to be delivered at the wells or *to the credit of lessor* in the pipeline to which the wells may be connected, or, at the option of lessee, from time to time, the market price at the wells of such one-eighth on the day it is run to the pipeline or storage tanks, lessor's interest in either case to bear its proportion of any expense of treating unmerchantable oil to render it merchantable as crude, and (b) on gas produced from said land and sold or used off of the land or in the manufacture of gasoline, including casinghead gas, the market price at the well of one-eighth of the gas so sold or used, provided that if and when lessee shall sell gas at the wells *lessor's royalty* thereon shall be one-eighth of the amount realized from such sales.”

We have underscored or italicized the words in the royalty provision of the lease, supra, showing the royalties to have been reserved by Baker for himself as lessor. In a subsequent paragraph (10) of the lease, provision is made for *payment to the lessor* of a royalty on other minerals than oil and gas if they should be found in paying quantities, Baker, and Baker only, was the lessor. And in terms as plain as could be expressed, the lease stipulates that the 1/8th royalty payable under it shall be payable to Baker, the lessor.

We have held that Baker acquired from Klein all the minerals in the west 50 acres, and 7/8ths of the minerals in the east 10 acres of the 60-acre tract. As Baker owned only 7/8ths of the minerals in the east 10 acres, then, as respects said 10 acres, only that 7/8ths interest could be the subject-matter of the oil and gas lease granted to Weinert. We think that by the clear terms of the lease set out supra, Baker reserved for himself 1/8th of all the minerals that he owned in the 60 acres of land. That is 1/8th of the minerals in the west 50 acres, and

1/8th of 7/8ths, or 7/64ths of the minerals in the east 10 acres. Baker's lease to Weinert described the land covered by the lease as 60 acres, less 8/10ths of an acre which had been conveyed by a former owner, and recited that the land covered by the lease was the same land conveyed to Baker by Klein by deed recorded in the deed records of Guadalupe county, Tex., Book 98, pages 401 and 402. The rule is well settled that this reference to the Klein deed incorporated said deed into the lease and into the description of the property conveyed, and put Weinert and his assignee, the Humble Company, on notice that the land covered by the lease was the same Baker had acquired from Klein, and only that land. This reference informed them just what interest Klein conveyed to Baker. They accepted the lease with full knowledge, in law, of all facts disclosed by it and its references, which were a part thereof.

In Wallace v. Hoyt (Tex. Civ. App.) 225 S. W. 425, 429 (writ refused), Judge Key said:

"It is a well-settled rule that one is charged with knowledge of every fact disclosed by his chain of title, although he may never have read the instruments constituting that chain, and never had any actual knowledge of their contents.”

He further said: "While the primary purpose of our registration statute may be to protect innocent purchasers for value, it is also intended to protect those whose rights are disclosed by the record.”

**\*919** In Loomis v. Cobb (Tex. Civ. App.) 159 S. W. 305, 307 (writ refused), it is said:

"It is a familiar and thoroughly well-settled principle of realty law that a purchaser has constructive notice of every matter connected with or affecting his estate which appears *by recital, reference, or otherwise* upon the face of any deed which forms an essential link in the chain of instruments through which he deraigns his title. The rationale of the rule is that any *description, recital of fact, or reference* to other documents puts the purchaser

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of all the matters referred to and affecting the estate is obtained. Being thus put upon inquiry, the purchaser is presumed to have prosecuted it until its final result and with ultimate success." (Italics ours.)

Numerous authorities could be cited supporting the rule.

We think it should be said that since the deed from Stein to Klein reserved for Stein 1/8th of the minerals in the east 10 acres, and as the Klein deed to Baker referred to the Stein deed with its record, which incorporated it into the Klein deed, and as Baker's lease to Weinert referred to the Klein deed with its record, thus incorporating this deed, which by reference included the Stein deed, into the lease, that the Humble Company, which held the lease by assignment from Weinert, should be held to know exactly what estate Baker owned in the land and minerals, and exactly what estate his lease purported to and did convey, and that it took the lease with this knowledge, and cannot be heard to assert to the contrary. Polk v. Chaison, 72 Tex. 500, 10 S. W. 581; Caruth v. Grigsby, 57 Tex. 259.

Our holdings above dispose of the decisive questions in the case, and render unnecessary a discussion of the other questions presented.

From what we have said, it follows that that part of the judgment denying a recovery to appellants F. F. Klein et al. should be affirmed, and that portion of the judgment awarding appellant Baker judgment for 2/64ths of the oil produced from the east 10 acres of the land in question, being the net interest owned by him which he had acquired out of the Stein 1/8th interest in said 10 acres, should also be affirmed, and that portion of the judgment denying Baker any recovery on his cross-action for the 1/8th interest reserved by him in his lease as relating to the east 10 acres, should be reversed and here

rendered in his favor, and that his total recovery as relating to said 10 acres should and is adjudged to be 1/8th of 7/8ths, or 7/64ths of the minerals in the said 10 acres, together with the 2/64ths before mentioned, totaling 9/64ths interest in all in said east 10 acres of land, and it is so ordered. And it appearing that there is an agreement in the record that up to April 1, 1931, there had been produced and saved from the said 10 acres of land, oil to the value of $616,982.79 it is here held and adjudged that Baker have judgment for 9/64ths of said sum, or $86,763.15, and that said Baker have judgment for 9/64ths of the value of all of the oil taken from said 10 acres of land since April 1, 1931, and that he be and is decreed the owner of 9/64ths of all oil, gas, and other minerals to be taken from the said 10 acres in the future, and it is so ordered. Affirmed in part and reversed and rendered in part.

Tex.Civ.App. 1934.
Klein v. Humble Oil & Refining Co.
67 S.W.2d 911

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


90 S.W.3d 697, 46 Tex. Sup. Ct. J. 167
**(Cite as: 90 S.W.3d 697)**

▷

Supreme Court of Texas.
MARCUS CABLE ASSOCIATES, L.P. d/b/a
Charter Communications, Inc., Petitioner,
v.
Alan and Myrna KROHN, Respondents.

No. 01–0291.
Argued Feb. 20, 2002.
Delivered Nov. 5, 2002.

Property owners brought action against cable company for trespass and negligence, alleging that company had placed its cable lines over their property without their knowledge or consent. The 40th Judicial District Court, Ellis County, Gene Knize, J., entered summary judgment for cable company. Property owners appealed. The Waco Court of Appeals, 43 S.W.3d 577, reversed and remanded. Cable company petitioned for review. The Supreme Court, Harriet O'Neill, J., held that: (1) easement permitting use of property for the purpose of constructing and maintaining an "electric transmission or distribution line or system" did not permit cable-television lines to be strung across property owners' land without their consent, and (2) statute permitting cable companies to install lines on a "utility easement" did not apply to private-easement grants, disapproving *Inwood West Civic Association v. Touchy,* 754 S.W.2d 276.

Affirmed.

Hecht, J., filed dissenting opinion.

West Headnotes

**[1] Easements 141 ⚷1**

141 Easements
   141I Creation, Existence, and Termination
      141k1 k. Nature and elements of right. Most Cited Cases
    A landowner may choose to relinquish a por-

tion of the right to exclude others from his or her property by granting an easement, but such a relinquishment is limited in nature.

**[2] Easements 141 ⚷24**

141 Easements
   141I Creation, Existence, and Termination
      141k24 k. Transfer of right. Most Cited Cases
    While certain easements may be assigned or apportioned to a third party, the third party's use cannot exceed the rights expressly conveyed to the original easement holder.

**[3] Easements 141 ⚷42**

141 Easements
   141II Extent of Right, Use, and Obstruction
     141k39 Extent of Right
      141k42 k. By express grant or reservation. Most Cited Cases
    Courts apply basic principles of contract construction and interpretation when considering an express easement's terms.

**[4] Easements 141 ⚷42**

141 Easements
   141II Extent of Right, Use, and Obstruction
     141k39 Extent of Right
      141k42 k. By express grant or reservation. Most Cited Cases
    The contracting parties' intentions, as expressed in an easement's grant, determine the scope of the conveyed interest.

**[5] Easements 141 ⚷42**

141 Easements
   141II Extent of Right, Use, and Obstruction
     141k39 Extent of Right
      141k42 k. By express grant or reservation. Most Cited Cases
    When an easement grant's terms are not spe-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

cifically defined, they should be given their plain, ordinary, and generally accepted meaning.

**[6] Easements 141 🔑51**

141 Easements
   141II Extent of Right, Use, and Obstruction
      141k51 k. Purposes of use. Most Cited Cases

An easement's express terms, interpreted according to their generally accepted meaning, delineate the purposes for which the easement holder may use the property; nothing passes by implication except what is reasonably necessary to fairly enjoy the rights expressly granted.

**[7] Easements 141 🔑51**

141 Easements
   141II Extent of Right, Use, and Obstruction
      141k51 k. Purposes of use. Most Cited Cases

If a particular purpose is not provided for in the grant, a use pursuing that purpose is not allowed under an easement.

**[8] Easements 141 🔑50**

141 Easements
   141II Extent of Right, Use, and Obstruction
      141k50 k. Mode of use. Most Cited Cases

The manner, frequency, and intensity of an easement's use may change over time to accommodate technological development, but such changes must fall within the purposes for which the easement was created, as determined by the grant's terms. Restatement (Third) of Property (Servitudes) §§ 1.2, 4.10.

**[9] Easements 141 🔑50**

141 Easements
   141II Extent of Right, Use, and Obstruction
      141k50 k. Mode of use. Most Cited Cases

An express easement encompasses only those technological developments that further the particular purpose for which the easement was granted. Restatement (Third) of Property (Servitudes) §§ 1.2, 4.2, 4.10.

**[10] Easements 141 🔑42**

141 Easements
   141II Extent of Right, Use, and Obstruction
      141k39 Extent of Right
         141k42 k. By express grant or reservation.
Most Cited Cases

An asserted public policy does not permit a court to circumvent the contracting parties' intent by disregarding an easement's express terms and the specific purpose for which it was granted. Restatement (Third) of Property (Servitudes) § 4.1.

**[11] Easements 141 🔑51**

141 Easements
   141II Extent of Right, Use, and Obstruction
      141k51 k. Purposes of use. Most Cited Cases

If a use does not serve the easement's express purpose, it becomes an unauthorized presence on the land whether or not it results in any noticeable burden to the servient estate.

**[12] Easements 141 🔑42**

141 Easements
   141II Extent of Right, Use, and Obstruction
      141k39 Extent of Right
         141k42 k. By express grant or reservation.
Most Cited Cases

When an easement is susceptible to only one reasonable, definite interpretation after applying established rules of contract construction, court is obligated to construe it as a matter of law even if the parties offer different interpretations of the easement's terms.

**[13] Telecommunications 372 🔑1223**

372 Telecommunications
   372VI Cable Television
      372k1220 Rights of Way to Public or Private
Property
         372k1223 k. Private property in general.
Most Cited Cases
  (Formerly 372k451)

Private easement granted to electrical utility,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

90 S.W.3d 697, 46 Tex. Sup. Ct. J. 167
**(Cite as: 90 S.W.3d 697)**

permitting utility to use property for the purpose of constructing and maintaining an "electric transmission or distribution line or system," did not permit cable-television lines to be strung across property owners' land without their consent.

**[14] Statutes 361 ☞1072**

361 Statutes
    361III Construction
        361III(A) In General
           361k1071 Intent
               361k1072 k. In general. Most Cited Cases

(Formerly 361k181(1))

Court's purpose in construing a statute is to determine the Legislature's intent.

**[15] Statutes 361 ☞1080**

361 Statutes
    361III Construction
        361III(A) In General
           361k1078 Language
               361k1080 k. Language and intent, will, purpose, or policy. Most Cited Cases

(Formerly 361k188)

**Statutes 361 ☞1082**

361 Statutes
    361III Construction
        361III(A) In General
           361k1082 k. Construction based on multiple factors. Most Cited Cases

(Formerly 361k176)

As a starting point, courts construe statutes as written and, if possible, ascertain intent from the statutory language; court may also consider other factors, including the object the statute seeks to obtain, legislative history, and the consequences of a particular construction. V.T.C.A., Government Code § 311.023.

**[16] Statutes 361 ☞1155**

361 Statutes

361III Construction
    361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
        361k1155 k. Construing together; harmony. Most Cited Cases

(Formerly 361k208, 361k205)

Court must always consider a statute as a whole and attempt to harmonize its various provisions. V.T.C.A., Government Code § 311.021.

**[17] Constitutional Law 92 ☞994**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
        92VI(C)3 Presumptions and Construction as to Constitutionality
           92k994 k. Avoidance of constitutional questions. Most Cited Cases

(Formerly 92k48(1))

Court must, if possible, construe statutes to avoid constitutional infirmities. V.T.C.A., Government Code § 311.021(1).

**[18] Telecommunications 372 ☞1223**

372 Telecommunications
    372VI Cable Television
        372k1220 Rights of Way to Public or Private Property
           372k1223 k. Private property in general. Most Cited Cases

(Formerly 372k451)

Term "utility easement," as used in statute granting cable companies the right to install lines on a utility easement, covers only public easements, that is, those easements dedicated to the public's use; thus, the statute does not cover private-easement grants that are negotiated between owners of private property and individual utility companies; disapproving *Inwood West Civic Association v. Touchy*, 754 S.W.2d 276. V.T.C.A., Utilities Code § 181.102.

**\*698** Bob E. Shannon, William Paul Johnson,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

90 S.W.3d 697, 46 Tex. Sup. Ct. J. 167
**(Cite as: 90 S.W.3d 697)**

Baker & Botts, Austin, Samara L. Kline, Baker & Botts, Dallas, and Joe R. Greenhill, Baker & Botts, Austin, Linda Reisner, for Petitioner.

Brett L. Bigham, Waxahachie, for Respondents.

**\*699** Justice O'NEILL delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, Justice HANKINSON, Justice JEFFERSON, Justice RODRIGUEZ, and Justice SCHNEIDER joined.

In this case, we must decide whether an easement that permits its holder to use private property for the purpose of constructing and maintaining "an electric transmission or distribution line or system" allows the easement to be used for cable-television lines. We hold that it does not. We further hold that section 181.102 of the Texas Utilities Code, which grants cable companies the right to install lines on a "utility easement," does not apply to private easements like the one at issue here. Accordingly, we affirm the court of appeals' judgment reversing summary judgment in the cable company's favor. 43 S.W.3d 577.

### I. Background

This case centers around the scope of a property interest granted over sixty years ago. In 1939, Alan and Myrna Krohn's predecessors in interest granted to the Hill County Electric Cooperative an easement that allows the cooperative to use their property for the purpose of constructing and maintaining "an electric transmission or distribution line or system." The easement further granted the right to remove trees and vegetation "to the extent necessary to keep them clear of said electric line or system."

In 1991, Hill County Electric entered into a "Joint Use Agreement" with a cable-television provider, which later assigned its rights under the agreement to Marcus Cable Associates, L.P. Under the agreement, Marcus Cable obtained permission from Hill County Electric to attach its cable lines to the cooperative's poles. The agreement permitted Marcus Cable to "furnish television antenna service" to area residents, and allowed the cable wires to be attached only "to the extent [the cooperative] may lawfully do so." The agreement further provided that the electric cooperative did not warrant or assure any "right-of-way privileges or easements," and that Marcus Cable "shall be responsible for obtaining its own easements and rights-of-way."

Seven years later, the Krohns sued Marcus Cable, alleging that the company did not have a valid easement and had placed its wires over their property without their knowledge or consent. The Krohns asserted a trespass claim, and alleged that Marcus Cable was negligent in failing to obtain their consent before installing the cable lines. The Krohns sought an injunction ordering the cable wires' removal, as well as actual and exemplary damages. In defense, Marcus Cable asserted a right to use Hill County Electric's poles under the cooperative's easement and under Texas statutory law.

Both parties filed motions for summary judgment. The Krohns moved for partial summary judgment, arguing that Marcus Cable's wires constituted a trespass. The Krohns requested the court to order the wires' removal and to set for trial the determination of damages. Marcus Cable filed a response and its own summary-judgment motion, arguing that both the Hill County Electric easement and section 181.102 of the Texas Utilities Code gave it the legal right to place its wires on the Krohns' property.

The trial court granted summary judgment in Marcus Cable's favor. The court of appeals reversed and remanded, holding that neither section 181.102 nor the easement allowed Marcus Cable's use. 43 S.W.3d at 579. We granted review to consider whether the cooperative's easement or section 181.102 permit Marcus **\*700** Cable to attach cable-television lines to Hill County Electric's utility poles without the Krohns' consent.

### II. Common Law

[1] A property owner's right to exclude others

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

from his or her property is recognized as " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " *Dolan v. City of Tigard,* 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 433, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979))); *see also* II W. BLACKSTONE, BLACKSTONE'S COMMENTARIES 139 (Tucker ed. 1803). A landowner may choose to relinquish a portion of the right to exclude by granting an easement, but such a relinquishment is limited in nature. *Cf. San Jacinto Sand Co. v. Southwestern Bell Tel. Co.,* 426 S.W.2d 338, 345 (Tex.Civ.App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.); *see generally* II GEORGE W. THOMPSON, THOMPSON ON PROPERTY §§ 315–16, 319, at 6–7, 14–16, 32–34. Unlike a possessory interest in land, an easement is a nonpossessory interest that authorizes its holder to use the property for only particular purposes. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 1.2 cmt. d.

[2] Marcus Cable claims rights under Hill County Electric's express easement, that is, an easement conveyed by an express grant. *See DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 103 (Tex.1999). While the common law recognizes that certain easements may be assigned or apportioned to a third party, the third party's use cannot exceed the rights expressly conveyed to the original easement holder. *See Cantu v. Cent. Power & Light Co.,* 38 S.W.2d 876, 877 (Tex.Civ.App.-San Antonio 1931, writ ref'd); *Keokuk Junction Ry. Co. v. IES Indus., Inc.,* 618 N.W.2d 352, 356, 362 (Iowa 2000); *Buhl v. U.S. Sprint Communications Co.,* 840 S.W.2d 904, 910 (Tenn.1992); *cf. Carrithers v. Terramar Beach Cmty. Improvement Assoc.,* 645 S.W.2d 772, 774 (Tex.1983) ( "[A]n easement may not create a right or interest in a grantee's favor which the grantor himself did not possess."). Marcus Cable's rights, therefore, turn on whether the cooperative's easement permits the Krohns' prop-

erty to be used for the purpose of installing cable-television lines.

Marcus Cable raises three arguments to support its contention that the original easement encompasses cable-television use. First, it argues that easements must be interpreted to anticipate and encompass future technological developments that may not have existed when the easement was originally granted. Second, Marcus Cable contends that courts should give strong deference to the public policy behind expanding the provision of cable-television services. Third, Marcus Cable argues that its use is permitted because adding cable-television wires does not increase the burden on the servient estate. These arguments, however, ignore fundamental principles that govern interpreting easements conveyed by express grant. Those principles lead us to conclude that the original easement does not encompass Marcus Cable's use.

**A. Express Easements**

[3][4] We apply basic principles of contract construction and interpretation when considering an express easement's terms. *DeWitt County,* 1 S.W.3d at 100; *Armstrong v. Skelly Oil, Co.,* 81 S.W.2d 735, 736 (Tex.Civ.App.-Amarillo 1935, writ ref'd). The contracting parties' intentions, as expressed in the grant, determine the **\*701** scope of the conveyed interest. *See DeWitt County,* 1 S.W.3d at 103 (stating that "the scope of the easement holder's rights must be determined by the terms of the grant"); *see also Houston Pipe Line Co. v. Dwyer,* 374 S.W.2d 662, 664–65 (Tex.1964) (holding that parties' intentions are determined by interpreting the real-property grant's language); *Garrett v. Dils Co.,* 157 Tex. 92, 299 S.W.2d 904, 906 (1957) (same); *City of Dallas v. Etheridge,* 152 Tex. 9, 253 S.W.2d 640, 642 (1952) (same); RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 (providing that an easement "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding the creation of the servitude, and to carry out the purpose for which it

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

was created").

[5][6][7] When the grant's terms are not specifically defined, they should be given their plain, ordinary, and generally accepted meaning. *DeWitt, 1 S.W.3d at 101; see also* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES)))))))))))) § 4.1 cmt. d ("[Easement] language should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it...."); RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(a) ("Unless a different intention is manifested, where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."). An easement's express terms, interpreted according to their generally accepted meaning, therefore delineate the purposes for which the easement holder may use the property. *See DeWitt,* 1 S.W.3d at 100, 103; *see also Coleman v. Forister,* 514 S.W.2d 899, 903 (Tex.1974); *Vahlsing v. Harrell,* 178 F.2d 622, 624 (5th Cir.1949) (applying Texas law). Nothing passes by implication "except what is reasonably necessary" to fairly enjoy the rights expressly granted. *Coleman,* 514 S.W.2d at 903; *Bland Lake Fishing & Hunting Club v. Fisher,* 311 S.W.2d 710, 715–16 (Tex.Civ.App.-Beaumont 1958, no writ). Thus, if a particular purpose is not provided for in the grant, a use pursuing that purpose is not allowed. *See Coleman,* 514 S.W.2d at 903; *Kearney & Son v. Fancher,* 401 S.W.2d 897, 904–05 (Tex.Civ.App.-Fort Worth 1966, writ ref'd n.r.e.); *cf. Bickler v. Bickler,* 403 S.W.2d 354, 359 (Tex.1966). If the rule were otherwise,

> then the typical power line or pipeline easement, granted for the purpose of constructing and maintaining a power line or pipeline across specified property, could be used for any other purpose, unless the grantor by specific language negated all other purposes.

*Kearney & Son,* 401 S.W.2d at 904–05 (citing LANGE, 4 TEXAS PRACTICE, *Land Titles* § 384, at 173); *see also City of Pasadena v. California–Michigan Land & Water Co.,* 17 Cal.2d 576,

110 P.2d 983, 985 (1941) ("It is not necessary for [the easement grantor] to make any reservation to protect his interests in the land, for what he does not convey, he still retains.").

[8][9] The common law does allow some flexibility in determining an easement holder's rights. In particular, the manner, frequency, and intensity of an easement's use may change over time to accommodate technological development. RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10. But such changes must fall within the purposes for which the easement was created, as determined by the grant's terms. *See id.* § 1.2 cmt. d ("The holder of the easement ... is entitled to make only the uses reasonably necessary for the specified purpose."); § 4.10 & cmt. a (noting that manner, frequency, and intensity of easement may change to take advantage of technological advances, but only for purposes for which easement was created); *see, e.g.,* **\*702***Edgcomb v. Lower Valley Power & Light, Inc.,* 922 P.2d 850, 854–55, 858 (Wyo.1996) (holding that, under easement granted for an electric or telephone line, the easement holder could increase the electricity-carrying capacity and replace the static-telephone line with fiber-optics line as a matter of "normal development of the respective rights and use"); *City Pub. Serv. Bd. of San Antonio v. Karp,* 585 S.W.2d 838, 841–42 (Tex.Civ.App.-San Antonio 1979, no writ) (holding that a "transformer easement" permitted its holder to replace a malfunctioning underground transformer with an aboveground one as "a matter of normal development"); *Lower Colo. River Auth. v. Ashby,* 530 S.W.2d 628, 629, 632–33 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.) (holding that, under the electric-transmission easement at issue, the easement holder could replace wooden towers with new steel towers and could increase the electricity-carrying capacity); RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.10 illus. 13 (stating that, under a 1940s telephone easement, easement holder could mount transmitters on its poles for cellular-telephone transmissions unless doing so would unreas-

onably interfere with enjoyment of the servient estate). Thus, contrary to Marcus Cable's argument, an express easement encompasses only those technological developments that further the particular purpose for which the easement was granted. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §§ 1.2 cmt. d., 4.2 cmt. a, 4.10 & cmt. a. Otherwise, easements would effectively become possessory, rather than nonpossessory, land interests. *See id.* § 1.2 cmt. d (distinguishing between an easement that permits its owner to use land for only specified purposes, and a possessory land interest that permits its owner to make any use of the property).

The emphasis our law places upon an easement's express terms serves important public policies by promoting certainty in land transactions. In order to evaluate the burdens placed upon real property, a potential purchaser must be able to safely rely upon granting language. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 cmt. d. Similarly, those who grant easements should be assured that their conveyances will not be construed to undermine private-property rights—like the rights to "exclude others" or to "obtain a profit"—any more than what was intended in the grant. *See Loretto,* 458 U.S. at 436, 102 S.Ct. 3164.

[10] Marcus Cable suggests that we should give greater weight to the public benefit that results from the wide distribution of cable-television services, arguing that technological advancement in Texas will be substantially impeded if the cooperative's easement is not read to encompass cable-television use.[FN1] But even if that were so, we may not circumvent the contracting parties' intent by disregarding the easement's express terms and the specific purpose for which it was granted. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES)))))))))))))) § 4.1 & cmt. d (indicating that a court may not adopt an easement interpretation based on public policy unless that interpretation is supported by the grant's terms). Ad-

hering to basic easement principles, we must decide not what is most convenient to the public or profitable to Marcus Cable, but what purpose the contracting parties intended the easement to serve. *See* **\*703***Dauenhauer v. Devine,* 51 Tex. 480, 489–90 (1879). Hill County Electric could only permit Marcus Cable to use its easement "so long as that use is devoted exclusively to the purposes of the grant." *Cantu,* 38 S.W.2d at 877.

> FN1. We note that the summary-judgment evidence indicates that Marcus Cable has readily available alternatives to attaching its cable lines to Hill County Electric's utility poles. Furthermore, it is undisputed that cable-television providers may place their lines on public property in unincorporated areas. *See* TEX. UTIL.CODE § 181.102.

[11] Finally, Marcus Cable contends that its use should be allowed because attaching cable-television wires to Hill County Electric's utility poles does not materially increase the burden to the servient estate. But again, if a use does not serve the easement's express purpose, it becomes an unauthorized presence on the land whether or not it results in any noticeable burden to the servient estate. *See McDaniel Bros. v. Wilson,* 70 S.W.2d 618, 621 (Tex.Civ.App.-Beaumont 1934, writ ref'd) ("[E]very unauthorized entry upon land of another is a trespass even if no damage is done or the injury is slight ...."); *see also Rio Costilla Co-op. Livestock Ass'n v. W.S. Ranch Co.,* 81 N.M. 353, 467 P.2d 19, 25 (1970); *Beckwith v. Rossi,* 157 Me. 532, 175 A.2d 732, 735–36 (1961). Thus, the threshold inquiry is not whether the proposed use results in a material burden, but whether the grant's terms authorize the proposed use. With these principles in mind, we turn to the easement at issue in this case.

### B. Hill County Electric's Easement

[12] Both parties urge us to determine Marcus Cable's easement rights as a matter of law. When an easement is susceptible to only one reasonable, definite interpretation after applying established rules of contract construction, we are obligated to con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

strue it as a matter of law even if the parties offer different interpretations of the easement's terms. *DeWitt,* 1 S.W.3d at 100. Because the easement here can be given a definite meaning, we interpret it as a matter of law.

[13] The easement granted Hill County Electric the right to use the Krohns' property for the purpose of constructing and maintaining an "electric transmission or distribution line or system." The terms "electric transmission" and "electric distribution" are commonly and ordinarily associated with power companies conveying electricity to the public. *See, e.g., Texas Power & Light Co. v. Cole,* 158 Tex. 495, 313 S.W.2d 524, 526–27, 530 (1958); *Resendez v. Lyntegar Elec. Coop., Inc.,* 511 S.W.2d 350, 352–53 (Tex.Civ.App.Amarillo 1974, no writ); *Upshur–Rural Elec. Coop. Corp. v. State,* 381 S.W.2d 418, 424 (Tex.Civ.App.-Austin 1964, writ dism'd) (using terms electric transmission and/or distribution to describe equipment used by power companies to convey electricity); *see also* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES)))))))))))))) § 4.10 illus. 3 & 12 (using "electric-transmission lines" to designate lines operated by power companies); TEX. UTIL.CODE § 39.157(a), (d)(3) (providing that Public Utility Commission shall regulate market-power abuses in the sale of electricity by utilities "providing electric transmission or distribution services"). Texas cases decided around the time the cooperative's easement was granted strongly suggest that this was the commonly understood meaning of those terms. *See, e.g., City of Bryan v. A & M Consol. Indep. Sch. Dist.,* 179 S.W.2d 987, 988 (Tex.Civ.App.-Waco 1944), *aff'd,* 143 Tex. 348, 184 S.W.2d 914 (1945); *Texas–New Mexico Utils. Co. v. City of Teague,* 174 S.W.2d 57, 59 (Tex.Civ.App.-Fort Worth 1943, writ ref'd w.o.m.); *Arcola Sugar Mills Co. v. Houston Lighting & Power Co.,* 153 S.W.2d 628, 629–30 (Tex.Civ.App.-Galveston 1941, writ ref'd w.o.m.); *McCulloch County Elec. Co-op., Inc. v. Hall,* 131 S.W.2d 1019, 1020, 1022 (Tex.Civ.App.-Austin 1939, writ dism'd); *Willacy County v. Central*

*Power & Light Co.,* 73 S.W.2d 1060, 1061 (Tex.Civ.App.-San Antonio 1934, writ dism'd) (using term electric **\*704** transmission to describe equipment used by power companies to convey electricity). Accordingly, we construe the easement's terms to allow use of the property for facilities to transmit electricity.

Marcus Cable does not argue that the generally prevailing meaning of the easement's grant encompasses cable-television services. Instead, it claims that, for reasons of public policy, we should construe the easement to embrace modern developments, without regard to the easement's language. In support of that position, Marcus Cable cites a number of decisions in other jurisdictions that have allowed the use of easements predating cable technology to allow installation of cable transmission lines.

The cases Marcus Cable cites, however, involve different granting language and do not support the proposition that we may disregard the parties' expressed intentions or expand the purposes for which an easement may be used. To the contrary, those cases involve easements containing much broader granting language than the easement before us. Most of them involved easements granted for communications media, such as telegraph and telephone, in addition to electric utility easements. In concluding that the easements were broad enough to encompass cable, the reviewing courts examined the purpose for which the easement was granted and essentially concluded that the questioned use was a more technologically advanced means of accomplishing the same communicative purpose.

For example, in *Salvaty v. Falcon Cable Television,* the 1926 easement permitted its holder to maintain both electric wires *and* telephone wires. 165 Cal.App.3d 798, 212 Cal.Rptr. 31, 32, 35 (1985). The court held that cable-television lines were within the easement's scope, observing that cable television is "part of the natural evolution of *communications* technology." *Id.* at 34–35

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(emphasis added); *accord Witteman v. Jack Barry Cable TV,* 228 Cal.Rptr. 584, 589 (Cal.Ct.App.1986) (same). Similarly, the Fourth Circuit held that an easement allowing its holder to use the land for the purpose of maintaining pole lines for "electrical and telephone service" was sufficiently broad to encompass cable-television lines. *C/R TV, Inc. v. Shannondale, Inc.,* 27 F.3d 104, 106, 109–10 (4th Cir.1994) (applying West Virginia law). In reaching its conclusion, the court relied on the similar communicative aspects of both "telephone services" and cable-television services. *Id.* at 109–10. Other cases Marcus Cable cites also involvedeasementsgrantedforcommunications-transmission purposes. *See, e.g., Cousins v. Alabama Power Co.,* 597 So.2d 683, 686–87 (Ala.1992) (involving easements—granted for the purpose of maintaining "electric transmission lines and all telegraph and telephone lines"—that the landowners conceded included the right to maintain fiber-optics telecommunications lines); *Jolliff v. Hardin Cable Television Co.,* 26 Ohio St.2d 103, 55 O.O.2d 203, 269 N.E.2d 588, 591 (1971) (concluding that cable-television wires were a burden "contemplated at the time of the grants [to the power company], as evidenced by the specific reference to telegraph and telephone wires" in the 1940 easement); *Am. Tel. & Tel. Co. of Mass. v. McDonald,* 273 Mass. 324, 173 N.E. 502, 502–03 (1930) (concluding that easement granted for the purpose of maintaining "lines of telephone and telegraph" could be apportioned by the easement holder to a telephone company seeking to install a telephone cable, and that "[n]othing granted to the [company] enables it to do anything which the original grantee could not have done"); *Henley v. Continental Cablevision of St. Louis County, Inc.,* 692 S.W.2d 825, 827, 829 (Mo.Ct.App.1985) (concluding that cable television fell within the 1922 easement grantors' expressed **\*705** intention to provide "electric power and telephonic communications" to subdivision residents); *Hoffman v. Capitol Cablevision Sys., Inc.,* 52 A.D.2d 313, 383 N.Y.S.2d 674, 676, 677 (N.Y.App.Div.1976) (involving easements for the "distribution of electricity and messages," and con-cluding that cable-television wires were no greater burden "than that contemplated by the original easements").

We express no opinion about whether the cases Marcus Cable relies upon were correctly decided. But, unlike the cases Marcus Cable cites, Hill County Electric's easement does not convey the right to use the property for purposes of transmitting communications. While cable television may utilize electrical impulses to transmit communications, as Marcus Cable claims,[FN2] television transmission is not a more technologically advanced method of delivering electricity. Thus, the above-referenced cases do not support Marcus Cable's argument that the easement here encompasses the additional purpose of transmitting television content to the public.

> FN2. Marcus Cable did not offer any evidence about the nature of cable-television transmissions; thus, the record is silent on this point. But we note that, in recent years, many telecommunications providers, including cable-television operators, have moved toward fiber-optics cables that use light lasers, rather than electrical impulses, to transmit communications over their lines to the public. *See, e.g.,* Mike Mills, *Fine Lines of Telecommunications,* THE WASH. POST,, Aug. 5, 1996, at F17.

Marcus Cable cites only two cases involving easements whose grants did not include telephone or telegraph services, and neither supports its position. In *Centel Cable Television, Inc. v. Cook,* the court interpreted easement language that permitted its holder to maintain "a line for the transmission and/or distribution of electric energy thereover, *for any and all purposes for which electric energy is now, or may hereafter be used.*" 58 Ohio St.3d 8, 567 N.E.2d 1010, 1014 (1991) (emphasis added). Observing that cable-television broadcasting "*utilize[s] ... 'electric energy,' *" the court concluded that the grant language was broad enough to encompass cable television. *Id.* (emphasis added).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

And *Hise v. BARC Electric Cooperative,* 254 Va. 341, 492 S.E.2d 154, 158 (1997), involved a right-of-way easement by prescription that had been used for cable-television lines during the prescriptive period and that was later widened through eminent domain. It did not involve a privately-negotiated, express easement. *See, e.g., Nishanian v. Sirohi,* 243 Va. 337, 414 S.E.2d 604, 606 (1992) ("The use of an [express] easement must be restricted to the terms and purposes on which the grant was based." (citing *Robertson v. Bertha Mineral Co.,* 128 Va. 93, 104 S.E. 832, 834 (1920))). The easements in Marcus Cable's cited cases are simply not comparable to the more limited, express easement presented here.

Finally, Marcus Cable cites *San Antonio & Aransas Pass Railway v. Southwestern Telegraph & Telephone Co.,* 93 Tex. 313, 55 S.W. 117 (1900), for the proposition that an easement must be interpreted to embrace technological change. But that case does not support the idea that a court may ignore the contracting parties' intent as reflected in their written language. There, we were called upon to determine whether a statute granting condemnation power to "telegraph" companies applied equally to "telephone" companies. *Id.* Relying upon later statutory enactments that reflected the Legislature's intent to treat both the same, and recognizing that telegraph and telephone are two different means of accomplishing the same communicative purpose, we held that the statute **\*706** at issue applied to telephone companies. *Id.* at 118–19.

The dissenting Justice would hold that the easement could properly be read to encompass cable because electricity is used in the transmission of cable television signals. Under such a reading, however, the easement could also be used for telegraph or telephone lines. Obviously, the Krohns' predecessors could have granted an easement for those purposes. But the easement's specific terms cannot be read so broadly.

In sum, the easement language here, properly construed, does not permit cable-television lines to

be strung across the Krohns' land without their consent. However laudable the goal of extending cable service might be, we cannot disregard the easement's express terms to enlarge its purposes beyond those intended by the contracting parties. To the extent the trial court granted Marcus Cable summary judgment on this basis, it erred, and the court of appeals correctly reversed.

### III. Section 181.102

Marcus Cable contends that, even if Hill County Electric's easement does not permit it to string cable-television wires across the Krohns' property, section 181.102 of the Texas Utilities Code does. That section, which allows cable-television service providers to utilize certain properties, provides:

(a) In an unincorporated area, a person in the business of providing community antenna or cable television service to the public may install and maintain equipment through, under, along, across, or over a utility easement, a public road, an alley, or a body of public water in accordance with this subchapter.

(b) The installation and maintenance of the equipment must be done in a way that does not unduly inconvenience the public using the affected property.

TEX. UTIL.CODE § 181.102.

Marcus Cable argues that the statute's plain language encompasses private easements like the one at issue here. Specifically, Marcus Cable contends that the term "utility easement" is not qualified by the term "public," as are other properties listed in the statute, and therefore the Legislature must have intended to cover private-easement grants to utility companies. The Krohns, on the other hand, argue that the statute's language, purpose, and legislative history support a distinction between general-use, public-utility easements and limited private-easement grants. We agree with the Krohns.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

[14][15][16][17] Our purpose in construing a statute is to determine the Legislature's intent. *See Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 493 (Tex.2001). As a starting point, we construe statutes as written and, if possible, ascertain intent from the statutory language. *Id.* (citing *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985)). We may also consider other factors, including the object the statute seeks to obtain, legislative history, and the consequences of a particular construction. *Id.; see also* TEX. GOV'T CODE § 311.023. Moreover, we must always consider a statute as a whole and attempt to harmonize its various provisions. *Helena Chem.,* 47 S.W.3d at 493; *see also* TEX. GOV'T CODE § 311.021. We must also, if possible, construe statutes to avoid constitutional infirmities. *In re Bay Area Citizens Against Lawsuit Abuse,* 982 S.W.2d 371, 380 (Tex.1998); *Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 662 (Tex.1996); *see also* TEX. GOV'T CODE § 311.021(1).

[18] Applying these principles, we hold that section 181.102 does not encompass **\*707** private easements granted to utilities. The term "utility easement" appears in a list of properties—public roads, alleys, and public waterways—that are generally dedicated to public use. Subsection (b) goes on to prohibit cable companies from "unduly inconvenienc[ing] *the public using the affected property,*" indicating that the Legislature presumed public access to the property interests listed in subsection (a). TEX. UTIL.CODE § 181.102(b) (emphasis added). Thus, consistent with the nature of the other specified properties, and harmonizing the statute's subsections, "utility easement" can reasonably be read to cover only public easements, that is, those easements dedicated to the public's use. *See, e.g., Clark v. El Paso Cablevision, Inc.,* 475 S.W.2d 575, 577 (Tex.Civ.App.-El Paso 1971, no writ).

The limited legislative history that is available supports this interpretation. Statements were repeatedly made in hearings indicating that section 181.102 was intended to encompass only public easements. *Hearings on S.B. 643 Before the House Comm. on Urban Affairs,* 68th Leg., R.S. (April 28, 1983). Finally, construing the statute to cover only public easements avoids constitutional infirmities. In *Loretto,* the United States Supreme Court analyzed a New York statute that granted cable-television companies the right to place their equipment on apartment buildings, and held that applying the statute to private property would effect a "taking" in violation of the Fifth Amendment. *Loretto,* 458 U.S. at 421, 102 S.Ct. 3164. The Court reasoned that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve," and that "permanent occupations of land by such installations as telegraph and telephone lines ... or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." *Id.* at 426, 430, 102 S.Ct. 3164. We also note that a number of federal courts, construing the Cable Communications Policy Act, have recognized the constitutional concerns that would arise from requiring private parties to grant property access to uninvited cable companies whenever a private easement has been granted to other specific service providers. *See, e.g., Cable Ariz. Corp. v. CoxCom, Inc.,* 261 F.3d 871, 876 (9th Cir.2001); *TCI of N.D., Inc. v. Schriock Holding Co.,* 11 F.3d 812, 815 (8th Cir.1993); *Cable Holdings of Ga., Inc. v. McNeil Real Estate Fund VI, Ltd.,* 953 F.2d 600, 604–05 (11th Cir.), *cert. denied,* 506 U.S. 862, 113 S.Ct. 182, 121 L.Ed.2d 127 (1992); *Cable Invs., Inc. v. Woolley,* 867 F.2d 151, 159–60 (3d Cir.1989). Thus, construing section 181.102 to cover private property could have significant constitutional implications.

In sum, we hold that section 181.102 does not cover private-easement grants, like the one at issue here, that are negotiated between owners of private property and individual utility companies.[FN3]

> FN3. In *Inwood West Civic Association v. Touchy,* 754 S.W.2d 276, 277

(Tex.App.-Houston [14th Dist.] 1988, orig. proceeding), in the course of considering a pre-trial discovery dispute, the court stated in dicta that section 181.102 gives "cable television companies free access to utility easements across private property for the installation of their equipment." We disapprove this statement.

### IV. Conclusion

We hold that Hill County Electric's easement does not convey the right to string cable-television wires over the Krohns' private property. Nor does section 181.021 confer such a right upon Marcus Cable, because the statute covers only utility easements that are dedicated to **\*708** public use. Accordingly, we affirm the court of appeals' judgment reversing and remanding this case to the trial court for further proceedings.

Justice HECHT filed a dissenting opinion.

Justice HECHT, dissenting.

The electric television (not its short-lived electro-mechanical predecessor) was conceived in 1921 by fourteen-year-old Philo Farnsworth, who made a working model in 1927,[FN1] twelve years before RCA's National Broadcasting Company first began regular telecasts from the World's Fair in New York City, and H.W. and Ruth Curtis granted Hill County Electric Cooperative an easement on their land north of Sardis, Texas, "to place, construct, operate, repair, maintain, relocate and replace ... an electric transmission and distribution line or system". After 1939, television took off. Cable television is said to have originated in 1948 when John Walson of Mahanoy City, Pennsylvania, used a twin-lead wire to transmit an electric signal from a remote antenna to his store to demonstrate to his customers how reception could be improved and thereby increase his sales of the newfangled television sets.[FN2] The Curtises no doubt intended that by granting the Co-op an easement, wires strung on poles erected on their property would be used to transmit electric current to power lights and appliances. They probably did not envision that one such

appliance in the Sardis area would be a television set. And they could not possibly have imagined that televisions powered by the electric current carried by lines over their easement would have better reception if supplied with an electric signal transmitted over another look-alike line hung on the same poles, even if the Curtises had been as precocious as Philo Farnsworth himself.

FN1. *See generally* EVAN I. SCHWARTZ, THE LAST LONE INVENTOR: A TALE OF GENIUS, DECEIT, AND THE BIRTH OF TELEVISION (2002); DANIEL STASHOWER, THE BOY GENIUS AND THE MOGUL: THE UNTOLD STORY OF TELEVISION (2002); Neil Postman, *Electrical Engineer,* TIME, March 29, 1999, at 92 (quoting Farnsworth's son Kent as saying of his father: "I suppose you could say that he felt he had created kind of a monster, a way for people to waste a lot of their lives. Throughout my childhood his reaction to television was, 'There's nothing on it worthwhile, and we're not going to watch it in this household, and I don't want it in your intellectual diet.' ").

FN2. *See* S. Res. 445, 100th Cong. (1988).

So if the question is, what were the Curtises thinking in 1939 when they gave the Co-op an easement for "an electric transmission and distribution line or system", the answer is easy: they were thinking about electric power, not an electric cable television signal, even though both are electric. But that's not the question because, as the Court correctly holds, the scope of an easement is measured by the parties' intent as expressed in the words used,[FN3] broadened by changes in the manner, frequency, and intensity of the intended use that are due to technological advances and do not unreasonably burden the servient estate.[FN4] An easement need not accommodate unintended uses merely because they present no additional burden, nor can an easement be enlarged merely because additional

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

uses would benefit the public. But a use that is within the language of an easement as it has come to be understood with changes in technology is not prohibited simply because it was not part of the parties' original thinking. So **\*709** the question in this case is whether a cable carrying an electric television signal to various users is "an electric transmission and distribution line or system" as we have come to understand more of what those words entail.

> FN3. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100–103 (Tex.1999). *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 (1998).

> FN4. *See* RESTATEMENT, *supra* note 3, at § 4.10 & cmt. a.

Now if one were to stick just to the words, the answer would clearly be yes. A television cable is a "line". A television signal is "electric", assuming, as the Court does, that the cable is not fiber optic (although even if the cable were fiber optic, the signal would still start out electric at the transmitter and end up electric at the receiver).[FN5] Sending the signal is "an electric transmission". Transmitting it among a number of users is "an electric distribution". Thus, a television cable is "an electric transmission and distribution line". Looking at a pole carrying lines transmitting electric power and a line transmitting television signals, a person unfamiliar with differences in the physics of the transmissions could not tell which was which.

> FN5. *Cf.* KENNETH T. DESCHLER, CABLE TELEVISION TECHNOLOGY 24 (1987) (explaining that for a signal broadcast by air, "[i]n effect, electrical energy from the transmitter is converted into electromagnetic energy by the antenna and radiated into space. On the reception end, electromagnetic energy is converted into electrical energy by the antenna and fed into the receiver.").

But the Court answers the question no. Here is its analysis:

(1) "The terms 'electric transmission' and 'electric distribution' are commonly and ordinarily associated with power companies conveying electricity to the public."[FN6]

> FN6. *Ante* at 703.

(2) "Texas cases decided around the time the co-operative's easement was granted strongly suggest that this was the commonly understood meaning of those terms."[FN7]

> FN7. *Ante* at 703.

(3) "While cable television may utilize electrical impulses to transmit communications, as Marcus Cable claims, television is not a more technologically advanced method of delivering electricity."[FN8]

> FN8. *Ante* at 705 (footnote omitted).

(4) Although easements for electric transmission have been held to include cable television signal transmission in all seven cases that have considered the matter in other jurisdictions,[FN9] the language of the easements in all those cases was broader.[FN10]

> FN9. *Centel Cable Television Co. v. Cook,* 58 Ohio St.3d 8, 567 N.E.2d 1010, 1014–1015 (1991); *Jolliff v. Hardin Cable Television Co.,* 26 Ohio St.2d 103, 55 O.O.2d 203, 269 N.E.2d 588, 591 (1971); *Salvaty v. Falcon Cable Television,* 165 Cal.App.3d 798, 212 Cal.Rptr. 31, 34–36 (1985); *Witteman v. Jack Barry Cable TV,* 228 Cal.Rptr. 584 (Cal.Ct.App.1986), *review dismissed,* 240 Cal.Rptr. 449, 742 P.2d 779 (Cal.1987); *Henley v. Cont'l Cablevision, Inc.,* 692 S.W.2d 825, 829 (Mo.Ct.App.1985); *Hoffman v. Capitol Cablevision Sys., Inc.,* 52 A.D.2d 313, 383

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

N.Y.S.2d 674, 677–678 (N.Y.App.Div.1976); *C/R TV, Inc. v. Shannondale, Inc.,* 27 F.3d 104, 108–109 (4th Cir.1994) (applying West Virginia law).

FN10. *Ante* at 704.

While each of these elements in the Court's reasoning is irrefutable, they prove nothing. The fact (1) that the words "electric transmission and distribution" are often used in reference to electric power does not mean that they therefore cannot be used in reference to any other electric transmission, like a cable television signal. In fact, the words have a broader reference. For example, a statute regulating telecommunications refers to "any type of system in which electric ... signals are **\*710** used to transmit information, including a system transmitting information by ... wire or cable" FN11—in other words, an electric transmission system for information by line or cable. Of course, (2) the words could not have referred to a cable television signal in 1939, but only because no such thing existed, not because of the caselaw of the era. Our understanding of what "electric" means has changed immensely over time. Before Michael Faraday, Benjamin Franklin, and others discovered electric currents, "electric" referred to the static, magnetic condition of certain materials, like amber rubbed with a cloth.FN12 Indeed, the word "electric" derives from the Latin, *electrum,* meaning "amber". The meaning of "electric", as we have come to understand better the phenomenon to which it refers, can no more be confined to electric current than it could to static electricity or cloth-rubbed amber. Caselaw reflecting the understanding of "electric" in 1939 does not dictate all that the word means.

FN11. TEX. OCC.CODE § 1701.405(a)(1)(B).

FN12. *See generally Ask the Globe,* THE BOSTON GLOBE, August 3, 1989, at 28 (explaining that, in 1600, Dr. William Gilbert coined the phrase 'electrica' in a book about amber); 10 ENCYCLOPEDIA AMERICANA 134 (Int'l ed.1976).

As the Court says (3), television is certainly not a more technologically advanced method of delivering electric current, but that simplistic observation begs the issue. Are the technological changes relevant to understanding the scope of the easement those in "electric transmission and distribution" of whatever nature, or only those in the transmission and distribution of electric *current?* The answer is the former, if we are to be faithful to the language of the easement. Is transmission of a cable television signal a more technologically advanced "electric transmission"? Clearly, yes.

The Court is correct (4) that in six of the seven cases from other jurisdictions that have considered whether an easement for electric transmission can be shared by cable television, the easements expressly permitted telephone lines.FN13 Because the telephone is used for communication, the Court reasons, the easements in those cases were broader and could include—the Court will not say could *properly* include—cable television. Since the easement in the present case does not expressly allow for telephone lines, the Court concludes that it does not permit any use for purposes**\*711** of communication. But electric power is used for communication in the very important sense that neither a television nor a telephone will operate without it. Indeed, a television without a cable signal still has limited reception, while a television without electric power is nothing but a big doorstop, whether it is hooked up to cable or not. It is just not true that an easement for telephone wires contemplates the use of communication devices and an easement for electric current does not. It makes no sense to say, as the Court does, that because an easement for electric lines can be used to supply power to a television receiver, the easement excludes an electric line used to supply a signal to that receiver. It is not surprising, then, that the courts in the six cases do not draw this distinction; that is, none says that if an easement referred only to electric transmission and not telephone transmission, cable television trans-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

mission over the easement would be prohibited.

> FN13. *Jolliff v. Hardin Cable Television Co.,* 26 Ohio St.2d 103, 269 N.E.2d 588, 590 (1971) (involving an easement "to construct, erect, operate and maintain a line of poles and wires for the purpose of transmitting electric or other power, including telegraph or telephone wires"); *Salvaty v. Falcon Cable Television,* 165 Cal.App.3d 798, 212 Cal.Rptr. 31, 32 (1985) (involving easement "for the construction, operation, repair and maintenance thereon and thereover of a pole line for the stringing of telephone and electric light and power wires thereon"); *Witteman v. Jack Barry Cable TV,* 228 Cal.Rptr. 584, 586 (Cal.Ct.App.1986), *review dismissed,* 240 Cal.Rptr. 449, 742 P.2d 779 (Cal.1987) (involving an easement for "constructing, adding to, maintaining, removing and repairing ... pole lines ... for the transmission of electrical energy and for telephone lines"); *Henley v. Cont'l Cablevision, Inc.,* 692 S.W.2d 825, 827 (Mo.Ct.App.1985) (involving an easement to "construct, reconstruct, repair, operate and maintain its lines for telephone and electric light purposes"); *Hoffman v. Capitol Cablevision Sys., Inc.,* 52 A.D.2d 313, 383 N.Y.S.2d 674, 676, 677–678 (1976) (involving an easement "to construct, maintain, operate, repair and replace lines, consisting of poles, conduits, guys, guy stubs, crossarms, wires and appurtenances for the distribution of electricity and messages"); *C/R TV, Inc. v. Shannondale, Inc.,* 27 F.3d 104, 109 (4th Cir.1994) (applying West Virginia law) (involving an easement for "the installation, erection, maintenance, repair and operation of electric transmission and distribution pole lines, and electric service lines, with telephone wires thereon").

In fact, Marcus Cable asserts that no case in the country has ever barred cable television from an easement for electric transmissions, and neither the Krohns nor the Court has found one. Today's decision stands alone in the nation athwart the path to providing cable television and related services to rural areas. It directly conflicts with one of the seven cases that did not involve an easement that referred to telephone transmissions. There, the Supreme Court of Ohio held that an easement "for a line for the transmission and/or distribution of electric energy thereover, for any and all purposes for which electric energy is now, or may hereafter be used" allowed for a cable television line.[FN14] But the easement in that case only provided expressly what the law implies in the easement before us: that "electric transmission and distribution" includes all purposes for which electric transmissions are now or may hereafter be used, uses made possible only by subsequent technological developments. The legal effect of the language in both easements should be the same.

> FN14. *Centel Cable Television Co. v. Cook,* 58 Ohio St.3d 8, 567 N.E.2d 1010, 1015 (1991).

I would hold that the easement in the present case can be shared with a cable television provider if the servient estate is not additionally burdened. The Krohns argue that there would be an additional burden for three reasons. First, the Krohns suggest that "the placement of the cable line decreases the clearance which we have through one of our entrances". Assuming that this is so, as we must in reviewing a summary judgment, there is no evidence that a cable line is or could be lower than lines already on the poles. The height of lines on electric poles is governed by statute.[FN15] If the clearance at an entrance is decreased, it is only because the decrease is permitted by law regardless of whether the easement is used for cable television or other electric transmission. Second, the Krohns argue that if the Co-op lets one cable television provider share the easement, federal law requires that it let all such

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

providers do so on a nondiscriminatory basis, and if more providers are allowed to hang their wires on the poles, the burden to the servient estate will be increased as workers and equipment enter the property to construct and maintain the lines. Obviously, the Krohns' concern is somewhat iffy, but even if it were to begin to materialize, their easement would not be required to accommodate uses that presented an additional burden, and thus the number of users would be limited. Finally, the Krohns argue that to allow a cable television line on the Co-op's poles clouds **\*712** their title. But the Krohns do not explain how their title is more affected by Marcus Cable's use of the easement than by the Co-op's use. Thus, I would conclude that the Krohns have failed to show that Marcus Cable's use of the easement poses any greater burden to their estate.

> FN15. TEX. UTIL.CODE § 181.045.

Two amici curiae in support of the Krohns' position [FN16] urgently warn that to allow Marcus Cable to share the Co-op's easement will profoundly impact the property rights of all Texas landowners. Other amici concur in less dramatic terms. [FN17] The threat they perceive is inconsistent with experience. The Texas Cable and Telecommunications Association, as amicus curiae for Marcus Cable, advises that cable television providers already share electric poles on easements covering thousands of miles in Texas. The Association states, and the United States Supreme Court confirms, [FN18] that this has been going on for decades all over the country. Although every case to consider the issue until today has allowed cable television lines to be hung on electric power and telephone poles, private land ownership has survived.

> FN16. Independent Cattlemen's Association of Texas and Texas Forestry Association.

> FN17. The Texas Land & Mineral Owners Association, The Texas and Southwestern Cattle Raisers Association, Temple–Inland Forest Products Corporation, International

Paper Company, and Texas Farm Bureau.

> FN18. *Federal Communications Comm'n v. Florida Power Corp.,* 480 U.S. 245, 247, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987) ("Cable television operators, in order to deliver television signals to their subscribers, must have a physical carrier for the cable; ... [u]tility company poles provide ... virtually the only practical physical medium for the installation of television cables. Over the past 30 years, utility companies throughout the country have entered into arrangements for the leasing of space on poles to operators of cable television systems.")

The Association, on the other hand, warns that this case "will significantly affect the future of the cable and telecommunications industries in Texas," especially in rural areas. The gravity of this threat cannot be evaluated without knowing how many of the thousands of other easements that are being used are like the one in this case, and whether the Court would construe other language differently. One can reasonably expect, however, that there will be ample litigation over the matter, thereby increasing the costs of providing telecommunications services without affording any benefit.

I would hold that the Krohns' easement to the Co-op for electric transmission and distribution lines can be apportioned or divided with Marcus Cable, based on the development of cable television since the easement was granted in 1939. Accordingly, I respectfully dissent.

Tex.,2002.
Marcus Cable Associates, L.P. v. Krohn
90 S.W.3d 697, 46 Tex. Sup. Ct. J. 167

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

105 S.W.3d 754
**(Cite as: 105 S.W.3d 754)**



Court of Appeals of Texas,
Houston (14th Dist.).
METROPOLITAN TRANSIT AUTHORITY OF
HARRIS COUNTY, TEXAS, Appellant,
v.
Mary Francis Hofheinz GRAHAM, formerly
known as Mary F. Hofheinz, Individually and as
Executor of the Estate of Roy M. Hofheinz, Deceased, Roy M. Hofheinz, Jr., James Fred Hofheinz, Dene Hofheinz Anton, also known as Dene
Hofheinz Mann and the Hofheinz Family Trust No.
2, Appellees.

No. 14–02–00284–CV.
May 8, 2003.

County transit authority initiated eminent domain proceedings against owners of 1.63-acre tract of land for construction of light rail line. The County Civil Court at Law No. 4, Harris County, Cynthia Crowe, J., initially approved special commissioners' award, but later dismissed original lawsuit for lack of jurisdiction. Transit authority appealed. The Court of Appeals, Eva M. Guzman, J., held that, as a matter of first impression: (1) trial court had jurisdiction to adjudicate the undivided property interests of owners who were properly served; (2) service on fewer than all named owners of undivided property interests did not defeat jurisdiction; and (3) a portion of undivided interests could be subject of an otherwise lawful condemnation proceeding.

Reversed and remanded.

West Headnotes

**[1] Eminent Domain 148 ⚷166**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k166 k. Nature and Form of Proceeding.

Most Cited Cases

**Eminent Domain 148 ⚷167(4)**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k167 Statutory Provisions and Remedies
         148k167(4) k. Strict Compliance with Statutory Requirements. Most Cited Cases

Proceedings to condemn private land for public use are special in character, and a party attempting to establish its right to condemn must show strict compliance with law governing eminent domain proceedings. V.T.C.A., Property Code § 21.001 et seq.

**[2] Eminent Domain 148 ⚷180**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k179 Process or Notice
         148k180 k. Necessity. Most Cited Cases

All parties to a condemnation proceeding are entitled to notice of the time and place of the hearing, and the requirement that notice of the commissioners' hearing be served on a party is equivalent to the requirement in ordinary judicial proceedings that citation be properly served on a defendant. V.T.C.A., Property Code §§ 21.014, 21.015.

**[3] Eminent Domain 148 ⚷184**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k179 Process or Notice
         148k184 k. Defects, Objections, and Amendment. Most Cited Cases

Trial court had jurisdiction over condemnation proceeding to adjudicate the undivided property interests of owners who were properly served, even though some owners were not served, where no action was taken against the unserved owners, a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

105 S.W.3d 754
**(Cite as: 105 S.W.3d 754)**

second proceeding was initiated to acquire interests of the unserved owners, and the unserved owners did not allege any harm. V.T.C.A., Property Code § 21.001 et seq.

**[4] Eminent Domain 148 ⟲184**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k179 Process or Notice
         148k184 k. Defects, Objections, and Amendment. Most Cited Cases

Service of notice of condemnation proceeding on fewer than all named owners of undivided property interests did not defeat the jurisdiction of the special commissioners or the trial court to hear and determine the rights of those owners who were properly served. V.T.C.A., Property Code § 21.001 et seq.

**[5] Eminent Domain 148 ⟲184**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k179 Process or Notice
         148k184 k. Defects, Objections, and Amendment. Most Cited Cases

Naming but not serving one or more owners of a particular property with notice of condemnation proceeding does not invalidate jurisdiction as to those owners properly served and before the court, and it does not defeat the special commissioners' authority to assess damages as to those owners properly before it. V.T.C.A., Property Code § 21.001 et seq.

**[6] Eminent Domain 148 ⟲45**

148 Eminent Domain
   148I Nature, Extent, and Delegation of Power
      148k44 Property Subject to Appropriation
         148k45 k. In General. Most Cited Cases

A portion of undivided interests in property could be the subject of an otherwise lawful con-

demnation proceeding.

**[7] Eminent Domain 148 ⟲45**

148 Eminent Domain
   148I Nature, Extent, and Delegation of Power
      148k44 Property Subject to Appropriation
         148k45 k. In General. Most Cited Cases

A condemnor can condemn any property interest that can be privately acquired or conveyed.

**[8] Tenancy in Common 373 ⟲44**

373 Tenancy in Common
   373III Rights and Liabilities of Cotenants as to Third Persons
      373k42 Sales and Conveyances
         373k44 k. Undivided Share. Most Cited Cases

Undivided interests are property rights that can be freely acquired and conveyed.

**[9] Action 13 ⟲13**

13 Action
   13I Grounds and Conditions Precedent
      13k13 k. Persons Entitled to Sue. Most Cited Cases

Standing pertains to an individual's justiciable interest in a lawsuit, and a person has standing when an alleged wrong affects him personally.

**\*755** J. Mark Breeding, Houston, for appellant.

W. Allyn Hoaglund, Houston, for appellees.

Panel consists of Justices EDELMAN, SEYMORE, and GUZMAN.

**OPINION**

EVA M. GUZMAN, Justice.

Appellant Metropolitan Transit Authority of Harris County ("Metro") appeals the dismissal of its eminent domain proceeding against appellees Mary Francis Hofheinz Graham, formerly known as Mary F. Hofheinz, individually and as executor

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1 of the Estate of Roy M. Hofheinz, Deceased, James Fred Hofheinz, and Dene Hofheinz Anton, also known as Dene Hofheinz Mann (collectively "the Adjudicated Owners"). Roy M. Hofheinz, Jr. and the Hofheinz Family Trust No. 2 (the latter entity being "the Trust"), named in the condemnation petition but not served with notice of the hearing, also appear as appellees (together "the Unserved Owners"). Finding the trial court erred in dismissing Metro's lawsuit for lack of jurisdiction, we reverse the dismissal and award of attorney's fees, and remand the case for further proceedings.

> FN1. The record reflects Mary F. Hofheinz as "executor," not "executrix." We have followed the record's designation.

### *756 FACTUAL BACKGROUND

As part of the construction of the 7.5–mile light rail line running from downtown Houston to the Astrodome area, Metro sought to acquire a 1.65–acre tract of land owned by appellees. Metro began construction work on the property under a temporary right of entry agreement obtained from two of the appellees, however when purchase negotiations deteriorated, Metro initiated condemnation proceedings. Metro's original petition and statement in condemnation filed July 2001 named all of the appellees as owners of the property. The trial court appointed special commissioners pursuant to Section 21.014 of the Texas Property Code and set the required hearing, but Metro was unable to serve notice of the hearing on the two Unserved Owners. On September 26, 2001, the morning of the hearing, Metro filed a notice of absence of service advising the special commissioners that despite diligent efforts, it had not been able to serve Roy M. Hofheinz, Jr. and the Trust, and would be proceeding only against the owners of a 5/12 undivided interest in the property who had been served. After the hearing, the special commissioners entered an award as to the 5/12 undivided interests of the owners who had been served, but did not adjudicate the remaining 7/12 undivided interests of Roy M. Hofheinz, Jr. and the Trust. Metro then initiated a second condemnation proceeding in another court to acquire rights to the remaining 7/12 undivided interests, a proceeding not involved in this appeal. FN2

> FN2. Metro filed an amended petition deleting reference to the Unserved Owners after the hearing and the filing of its objections, but prior to the dismissal order.

Following the trial court's approval of the special commissioners' award, Metro filed objections to the commissioners' findings under section 21.018 of the Texas Property Code, appealing the award and findings to the trial court. Shortly thereafter, the Adjudicated Owners and the Unserved Owners jointly filed a motion to dismiss the condemnation proceeding, arguing that lack of notice and service on the Unserved Owners deprived the special commissioners (and thus the trial court) of subject matter jurisdiction. FN3 After initially rejecting this argument, the trial court subsequently agreed and dismissed the original lawsuit for lack of jurisdiction. At the dismissal hearing, the court noted that although separate condemnation proceedings are not prohibited, Metro had opted to name all the undivided interest owners in one proceeding then failed to dismiss the two unserved parties prior to the special commissioners' hearing, thus violating the requirement that all parties be given notice of the hearing. In its findings of fact and conclusions of law, the trial court concluded that Metro failed to strictly comply with the Texas Property Code by failing to serve notice of the hearing on Roy M. Hofheinz, Jr. and the Trust or dismissing them prior to the hearing. This, in turn, deprived the commissioners of jurisdiction to proceed with the condemnation hearing and deprived the trial court of jurisdiction to proceed with the lawsuit. The dismissal order granted appellees attorney's fees and costs against Metro in an amount of $57,452.50.

> FN3. Appellees also jointly filed objections to the award in the same pleading, subject to their motion to dismiss.

105 S.W.3d 754
**(Cite as: 105 S.W.3d 754)**

In two issues, Metro contends the dismissal was inappropriate because (1) appellees lacked standing to seek dismissal; and (2) the trial court erred in ruling it had no jurisdiction.

### ANALYSIS

Texas has enacted a comprehensive statutory scheme governing the State's **\*757** eminent domain power, setting forth jurisdictional requirements that must be met before it can condemn private property for public use. *See* TEX. PROP.CODE §§ 21.001 –.065. Condemnation proceedings have two distinct phases. The first phase is administrative, involving a hearing before three special commissioners appointed by the trial court. *Id.* §§ 21.014–.015. After a hearing, the commissioners enter findings and determine condemnation damages due the property owner. *Id.* §§ 21.014, 21.018. If any party timely files an objection to the commissioners' award, the award is vacated and the case proceeds to the second phase as any other judicial proceeding in the trial court. *Id.* § 21.018; *State v. Blackstock,* 879 S.W.2d 125, 126 Tex.App.-Houston [14th Dist.] (1994), writ denied.

[1][2] As recently confirmed by the Texas Supreme Court, proceedings to condemn private land for public use are special in character, and a party attempting to establish its right to condemn must show strict compliance with chapter 21 of the Texas Property Code. *State v. Bristol Hotel Asset Co.,* 65 S.W.3d 638, 641 (Tex.2002). All parties to the proceeding are entitled to notice of the time and place of the hearing, and the requirement that notice of the commissioners' hearing be served on a party is equivalent to the requirement in ordinary judicial proceedings that citation be properly served on a defendant. *Id.*

In *Bristol,* the supreme court stated, "Unless notice has been properly served in accordance with the statute, the commissioners have no jurisdiction to assess damages or do anything that would declare a condemnation of the property." *Id.* Appellees rely on this language to support their contention that the trial court properly dismissed Metro's condemnation action. In essence, appellees contend the court lacked jurisdiction because (1) all owners must be named and served in one proceeding; and (2) not all of the named owners were served in this case.

### *Subject Matter Jurisdiction—Failure to Serve all Owners*

[3] Regarding Metro's jurisdiction issue, appellees first argue that the trial court lacked jurisdiction over the condemnation proceeding because Metro failed to serve all owners with notice of the commissioners' hearing. Implicit in this argument is the assertion that jurisdiction is not acquired unless all owners are named and served in one condemnation proceeding. Because the only evidence presented at the dismissal hearing pertained to costs and attorney's fees, the validity of the dismissal must be determined solely as a matter of law. *Lo–Vaca Gathering Co. v. Earp,* 487 S.W.2d 789, 790 (Tex.Civ.App.-El Paso 1972, no writ).

It is undisputed that all appellees except the two Unserved Owners were properly served with notice of the hearing, and that the commissioners' award only involved the 5/12 undivided interests of the appellees who were properly served, leaving untouched the undivided 7/12 ownership interests of the Unserved Owners. Although the Texas Supreme Court has yet to address the jurisdictional aspects of proceeding against less than all owners of undivided property interests in a condemnation proceeding, we find guidance in cases allowing condemnation actions to proceed in the absence of all owners when, as here, the rights of the unserved owners were not adjudicated or harmed. Noteworthy is the *Lo–Vaca* case wherein the court stated:

The failure of a condemnor to join an owner of an interest in the land renders ineffectual the proceedings *as to interest of the party not joined.* Such failure, however, *should not invalidate the entire***\*758** *proceedings* insofar as the interest of the parties who are properly designated and made parties to the proceedings.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

487 S.W.2d at 790 (emphasis added). Had the commissioners proceeded to adjudicate the 7/12 undivided interests of the Unserved Owners, a different case would be presented, as *Lo–Vaca* would recognize the impropriety of adjudicating interests of property owners not before the court. *See also City of Houston v. Kunze,* 153 Tex. 42, 262 S.W.2d 947, 951 (1953) (holding as void condemnation proceedings involving property rights of parties not properly served with notice). Because Metro notified the commissioners and the other parties it would be proceeding only against the owners who had been served and no action was taken against the Unserved Owners, *Lo–Vaca* supports the commissioners' actions regarding the Adjudicated Owners in absence of the Unserved Owners.

Similarly, the decision of *Elliott v. Joseph,* 163 Tex. 71, 351 S.W.2d 879, 884 (1961), is helpful in its holding that all persons having an interest in the property must be made parties in order for the condemning authority to obtain *complete title.* As noted, Metro acquired only the property interests of the Adjudicated Owners, not title to the entirety, and a second proceeding was initiated to acquire the interests of the Unserved Owners. The special commissioners below did not adjudicate the undivided property interests of the unserved appellees, and appellees do not allege they have been harmed by the proceedings below. Appellees do not cite, nor have we identified, any controlling authority depriving the court of jurisdiction over condemnation proceedings when all undivided interest owners have not been served with notice of the hearing, particularly when there has been no showing that the rights of unserved parties were injuriously affected.

In sum, appellees' arguments for lack of jurisdiction based on Metro's failure to serve all owners is without merit, and neither the commissioners nor the trial court were deprived of jurisdiction by Metro's failure to serve the two Unserved Owners under the circumstances of this case.

***Subject Matter Jurisdiction—Failure to Serve all***

***Named Owners***

[4] Nevertheless, appellees further assert that by originally naming Roy M. Hofheinz, Jr. and the Trust as two of the owners of undivided interests in the property, Metro could not proceed until they had been served with notice of the hearing. Citing *Bristol,* appellees contend that once an owner is identified in a condemnation petition, subject matter jurisdiction is not acquired unless that owner is served with notice of the hearing. Implicit in this argument is that Metro could not, after filing its petition, elect to proceed against less than all of the identified owners. *Bristol,* however lends appellees no support in this regard. In *Bristol,* the court was called upon to determine the requirements for proof of notice of service in a condemnation proceeding, distinguishing the service requirements for return of a citation and the return in condemnation proceedings. 65 S.W.3d at 642. The method of securing and proving proper notice of the hearing, not the entities entitled to notice, was at issue in *Bristol,* which the court resolved by holding that returns of service in condemnation proceedings satisfying the statutory requirements are prima facie evidence of the facts recited therein. *Bristol* does not answer the question before us.

We are, however, not entirely without guidance. In ***759****Union Fraternal Latino Americana v. City of San Antonio,* 315 S.W.2d 68, 70 (Tex.Civ.App.-San Antonio 1958, no writ), condemnation proceedings were instituted against owners of certain property, all of whom were served with notice by publication, including the appellant. Appellant appeared at the hearing and was awarded damages. *Id.* The appellee City of San Anon filed its objection to the award, and at trial, the appellant was found to be the sole owner and was awarded damages. *Id.* On appeal, the appellant argued the trial court lacked jurisdiction because there was defective service of the hearing notice. *Id.* The court of appeals acknowledged the deficient service, but held appellant waived the defect by appearing in person at the hearing. *Id.* Moreover, the court held it was immaterial that service on the other owners

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

105 S.W.3d 754
**(Cite as: 105 S.W.3d 754)**

was defective, stating

> The proper service of notice on such other defendants was not a necessary prerequisite to confer jurisdiction on the court to hear and determine the rights of appellant, who effectively waived such notice by appearing and by submitting its case to the court.

*Id.* Thus, under *Union Fraternal Latino Americana,* lack of service on the Unserved Owners did not defeat the commissioners' and court's jurisdiction to hear and determine the rights of the Adjudicated Owners.

Additional guidance is found in *City of Houston v. Kunze,* 153 Tex. 42, 262 S.W.2d 947 (1953), which recognized the corollary issue that special commissioners and courts do not acquire jurisdiction over owners not properly served with notice of the hearing (and who otherwise do not appear or waive notice). In *Kunze,* the special commissioners found all owners had been served with notice, but that only appellee was entitled to condemnation damages. *Id.* at 949, 262 S.W.2d 947. The owners other than appellee filed objections to the award, but appellee filed a trespass to try title suit against the other owners and the appellant City of Houston, which the City attempted to enjoin. *Id.* At 949–50. In upholding denial of the injunction based on the City's improper service of notice on appellee, the court of appeals held that until an owner is properly served with notice of the hearing, the commissioners and court are without jurisdiction or authority to assess damages as to an unserved owner. *Id.* at 951. Because the appellee had not been served, the City of Houston had no right to enjoin his trespass to try title suit as to his interests in the property. *Id.*

[5] Taken together, these cases support Metro's proposition that it need not have served all owners in one proceeding, and that going forward without service on the Unserved Owners did not invalidate jurisdiction over the owners and their property interests who had been served. Under *Union Fraternal Latino Americana* and *Kunze,* naming but

not serving one or more owners of a particular property does not invalidate jurisdiction as to those owners properly served and before the court, and does not defeat the commissioners' authority to assess damages as to those owners properly before it. Appellees' argument would require us to hold that unless all named owners are served in one condemnation proceeding, special commissioners are unauthorized to take action and trial courts are without jurisdiction in chapter 21 proceedings, a position we are not inclined to adopt in light of these cases holding to the contrary.

Nothing in the statutory scheme for condemnation actions prohibited Metro from electing to proceed against only the Adjudicated Owners at the hearing, thereby impliedly abandoning its claims at that point against the Unserved Owners. Metro's failure to serve all of the named owners with notice of the hearing may have **\*760** deprived the court of jurisdiction over the Unserved Owners, but did not deprive it of jurisdiction over the Adjudicated Owners.

### Condemnation of Undivided Interests in Property

[6][7][8] Last, appellees argue that regardless of the procedural and jurisdictional defects, condemnation of only a portion of undivided interests in property is not authorized by state law. Appellees base their argument not on the existence of prohibitory law, but on the lack of permissive law. While it is true this issue has not been squarely addressed by our supreme court, supportive authority does exist for condemnation of undivided interests. Texas has long recognized that a condemnor can condemn any property interest that can be privately acquired or conveyed. *Houston N. Shore R. Co. v. Tyrell,* 128 Tex. 248, 98 S.W.2d 786, 793 (1936). *See also Lo–Vaca,* 487 S.W.2d at 790. Undivided interests are property rights that can be freely acquired and conveyed. *See, e.g., Burns v. Goodrich,* 392 S.W.2d 689 (Tex.1965); *Whitaker v. Neal,* 187 S.W.2d 147 (Tex.Civ.App.-Texarkana 1945, writ ref'd). Applying these cases in conjunction, we see no reason why a portion of undivided interests in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

105 S.W.3d 754
**(Cite as: 105 S.W.3d 754)**

property cannot be the subject of otherwise lawful condemnation proceedings. Appellee fails to cite any authority, and we have found none, which dictates a different conclusion.

We find the trial court had jurisdiction over the condemnation proceeding and that the special commissioners were authorized to go forward regarding the 5/12 undivided interests of the appellees who were served with notice. Metro's notice of absence of service filed prior to the hearing limited the scope of its intended actions to those parties (and their respective property interests) who were served with notice. The record shows that such pleading was accepted by the special commissioners, as they entered an award in conformity with the notice of absence of service. Although more traditional procedures may have been available, Metro's use of the notice of absence of service to limit the scope of its condemnation action was not procedurally improper. While we are cognizant that multiple condemnation proceedings against portions of undivided interests in property may run the risk of potentially inconsistent damages and results, nothing suggests this factor alone operates to deprive the court of jurisdiction over the parties and property interests who are properly before it. Metro's second issue is sustained.

### Standing to Seek Dismissal

Metro also challenges the trial court's granting of the dismissal, arguing that none of the appellees had standing to seek dismissal. According to Metro, the Unserved Owners had no standing because their undivided ownership interests were not adjudicated by the special commissioners and the Adjudicated Owners were without standing to raise any violation of the Unserved Owners' rights. We are without benefit of appellees' response to this argument, as they have not addressed the issue in their brief.

[9] It is well-established that standing pertains to an individual's justiciable interest in a lawsuit, and a person has standing when an alleged wrong affects him personally. *See Nootsie, Ltd. v. Willi-*

*amson County Appraisal Dist.,* 925 S.W.2d 659, 661 (Tex.1996). Here, the commissioners' award did not adjudicate the Unserved Owners' property interests and the Adjudicated Owners had no claim for enforcing any rights of the Unserved Owners. *See Union Fraternal Latino Americana,* 315 S.W.2d at 70. We need not reach the merits of this issue, however, as we have sustained Metro's second issue on the basis of jurisdiction and are reversing the **\*761** dismissal and remanding the case to the trial court. We note that it ultimately makes little difference, if any, whether or not appellees had standing to seek dismissal; our remand of this case to the trial court returns appellant and appellees to their pre-dismissal status, with all owners and Metro having filed objections to the special commissioners' findings. *See Blackstock,* 879 S.W.2d at 126–27 (stating that upon filing of objections to commissioners' award, award is vacated and administrative proceeding converts into normal judicial cause in civil court). As this would remain the result whether we sustain one or both of Metro's issues on appeal, the first issue is moot. *See VE Corp. v. Ernst & Young,* 860 S.W.2d 83, 84 (Tex.1993) (noting that an appeal is moot when a court's actions cannot affect the rights of the parties). Metro's first issue is overruled.

### CONCLUSION

Appellant's second issue is sustained, the order of dismissal and award of attorney's fees is reversed and the case is remanded for further trial proceedings.

Tex.App.–Houston [14 Dist.],2003.
Metropolitan Transit Authority Harris County, Texas v. Graham
105 S.W.3d 754

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

879 S.W.2d 375
**(Cite as: 879 S.W.2d 375)**



Court of Appeals of Texas,
Eastland.

PATRICK MEDIA GROUP, INC., Appellant,
v.
DALLAS AREA RAPID TRANSIT, Appellee.

No. 11–93–246–CV.
June 23, 1994.
Rehearing Denied Aug. 4, 1994.

Lessee who operated billboard on condemned land filed objections to compensation award rendered by special commissioners in condemnation proceedings. The County Court, Dallas County, Bob Day, J., entered judgment without addressing lessee's claims. Lessee appealed. The Court of Appeals, McCloud, C.J., held that: (1) condemnation proceeding was administrative proceeding in which lessee could not intervene, absent objection to award by party to award; (2) trial court had no jurisdiction over objections by lessee who was not party to proceedings or award; and (3) Court of Appeals lacked jurisdiction to entertain appeal, absent objections to award by actual parties to proceedings.

Appeal dismissed.

West Headnotes

**[1] Eminent Domain 148 ⚷166**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k166 k. Nature and Form of Proceeding. Most Cited Cases
Condemnation proceeding is administrative proceeding and only becomes judicial proceeding or civil case if party files objections to judgment of special commissioners.

**[2] Eminent Domain 148 ⚷166**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k166 k. Nature and Form of Proceeding. Most Cited Cases

**Eminent Domain 148 ⚷178**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k175 Parties
         148k178 k. Intervention or Substitution. Most Cited Cases
Condemnation proceeding before special commissioners was administrative proceeding to which rule authorizing intervention in civil cases did not apply, absent objection by either party to special commissioners' award to advance proceeding to stage of being case in court. Vernon's Ann.Texas Rules Civ.Proc., Rule 60.

**[3] Eminent Domain 148 ⚷238(1)**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k225 Assessment by Commissioners, Appraisers, or Viewers
         148k238 Review by Court
            148k238(1) k. Nature and Form of Remedy and Jurisdiction. Most Cited Cases
Trial court in condemnation proceedings has appellate jurisdiction limited to parties and issues involved in administrative proceeding before special commissioners.

**[4] Eminent Domain 148 ⚷238(3)**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k225 Assessment by Commissioners, Ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

879 S.W.2d 375
**(Cite as: 879 S.W.2d 375)**

praisers, or Viewers

148k238 Review by Court

148k238(3) k. Right of Review and Parties. Most Cited Cases

Trial court had no jurisdiction over lessee's objections to special commissioners' compensation award, in light of fact that lessee had been dismissed from condemnation proceedings before issuance of award so that lessee was not party to award.

**[5] Eminent Domain 148 ⊂⊃256**

148 Eminent Domain

148III Proceedings to Take Property and Assess Compensation

148k250 Appeal

148k256 k. Parties. Most Cited Cases

Court of Appeals lacked jurisdiction to entertain lessee's appeal from judgment of trial court on special commissioner's compensation award, absent objections to award by actual parties to condemnation proceedings; lessee had been dismissed from condemnation proceedings before special commissioners issued compensation award.

**\*376** Paul C. Isham, Decker, Jones, McMackin, McClane, Hall & Bates, Fort Worth, J. Allen Smith, Michael J. Vernone, Settle & Pou, Dallas, for appellant.

David C. Schulze, Dallas Area Rapid Transit, Office of General Counsel, Dallas, for appellee.

Opinion

McCLOUD, Chief Justice.

This is a condemnation suit. We dismiss the appeal for want of jurisdiction.

Dallas Area Rapid Transit (DART) filed a condemnation proceeding in county court at law against Harris, Clayton, Schulz, Inc. (Harris), the owner of the land. Patrick Media Group, Inc. (Patrick) held a leasehold interest in the land for the operation of a billboard and was added as a defendant in DART's first amended petition. The condemnation proceeding was set for a hearing before special commissioners on June 22, 1993.

On the day of the hearing, DART filed a motion to nonsuit Patrick, stating that it chose not to condemn Patrick's interest in the land because the billboard could remain in place until the end of Patrick's license agreement. That same day, the court granted DART's motion but did not hold a hearing on the motion for nonsuit or make an allowance for Patrick's attorney's fees and court costs.

On June 24, Patrick moved the court to reconsider its dismissal, complaining that it was dismissed without a hearing. The court refused to reconsider the order of dismissal.[FN1]

FN1. The trial court's order, signed on July 12, stated:

The Court, having considered the Motion and the arguments of counsel, but having refused to consider or allow the proffered evidence of Patrick Media Group, Inc. as to its compensable interests, prejudice resulting from the dismissal and/or attorneys' fees and costs, is of the opinion that the Motion should be denied.

The commissioners filed their compensation award with the court on July 20. The award neither reflected that Patrick was a party to the proceeding nor awarded Patrick any compensation for its interest in the property. The same day that the award was filed, Patrick filed a plea in intervention claiming that its interest in the property would be materially and adversely affected by the condemnation of the property.

On August 13, Patrick filed objections to the decision of the commissioners and requested a jury trial to determine its damages as a result of the condemnation. On August 19, the court noted that none of the "parties" objected to the commissioners'

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

879 S.W.2d 375
**(Cite as: 879 S.W.2d 375)**

award and rendered judgment granting DART fee simple title to the property and awarding Harris $272,191 as compensation. Patrick perfected this appeal from the August 19 judgment.[FN2]

> FN2. Patrick argues on appeal that the trial court should have conducted a hearing on the motion for nonsuit under TEX.PROP.CODE ANN. § 21.019(a) (Vernon 1984); that attorney's fees and court costs should have been awarded under TEX.PROP.CODE ANN. § 21.019(b) (Vernon Supp.1994); and that it timely filed objections to the commissioners' award.

Relying on TEX.R.CIV.P. 60, Patrick argues that it became a party for all purposes when it filed its plea in intervention on July 20. We disagree.

[1] The rule is well established that a condemnation proceeding is an administrative proceeding and only becomes a judicial proceeding or civil case when a party files objections to the judgment of the special commissioners. *State v. Giles,* 368 S.W.2d 943 (Tex.1963); *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935 (1958). The court in *Rose v. State,* 497 S.W.2d 444 (Tex.1973), stated:

> The nature of this action is of controlling significance. A judgment which a county court renders upon the basis of an award to which there have been no objections is the judgment of a special tribunal. Such a judgment is ministerial in nature and is the judgment of an administrative agency. **\*377** It is not a judgment from which an appeal will lie. *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935 (1958). It is not a judgment in a civil suit, because the proceedings did not reach the stage of "a case in court." *Sinclair v. City of Dallas,* 44 S.W.2d 465, 466 (Tex.Civ.App.1931, writ ref'd).

[2] Neither DART nor Harris, the parties to the July 20 special commissioners' award, filed objections to the award. Although it applies to civil ac-

tions in county courts,[FN3] Rule 60 does not apply to this special statutory proceeding. When Patrick filed its plea in intervention, the special statutory proceeding had not reached the stage of a "case in court" as recognized in *Rose.*

> FN3. TEX.R.CIV.P. 2.

[3][4][5] Furthermore, in condemnation proceedings, the trial court has appellate jurisdiction limited to the parties and issues involved in the administrative proceeding before the special commissioners. *Board of Regents of the University of Texas System v. Puett,* 519 S.W.2d 667 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.). Patrick was dismissed from the condemnation proceeding on June 22 and was not a party to the commissioners' award. The trial court had no jurisdiction over Patrick's claim; and Patrick's objections to the commissioners' award did not prevent the commissioners' award from becoming final as between DART and Harris, the parties to the condemnation proceeding. Absent objections to the commissioners' award by the parties to the condemnation proceeding, we have no jurisdiction to entertain this appeal.[FN4]

> FN4. See *Rosenthal v. Ottis,* 865 S.W.2d 525, 528 (Tex.App.—Corpus Christi 1993, orig. pro.), where the court held that mandamus was a proper remedy to compel the trial court to hold a hearing following the dismissal of a condemnation proceeding and to determine the amount of reasonable and necessary attorney's fees and expenses mandated by Section 21.019(b). See also *Pearson v. State, supra,* where the court stated that mandamus would be available to correct certain irregularities that occur in connection with the special commissioners' award where no objections to the award were filed.

The appeal is dismissed.

Tex.App.–Eastland,1994.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

879 S.W.2d 375
**(Cite as: 879 S.W.2d 375)**

Patrick Media Group, Inc. v. Dallas Area Rapid Transit
879 S.W.2d 375

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.




Supreme Court of Texas.
L. A. PICH, Petitioner,
v.
A. H. LANKFORD et al., Respondents.

No. A-6165.
May 15, 1957.
Rehearing Denied by June 19, 1957.

Cross-actions to try title to mineral interest in land, wherein defendant contended that he had acquired mineral interest by quitclaim deeds. The District Court, Childress County, Luther Gribble, J., rendered judgment for plaintiffs and defendant appealed. The Amarillo Court of Civil Appeals, Seventh Supreme Judicial District, 295 S.W.2d 749, affirmed District Court judgment, and defendant brought error. The Supreme Court, Calvert, J., held that where two successive deeds excepted three-quarters of mineral interest in land, and stated that such mineral interests had been 'heretofore reserved' and did 'not belong to grantors,' fact that reservations in prior deeds had been for smaller fractional interests, did not reduce amount of interest excepted, and an undivided three-quarters interest in mineral in place was excluded from grants and did not pass to second grantee.

Reversed and remanded.

Grawood, J., dissented.

West Headnotes

**[1] Mines and Minerals 260 ⚷48**

260 Mines and Minerals
  260II Title, Conveyances, and Contracts
    260II(A) Rights and Remedies of Owners
      260k48 k. What Are Minerals and Nature of Property in Minerals. Most Cited Cases
An interest in minerals in place and interest in royalty are separate and distinct estates in land.

**[2] Mines and Minerals 260 ⚷55(5)**

260 Mines and Minerals
  260II Title, Conveyances, and Contracts
    260II(B) Conveyances in General
      260k55 Grants and Reservations of Minerals and Mining Rights
        260k55(5) k. Kind, Quantity, and Location of Minerals Granted or Reserved. Most Cited Cases
Where two successive deeds excepted three-quarters of mineral interest in land, and stated that such mineral interest had been "heretofore reserved," and did "not belong to grantors", fact that reservations in prior deeds had been for smaller fractional interests, did not reduce amounts of interest excepted, and an undivided three-quarters interest in minerals in place was excluded from grants and did not pass to second grantee.

**[3] Deeds 120 ⚷139**

120 Deeds
  120III Construction and Operation
    120III(D) Exceptions
      120k139 k. Validity of Exceptions. Most Cited Cases
The giving of a false reason for an exception from a grant does not operate to alter or cut down the interest or estate excepted, nor does it operate to pass the excepted interest or estate to the grantee.

**[4] Mines and Minerals 260 ⚷55(4)**

260 Mines and Minerals
  260II Title, Conveyances, and Contracts
    260II(B) Conveyances in General
      260k55 Grants and Reservations of Minerals and Mining Rights
        260k55(4) k. Nature of Estate Granted or Reserved. Most Cited Cases
Where deed excepted from grant three-quarters of mineral interest and prior deeds had reserved smaller fractional interest, since interest in excess

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

of that previously reserved did not pass to grantee and was not outstanding in another, the legal effect of exception was to leave it to grantor.

*336 **646 Williams, Broughton & Forbis, Childress, Homer L. Baughman, G. R. Pate, Ft. Worth, for petitioner.

James L. Cutcher, Taylor, Richard D. Bird, Childress, for respondents.

CALVERT, Justice.

This case presents question of ownership of mineral fee and royalty interests in a tract of 160 acres of land described as the Southwest one-fourth (1/4) of Section No. 490, Block H, W. & N. W. Ry. Co. Survey, Childress County.

Petitioner, L. A. Pich, is the agreed common source of title.

On September 28, 1928 petitioner conveyed the 160 acres of land to F. D. Turner by a deed containing a reservation of 'one half of the full 1/8th Oil Royalty, or a 1/16th of all minerals produced on said land.'

On May 20, 1929 Turner conveyed the land to Lewis B. Adams by a deed which contained no reservations or exceptions.

On February 27, 1930 Adams and wife conveyed the land to S. J. Higgs by a deed containing a reservation to the grantors of 'one fourth of all royalty, the same being 1/32 of all oil and gas produced from said land.' The one-fourth royalty reserved by Adams was in due course conveyed by him to Cecil H. Canfield and by Canfield to his daughter, Dorothy Canfield Fuehr.

*337 On October 18, 1941 Frank S. Magers, administrator of the estate of S. J. Higgs, deceased, conveyed all right and title of S. J. Higgs in and to the land to Collins Howard by a deed which contained no reservations or exceptions.

On January 26, 1943 Collins Howard and wife conveyed the land to W. J. Sharp and wife, Emma E. Sharp, by a deed which, following the description of the land, contained the following language: 'Save and Except an undivided three-fourths of the oil, gas and other minerals in, on and under said land, which have been heretofore reserved.'

On September 26, 1947 W. J. Sharp and wife conveyed all of Section 490 to respondents, A. H. and B. L. Lankford, by a deed which, following the description of the land, contained the following language: 'Save and Except an undivided three-fourths of the oil, gas and other minerals in and under the Southwest Quarter thereof, and an undivided one-fourth of the minerals in and under the remainder of said survey, which minerals do not belong to the grantors herein.'

On November 15, 1955 Collins Howard and wife quitclaimed to petitioner, Pich, all of their right, title and interest in the three-fourths of the minerals 'excepted and reserved' by them in their deed to the **647 Sharps, and on December 12, 1955 the Sharps quitclaimed to petitioner all of their right, title and interest in the three-fourths of the minerals in and under the 160 acres of land 'reserved and excepted' by them in their deed to the respondents.

Respondents were plaintiffs in the trial court. Petitioner and Mrs. Fuehr and her husband were defendants. The petition on which respondents went to trial contained statutory allegations in trespass to try title to the entire fee title to the 160 acres of land, with specific allegations that the reservation by petitioner in the deed of 1928 was a reservation of 'a one-half (1/2) undivided interest in and to all of the oil, gas and other minerals in and under said lands' and that the reservations by Adams in the deed of 1930 was a reservation of 'a one-fourth (1/4) undivided interest in and to all the oil, gas and other minerals in and under said lands', which reservations, they alleged, conferred no title on the grantors but were illegal and void and constituted clouds on respondents' title which should be re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

moved and cancelled. In a separate count they alleged that the exception in the deed executed by the Howards to the Sharps on **\*338** January 26, 1943 did not reserve any interest to the grantors and that 'the pure intention of the grantors in said deed was to convey all of the interest in said lands that the grantors owned'; that the reservation created a cloud on petitioners' title which should be removed and cancelled. The petition contained no specific allegations with reference to the exception contained in the deed executed to respondents by the Sharps.

In their answer petitioner and Mrs. Fuehr pleaded not guilty and disclaimed as to all interest in the land except as to 'an undivided three-fourths (3/4) interest in and to all of the oil, gas and other minerals in, under and that might be produced from said land.' By was of cross-action petitioner and Mrs. Fuehr then sought by a statutory trespass to try title action to recover title to and possession of the undivided three-fourths (3/4) interest in the minerals. To the cross-action respondents had a plea of not guilty and a general denial.

No evidence other than the instruments heretofore described was tendered or introduced on the trial. At the conclusion of a trial before the court the trial judge adjudged Dorothy Canfield Fuehr to be the owner of one-fourth (1/4) of the one-eighth (1/8) non-participating royalty, petitioner, L. A. Pich, to be the owner of one-half (1/2) of the one-highth (1/8) non-participating royalty, and respondents, A. H. and B. L. Lankford, to be the owners of the fee title to the 160 acres of land, less the royalty interests adjudged to Mrs. Fuehr and to petitioner.

Both petitioner and respondents appealed from the judgment, petitioner asserting in the Court of Civil Appeals that the tiral court erred in failing to adjudge to him the title to three-fourths (3/4) of the minerals from which a one-fourth (1/4) royalty interest should have been carved and awarded to Mrs. Fuehr, and respondents asserting that the trial court erred in awarding a recovery of any interest to Mrs. Fuehr. The Court of Civil Appeals affirmed the tri-

al court's judgment. 295 S.W.2d 749. Respondents did not file an application for writ of erro f and the judgment awarding Mrs. Fuehr title to one-fourth (1/4) of the one-eighth (1/8) non-participating roylaty has therefore become final and is not in issue in this court.

The real question to be decided is as to the effect of the language quoted from the deeds executed by the Howards to the Sharps and by the Sharps to respondents.

**\*339** Petitioner contends that the legal effect of the language was to except from the grants in the deeds a three-fourths (3/4) undivided interest in and to the minerals in place and that title to that interest never passed to respondents and they never became the owners thereof; that the fact that a false reason may have been given for the exception does not alter the operative effect thereof. He further contends that since the interest was excluded from the grants in **\*\*648** the deeds it necessarily remained in the grantors whose rights, title and interests petitioner holds.

Respondents contend that the deeds must be construed most strongly against the grantors and so as to pass the largest estate possible to the grantees, and that when so construed it is apparent that the Howards and the Sharps did not intend by the language in their deeds to reserve unto themselves any interest or estate in the minerals in place, but, in order to protect themselves on their warranties, intended only to except from the grants in the deeds the one-half (1/2) and one-fourth (1/4) interests in royalty which had been theretofore reserved in the deeds executed by petitioner and Adams.

The Court of Civil Appeals agreed with respondents' contention, citing as authority for its conclusion Klein v. Humble Oil & Refining Co., 126 Tex. 450, 86 S.W.2d 1077; Methodist Home v. Mays, Tex.Civ.App., 273 S.W.2d 444, writ refused, n.r.e., and Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617. We agree with petitioner and disagree with respondents and the Court of Civil Appeals.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) The decisions of this Court have established that an interest in minerals in place and an interest in royalty are separate and distinct estates in land. Richardson v. Hart, 143 Tex. 392, 185 S.W.2d 563; Benge v. Scharbauer, 152 Tex. 447, 259 S.W.2d 166; Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617. See also Palmer v. Crews, 203 Miss. 806, 35 So.2d 430, 4 A.L.R.2d 483. It is also well established that an interest or estate in land excepted from a grant is excluded from the grant and does not pass to the grantee. King v. First National Bank of Wichita Falls, 144 Tex. 583, 192 S.W.2d 260, 262, 163 A.L.R. 1128; Reynolds v. McMan Oil & Gas Co., Tex.Com.App., 11 S.W.2d 778, 781, motion for re-hearing overruled, 14 S.W.2d 819; 14 Tex.Jur. 958, Deeds, sec. 175.

(2)(3) There is no patent ambiguity in the Howard and Sharp **\*340** deeds. The deeds do not except from the grants only such roylaty interests or interests in the minerals as 'have heretofore been reserved' or that 'do not belong to the grantors herein'; they except an undivided three-fourths (3/4) interest in the minerals in place in plain and unambiguous language. The quoted phrases are but recitals which purport to state why the exceptions are made. The chain of title conclusively negatives the recitals. It shows they are flase. The giving of a false reason for an exception from a grant does not operate to alter or cut down the interest or estate excepted, nor does it operate to pass the excepted interest or estate to the grantee. Roberts v. Robertson, 53 Vt. 690, 38 Am.Rep. 710; Ambs v. Chicago, St. P., M. & O. Ry. Co., 44 Minn. 266, 46 N.W. 321; Georgia Vitrified Brick & Clay Co. v. Georgia R. & Banking Co., 148 Ga. 650, 98 S.E. 77; Oldham v. Fortner, 221 Miss. 732, 74 So.2d 824; Gibson v. Sellars, Ky., 252 S.W.2d 911, 37 A.L.R.2d 1435.

In Roberts v. Robertson, supra, the Vermont court dealt with a deed conveying specifically described land and containing the following clause: 'Said J. C. Roberts reserving lots sold, Nos. 1, 2, 3, * * * 32, 33.' Lots 32 and 33 had not, in fact, been sold. With respect to the effect of the language used in the reservation, the court said:

'Here lots 32 and 33 are described as lots sold. If the grantor had said, 'I except all the lots hereto-fore sold,' and had added nothing more by way of description, the reasoning of the defendant would be sound. The exception then would cover only such lots as had in fact been sold. But the plaintiff specially enumerates the lots excepted from his grant, and describes them by number, the only prac-ticable way in which such lots can be described. The false circumstance that they were sold, added to the certain**\*\*649** description given, must be dis-regarded.' 53 Vt. 693.

The deed involved in Ambs v. Chicago Ry. Co., supra, conveyed certain land by metes and bounds description, following which were these words: 'with the exception of Lot 6, Block 36, here-tofore conveyed to William H. Brown by Louis Robert and wife.' The question before the Supreme Court of Minnesota was whether title to such lot passed under the deed. With respect to that question the court said: 'The deed clearly shows an intention that from the land granted by it there should be ex-cepted a tract which was designated Lot 6, in Block 36, and which was further described as having been previously conveyed to William H. Brown * * *. Though it was not shown that **\*341** the lot had in fact been conveyed to William H. Brown, or even if it had been shown that such was not the fact, the maxim falsa demonstratio non nocet would apply, adn that fact would be immaterial, the excepted lot being otherwise described with sufficient cer-tainty.' 46 N.W. 321-322.

Gibson v. Sellars, supra, (252 S.W.2d 912) in-volved a deed of conveyance of the fee simple title to certain lands, the deed containing the following exception: 'It is expressly understood and agreed by the parties that the coal and mineral rights underly-ing said tract of land have been heretofore sold by the First Party and are not intended to be conveyed by this deed and are expressly excluded herefrom.' The record reflects that the coal had been thereto-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fore sold but that the other minerals underlying said lands had not been, and the contention was made that the other minerals were not excepted. The contention was overruled, the court saying: 'The recitation of erroneous circumstances or the reason for an exception does not limit the exception. The court is not concerned with reasons for the exception, but rather, what is the exception. We are not required to determine why Lockie Gibson excepted certain substances. Our concern is, what substances did she except.' After quoting from certain authorities the court continued: 'We, therefore, conclude that the recitation in the exception before us that the coal and mineral rights had heretofore been sold was at most only an erroneous recitation of fact and did not limit or restrict the effect of the exception.'

The rule drawn from the foregoing cases by the writer of the text in Corpus Juris Secundum (26 C.J.S. Deeds s 139, p. 1008) is as follows:

'Further, when certain tracts excepted are specifically described, and it is further recited that they have been previously sold or conveyed, the exception will be good, although the recital is false since it may be rejected, or although the prior conveyance did not effectuate a transfer of the property described therein, or even though the property previously conveyed reverts to the grantor by reason of the grantee in the prior conveyance ceasing to use it for the purpose prescribed in the deed.'

See also 16 Am.Jur. 619, Deeds, sec. 318.

The only Texas case which appears to bear on the question is Umscheid v. Scholz, 84 Tex. 265, 16 S.W. 1065, 1066. In that case *342 the deed involved contained the following language: 'it being understood that the public thoroughfare formerly existing along the edge of the river at this point is not intended to be conveyed by these presents, the corporation of the City of Bexar having the right to open said thoroughfare when it sees fit.' There was no evidence that the City had the right to open the thoroughfare, but this Court held that the exception was not affected by the false recitation and that the

property previously used for such thoroughfare did not pass to the grantee.

The exceptions in the Howard and Sharp deeds cannot by construction be made to deal with a royalty interest when they so plainly deal with an interest in minerals in place. Only by reformation may they **650 be made to deal with the outstanding royalty interests and, as our analysis of the pleadings shows, there were no allegations of fraud, accident or mistake and no prayer for reformation. Klein v. Humble Oil & Refining Co., supra, and Methodist Home v. Mays, supra, are not controlling. In each of those cases the deed being construed reserved and excepted from the grant an estate in land identical with the one theretofore reserved or conveyed by a prior grantor. Woods v. Sims, supra, does not bear on the point. The undivided three-fourths (3/4) interest in the minerals in place was excluded from the grants in the Howard and Sharp deeds and title thereto did not pass to respondents.

Since the title to the three-fourths (3/4) interest in the minerals in place never passed to respondents, we have next to decide whether the trial court and Court of Civil Appeals erred in failing to adjudge title thereto to be in petitioner.

(4) Petitioner acquired by quitclaim deed from the Howards whatever right, title or interest they then owned. The language heretofore quoted from the deed from Howard to Sharp did not reserve the interest in the minerals to Howard; it only excepted it from the grant. However, since the interest did not pass to the grantee and was not outstanding in another the legal effect of the language excepting it from the grant was to leave it in the grantor, Howard. The words 'exception' and 'reservation' are not strictly synonymous, Donnell v. Otts, Tex.Civ.App., 230 S.W. 864, 865, no writ history; 14-B Tex.Jur. 714, Deeds, sec. 247, but they are often used interchangeably. King v. First National Bank of Wichita Falls, 144 Tex. 583, 192 S.W.2d 260, 262, 163 A.L.R. 1128; Reynolds v. McMan Oil & Gas Co., Tex.Com.App., 11 S.W.2d 778;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Klein v. Humble Oil & Refining Co., Tex.Civ.App., 67 S.W.2d 911, 915, affirmed**\*343** 126 Tex. 450, 86 S.W.2d 1077. In the case last cited it is said: 'The primary distinction between a reservation and exception is that a reservation must always be in favor of and for the benefit of the grantor, whereas, an exception is a mere exclusion from the grant, in favor of the grantor only to the extent that such interest as is excepted may then be vested in the grantor and not outstanding in another.' (Emphasis ours.)

Petitioner, L. A. Pich, is adjudged to be the owner of an undivided three-fourths (3/4) interest in the minerals in, on and under the 160 acres of land. Respondents are adjudged to be the owners of the surface and an undivided one-fourth (1/4) interest in the minerals in, on and under the 160 acres of land. Mrs. Dorothy Canfield Fuehr is adjudged to be the owner of an undivided one-fourth (1/4) of the one-eighth (1/8) non-participating royalty of all oil, gas and other minerals in, on and under and which may be produced from said land. Ordinarily the royalty interest adjudged to Mrs. Fuehr would be carved proportionately from the two mineral ownerships but petitioner has asserted in his appeal brief that it should be carved entirely from the mineral interest adjudged to petitioner and it will be so adjudged.

The judgments of the trial court and Court of Civil Appeals are reversed and the cause is remanded to the trial court for the entry of judgment in accordance with this opinion.

GARWOOD, Justice (dissenting).

In that portion of the judgment and opinion of the Court of Civil Appeals in the Klein case, which was expressly affirmed and approved by this Court ( 67 S.W.2d 911, 913-917; 126 Tex. 450, 86 S.W.2d 1077), the former Court held a purported exception of '1/8 of all mineral rights' in a deed from one Klein to one Baker to be, not truly an exception, but merely a reference back to a reservation of 'one-eighth (1/8) of all mineral rights' made by a prior grantor (Stein), the 'exception' being made (according to the Court) only for the purpose of limiting the granting clause used by Klein, which **\*\*651** otherwise covered the full title to the premises, and thus avoiding Klein becoming liable on a warranty of the full title. The Court reasoned, with our approval, that if the 'exception' were construed to hold out any interest other than that already reserved **\*344** by the prior grantor (Stein), Klein's grant to Baker would purport to convey to Baker more than Baker actually got. So the Court proceeded, with our approval, to construe Klein's purported 'exception' as referring only to the earlier reservation.

In the instant case, according to our holding, the grantor Howard, who corresponds to Klein, will have purported to convey with warranty that which he did not have, to wit, a free and clear 1/4 of the minerals. Any 1/4 'mineral interest' purportedly conveyed was subject to the reserved royalty, so was not free and clear. A 1/4 mineral estate subject to an outstanding royalty interest is worth less to the owner than it would be if not so burdened. So the grantor, Howard, will have breached his warranty, if we hold that the 'exception' was an exception of something other than the royalty previously reserved.

In support of its holding, the Court in the Klein case reasoned further that the use by the grantor, Klein, of the very word 'excepted', as distinguished from 'reserved', tended to show that the 'exception' might well be for the purpose which the Court held him to have had in mind, and in this connection it used the very words now quoted in the instant case as apparently conducing to a contrary view. In the Klein case, incidentally, the grantor, Klein, at the time he executed the deed, owned all interests in the land except the 1/8 outstanding interest reserved by his grantor (Stein) even as Howard did in the instant case at the time of his conveyance to Sharp.

The Court in the Klein case also made reference to all the language of the 'exception' in the Klein deed and the language in the previous Stein reservation.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

It is also of interest to note that the Supreme Court, in dealing with the other question in the Klein case, that is, the controversy between Baker as mineral lessor and Humble as assignee of the lease, held that, under the circumstances, the Stein reservation above mentioned was actually a royalty despite its language 'one-eighth (1/8) of all mineral rights in and under' the land.

As I see it, we cannot charge off the Klein case by saying that in the instant case, the 'exception' was clearly one of a 3/4 'mineral interest' in the technical sense of that term and that, such an interest being a different kind of estate from the **\*345** royalty estate outstanding, the 'exception' could not possibly be taken to refer to the outstanding royalty. The theory of the Klein holding is that the whole Klein deed, as well as other things, might be looked to in order to determine what the 'exception' meant. And I think that same theory may be extended to an enquiry in the instant case as to whether the words, 'SAVE AND EXCEPT an undivided three-fourths of the oil, gas and other minerals in, on and under said land, which have been heretofore reserved', are necessarily to be construed, under the particular circumstances, as a mineral interest in the sense that excludes a royalty interest.

Obviously a royalty is, in a perfectly normal and legitimate sense, a mineral interest, and not only that, but an interest in minerals in place. It may be created in advance of a lease and even be the subject of ad valorem taxes as real estate before the owner of it receives any proceeds from it. The fraction in which it is expressed may be, and often is, considered as that particular fraction of the minerals, although the latter may be still 'in place'. **\*\*652** Indeed, in the instant case, one of the reserved royalties is expressed both in terms of 'royalty' and in terms of the same fraction 'of all minerals'.

The fact that there is a well recognized and important difference between the character of the two estates, and that, in the same instrument, a grantor may validly convey one fraction of the mineral estate and reserve or except a different fraction as royalty, does not, of course, require that language, such as in the Howard 'exception' clause, shall necessarily and always mean something other than a royalty. None of the cases cited in the main opinion, as I read them, so hold. As above pointed out, we actually held in the Klein case that, under the circumstances of that case, words, such as we now hold to mean a 'mineral interest' beyond possibility of a different construction, actually meant a royalty interest.

Under the circumstances of this case, it seems to me that we may also properly consider the recital in the Howard deed 'which have been heretofore reserved.' The Court will, I'm sure, concede that the recital is not false, unless we assume that the preceding words, 'three-fourths of the oil, gas and other minerals in, on and under', necessarily exclude a reserved royalty interest, considering the deed as a whole. Roberts v. Robertson, 53 Vt. 690, and the other decisions cited in connection with the matter of false recitals, are relevant only on that assumption, which I do not think we should indulge. If the preceding**\*346** language is at all subject to construction, as I think it is in the light of the Klein case, the reference, 'heretofore reserved', can be properly considered.

On the whole, the Klein case appears to me to be controlling and to require a different result than we have reached.

TEX. 1957.
Pich v. Lankford
157 Tex. 335, 302 S.W.2d 645

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


895 S.W.2d 692, 38 Tex. Sup. Ct. J. 462
**(Cite as: 895 S.W.2d 692)**

Supreme Court of Texas.
Rodney Wayne SMITH, Relator
v.
The Honorable Lamar McCORKLE, Judge, the
Honorable Scott Brister, Judge, and Katherine Tyra,
District Clerk, Respondents.

No. 94–1199.
March 30, 1995.

Inmate petitioned for writ of mandamus, after contest to his affidavit of inability to pay costs of appeal was sustained. The Supreme Court held that inmate's declaration complied with statute permitting inmates to file unsworn declarations and was proper substitute for affidavit of inability to pay.

Writ conditionally issued.

West Headnotes

**[1] Appeal and Error 30 ⚷389(4)**

30 Appeal and Error
   30VII Transfer of Cause
      30VII(C) Payment of Fees or Costs, and Bonds or Other Securities
         30k389 Proceeding in Forma Pauperis
            30k389(4) k. Truth of Affidavit or Oath. Most Cited Cases

For purposes of rule that in absence of written order sustaining contest to affidavit of inability to pay costs of appeal allegations of affidavit are taken to be true, docket entry does not constitute "written order." Rules App.Proc., Rule 40(a)(3).

**[2] Appeal and Error 30 ⚷389(2)**

30 Appeal and Error
   30VII Transfer of Cause
      30VII(C) Payment of Fees or Costs, and Bonds or Other Securities
         30k389 Proceeding in Forma Pauperis

            30k389(2) k. Form and Contents, Affidavit or Oath. Most Cited Cases

Declaration that substantially complies with statute permitting inmates to file unsworn declarations that follow prescribed form is proper substitute for affidavit of inability to pay costs of appeal. V.T.C.A., Civil Practice & Remedies Code § 132.001; Rules App.Proc., Rule 40(a)(3).

**[3] Mandamus 250 ⚷57(1)**

250 Mandamus
   250II Subjects and Purposes of Relief
      250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
         250k57 Proceedings for Review
            250k57(1) k. In General. Most Cited Cases

Mandamus is appropriate remedy when contest to affidavit of inability to pay costs of appeal is improperly sustained. Rules App.Proc., Rule 40(a)(3).

**\*692** Rodney Wayne Smith, Rosharon, pro se.

Frank E. Sanders, Glen Van Slyke, and Mike Driscoll, Houston, for respondents.

ON PETITION FOR WRIT OF MANDAMUS
PER CURIAM.

Rodney Wayne Smith, an inmate in the Texas Department of Corrections, filed suit in Harris County against administrators of the Harris County Hospital District. The trial court granted the defendants' motion for summary judgment, and Smith filed a timely notice of appeal and affidavit of inability to pay costs. The Harris County District Clerk contested Smith's request to proceed in forma pauperis, alleging that Smith was not too poor to pay costs and that Smith had "failed to file an Affidavit as required by Rule 49(3)" of the Texas Rules of Appellate Procedure.[FN1] After giving notice to Smith, the trial court held a hearing and orally sustained the contest to Smith's affidavit. No written order was entered in the record, although the docket

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

entries reflect that Smith's motion was "denied as presented." After unsuccessfully seeking mandamus in the Court of Appeals, Smith requested mandamus in this Court.

> FN1. There is no Rule 49(3) in the Texas Rules of Appellate Procedure. We assume that the clerk meant Rule 40(a)(3), which governs affidavits of inability to pay.

[1] In the absence of a written order sustaining a contest, the allegations of the affidavit are taken to be true. *See* TEX.R.APP.P. 40(a)(3); *Ranier v. Brown,* 623 S.W.2d 682, 685 (Tex.App.—Houston [1st Dist.] 1981 orig. proceeding). A docket entry does not constitute a written order. *See McCormack v. Guillot,* 597 S.W.2d 345, 346 (Tex.1980). Taken as true, the allegations in Smith's affidavit conclusively demonstrate his inability to pay.

[2] We note that the contest challenges Smith's failure to submit a sworn affidavit. However, section 132.001 of the Texas Civil Practice and Remedies Code permits inmates to file unsworn declarations that follow a prescribed form. A declaration that substantially complies with the statute is a proper substitute for an affidavit of inability to pay. *See Thomas v. Pankey,* 837 S.W.2d 826, 830 (Tex.App.—Tyler 1992, no writ). Smith's **\*693** declaration complied in every respect with section 132.001.

[3] Mandamus is the appropriate remedy when a contest to an affidavit of inability to pay is improperly sustained. *Allred v. Lowry,* 597 S.W.2d 353, 354 n. 2 (Tex.1980). Pursuant to Texas Rule of Appellate Procedure 122, a majority of this Court, without hearing oral argument, directs that the trial court enter an order overruling the contest to Smith's affidavit of inability to pay costs. The writ will issue only if the trial court fails to comply.

Tex.,1995.
Smith v. McCorkle
895 S.W.2d 692, 38 Tex. Sup. Ct. J. 462

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



▷

Court of Appeals of Texas,
Corpus Christi.

STATE FARM INSURANCE COMPANY, Appellant,
v.
Alice PULTS, Appellee.

No. 13–91–316–CV.
March 4, 1993.

In bad-faith insurance case, the 92nd District Court, Hidalgo County, Homer Salinas, J., imposed discovery sanctions against insurer, and subsequently entered judgment from which insurer appealed. The Court of Appeals, Seerden, J., held that: (1) court order requiring insurer to produce documents was not effective, precluding imposition of sanctions for violation, as order had not been announced in open court, issued in writing or filed in papers of cause prior to sanctions hearing, and (2) "death penalty" sanctions striking insurer's witnesses and pleadings for insurer's alleged wrongful and improper seeking of continuance of trial date and violation of court's open court ruling freezing discovery were unwarranted.

Reversed and remanded.

West Headnotes

**[1] Motions 267 ⚿51**

267 Motions
   267k50 Form and Requisites of Orders
      267k51 k. In General. Most Cited Cases

**Motions 267 ⚿55**

267 Motions
   267k50 Form and Requisites of Orders
      267k55 k. Direction to Enter or Signature.
Most Cited Cases

**Motions 267 ⚿56(1)**

267 Motions
   267k56 Entry or Filing of Orders
      267k56(1) k. In General. Most Cited Cases

All orders must be entered of record to be effective and entries made in judge's docket are not accepted as substitute for that record; order must be reduced to writing, signed by trial court, and entered in record.

**[2] Motions 267 ⚿56(1)**

267 Motions
   267k56 Entry or Filing of Orders
      267k56(1) k. In General. Most Cited Cases

Order pronounced in open court is considered "rendered" when it is officially announced and is valid from that time, making formal entry only ministerial act.

**[3] Pretrial Procedure 307A ⚿412**

307A Pretrial Procedure
   307AII Depositions and Discovery
      307AII(E) Production of Documents and Things and Entry on Land
         307AII(E)4 Proceedings
            307Ak412 k. Order. Most Cited Cases

Court order requiring party to produce documents was not effective, precluding imposition of sanctions for violation of order, as order had not been announced in open court, issued in writing or filed in papers of cause prior to sanctions hearing; it was not enough that court employee had noted court's ruling on party's motion for protective order on docket sheet and that court had read those entries into record at sanctions hearing.

**[4] Appeal and Error 30 ⚿863**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in General

850 S.W.2d 691
**(Cite as: 850 S.W.2d 691)**

30k862 Extent of Review Dependent on Nature of Decision Appealed from

30k863 k. In General. Most Cited Cases

In determining whether sanctions imposed for discovery abuse are just, Court of Appeals determines whether direct relationship exists between offensive conduct and sanction imposed, and whether sanction is excessive. Vernon's Ann.Texas Rules Civ.Proc., Rule 215, subd. 3.

**[5] Pretrial Procedure 307A ⟜44.1**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(A) Discovery in General
            307Ak44 Failure to Disclose; Sanctions
                307Ak44.1 k. In General. Most Cited Cases

Sanctions imposed for discovery abuse should be only as severe as necessary to satisfy its legitimate purpose. Vernon's Ann.Texas Rules Civ.Proc., Rule 215.

**[6] Pretrial Procedure 307A ⟜44.1**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(A) Discovery in General
            307Ak44 Failure to Disclose; Sanctions
                307Ak44.1 k. In General. Most Cited Cases

**Pretrial Procedure 307A ⟜45**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(A) Discovery in General
            307Ak44 Failure to Disclose; Sanctions
                307Ak45 k. Facts Taken as Established or Denial Precluded; Preclusion of Evidence or Witness. Most Cited Cases

Before imposing sanctions for discovery abuse, including exclusion of essential evidence and striking of pleadings, court must consider availability of less stringent sanctions and whether they would fully promote compliance. Vernon's Ann.Texas Rules Civ.Proc., Rule 215.

**[7] Pretrial Procedure 307A ⟜44.1**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(A) Discovery in General
            307Ak44 Failure to Disclose; Sanctions
                307Ak44.1 k. In General. Most Cited Cases

"Death penalty" sanctions striking party's witnesses and pleadings for party's alleged wrongful and improper seeking of continuance of trial date and violation of court's open court ruling freezing discovery were unwarranted; record did not indicate that trial court considered imposition of lesser sanctions or whether lesser sanctions would have promoted compliance. Vernon's Ann.Texas Rules Civ.Proc., Rule 215.

**\*692** John Milano, Jr., Richard J. Reynolds, III, Portia J. Bott, Thornton, Summers, Biechlin & Dunham, San Antonio, Robert L. Guerra, Thornton, Summers, Biechlin & Dunham, McAllen, Anthony B. James, Willette & James, Brownsville, for appellant.

Ezequiel Reyna, Jr., Law Office of Ezequiel Reyna, Jr., Weslaco, Jose E. Garcia, Garcia & Ramirez, Roger Reed, Victor M. Carrera, Munoz, Hockema & Reed, McAllen, for appellee.

Before SEERDEN, KENNEDY, and FEDERICO G. HINOJOSA, Jr., JJ.

OPINION

SEERDEN, Justice.

Appellant, State Farm Insurance Company, appeals from the trial court's judgment in this bad faith insurance case. By eleven points of error, State Farm complains generally of the impropriety of discovery sanctions imposed prior to trial, as well as the sufficiency of evidence, evidentiary rulings, and excessive awards at both the bench trial

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

and the jury trial. We reverse and remand.

Because of alleged violations of its rulings regarding discovery, the trial court imposed discovery sanctions striking appellant's witnesses and pleadings. The order specifically stated that appellant failed to comply with 1) the court order concerning the production of documents and 2) the court's ruling made in open court freezing discovery. After a bench trial, the court found appellant liable for all causes of action pleaded, and awarded liquidated damages and attorney's fees. A separate trial on unliquidated damages resulted in a jury award of actual and punitive damages.

By point of error one, appellant contends the trial court abused its discretion in granting plaintiff's motion for sanctions and striking defendant's answer and witnesses because defendant did not violate a valid order concerning the production of documents as alleged by plaintiff. Pults contends the trial court properly imposed sanctions against appellant for failing to produce documents in response to a valid order.

[1] The threshold question on appeal is whether a telephonic notice of the October **\*693** 17, 1989, ruling was an effective order. Since 1923, Texas courts have consistently enforced the following general rule: All orders must be entered of record to be effective. *Ex parte Rains,* 113 Tex. 428, 257 S.W. 217, 220 (1923). Entries made in a judge's docket are not accepted as a substitute for that record. *Hamilton v. Empire Gas & Fuel Co.,* 134 Tex. 377, 110 S.W.2d 561, 566 (Tex.Comm'n App.1937, opinion adopted). The order must be reduced to writing, signed by the trial court, and entered in the record. *Utilities Pipeline Co. v. American Petrofina Marketing,* 760 S.W.2d 719, 723 (Tex.App.—Dallas 1988, no writ).

[2] One exception to the general rule exists. An order pronounced in open court is considered "rendered" when it is officially announced and is valid from that time, making formal entry only a ministerial act. *Dunn v. Dunn,* 439 S.W.2d 830, 832

(Tex.1969); *UMC, Inc. v. Arthur Bros., Inc.,* 626 S.W.2d 819, 820 (Tex.App.—Corpus Christi 1981), *writ ref'd n.r.e.,* 647 S.W.2d 244 (Tex.1982).

[3] Both parties were notified by telephone of the court's October 17, 1989, ruling on appellant's Motion for Protective Order. Although court employees noted the rulings on the docket sheet and the court read these entries into the record at the sanctions hearing held immediately prior to trial on January 29, 1990, the order had not been announced in open court, issued in writing or filed in the papers of the cause prior to that time. The court's interlocutory order stated that sanctions were imposed, in part, because appellant failed to comply with the court order requiring appellant to produce documents.

Because there was no effective order requiring production of documents when the court imposed sanctions, we conclude that the court erred in granting the Motion for Sanctions based on appellant's violation of that purported order.

Additionally, appellant urges that "death penalty" sanctions are inappropriate and too harsh under the facts of this case, and contends that the conduct involved was not outrageous, willfully disobedient, or done in bad faith. Pults urges that this case reveals a calculated pattern of discovery abuse by appellant, which fully merits the sanctions chosen by the trial court. Further, Pults urges that appellant's unfair tactical use of a motion for continuance to gain an advantage at trial clearly constitutes a "non-specific" discovery abuse for which sanctions may be imposed. *See* Tex.R.Civ.P. 215(3); *Plorin v. Bedrock Foundation & House Leveling Co.,* 755 S.W.2d 490, 491 (Tex.App.—Dallas 1988, writ denied).

[4] Rule 215 authorizes the imposition of appropriate sanctions for discovery abuse. Tex.R.Civ.P. 215; *Braden v. Downey,* 811 S.W.2d 922, 928 (Tex.1991); *Parras v. McLelland,* 846 S.W.2d 44, 47–48 (Tex.App.—Corpus Christi 1992, writ requested). We follow a two part stand-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

850 S.W.2d 691
**(Cite as: 850 S.W.2d 691)**

ard for determining whether imposed sanctions are just. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991). A direct relationship must exist between the offensive conduct and the sanction imposed, and it must not be excessive. *Parras,* 846 S.W.2d at 47–48 (citing *TransAmerican,* 811 S.W.2d at 917).

[5][6] Under the second prong of the test, the sanctions should be only as severe as necessary to satisfy its legitimate purpose. *Id.* The court must consider less stringent sanctions and whether they would fully promote compliance. *Id.* Further, before imposing sanctions, including exclusion of essential evidence and the striking of pleadings, the court must consider the availability of less stringent sanctions and whether they would fully promote compliance. *TransAmerican,* 811 S.W.2d at 917; *see Braden,* 811 S.W.2d at 929.

The record reveals discovery delays on both sides. Motions were filed and hearings requested. When scheduled, hearings were often rescheduled or passed at the request of either or both parties, or the court. The same is true of the trial dates. Because of the informal nature of the discovery in this case, the record is vague.

**\*694** [7] The trial court based its sanctions, in part, on appellant's wrongful and improper seeking of a continuance of the trial date and its violation of the court's open court ruling freezing discovery. On January 15th, the scheduled trial date, the court heard and granted appellant's Motion for Continuance. However, for purposes of discovery, the court stated that the trial commenced January 15th. The court ordered all discovery frozen. After the hearing, appellant re-issued notices for the taking of depositions in New York and took one of the three re-noticed depositions. Appellant argues that the taking of this trial deposition, originally scheduled for October, 1988, was not a violation of the trial court's freeze on discovery.

On January 29th, the court heard the Motion to Strike and Motion for Protection and Notice to

Quash the Deposition[s]. Before trial on January 30th, the court imposed sanctions.

We conclude that death penalty sanctions for discovery abuse, if any, were unwarranted. The record does not indicate that the trial court considered the imposition of lesser sanctions or whether a lesser sanction would have promoted compliance. The extreme sanctions imposed fail to meet *TransAmerican's* second prong. We sustain appellant's point of error one.

Due to our disposition of the first point of error, we find it unnecessary to discuss appellant's remaining points. *See* Tex.R.App.P. 90(a).

The case is reversed and remanded.

Tex.App.–Corpus Christi,1993.
State Farm Ins. Co. v. Pults
850 S.W.2d 691

END OF DOCUMENT



Supreme Court of Texas.
The STATE of Texas, Petitioner,

v.

BRISTOL HOTEL ASSET COMPANY, Nomura Asset Capital Corporation, and Comptroller of Public Accounts, Respondents.

No. 00–1146.
Argued Oct. 10, 2001.
Nov. 29, 2001.
As Corrected on Denial of Rehearing Feb. 14, 2002.

State brought condemnation proceedings against hotel. The Probate Court, Bexar County, Polly Jackson Spencer, J., dismissed on basis that hotel had not been properly served notice of commissioners' hearing, and state appealed. The San Antonio Court of Appeals, 30 S.W.3d 418, affirmed. State petitioned for review. The Supreme Court, Enoch, J., held that properly executed return of service that strictly complied with statutory requirements was prima facie evidence that condemnee had notice of the proceedings.

Reversed and remanded.

Baker, J., dissented and filed opinion in which Hankinson and Rodriguez, JJ., joined.

West Headnotes

**[1] Eminent Domain 148 €~166**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k166 k. Nature and form of proceeding. Most Cited Cases

**Eminent Domain 148 €~167(4)**

148 Eminent Domain

148III Proceedings to Take Property and Assess Compensation
      148k167 Statutory Provisions and Remedies
         148k167(4) k. Strict compliance with statutory requirements. Most Cited Cases

Proceedings to condemn land are special in character, and the party attempting to establish its right to condemn must show strict compliance with the law authorizing private property to be taken for public use.

**[2] Eminent Domain 148 €~231**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k225 Assessment by Commissioners, Appraisers, or Viewers
         148k231 k. Conduct of proceedings in general. Most Cited Cases

Unless notice of the commissioners' hearing has been properly served in accordance with the condemnation statute, the commissioners have no jurisdiction to assess damages or do anything that would declare a condemnation of the property. V.T.C.A., Property Code § 21.015(a).

**[3] Eminent Domain 148 €~231**

148 Eminent Domain
   148III Proceedings to Take Property and Assess Compensation
      148k225 Assessment by Commissioners, Appraisers, or Viewers
         148k231 k. Conduct of proceedings in general. Most Cited Cases

Return of service of notice of commissioners' hearing in condemnation proceedings was prima facie evidence that condemnee was served in compliance with condemnation statute, even though condemnee argued that proof by live testimony of person serving notice was required; return of service was completed in strict compliance with statutory requirements, there was no reason to distin-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

65 S.W.3d 638, 45 Tex. Sup. Ct. J. 144
**(Cite as: 65 S.W.3d 638)**

guish service of notice in condemnation proceeding from service of notice in judicial proceeding where return of service is prima facie evidence of notice, and requirement that person serving notice be competent to testify did not imply that live testimony was necessary method to prove service. V.T.C.A., Property Code § 21.016.

**[4] Eminent Domain 148 ☞231**

148 Eminent Domain
    148III Proceedings to Take Property and Assess Compensation
       148k225 Assessment by Commissioners, Appraisers, or Viewers
         148k231 k. Conduct of proceedings in general. Most Cited Cases

It is the state's burden to prove notice of the commissioners' hearing in compliance with the condemnation statute in order to establish the commissioners' jurisdiction.

**\*638** Jeffrey S. Boyd, Ronda Leigh Neff, Cavitt Wendlandt, Office of Atty. Gen., John Cornyn, Atty. Gen., Andy Taylor, Locke Liddell & Sapp, Grady Click, Office of Atty. Gen., Howard G. Baldwin, Deputy Atty. Gen., Susan Desmarais Bonnen, Office of Atty. Gen., Austin, for petitioner.

**\*639** John N. McClish, Womack & McClish, Austin, Linda J. McKinnis, CT Corp. Systems, Dallas, for respondents.

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice O'NEILL, and Justice JEFFERSON join.

The issue in this case is whether an executed return of service filed with the special commissioners in administrative condemnation proceedings is evidence that notice of the hearing before the special commissioners was properly served. We conclude that, like a return of service of a citation or a certificate of service in judicial proceedings, a re-

turn of service of notice in administrative condemnation proceedings that satisfies the statutory requirements is prima facie evidence of the facts recited therein. Thus, the court of appeals erred in affirming the trial court's judgment dismissing this case.FN1 We therefore reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.

    FN1. 30 S.W.3d 418, 420–21.

In 1997, the State began condemnation proceedings against Bristol Hotel Asset Company and others, seeking to acquire a ten-foot wide strip of land for a road project. On March 25, 1998, special commissioners appointed by the trial court held a hearing to determine the damages resulting from the condemnation. More than eleven days before the hearing, the commissioners issued notice to each party of the date, time and place for the hearing, as required by the Property Code.FN2 The return of service stated:

    FN2. TEX. PROP.CODE § 21.016(b).

The (attached) Notice came to my hand on the 17th day of February, 1998, at 10 o'clock A.M., and I served it at 11:25 o'clock A.M. on the 26th day of February, 1998, at 14295 Midway Rd., Dallas, TX 75244 by delivering a copy of the same, by _____ to J. Peter Kline, President, Agent for Service for Bristol Hotel Asset Company, Fee Owner, together with a copy of the First Amended Petition attached thereto.

I am a person competent to testify.

The return was signed and sworn to before a notary public by Susan Kelly, a Texas Department of Transportation employee.

Bristol did not appear at the commissioners' hearing, although Bristol acknowledges being aware of the hearing several days before it took place. After taking evidence, the commissioners awarded Bristol $196,674. Thereafter, Bristol filed objections to the award and a verified plea to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

65 S.W.3d 638, 45 Tex. Sup. Ct. J. 144
**(Cite as: 65 S.W.3d 638)**

jurisdiction in the trial court. Bristol's plea to the jurisdiction alleged that it had not been properly served with notice of the commissioners' hearing, and that the State failed to engage in good faith negotiations.

A hearing on Bristol's plea to the jurisdiction was set for April 20, 1999. On April 16, the State requested a continuance. After the parties agreed that all discovery responses would be "frozen" and no new witnesses would be designated, the trial court reset the hearing for May 24.

At the hearing, the State offered the executed return of service from the commissioners' file as proof that Bristol had been properly served with notice of the commissioners' hearing. The trial court sustained Bristol's objection to the notice as hearsay. The State then attempted to call Susan Kelly to testify to the facts contained in the return. Bristol objected to Kelly's testimony because the State had **\*640** not identified her in its interrogatory answers as a person with relevant knowledge and had agreed not to designate any new witnesses. The trial court again sustained the objection and denied the State's request for a continuance. Thereafter, the trial court allowed Kelly to testify in an offer of proof, and also allowed the State to introduce the return for bill of review purposes. After hearing testimony from Bristol on its attorneys' fees, the trial court dismissed the condemnation suit and rendered judgment for Bristol for its attorneys' fees and costs.

The State appealed, arguing that the trial court abused its discretion by refusing to admit the return as evidence of service, and further erred when it excluded Kelly's testimony. The court of appeals affirmed the trial court's judgment, concluding that "[t]he State cannot rely solely on the documentation of return of service to prove service was made ... because such evidence is hearsay when service was executed to provide notice of a commissioner's hearing." [FN3] The court of appeals relied on *Baird v. Sam Houston Electric Cooperative, Inc.* [FN4] and *Rotello v. Brazos County Water Control & Im-*

*provement District No. 1* [FN5] for the proposition that the presumption of proper service that attaches to a return of service of citation in a judicial proceeding does not attach to a return in the context of service of notice of a commissioners' hearing. [FN6] Rather, the court stated, the condemnor must prove proper service through the testimony of the person effecting service. [FN7] Further determining that the trial court did not err when it excluded Kelly's testimony, the court of appeals affirmed the trial court's judgment.

> FN3. 30 S.W.3d at 420–21.
>
> FN4. 627 S.W.2d 734, 737 (Tex.App.—Houston [1st Dist.] 1981, writ dism'd).
>
> FN5. 574 S.W.2d 208, 210–12 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ).
>
> FN6. 30 S.W.3d at 420.
>
> FN7. *Id.*

We granted the State's petition for review to determine the requirements for proof of notice in a condemnation proceeding. The State argues that: 1) the return should have been admitted as prima facie evidence that notice was served; 2) the trial court abused its discretion in refusing to admit Kelly's testimony because Bristol would not have been surprised or prejudiced by that testimony even though the State had not identified her in its interrogatory answers; and 3) the trial court abused its discretion by dismissing the case without considering the standards for death penalty sanctions set forth in *TransAmerican Natural Gas Corporation v. Powell.* [FN8] Because of our resolution of the first issue, we do not reach the other two. Neither the trial court nor the court of appeals addressed the good-faith negotiations issue that Bristol asserted in its plea, and that issue is not before us.

> FN8. 811 S.W.2d 913 (Tex.1991).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[1][2] Proceedings to condemn land are special in character, and the party attempting to establish its right to condemn must show strict compliance with the law authorizing private property to be taken for public use.FN9 Currently, that law is set out in Chapter 21 of the Texas Property Code. A condemnation proceeding begins when the condemnor files a petition with the appropriate trial court.FN10 After the *641 petition is filed, the trial court appoints three special commissioners to assess the condemnee's damages.FN11 The commissioners must schedule a hearing.FN12 All parties to the proceeding are entitled to notice of the time and place of the hearing, which must be served not later than eleven days before the hearing date.FN13 Anyone competent to testify may serve notice, and must return the original notice plus a return of service to the commissioners on or before the hearing date.FN14 Unless notice has been properly served in accordance with the statute, the commissioners have no jurisdiction to assess damages or do anything that would declare a condemnation of the property.FN15

> FN9. *City of Houston v. Kunze,* 153 Tex. 42, 262 S.W.2d 947, 951 (1953); *Parker v. Fort Worth & Denver City Ry. Co.,* 84 Tex. 333, 19 S.W. 518, 519 (1892).
>
> FN10. TEX. PROP.CODE § 21.012(a).
>
> FN11. *Id.* § 21.014.
>
> FN12. *Id.* § 21.015(a).
>
> FN13. *Id.* § 21.016(a), (b).
>
> FN14. *Id.* § 21.016(b), (c).
>
> FN15. *Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519.

[3][4] A party may challenge the commissioners' findings by filing written objections with the trial court.FN16 Here, Bristol did so, challenging the commissioners' jurisdiction on the grounds that Bristol had not been properly notified of the commissioners' hearing. It is the State's burden to prove notice in compliance with the statute in order to establish the commissioners' jurisdiction.FN17

> FN16. TEX. PROP.CODE § 21.018(a).
>
> FN17. *See Parker,* 19 S.W. at 519.

The requirement that notice of the commissioners' hearing be served finds a parallel in ordinary judicial proceedings with the requirement that citation be properly served on the defendant.FN18 The person completing service must execute a verified return of service, which must be filed with the court.FN19 The return of service in judicial proceedings "has long been considered prima facie evidence of the facts recited therein."FN20

> FN18. *See* TEX.R. CIV. P. 99(c); *see also* TEX. CIV. PRAC. & REM.CODE § 17.027(c).
>
> FN19. TEX.R. CIV. P. 107.
>
> FN20. *Primate Constr., Inc. v. Silver,* 884 S.W.2d 151, 152 (Tex.1994).

Bristol argues, citing the Houston court of appeals' opinions in *Baird* and *Rotello,* that because the commissioners' proceedings are administrative rather than judicial, and because service of notice of the commissioners' hearing is not an official duty of the sheriff or constable, the return of service in this case is not entitled to the same weight as a return of service of a citation.FN21 But this distinction is not persuasive. Under our civil procedure rules, a citation need not be served by a sheriff or constable. It can be served by anyone over eighteen whom the court has authorized to do so, as long as the person is not a party and has no interest in the suit's outcome.FN22 Thus, a citation is issued by the court and served by someone authorized by the court. Similarly, the commissioners, who are court-appointed, issue the notice of hearing, which by statute may be served by anyone competent to testify.FN23 In either circumstance, the effect is exactly the same—service is performed at the state's direc-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

65 S.W.3d 638, 45 Tex. Sup. Ct. J. 144
**(Cite as: 65 S.W.3d 638)**

tion and with the state's authorization. Consequently, the return in this case, which was executed by a person competent to testify and sworn to before a notary public, is entitled to be treated the **\*642** same as a return in a judicial proceeding, at least to the extent of establishing prima facie that service occurred.[FN24] We therefore disapprove of *Baird* and *Rotello* to the extent that they hold otherwise.

> FN21. *See Baird,* 627 S.W.2d at 737; *Rotello,* 574 S.W.2d at 211.
>
> FN22. TEX.R. CIV. P. 103.
>
> FN23. *See* TEX. PROP.CODE § 21.016(b).
>
> FN24. *See, e.g., Parks v. City of Waco,* 274 S.W. 1006, 1008 (Tex.Civ.App.—Waco 1925, no writ).

The only potentially significant distinction between return of a citation and the return in condemnation proceedings is that the former must be verified while the latter need not be.[FN25] In this regard, we note Texas Rule of Civil Procedure 21a, which prescribes the methods for serving all notices and other papers in a judicial proceeding aside from the citation. This Rule specifically permits "a party to the suit, an attorney of record, a sheriff or constable, or ... any other person competent to testify" to effect service.[FN26] A certificate completed by a party or an attorney of record, or an affidavit of any person showing service, "shall be prima facie evidence of the fact of service."[FN27] Like the Property Code, Rule 21a permits service by any person competent to testify. Also like the Property Code, Rule 21a does not require that a certificate of service be verified. Nonetheless, under the Rule such a certificate provides prima facie evidence of service. We see no meaningful distinction between a certificate of service in a judicial proceeding and the return of notice here, and therefore conclude that both should be entitled to the same weight.

> FN25. *Compare* Tex.R. Civ. P. 107, *with* TEX. PROP.CODE § 21.016(c).
>
> FN26. TEX.R. CIV. P. 21a.
>
> FN27. *Id.*

We therefore hold that a return of service of notice of a commissioners hearing that strictly complies with section 21.016 of the Property Code is prima facie evidence that the condemnee has been served with the notice in compliance with the statute. When the State introduces such a return, the condemnee must offer evidence that it was not served to raise a fact issue.

Our opinion in *City of Houston v. Kunze* does not compel a different result. There, we stated that "recitations contained in the decree of condemnation and other orders" did not prove that the condemnee had been properly served with notice of the commissioners' hearing.[FN28] In *Kunze,* the city relied solely on the condemnation award, which stated that notice had been duly served and the condemnee appeared through his attorney, as proof of service.[FN29] The city did not offer an executed, sworn return of service.[FN30] Likewise in *Parker v. Fort Worth & Denver City Railway Company* we only considered the effect of the declarations contained in the report of the commissioners and in the decree of condemnation.[FN31] We therefore have not had the occasion to consider the evidentiary effect of a return of service, nor have we decided what that effect would be. The dissent simply misleads the reader by citing both *Kunze* and *Parker* and asserting they hold that the State may not rely on "documents in the court's file"—a circumstance not considered by the Court.[FN32]

> FN28. 262 S.W.2d at 951.
>
> FN29. *See id.* at 949.
>
> FN30. *Id.* at 951.
>
> FN31. 19 S.W. at 519.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN32. 65 S.W.3d at 647 (Baker, J., dissenting).

Moreover, *Kunze* and our holding today are consistent with the rule regarding proof of service in a collateral attack on a default judgment. When a defendant contests a default judgment on the grounds that he was not properly served, **\*643** recitations in the judgment will not prove service when the record contains no independent evidence of service, such as a return. FN33 The return in this case is not simply a recitation in the commissioners' award. Rather, it is independent evidence of proper service.

FN33. *Flynt v. City of Kingsville,* 125 Tex. 510, 82 S.W.2d 934, 934–35 (1935).

Bristol further argues that section 21.016(b)'s requirement that the person who serves notice of the commissioners' hearing must be competent to testify means the Legislature intended that the only way service could be proved was through that person's testimony. The State counters that the phrase "competent to testify" defines the class of people who may serve notice, not the manner of proving service. The State analogizes the statute to Texas Rule of Appellate Procedure 52.3, which requires a person "competent to testify" to verify the factual allegations in a petition for an original proceeding, FN34 noting that the Rule obviously does not contemplate live testimony in such a proceeding. Moreover, the State maintains, if we adopt Bristol's reading of the statute, condemnees can too easily challenge the commissioners' jurisdiction every time a person outside the court's subpoena power serves notice of a commissioners' hearing. This happens frequently, according to the State, when the State must serve notice on condemnees who live hundreds of miles from the land to be condemned.

FN34. TEX.R.APP. P. 52.3.

We agree with the State that the phrase "competent to testify" in Property Code section 21.016(b) does not mean that service can only be proven by testimony from the person who completed service. Indeed, requiring the person to be "competent to testify" insures that a properly executed return can replace live testimony, for it could not do so if the person completing the return were not competent to testify to the circumstances under which the notice was served. Further, there is no obvious policy reason for requiring live testimony about service in every condemnation proceeding in which service is challenged. Rather, such a requirement could provoke an explosion in such challenges, if for no better reason than that the condemnee suspects that the condemnor will not be able to produce the person who completed service.

Bristol next argues that the return in this case does not strictly comply with the Property Code, because it contains a blank that was not filled in, and does not clearly state that the notice was hand-delivered. Bristol does not argue that J. Peter Kline, identified in the return as Bristol's agent for service, was not in fact its agent for that purpose. The State responds that hand-delivery to Mr. Kline can be inferred from the rest of the return's language. We think it is not necessary to draw inferences from the return. Section 21.016(c) of the statute specifies that the return must state "how and when [the notice] was served." FN35 Section 21.016(d) describes how notice may be served. The only method relevant to this case is "by delivering a copy of the notice to the party or to the party's agent or attorney[.]" FN36 This is precisely what the return states was done: Susan Kelly delivered a copy of the notice to Mr. Kline as Bristol's agent for service on February 26, 1998, at 14295 Midway Road, Dallas, Texas, at 11:25 a.m. The return thus comports with the statute, and the trial court should have admitted it as prima facie evidence that the notice had been properly served.

FN35. TEX. PROP.CODE § 21.016(c).

FN36. *Id.* § 21.016(d)(1).

**\*644** Thus, the State has established prima facie that Bristol was served in compliance with the

65 S.W.3d 638, 45 Tex. Sup. Ct. J. 144
**(Cite as: 65 S.W.3d 638)**

statute. Bristol must therefore introduce evidence that it was not served in order to create a fact issue. Because the return should have been admitted, the court of appeals erred when it concluded otherwise. We therefore reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.

Justice BAKER filed a dissenting opinion, in which Justice HANKINSON and Justice RODRIGUEZ join.

Justice BAKER dissenting, joined by Justice HANKINSON and Justice RODRIGUEZ.

The Court states that we granted "the State's petition to determine the requirements for proof of notice in a condemnation proceeding." What the Court should have said is that the Court granted the State's petition to change over one-hundred years of condemnation law about the requirements the State must meet to prove service of the commissioners' hearing notice and thus jurisdiction in a condemnation proceeding. The $94,000 dollar question is: Why?

\* \* \* \* \* \*

This condemnation case involves whether the trial court correctly granted the landowner's plea to the jurisdiction on the ground that the State did not prove it properly served notice of the special commissioners' hearing on Bristol. The Court is asked to decide:

* whether, over a hearsay objection, a return of service of the notice of special commissioners' hearing is admissible as *prima facie* evidence to show the truth of its contents;

* whether the trial court abused its discretion by excluding testimony from the State's witness because the State did not timely identify her in its discovery responses; and

* whether the trial court entered an impermissible death-penalty sanction by excluding testimony from the State's witness and dismissing the case

for want of jurisdiction.

Applying our well-established condemnation law, the Court should conclude that: (1) the return's contents constitute hearsay and, therefore, the trial court did not abuse its discretion by sustaining the landowner's hearsay objection and excluding the return from evidence; (2) the trial court did not abuse its discretion by excluding testimony from the State's witness because the State failed to timely identify her as a witness; and (3) the trial court did not enter a "death-penalty" sanction order because of its evidentiary rulings and decision to dismiss the case. Because the Court concludes otherwise, I dissent.

## I. BACKGROUND

The Court's opinion omits certain pertinent facts, and, in doing so, ignores that the State caused its evidentiary problems and the resulting judgment dismissing its suit. In April 1998, Bristol objected to the commissioners' award and filed its plea to the jurisdiction based on its claim that it did not receive proper notice of the commissioners' hearing. Bristol set the jurisdictional hearing for January 22, 1999, but agreed to pass the hearing upon the State's request that the parties mediate. After the State indicated that it no longer wanted to mediate, Bristol reset the hearing for March 26, 1999. Because of a conflict, the trial court rescheduled the hearing for April 20, 1999.

On April 16, 1999, the State moved to continue the hearing, alleging a key witness's unavailability. Bristol opposed the motion for continuance. But the trial **\*645** court granted the State's motion and reset the hearing for May 24, 1999. The order granting the continuance also stated that the "parties agreed there will be no more discovery and no more witnesses designated prior to May 24, 1999." Bristol filed its plea to the jurisdiction and objections to the special commissioners' award in April 1998, more than one year before the jurisdictional hearing. Accordingly, for this entire time, the State knew it had the burden to prove jurisdiction to overcome Bristol's claim for lack of service of the commissioners'

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

hearing notice.

Moreover, during oral argument, the State conceded that it redesigned the project and completed its construction, so it no longer needs to condemn Bristol's land. Accordingly, whether the State can condemn Bristol's land is no longer an issue in this litigation. The sole remaining issue is whether the State can avoid the trial court's judgment awarding Bristol $94,000 in attorneys' fees, expert-witness fees, miscellaneous expenses, and court costs.

## II. THE PARTIES' CONTENTIONS

The State contends that in a hearing on a landowner's plea to the jurisdiction, the notice of commissioners' hearing and attached return of service are admissible as *prima facie* evidence that the notice was properly served. The State's principal argument is that the notice of hearing and return of service are statutorily mandated so that when jurisdiction is challenged, the trial court should admit the notice and return as *prima facie* proof of jurisdiction even in the face of a hearsay objection. Moreover, the State contends that section 21.016's requirement that a "person competent to testify" serve the notice only identifies the class of persons who can serve notice and does not suggest that, as the court of appeals concluded, the State must prove notice through that person's testimony. *See* 30 S.W.3d at 420.

Additionally, the State contends the trial court abused its discretion by refusing to allow Kelly, the State's employee who served the notice of commissioners' hearing on Bristol, to testify. Relying on our Rules of Civil Procedure, the State asserts the trial court's ruling was wrong because: (1) a hearing on a plea to the jurisdiction is not a trial for discovery purposes and, therefore, Rule 193.5's presumption that discovery supplemented less than thirty days before trial does not apply; and (2) the record affirmatively shows Bristol would not be surprised or prejudiced by allowing such testimony under Rule 193.6. Finally, the State argues that the trial court's refusing to allow Kelly to testify and dismissing the State's suit for want of jurisdiction

amounted to an impermissible death-penalty sanction.

In response, Bristol argues that the return of service of the notice of commissioners' hearing is not *prima facie* evidence of proper notice. Bristol contends that the traditional presumptions of regularity that attach to an officer's formal return of citation do not apply to a return of service of notice of hearing in a condemnation proceeding, and the State did not meet its burden to prove strict compliance with the Property Code's procedural requirements.

Moreover, Bristol argues that the trial court did not abuse its discretion by excluding Kelly's testimony because the State never timely designated Kelly as a person with knowledge of relevant facts. Bristol points out that the State had over a year to designate Kelly, knowing Bristol had objected to jurisdiction based on improper notice. And, Bristol relies on the parties' Rule 11 agreement that they would not designate any new witnesses. Finally, Bristol contends that the trial court's rulings that excluded Kelly's testimony**\*646** and dismissed the case for lack of jurisdiction do not amount to death-penalty sanctions, because the condemnation suit was dismissed without prejudice and thus the State could have immediately refiled its action.

### III. APPLICABLE LAW
### A. CONDEMNATION
### SUIT—JURISDICTIONAL REQUIREMENTS

Our Legislature has enacted a comprehensive statutory scheme that governs the State's eminent-domain power, and the jurisdictional requirements the State must meet before it can condemn property. TEX. PROP.CODE §§ 21.001 –.065; TEX. TRANSP. CODEE § 203.051. In Texas, the State's filing a condemnation petition begins the legal proceedings by which the State acquires private property for public use. TEX. PROP.CODE § 21.012. A condemnation action is divided into two distinct stages. The first stage is administrative and involves a hearing before three special commissioners appointed by the trial court where the State files

65 S.W.3d 638, 45 Tex. Sup. Ct. J. 144
**(Cite as: 65 S.W.3d 638)**

its condemnation petition. *See* TEX. PROP.CODE §§ 21.014–.015; *Patrick Media Group, Inc. v. Dallas Area Rapid Transit,* 879 S.W.2d 375, 376 (Tex.App.—Eastland 1994, writ denied). After a hearing, the commissioners make findings and determine the condemnation-damages award. TEX. PROP.CODE §§ 21.014, 21.018. The commissioners' hearing "is neither a suit at law nor a case in equity." *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 937 (1958) (quoting *Fortune v. Killebrew,* 86 Tex. 172, 23 S.W. 976, 978 (1893)). It is not until a party objects to the commissioners' award, or the time for objecting expires, that the case proceeds to the second stage as a judicial proceeding in the trial court. *See* TEX. PROP.CODE § 21.018; *Amason v. Natural Gas Pipeline Co.,* 682 S.W.2d 240, 242 (Tex.1984); *Pearson,* 315 S.W.2d at 937.

Our condemnation jurisprudence mandates that the landowner receive notice of the condemnation hearing in strict compliance with the statutory requirements. *City of Houston v. Kunze,* 153 Tex. 42, 262 S.W.2d 947, 951 (1953); *Parker v. Fort Worth & Denver City Ry. Co.,* 84 Tex. 333, 19 S.W. 518, 519 (1892); *McIntyre v. Luker,* 77 Tex. 259, 13 S.W. 1027, 1028 (1890). Under the Property Code, each party is entitled to written notice of the time and place of the commissioners' hearing, served at least eleven days before the hearing by a person competent to testify. TEX. PROP.CODE § 21.016.

A person is competent to testify unless the court determines he or she is (1) "insane" as our rules of evidence define, or (2) a child or any other person who the court finds "does not possess sufficient intellect" to testify. TEX.R. EVID. 601. Moreover, a person is not competent to testify about a matter unless evidence shows the person has personal knowledge of that matter. TEX.R. EVID. 602; *see also Loper v. Andrews,* 404 S.W.2d 300, 305 (Tex.1966); *Strickland Transp. Co. v. Ingram,* 403 S.W.2d 192, 195 (Tex.Civ.App.—Texarkana 1966, writ dism'd). The person who serves the notice must return the original notice to the commissioners on or before the hearing date, and that person shall write a return of service on the notice that states how and when the notice was served. TEX. PROP.CODE § 21.016(c).

Absent the landowner's waiver or stipulation, the State has the burden to prove exact adherence with the Property Code's condemnation-proceeding requirements to demonstrate jurisdiction. *See Denton County v. Brammer,* 361 S.W.2d 198, 200 (Tex.1962); *Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519. Thus, if notice of the commissioners' hearing was never properly served under the Property Code, the commissioners' condemnation-damages **\*647** award is invalid and the trial court lacks jurisdiction. *Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519; *McIntyre,* 13 S.W. at 1028; *Anderson v. Clajon Gas Co.,* 677 S.W.2d 702, 704 (Tex.Civ.App.—Houston [1st Dist.] 1984, no writ); *Maberry v. Pedernales Elec. Coop.,* 493 S.W.2d 268, 270 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.); *Bowie County v. Powell,* 66 S.W. 237, 237–38 (Tex.Civ.App.1901, no writ).

In meeting its burden to prove proper notice and thus jurisdiction in a condemnation proceeding, the State may not rely solely on recitations in the commissioners' award or other documents in the court's file, including the return itself. *Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519. And, if the State does not prove effective notice, the trial court must dismiss the proceeding:

> Inasmuch as condemnation proceedings are special in their character and involve a summary taking of property from its owner, it is the settled rule that they must be conducted in strict accordance with the governing statutes. It follows that condemnation proceedings in which the statutes have been ignored are wholly void, and, when the occasion therefor arises, the court will hold them to be void of its own motion.

*State v. Davis,* 139 S.W.2d 638, 640 (Tex.Civ.App.—Eastland 1940, writ dism'd) (quoting 16 TEX. JUR. 700 § 95); *see also Kunze,* 262 S.W.2d at 951; *McIntyre* 13 S.W. at 1028. We

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

liberally construe the Property Code's protections for the landowner's benefit. *John v. State,* 826 S.W.2d 138, 140 (Tex.1992). If the trial court grants a landowner's motion to dismiss based on the State not having a right to condemn the land, it may award the landowner "reasonable and necessary fees for attorneys, appraisers, and photographers and for the other expenses incurred by the property owner to the date of the hearing or judgment." TEX. PROP.CODE § 21.019(c).

### B. EVIDENTIARY ISSUES—STANDARD OF REVIEW

The trial court determines preliminary questions about admitting or excluding evidence. TEX.R. EVID. 104(a). Whether to admit or exclude evidence is a matter committed to the trial court's sound discretion. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995); *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). A trial court abuses its discretion when it acts without regard to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). Whether a trial court abused its discretion in making an evidentiary ruling is a question of law. *Jackson v. Van Winkle,* 660 S.W.2d 807, 810 (Tex.1983).

### C. DEATH PENALTY SANCTIONS

This Court defines "death-penalty" discovery sanctions as sanctions that terminate a party's right to present the merits of its claims. *See Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 845 (Tex.1992). Such sanctions include striking a party's pleadings, dismissing its action, or rendering a default judgment against a party for abusing the discovery process. *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917–18 (Tex.1991). A death-penalty sanction adjudicates a party's claims without regard to their merits and is based on the party's conduct during discovery. *TransAmerican,* 811 S.W.2d at 918. In other words, a sanction order is a death-penalty sanction only if it precludes a party from adjudicating the merits of his or her claims because of the party's discovery

abuses. *TransAmerican,* 811 S.W.2d at 918.

### *648 IV. ANALYSIS

Bristol contested the State's right to condemn its property by filing a verified plea to the jurisdiction. Thus, under our condemnation law, the State had the burden to prove strict compliance with all the procedural steps necessary for the commissioners' award to be valid and for the trial court to have jurisdiction. *See Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519; *McIntyre,* 13 S.W. at 1028; *Anderson,* 677 S.W.2d at 704; *Maberry,* 493 S.W.2d at 270; *Davis,* 139 S.W.2d at 640; *Powell,* 66 S.W. at 237–38. And if the State's proof was insufficient, the trial court correctly dismissed the proceeding for want of jurisdiction. *See Kunze,* 262 S.W.2d at 951; *McIntyre,* 13 S.W. at 1028.

The State recognizes that "notice of the commissioners' hearing is not citation or process, it is simply notice." Despite this acknowledgment, the State argues that the return of service of the notice of commissioners' hearing should be *prima facie* evidence that notice was served, just as a return of service of process in an ordinary judicial proceeding is treated. Ignoring that our condemnation law already sets out the State's burden of proof for the strict jurisdictional requirements in these special proceedings, the Court agrees with the State.

But anything more than the Court's cursory analysis shows that the procedures for serving notice of the commissioners' hearing are nothing like those for serving citation, which, in an ordinary judicial proceeding, provide a defendant with notice of suit. *See Primate Constr., Inc. v. Silver,* 884 S.W.2d 151, 152 (Tex.1994). In an ordinary judicial proceeding, the court's clerk issues a citation as an official court document. *See* TEX.R. CIV. P. 99. No party or other interested person is authorized to serve the citation; only a sheriff, constable, or other person authorized by law or court order may do so. *See* TEX.R. CIV. P. 103. Additionally, the officer serving the citation must verify the return of service. *See* TEX.R. CIV. P. 107.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

In an ordinary judicial proceeding, an officer's return of service that meets all procedural requirements is valid on its face and carries a presumption of the truth of the facts stated on the return and a presumption of its regularity. *See Sauve v. State,* 638 S.W.2d 608, 610 (Tex.App.—Dallas 1982, writ ref'd.). The return of service is *prima facie* evidence of service because our procedural rules ensure that independent, uninterested, and legally authorized persons serve process and verify the return. *See* TEX.R. CIV. P. 103, 107. Therefore, in an ordinary judicial proceeding, unless the party contesting service presents a preponderance of evidence to the contrary—for example the party's testimony along with corroborating facts or circumstances—the officer's return of service is sufficient proof that the citation and petition were properly served. *See Ward v. Nava,* 488 S.W.2d 736, 738 (Tex.1972); *Sauve,* 638 S.W.2d at 610.

In contrast, the Property Code explicitly governs how notice of the commissioners' hearing, an administrative proceeding, is issued and served in a condemnation proceeding. *See* TEX. PROP.CODE § 21.016; *Pearson,* 315 S.W.2d at 937; *Fortune,* 23 S.W. at 978. The commissioners issue a notice of hearing, which any "person competent to testify may serve." TEX. PROP.CODE § 21.016(b). The Property Code does not require that the return of service be verified. Thus, serving notice of the hearing is not a sheriff's or constable's official duty, and a court order authorizing any other person to effect such service is unnecessary. *Baird v. Sam Houston Elec. Coop., Inc.,* 627 S.W.2d 734, 737 (Tex.App.—Houston [1st Dist.] 1981, writ dism'd); **\*649***Rotello v. Brazos County Water Control & Improvement Dist.,* 574 S.W.2d 208, 210–12 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ).

In sum, during a condemnation action's administrative stage, any person competent to testify, even an interested person such as the State's employee, Kelly, may serve notice of the commissioners' hearing and return the service without verifying the return. Because of the statutory scheme, courts have recognized that the presumption in ordinary judicial proceedings—that the sheriff, constable, or other person authorized to serve process acted in an ordinary and lawful manner—does not arise when determining if a landowner in a condemnation proceeding received notice of the commissioners' hearing. *Baird,* 627 S.W.2d at 737; *Rotello,* 574 S.W.2d at 211. Consequently, the return of service of the commissioners' hearing notice must be regarded as hearsay upon proper objection, and, standing alone, the return is not evidence that service of the notice was proper. *Baird,* 627 S.W.2d at 737; *Rotello,* 574 S.W.2d at 211. This is because the return's contents constitute a statement other than one the declarant made while testifying at the trial or hearing, and the statement is offered into evidence to prove the truth of the matter asserted. *See* TEX.R. EVID. 801(d).

The special nature of a condemnation proceeding further demonstrates why the Court should not liken the return of service of the commissioners' hearing notice to a return of service of citation in an ordinary judicial proceeding. And, such special nature supports our concluding that the State must present independent admissible evidence to prove the notice was duly and legally served. *Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519. This Court has long recognized that a proceeding to condemn land is special in character. *Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519; *McIntyre,* 13 S.W. at 1028. Article 1, section 17 of our Constitution provides that "[n]o person's property shall be taken ... for or applied to public use without adequate compensation being made...." Thus, condemnation proceedings implicate constitutional concerns and protections. *See City of Houston v. Derby,* 215 S.W.2d 690, 692 (Tex.Civ.App.—Galveston 1948, writ ref'd). Indeed, the State's eminent-domain power, which "could be exercised very oppressively, ought to be, and is, very strictly regulated." *Derby,* 215 S.W.2d at 692. This is why we liberally construe the Property Code's protections for the landowner's benefit. *John,* 826 S.W.2d at 140. And it explains our long-standing jurisprudence that if the State fails to show strict compliance with the

Property Code's procedural requirements, the trial court must dismiss the case. *See Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519; *McIntyre,* 13 S.W. at 1028; *Davis,* 139 S.W.2d at 640.

Here, the return of service of the commissioners' hearing notice shows that Kelly, the State's employee, served the notice and verified the return. But, because the Property Code does not afford Bristol the same protections of service by an uninterested, legally authorized person as in an ordinary judicial proceeding, the Court cannot attribute the presumption of validity of service of citation to the return of service here. When the State tried to introduce the return as evidence of proper notice, Bristol made a timely hearsay objection. Under Texas' condemnation law, the trial court correctly sustained Bristol's objection. *See Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519; *McIntyre,* 13 S.W. at 1028; *Baird,* 627 S.W.2d at 737; *Rotello,* 574 S.W.2d at 211; *Davis,* 139 S.W.2d at 640. The State argues the trial court abused its discretion in making this ruling because a hearsay exception applies to the return of service of notice of the commissioners' **\*650** hearing. At oral argument, the State relied on rule 803(8) of the Rules of Evidence, which provides a hearsay exception for:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth: (A) the activities of the office or agency; (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding in criminal cases matters observed by police officers and other law enforcement personnel; or (C) in civil cases as to any party and in criminal cases as against the state, factual findings resulting from an investigation made pursuant to authority granted by law; unless the sources of information or other circumstances indicate lack of trustworthiness.

TEX.R. EVID. 803(8). The State contends that its employee's executing the return and filing it with the commissioners and the court records made the return a public record within rule 803(8)'s

meaning. But this argument lacks merit. Carrying the State's contention to its logical end, any paper filed by any person in any lawsuit would become admissible evidence merely because it was filed with the court.

Further, the State incorrectly contends that "competent to testify" in Property Code section 21.016 has no meaning beyond identifying the class of persons who can serve the notice. To the contrary, our rules of evidence and case law demonstrate that competency to testify speaks to whether a trial court may admit a person's testimony as evidence after determining that the person is not insane or a child or other person who the court finds does not have sufficient intellect to testify. *See* TEX.R. EVID. 601, 602; *Loper,* 404 S.W.2d at 305; *Strickland Transp. Co.,* 403 S.W.2d at 195. And, more importantly, a person is competent to testify only if he or she has personal knowledge about the facts related. *See* TEX.R. EVID. 601, 602; *Loper,* 404 S.W.2d at 305; *Strickland Transp. Co.,* 403 S.W.2d at 195. Therefore, section 21.016's explicit language requiring that a person competent to testify serve notice, demonstrates that testimony about service and not just the return itself is required to prove jurisdiction. Here, the return's contents constitute hearsay, and the only person who has personal knowledge about service is the person who served it—in this case, Kelly.

Additionally, the State misplaces its reliance on *Sauve v. State,* 638 S.W.2d at 608. That case is readily distinguishable. *Sauve* involves a juvenile's trial as an adult in a criminal district court. Specifically, the court of appeals considered whether a juvenile probation officer properly served a citation of a transfer proceeding in the juvenile court on the defendant. *Sauve,* 638 S.W.2d at 608. At the time, the Family Code required that service be made by any suitable person under the court's direction. *Sauve,* 638 S.W.2d at 610. Even though he conceded being served with process, the defendant argued that the criminal district court lacked jurisdiction over him because the juvenile court had not is-

sued a formal written order directing the probation officer to serve the citation of the transfer proceeding. *Sauve,* 638 S.W.2d at 609. In rejecting this argument, the court of appeals relied on the general rule that an officer's return which is valid on its face carries the presumption of the truth of the facts stated on the return and of regularity. *Sauve,* 638 S.W.2d at 610. Because of this presumption, the court of appeals concluded that a written order was unnecessary because a presumption exists that the probation officer would not have executed service unless the court had directed him to do so. *Sauve,* 638 S.W.2d at 610.

**\*651** Here, however, the issue is whether Bristol received proper notice of the commissioners' condemnation hearing—not a juvenile proceeding—and the Property Code, not the Family Code, provisions apply. Moreover, unlike juvenile proceedings, condemnation proceedings place the burden on the State to show notice was properly served. *Compare Kunze,* 262 S.W.2d at 951, *Parker,* 19 S.W. at 519, *and Anderson,* 677 S.W.2d at 704 *with Sauve,* 638 S.W.2d at 610. And, as previously discussed, the Property Code's express provisions governing the notice requirements and condemnation proceedings' special nature should preclude the Court from relying on the presumption that a return of service is valid on its face in this context. But because the Court disregards these important differences, it improperly applies the presumption and concludes that the trial court abused its discretion by excluding the return from evidence.

If the Court correctly applied condemnation law to hold that the return of service is inadmissable hearsay, it would next have to consider the State's argument that the trial court abused its discretion by refusing to allow its employee, Kelly, to testify about her serving the notice on Bristol. The State urges that the discovery rules requiring discovery supplementation thirty days before trial do not apply to jurisdictional hearings and that Kelly's testimony would not have prejudiced or surprised Bristol under discovery Rule 193.6. But the State's arguments are red herrings, raised to divert the Court's attention from the actual events in this case.

The record shows the State never designated Kelly as a person with knowledge of relevant facts in any of its discovery responses. The State did not designate Kelly even though Bristol, from the beginning of the trial-court proceeding, had challenged jurisdiction on the ground that it did not receive proper notice of the commissioners' hearing. Because the jurisdictional hearing was reset several times, the State had over a year to designate Kelly. And when the trial court granted the State's motion to continue the jurisdictional hearing from April 20 to May 24, 1999, the State agreed that "there will be no more discovery and no more witnesses designated prior to May 24, 1999." Accordingly, the trial court's ruling that excluded Kelly's testimony simply enforced the parties' Rule 11 agreement and the trial court's previous order.

The State asserts that the trial court imposed the discovery freeze at Bristol's insistence and not by the parties' agreement. But the record does not support this assertion. And the State provides no evidence that it repudiated the Rule 11 agreement or objected to it in the trial court or in the court of appeals. Moreover, the State conceded during oral argument that it had not objected to or complained about the Rule 11 agreement. The State cannot now rely on our discovery rules to ignore the Rule 11 agreement. Were the Court to allow the State to do so, we would be holding the State to a different standard than other litigants. We have long recognized:

[W]hen a State enters the Courts as a litigant, it must be held subject to the same rules that govern the other litigants, and abide the consequences of the suit.... When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

65 S.W.3d 638, 45 Tex. Sup. Ct. J. 144
**(Cite as: 65 S.W.3d 638)**

equity, and a judgment for or against her must be given the same effect as would have been given it had it **\*652** been rendered in a case between private individuals.

*Wortham v. Walker,* 133 Tex. 255, 128 S.W.2d 1138, 1145–46 (1939) (citations omitted). As a result, the Rule 11 agreement is valid and enforceable. Thus, the trial court did not abuse its discretion by excluding Kelly's testimony.

Additionally, the State's argument that the trial court's evidentiary rulings and dismissing the case for want of jurisdiction constitute a death-penalty sanction lacks merit. A death-penalty sanction only exists if the sanction terminates or inhibits a party from adjudicating its claims' merits. *Chrysler Corp.,* 841 S.W.2d at 845; *TransAmerican,* 811 S.W.2d at 918.

Here, the trial court's rulings did not adjudicate the State's condemnation action on its merits. The State concedes as much in its briefing. The trial court's dismissal did not bar the State from refiling its condemnation petition and instituting the condemnation proceeding against Bristol with proper notice. Thus, the trial court's order was not a death-penalty sanction and, therefore, was not an abuse of discretion.

### V. THE COURT'S WRITING

The Court's view that the return of service of the commissioners' hearing notice is analogous to a return of citation in an ordinary judicial proceeding turns Texas' condemnation jurisprudence on its head. Although the Court recognizes that condemnation proceedings are special in character, 65 S.W.3d at 640–42, it summarily concludes that because the commissioners issue the notice, and because a person competent to testify executed the return, the return must be taken as *prima facie* evidence of proper service. The Court reasons that, in both an ordinary judicial proceeding and a condemnation proceeding, service is performed at the State's direction and authorization; therefore, the return of service in both instances should be treated

the same. But this conclusion ignores that the State is a party in a condemnation suit, not the judiciary overseeing the action. And such a conclusion disregards that here, the State's employee, not an uninterested party, served the notice.

Additionally, the Court improperly relies on Rule 21a to support its contention that such return of service should be *prima facie* evidence of service. Rule 21a expressly provides that it governs how court filings "other than the citation to be served upon the filing of a cause of action" shall be served. TEX.R. CIV. P. 21a. Further, Rule 21a is entirely different from section 21.016 of the Property Code. This is because it explicitly advises parties about how they may ensure proper service. Moreover, Rule 21a is specifically designed to facilitate how parties must serve pleadings after the parties have been served with citation and are already before the court. TEX.R. CIV. P. 21a.

Further, the Court cites no authority, legal or otherwise, for the proposition that " 'competent to testify' insures that a properly executed return can replace live testimony, for it could not do so if the person completing the return were not competent to testify to the circumstances under which the notice was served." 65 S.W.3d at 643. But just because Kelly may be competent to testify, does not make her return *prima facie* proof of service. As previously discussed, "competent to testify" refers to whether a person can give testimony about a certain matter in a proceeding. *See* TEX.R. EVID. 601, 602; *Loper,* 404 S.W.2d at 305; *Strickland Transp. Co.,* 403 S.W.2d at 195. As a result, section 21.016's requiring that a person competent to testify effect service supports our concluding that the State must offer testimony**\*653** from the person with personal knowledge about service, not just the return itself, to prove notice was duly served.

Finally, the Court opines that there are no obvious policy reasons for requiring live testimony about service and that such a requirement could provoke an explosion of jurisdictional challenges because the condemnee may believe the State can-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

not produce the person who served the notice. 65 S.W.3d at 643. But the Court's myopic view of public policy causes it to miss the obvious policy reason behind treating the return here differently than an ordinary return of citation; that is, condemnation proceedings involve a constitutional taking. Additionally, the Court's statement simply adopts the oft-made cry, as the State makes here, that the "sky will fall" if this Court does not change existing law. For over one-hundred years, our condemnation law has required that the State prove that the statute's procedural requirements, including proper notice, were met. *See Kunze,* 262 S.W.2d at 951; *Parker,* 19 S.W. at 519; *McIntyre,* 13 S.W. at 1028; *Davis,* 139 S.W.2d at 640. Further, since *Rotello* and *Baird* issued in 1982 and 1978, respectively, I have found no other published condemnation cases in which the court had to determine if the State proved jurisdiction because it solely relied on the return, or because it failed to offer testimony from the party who served notice. Thus, for at least twenty years, there has been a dearth of condemnation cases involving jurisdictional pleas based on faulty notice of service.

### VI. CONCLUSION

Over one-hundred years of condemnation law dictates the outcome here. Remarkably, however, the Court changes this well-established law in a case in which the land the State sought to condemn is no longer an issue. And, because of this, landowners will no longer enjoy the protection in condemnation proceedings that the State must prove strict adherence to the Property Code's notice requirements to establish jurisdiction. The Court should hold that: (1) the return of service of the notice of commissioners' hearing in a condemnation case is not admissible as *prima facie* evidence of the truth of its contents in the face of a hearsay objection; (2) the trial court did not abuse its discretion by excluding testimony from the State's untimely identified witness, because the trial court enforced the parties' Rule 11 agreement to not designate any additional witnesses; and (3) the trial court's dismissal order was not a death-penalty

sanction and thus, the State can refile its condemnation action against Bristol. Because the Court does not so hold, I respectfully dissent.

Tex.,2001.
State v. Bristol Hotel Asset Co.
65 S.W.3d 638, 45 Tex. Sup. Ct. J. 144

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


661 S.W.2d 923
**(Cite as: 661 S.W.2d 923)**

C

Supreme Court of Texas.
Dorothy Reed TAACK, Relator,
v.
Hon. John R. McFALL, Judge, et al., Respondents.

No. C–2337.
Oct. 12, 1983.

Wife sought writ of mandamus to compel judge to vacate his order granting new trial on divorce action. The Supreme Court held that: (1) judge's oral pronouncement and docket entry granting new trial could not substitute for written order required by rule of civil procedure governing granting of motion for new trial, and (2) order issued after trial court lost jurisdiction of case purporting to grant new trial was nullity.

Writ granted conditionally.

West Headnotes

**[1] Divorce 134 ⚷151**

134 Divorce
   134IV Proceedings
      134IV(M) New Trial
         134k151 k. In General. Most Cited Cases

Judge's oral pronouncement and docket entry granting husband new trial on divorce action could not substitute for written order required by rules of civil procedure. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b(c).

**[2] Divorce 134 ⚷151**

134 Divorce
   134IV Proceedings
      134IV(M) New Trial
         134k151 k. In General. Most Cited Cases

Where husband's motion for new trial was not determined by written order signed within 75 days after default divorce decree was signed, motion was overruled by operation of law and judgment became final 30 days later and trial court lost jurisdiction; thus, order of trial court after it had lost jurisdiction purporting to grant new trial was nullity. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b(c, e).

**[3] Judgment 228 ⚷326**

228 Judgment
   228VIII Amendment, Correction, and Review in Same Court
      228k326 k. Allowing Amendment Nunc Pro Tunc. Most Cited Cases

Failure to follow express requirements of rule of civil procedure governing granting of motion for new trial is not clerical error which could be amended nunc pro tunc. Vernon's Ann.Texas Rules Civ.Proc., Rule 329b(c).

**\*923** Benson & Benson, Charles E. Benson and Barbara S. Benson, Lubbock, for relator.

McClendon & Richards, Jack McClendon, Lubbock, for respondents.

PER CURIAM.

Relator, Dorothy Reed Taack, seeks a writ of mandamus to compel Judge John R. McFall to vacate his order granting a new trial in a divorce action between relator and Wayne Taack. We conditionally grant the writ.

Dorothy Reed Taack sued Wayne Taack for divorce. Judge McFall rendered a default divorce decree on October 8, 1982. Wayne Taack timely filed a motion for new trial, and a hearing on the motion was held on November 3, 1982. Judge McFall orally granted Mr. Taack's motion for new trial and noted his action on the docket sheet. On that same day, November 3, Judge McFall granted Dorothy Taack's request for temporary orders regarding such matters as child support and custody. These temporary orders were signed by Judge McFall on

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

661 S.W.2d 923
**(Cite as: 661 S.W.2d 923)**

November 12, 1982. Apparently, the parties mistakenly believed that an order granting Mr. Taack's motion for new trial was also signed on that day.

On March 22, 1983, Wayne Taack filed a cross-petition for divorce. On June 13, 1983, Dorothy Taack filed a motion to dismiss, claiming that the decree of divorce signed on October 8, 1982, was final. On June 21, 1983, Judge McFall denied Dorothy Taack's motion to dismiss and rendered a judgment nunc pro tunc vacating the divorce decree of October 8, 1982, and granting Mr. Taack's motion for new trial.

An order granting a motion for new trial is not effective unless signed within seventy-five**\*924** days after the judgment is signed. TEX.R.CIV.P. 329b(c). If no written order is signed within this period, the motion for new trial is deemed overruled by operation of law. TEX.R.CIV.P. 329b(c). The trial court, however, retains jurisdiction to vacate, modify, correct or reform the judgment for an additional thirty days. TEX.R.CIV.P. 329b(e).

[1][2] Judge McFall's oral pronouncement and docket entry granting the new trial could not substitute for the written order required by Rule 329b(c). *Clark & Company v. Giles,* 639 S.W.2d 449 (Tex.1982); *McCormack v. Guillot,* 597 S.W.2d 345 (Tex.1980). Since Wayne Taack's motion for new trial was not determined by a written order signed within seventy-five days after the default divorce decree was signed on October 8, 1982, the motion was overruled by operation of law on December 22, 1982. The judgment became final thirty days later, and the trial court lost jurisdiction in the case. Therefore, the order of June 21, 1983, purporting to grant a new trial, is a nullity.

[3] Wayne Taack argues that the judgment nunc pro tunc rendered by Judge McFall corrected a clerical error and thus was authorized under TEX.R.CIV.P. 316. A similar argument was advanced without success by the respondent in *McCormack v. Guillot,* 597 S.W.2d 345. We hold that the failure to follow the express requirements of

Rule 329b(c) is not a clerical error.

Relator's motion for leave to file petition for writ of mandamus is granted, and without hearing oral argument, we conditionally grant the writ of mandamus to compel Judge McFall to vacate his order of June 21, 1983, granting a new trial. TEX.R.CIV.P. 483. The writ of mandamus will issue only if he does not vacate that order.

Tex.,1983.
Taack v. McFall
661 S.W.2d 923

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

10 S.W.3d 730
**(Cite as: 10 S.W.3d 730)**



Court of Appeals of Texas,
Houston (1st Dist.).
Glenn TILL, Appellant,
v.
Lora Williams THOMAS and Ennis Inc. d/b/a Quik
Park, Appellees.

No. 01–98–00678–CV.
Dec. 16, 1999.

Bus driver brought negligence action against van driver and her employer for injuries allegedly resulting from vehicle accident. The 281st Judicial District Court, Harris County, William F. Bell, J., entered take-nothing judgment based on jury verdict. Bus driver appealed. The Court of Appeals, Frank C. Price, J. (Assigned), held that: (1) van driver's admission that she misjudged distance between van and bus, in and of itself, did not show that van driver was negligent; (2) bus driver did not prove accident was proximate cause of back injuries; and (3) Court could not appraise assignment of error based on admission of testimony regarding matters not disclosed in discovery when bus driver failed to include interrogatories and answers in record.

Affirmed.

West Headnotes

**[1] Appeal and Error 30 ⟜1003(5)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1003 Against Weight of Evidence
                    30k1003(5) k. Great or overwhelming weight or preponderance. Most Cited Cases
    When a party attacks a jury finding concerning an issue upon which he had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence.

**[2] Appeal and Error 30 ⟜1003(7)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1003 Against Weight of Evidence
                    30k1003(7) k. Manifest weight of evidence. Most Cited Cases
    In reviewing a challenge that a jury finding is against the great weight and preponderance of the evidence, the Court of Appeals must examine the record to determine if there is some evidence to support the finding, and then determine, in light of the entire record, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

**[3] Appeal and Error 30 ⟜1003(7)**

30 Appeal and Error
    30XVI Review
        30XVI(I) Questions of Fact, Verdicts, and Findings
            30XVI(I)2 Verdicts
                30k1003 Against Weight of Evidence
                    30k1003(7) k. Manifest weight of evidence. Most Cited Cases
    When reviewing whether a jury finding is so contrary to overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, Court of Appeals cannot reverse merely because it concludes that the evidence preponderates toward an affirmative answer.

**[4] Appeal and Error 30 ⟜1003(5)**

30 Appeal and Error
    30XVI Review

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

30XVI(I) Questions of Fact, Verdicts, and Findings

30XVI(I)2 Verdicts

30k1003 Against Weight of Evidence

30k1003(5) k. Great or overwhelming weight or preponderance. Most Cited Cases

In reviewing a challenge that jury finding is against great weight and preponderance of evidence, Court of Appeals cannot substitute its opinion for that of the trier of fact and determine that it would reach a different conclusion.

**[5] Negligence 272 ☞1579**

272 Negligence

272XVIII Actions

272XVIII(C) Evidence

272XVIII(C)2 Presumptions and Inferences

272k1579 k. Happening of accident or injury. Most Cited Cases

Occurrence of an accident or a collision is not of itself evidence of negligence.

**[6] Automobiles 48A ☞146**

48A Automobiles

48AV Injuries from Operation, or Use of Highway

48AV(A) Nature and Grounds of Liability

48Ak146 k. Care required and liability in general. Most Cited Cases

**Automobiles 48A ☞201(.5)**

48A Automobiles

48AV Injuries from Operation, or Use of Highway

48AV(A) Nature and Grounds of Liability

48Ak201 Proximate Cause of Injury

48Ak201(.5) k. In general. Most Cited Cases

To prevail on negligence claim arising out of automobile accident, bus driver had to prove specific acts of negligence on the part of the other driver and also prove that the accident was the proximate

cause of his injuries.

**[7] Automobiles 48A ☞245(2.1)**

48A Automobiles

48AV Injuries from Operation, or Use of Highway

48AV(B) Actions

48Ak245 Questions for Jury

48Ak245(2) Care Required and Negligence

48Ak245(2.1) k. In general. Most Cited Cases

**Automobiles 48A ☞245(50.1)**

48A Automobiles

48AV Injuries from Operation, or Use of Highway

48AV(B) Actions

48Ak245 Questions for Jury

48Ak245(50) Proximate Cause of Injury

48Ak245(50.1) k. In general. Most Cited Cases

Whether the plaintiff alleging negligence resulting in automobile accident succeeds in proving negligence and proximate cause by a preponderance of the evidence is within the jury's province to determine.

**[8] Automobiles 48A ☞173(6)**

48A Automobiles

48AV Injuries from Operation, or Use of Highway

48AV(A) Nature and Grounds of Liability

48Ak173 Vehicles at Rest or Unattended

48Ak173(6) k. Passing vehicle parked or standing. Most Cited Cases

Van driver's admission that she misjudged distance between van and bus due to overhang on van's door, in and of itself, did not show that van driver was negligent with regard to overhang hitting bus' left side mirror as van passed parked bus, where van driver testified that she was not speeding

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

10 S.W.3d 730
**(Cite as: 10 S.W.3d 730)**

and was not in any type of hurry, and that she saw bus and attempted to avoid it.

**[9] Automobiles 48A ⬤⟿201(5)**

48A Automobiles
    48AV Injuries from Operation, or Use of Highway
        48AV(A) Nature and Grounds of Liability
           48Ak201 Proximate Cause of Injury
              48Ak201(1) Efficient Cause of Injury in General
                  48Ak201(5) k. Vehicles at rest or unattended. Most Cited Cases

Injured bus driver did not prove that accident with van driver was proximate cause of his back injuries, where there was ample testimony from bus driver's doctor that back surgery had been recommended before accident.

**[10] Appeal and Error 30 ⬤⟿1050.1(1)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
           30XVI(J)10 Admission of Evidence
              30k1050 Prejudicial Effect in General
                30k1050.1 Evidence in General
                  30k1050.1(1) k. In general.
Most Cited Cases

**Appeal and Error 30 ⬤⟿1056.1(1)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
           30XVI(J)11 Exclusion of Evidence
               30k1056 Prejudicial Effect
               30k1056.1 In General
                  30k1056.1(1) k. In general.
Most Cited Cases

To obtain reversal of a judgment based upon an error of the trial court in admitting or excluding evidence, appellant must show: (1) the trial court erred, and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

**[11] Appeal and Error 30 ⬤⟿1050.1(1)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
           30XVI(J)10 Admission of Evidence
               30k1050 Prejudicial Effect in General
                30k1050.1 Evidence in General
                  30k1050.1(1) k. In general.
Most Cited Cases

**Appeal and Error 30 ⬤⟿1056.1(1)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
           30XVI(J)11 Exclusion of Evidence
               30k1056 Prejudicial Effect
               30k1056.1 In General
                  30k1056.1(1) k. In general.
Most Cited Cases

In appeal of judgment based on an error of the trial court in admitting or excluding evidence, the appellate court must examine the entire record to determine whether the disputed evidence controlled the judgment.

**[12] Appeal and Error 30 ⬤⟿714(5)**

30 Appeal and Error
    30X Record
        30X(N) Matters Not Apparent of Record
           30k714 Matters Appearing Otherwise Than by Record
              30k714(5) k. Briefs. Most Cited Cases

Court of Appeals cannot consider documents attached to an appellate brief that do not appear in the record.

**[13] Appeal and Error 30 ⬤⟿714(5)**

30 Appeal and Error
    30X Record
        30X(N) Matters Not Apparent of Record
           30k714 Matters Appearing Otherwise

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

10 S.W.3d 730
**(Cite as: 10 S.W.3d 730)**

Than by Record

30k714(5) k. Briefs. Most Cited Cases

Court of Appeals must hear and determine a case on the record as filed, and it may not consider documents attached as exhibits to briefs.

**[14] Appeal and Error 30 ⌾907(5)**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k906 Facts or Evidence Not Shown by Record
        30k907 In General
          30k907(5) k. Contents of documents omitted from record. Most Cited Cases

Court of Appeals could not appraise bus driver's assignment of error that trial court erred in admitting expert testimony regarding matters not disclosed by van driver in interrogatory responses in suit brought by bus driver against van driver for negligence allegedly resulting in vehicle accident, and thus Court had to presume that proceedings and judgment below were regular and correct, where bus driver did not include interrogatories and answers in record.

**[15] Appeal and Error 30 ⌾907(5)**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k906 Facts or Evidence Not Shown by Record
        30k907 In General
          30k907(5) k. Contents of documents omitted from record. Most Cited Cases

Court of Appeals must presume documents missing from record would sustain trial court's ruling.

**[16] Appeal and Error 30 ⌾714(5)**

30 Appeal and Error
  30X Record
    30X(N) Matters Not Apparent of Record
      30k714 Matters Appearing Otherwise Than by Record
        30k714(5) k. Briefs. Most Cited Cases

Attachment of documents as exhibits or appendices to briefs is not a formal inclusion in the record on appeal and, thus, the documents cannot be considered.

**[17] Appeal and Error 30 ⌾230**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k230 k. Necessity of timely objection. Most Cited Cases

**Appeal and Error 30 ⌾231(5)**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k231 Necessity of Specific Objection
        30k231(5) k. Nature of evidence in general. Most Cited Cases

**Appeal and Error 30 ⌾241**

30 Appeal and Error
  30V Presentation and Reservation in Lower Court of Grounds of Review
    30V(B) Objections and Motions, and Rulings Thereon
      30k234 Necessity of Motion Presenting Objection
        30k241 k. Sufficiency and scope of motion. Most Cited Cases

To have preserved error in trial court's failure to declare mistrial after jury heard irrelevant and prejudicial evidence, injured bus driver must have made valid, timely, and specific request, motion, or objection. Rules App.Proc., Rule 33.

**[18] Appeal and Error 30 ⌾969**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k969 k. Conduct of trial or hearing in general. Most Cited Cases

Trial court's denial of a motion for mistrial will not be disturbed on appeal except on a showing of an abuse of discretion.

**[19] Trial 388 ☞131(3)**

388 Trial
   388V Arguments and Conduct of Counsel
      388k131 Objections and Exceptions
         388k131(3) k. Requisites and sufficiency. Most Cited Cases

Trial court did not abuse its discretion failing to declare mistrial in injured bus driver's suit against van driver for injuries allegedly sustained in accident, even though bus driver argued that testimony of doctor violated motion in limine, where bus driver's attorney did not state grounds for objection or explain for what type of "motion" he was moving.

**\*732** William Chu, Addison, for Appellant.

Erin E. Lunceford, Houston, for Appellees.

Panel consists of Justices O'CONNOR, HEDGES, and PRICE.<sup>FN\*</sup>

> FN\* The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

## OPINION

FRANK C. PRICE, Justice (Assigned).

Appellant, Glenn Till, drove a bus full of people from the economy parking lot at Bush Intercontinental Airport. He was parked in front of the terminal when his bus was struck by a van operated by appellee, Lora Williams Thomas, who was driving a shuttle for Quik–Park. Till appeals a take-nothing judgment based on the jury's verdict. We affirm.

## Fact Summary

On December 23, 1993, Thomas approached the terminal with a van full of holiday travelers. She was driving up the ramp and noticed Till's City of Houston bus. As she drove past the bus, the overhang over her door hit Till's left side mirror. She testified she could not stop at that point to survey the damage, because she would be blocking the entrance to the terminal. She called the Quik Park dispatcher and circled around the terminal and came back to the scene. Thomas was not injured, and she over-heard Till tell the police he was not injured. The investigating police officer's accident report reflects there were no injuries.

Peggy Kellum, the manager for Quik Park, testified the only damage to Thomas's van was a scrape which was removed with Compound W. There was no expense associated with the repair of the Quik Park van.

Till sued Thomas and Quik Park, alleging that Thomas's negligence proximately caused his need for back fusion surgery. At trial, Thomas presented evidence from Till's neurosurgeon, David Baskin, M.D., that Till had been advised, before the accident, he needed back surgery. Dr. Baskin also referred Till to a psychiatrist for pain management before this accident.

The jury decided Thomas was not negligent, and Till suffered no damages. Till appeals the jury's verdict.

## No Negligence

In point of error one, Till argues the jury's finding of no negligence was against the great weight and preponderance of the evidence given Thomas's repeated testimony that she misjudged the distance between the two vehicles.

[1][2][3][4] When a party attacks a jury finding

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

concerning an issue upon which he had the burden of proof, he must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. **\*733**_Honeycutt v. Billingsley,_ 992 S.W.2d 570, 578 (Tex.App.—Houston [1st Dist.] 1999, pet. denied). In reviewing a challenge that the jury finding is against the great weight and preponderance of the evidence, we must examine the record to determine if there is some evidence to support the finding, and then determine, in light of the entire record, whether the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. _Cain v. Bain,_ 709 S.W.2d 175, 176 (Tex.1986); _Hollander v. Capon,_ 853 S.W.2d 723, 726 (Tex.App.—Houston [1st Dist.] 1993, writ denied). We cannot reverse merely because we conclude that the evidence preponderates toward an affirmative answer. _Herbert v. Herbert,_ 754 S.W.2d 141, 144 (Tex.1988); _Honeycutt,_ 992 S.W.2d at 578. Nor can we substitute our opinion for that of the trier of fact and determine that we would reach a different conclusion. _Hollander,_ 853 S.W.2d at 726.

[5][6][7] The occurrence of an accident or a collision is not of itself evidence of negligence. _Rankin v. Nash–Texas Co.,_ 129 Tex. 396, 105 S.W.2d 195, 199 (1937); _Smith v. Cent. Freight Lines, Inc.,_ 774 S.W.2d 411, 412 (Tex.App.—Houston (14th Dist.) 1989, writ denied). The plaintiff must prove specific acts of negligence on the part of the driver and must also prove proximate cause. _Smith,_ 774 S.W.2d at 412. Whether the plaintiff succeeds in proving negligence and proximate cause by a preponderance of the evidence is then within the jury's province to determine. _Id._

[8] While it is true Thomas admitted she misjudged the distance due to the overhang on the door, this admission, in and of itself, does not constitute negligence. She testified she was not speeding, and she was not in any type of hurry. She saw Till and attempted to avoid him, but simply "misjudged" the distance. She was paying attention, but misjudged the space between the two vehicles.

[9] Also, Till did not prove that the accident with Thomas was the cause of his back injuries. There was ample testimony from Dr. Baskin that the back surgery had been recommended before the accident. Till did not prove Thomas proximately caused his injuries.[FN1]

> [FN1.] Till did not appeal the jury's decision to award him no damages.

We overrule point of error one.

### Expert Testimony

In point of error two, Till asserts the trial court erred by allowing Thomas's expert to testify about matters that were not disclosed in interrogatory responses.

### Standard of Review

[10][11] To obtain reversal of a judgment based upon an error of the trial court in admitting or excluding evidence, appellant must show (1) the trial court erred, and (2) the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. _Gee v. Liberty Mut. Fire Ins. Co.,_ 765 S.W.2d 394, 396 (Tex.1989). The appellate court must examine the entire record to determine whether the disputed evidence controlled the judgment. _Id._

[12][13] We cannot consider documents attached to an appellate brief that do not appear in the record. _$429.30 v. State,_ 896 S.W.2d 363, 365 (Tex.App.—Houston [1st Dist.] 1995, no writ). This Court must hear and determine a case on the record as filed, and may not consider documents attached as exhibits to briefs. _RWL Const., Inc. v. Erickson,_ 877 S.W.2d 449, 451 (Tex.App.—Houston [1st Dist.] 1994, no writ).

[14][15] We cannot appraise Till's assignment of error. We must presume the proceedings and judgment below were regular and correct. Till had the burden to supply us with an appellate record demonstrating the trial court abused its discretion in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

10 S.W.3d 730
**(Cite as: 10 S.W.3d 730)**

admitting Dr. Baskin's testimony because Thomas did not supplement her answers as required. **\*734** *Christiansen v. Prezelski,* 782 S.W.2d 842, 843 (Tex.1990). Till was obliged to include in the appellate record the interrogatories and answers. He did not. We must presume the missing documents would sustain the trial court's ruling. *University of Texas at Austin v. Hinton,* 822 S.W.2d 197, 202 (Tex.App.—Austin 1991, no writ).

[16] Till has attached, as an appendix to his brief, Thomas's answers to interrogatories. The discovery responses, however, were not included in the record of this case on appeal. The attachment of documents as exhibits or appendices to briefs is not a formal inclusion in the record on appeal and, thus, the documents cannot be considered. *Perry v. Kroger Stores Store No. 119,* 741 S.W.2d 533, 534 (Tex.App.—Dallas 1987, no writ).

We overrule point of error two.

### Mistrial

In point of error three, Till asserts the trial court erred by failing to declare a mistrial after the jury heard irrelevant and prejudicial evidence against him.

[17][18] To preserve error, Till must make a valid, timely, and specific request, motion, or objection. TEX.R.APP. P. 33; *Matter of Bates,* 555 S.W.2d 420, 432 (Tex.1977); *United Cab Co. v. Mason,* 775 S.W.2d 783, 785 (Tex.App.—Houston [1st Dist.] 1989, writ denied.). The court's denial of a motion for mistrial will not be disturbed on appeal except on a showing of an abuse of discretion. *City of Jersey Village v. Campbell,* 920 S.W.2d 694, 698 (Tex.App.—Houston [1st Dist.] 1996, writ denied).

[19] While questioning Dr. Baskin, Till's attorney asked Baskin what Till's complaints were when he was examined on June 1, 1993. Baskin responded, "Well, at that time he had been involved in a motor-vehicle accident." The exchange between Till's attorney and the trial court immediately after

Baskin's response was as follows:

Till's attorney: Objection, Your Honor.

The Court:ney: Sustained.

Till's attorney: Move for a motion, Your Honor.

The Court:ney: Overruled.

Till argues Baskin's comment violated the existing motion in limine excluding testimony about earlier motor vehicle accidents. The motion in limine, however, was not included in the appellate record and shall not be considered. *See RWL Const., Inc.,* 877 S.W.2d at 451.

Till's attorney did not state the grounds for his objection or explain for what type of "motion" he was moving. *See Haney v. Purcell Co., Inc.,* 796 S.W.2d 782, 789 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (holding that objection must be specific enough to inform trial court of reason for objection.) There has been no showing that the trial court abused its discretion.

We overrule point of error three.

We affirm the judgment of the trial court.

Tex.App.–Houston [1 Dist.],1999.
Till v. Thomas
10 S.W.3d 730

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



978 S.W.2d 684, 142 Oil & Gas Rep. 217
**(Cite as: 978 S.W.2d 684)**

▷

Court of Appeals of Texas,
Eastland.
Jimmy Max WRIGHT and Fairy Lynn Wright Appellants,
v.
E.P. OPERATING LIMITED PARTNERSHIP et al, Appellees.

No. 11–96–00261–CV.
Oct. 1, 1998.
Rehearing Overruled Nov. 25, 1998.

Former owners of tracts brought declaratory judgment action to quiet title to the mineral estate under tracts, claiming title by virtue of reservation and exception contained in deeds to present owners and their predecessor. The 32nd District Court, Nolan County, Glen Harrison, J., entered judgment for present owners, and former owners appealed. The Court of Appeals, Arnot, C.J., held that: (1) deeds did not reserve mineral estate, and (2) revivor was not sufficiently pleaded.

Affirmed.

West Headnotes

**[1] Mines and Minerals 260 ⚷56**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)1 In General
                260k56 k. Nature of mining leases and agreements. Most Cited Cases
There was no cause of action for negligence, nor for gross negligence, in leasing of mineral interest.

**[2] Deeds 120 ⚷93**

120 Deeds
    120III Construction and Operation
        120III(A) General Rules of Construction
            120k93 k. Intention of parties. Most Cited Cases
In construing a deed, the court endeavors to carry into effect the intent of the parties as expressed therein; it is not the intent that the parties may have had but failed to express in the instrument, but it is the intent that is expressed by the instrument.

**[3] Mines and Minerals 260 ⚷55(4)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(B) Conveyances in General
            260k55 Grants and Reservations of Minerals and Mining Rights
                260k55(4) k. Nature of estate granted or reserved. Most Cited Cases
Reservation and exception contained in deeds, which included statement that conveyance was made "subject to any and all reservations presently of record including without limitation that property reserved" by former owners, did not effectively reserve any mineral interests in former owners, but merely recognized prior reservation that no longer existed due to inadvertent foreclosure of mineral interests.

**[4] Mines and Minerals 260 ⚷55(8)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(B) Conveyances in General
            260k55 Grants and Reservations of Minerals and Mining Rights
                260k55(8) k. Remedies. Most Cited Cases
Former owners who claimed that their mineral interest in property was revived by actions of present owners were required to properly plead and prove revivor. Vernon's Ann.Texas Rules Civ.Proc., Rule 47.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[5] Mines and Minerals 260 ⟨⟩55(7)**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(B) Conveyances in General
            260k55 Grants and Reservations of Minerals and Mining Rights
                260k55(7) k. Conveyance, abandonment, or other termination of rights granted or reserved. Most Cited Cases

In cases of revivor of mineral interest, there is an acceptance under an oil and gas lease (such as a lease royalty payment of a lease that has lapsed) in addition to an instrument in writing (such as a ratification of a unit or pooling agreement).

**\*684** Donald M. Hunt, Gary M. Bellair, Carr Hunt Wolfe & Joy, Attorneys At Law, Lubbock, Maxie L. Houser, Attorney At Law, Corpus Christi, for Appellants.

Rick Mayer, C. Clint Adams, Dallas, Charles E. Jones, Charles E. Jones Jr. & Associates, Attorneys At Law, Rod E. Wetsel, Steakley & Wetsel, Attorneys At Law, Sweetwater, for Appellees.

Before ARNOT, C.J., and DICKENSON and WRIGHT, JJ.

OPINION

ARNOT, Chief Justice.

This appeal arises from a declaratory judgment action brought to quiet title to the mineral estate under five tracts of land in Nolan County. Appellants, Jimmy Max Wright and Fairy Lynn Wright, originally owned both the surface and the mineral estate. The Wrights now claim title to all of the mineral estate by virtue of a reservation and exception contained in a deed they executed to appellees' predecessor in title. Appellees are: E.P. Operating Limited Partnership; Enserch Exploration, Inc.; Enserch Corporation; The Jay Etheredge Trust; Jay Stanley Etheredge; John Oscar Martin; Helen C. Martin; Randall Bankhead; Mary Elizabeth Bankhead; Gaines H. Price; The Callie Michelle Price Trust; Eugene Fullwood; Mary Letha Fullwood; Clifford C. **\*685** Etheredge, Sr.; and Hilda Etheredge. They are the successors in title to the five individual tracts, having made individual purchases from the subsidiary of a bank which had foreclosed its deed of trust lien and acquired the property by substitute trustee's deed. The Wrights acknowledge that the foreclosure of the deed of trust lien also foreclosed their mineral interest, but they claim that the recitations in other instruments filed for public record referring to the Wrights' prior reservation of minerals establishes, as a matter of law, that the parties intended for the Wrights to retain their minerals. Utilizing well-established rules for construction of instruments, we affirm the judgment of the trial court. FN1

> FN1. In *Lee M. Bass, Inc. v. Shell Western E & P, Inc.*, 957 S.W.2d 159 (Tex.App.—San Antonio 1997, no writ), the court recited the appropriate standards of review:
>
> In reviewing a summary judgment on appeal, we must determine whether the movant met its burden of showing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *J.M. Huber Corp. v. Santa Fe Energy Resources, Inc.*, 871 S.W.2d 842, 845 (Tex.App.—Houston [14th Dist.] 1994, writ filed). In determining whether a material fact issue exists to preclude summary judgment, evidence favoring the non-movant is taken as true, and all reasonable inferences are indulged in the non-movant's favor. *Id.* When both parties file motions for summary judgment and one such motion is granted, we must review all of the issues presented and, if reversible error is found, render such judgment as the trial court should

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

have rendered, including rendering judgment for the other movant. Jones v. Strauss, 745 S.W.2d 898, 900 (Tex.1988); Santa Fe Energy Co. v. Baxter, 783 S.W.2d 643, 645 (Tex.App.—Houston [14th Dist.] 1989, writ denied).

Summary judgment is appropriate in cases involving the interpretation of an unambiguous document. *Bishop v. National Loan Investors, L.P.*, 915 S.W.2d 241, 245 (Tex.App.—Fort Worth 1995, writ denied); *Tri County Service Co. v. Nationwide Mutual Ins. Co.*, 873 S.W.2d 719, 721 (Tex.App.—San Antonio 1993, writ denied).

Although there are a number of transactions and parties involved, the chain of title in this case is not complicated. The Wrights owned and operated a farming operation on five different tracts of land in Nolan County. In 1981, the Wrights executed a deed of trust to Mercantile Bank pledging the surface and the minerals under all five tracts to secure one promissory note. About a year later, the Wrights agreed to sell the farming operation to Floyd Oliver, Layton Oliver, and O–O, Incorporated.

Under an assumption agreement dated May 4, 1982, the Olivers agreed to assume the Wrights' obligations to Mercantile Bank, and the Wrights agreed to transfer the farming equipment and the surface estate of the five tracts to the Olivers. Mercantile Bank agreed not to foreclose upon the mineral estates and to release the Wrights from all liability. The assumption agreement contained the following recitation:

Notwithstanding anything herein or in any other documents or instruments executed in connection herewith to the contrary, the [Wrights] shall not convey any rights, titles or interests in and to the mineral estate of the Real Property, which mineral estate shall be reserved to the [Wrights]

in any deed conveying the Real Property by the [Wrights] to the [Olivers].

This assumption agreement was not filed for public record. In their deed to the Olivers, dated May 21, 1982, the Wrights made the following exception:

Grantors do hereby *except and reserve* unto themselves, their heirs, successors and assigns *all of the oil, gas and other minerals* on, in and under all of the land described in this instrument, together with the right of ingress and egress for the purpose of exploring for, drilling for, producing and marketing said oil, gas and other minerals.[FN2] (Emphasis added)

> FN2. The deed also states:
>
> The excepted and reserved interest is subject to any valid, recorded oil and gas and other mineral lease or leases which cover this interest, but covers and includes all delay rentals and royalties, and any other rights and payments due or to become due or which may hereafter be payable or paid under the terms of said lease or leases to the lessor therein, his heirs, successors and assigns, insofar as said lease or leases cover all or any part of the land described in this deed. Upon termination of any/or all of such leases as to any land described herein, the interest of said lessee, his heirs, successors and assigns, shall revert to grantors herein, their heirs, successors and assigns. Notwithstanding anything herein to the contrary, the Grantors, their heirs, successors, and assigns shall pay reasonable damages to the grantees, their heirs, successors, and assigns for any damage done to the surface estate of the land herein conveyed as a result, direct or indirect, of any activities of Grantors, their heirs, successors, and assigns, undertaken with respect to the mineral estate

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

herein reserved.

**\*686** The Wrights did not receive a partial release of the deed of trust lien covering the reserved minerals from Mercantile.

As further evidence of the Wright's exercise of ownership over the minerals, the summary judgment evidence shows that the Wrights subsequently conveyed the minerals under the five tracts to Elmer O. Mahon, Fairy Lynn Wright's father, by warranty deed in June of 1982. Mr. Mahon died in 1994, and the Wrights reacquired the mineral interests by inheritance.

Approximately five years after assuming the loan, the Olivers defaulted on their obligations. On June 3, 1987, Mbank Dallas, successor in interest to Mercantile Bank, foreclosed its deed of trust lien on the five tracts and received a substitute trustee's deed.[FN3] The trustee's deed did not exclude the minerals, did not refer to the prior reservation of the minerals by the Wrights, and did not mention the assumption agreement. On October 29, 1987, Mbank conveyed the five tracts of land to its subsidiary, Oregon, Inc. Again, no reference to the reservation of the mineral estate was made.

> FN3. The deed of trust instrument was not included in the summary judgment evidence.

From October 1987 to January 1988, Oregon, Inc. made five separate conveyances of the property to five different grantees, who are appellees herein. Each special warranty deed contained the following language: "This conveyance is made subject and subordinate to ... (the "Permitted Exceptions") described in Exhibit "B" attached. Under a heading of "Permitted Exceptions," Exhibit "B" contained the following language:

> *Any and all valid and subsisting* leases, *reservations, severances* of any and all oil, gas and minerals in, on, and under the Property *which are presently of record* and which affect or relate to

the Property: *including, without limitation, that certain reservation of all oil, gas and minerals in, on and under the property reserved by Jimmy Max Wright, et al in Warranty Deed to Floyd Oliver, et al, dated May 21, 1982,* recorded in Volume 255, Page 615, Deed Records, Nolan County, Texas. (Emphasis added)

This dispute arose when appellees granted leases to conduct seismic operations on their lands and filed an affidavit of ownership as to the mineral estate under their respective surface estates. In a declaratory judgement action, the court was asked to decide who owned the minerals. After this dispute arose, Oregon, Inc. executed a quitclaim deed conveying any interest it had in the minerals under the five tracts to the Wrights.

The Wrights acknowledge that Mbank inadvertently foreclosed on their mineral interest when it foreclosed on its deed of trust lien. The Wrights argue that the trial court erred in granting a summary judgment holding that title to the minerals is vested in appellees because (1) Oregon specifically reserved the mineral interest in each special warranty deed and (2) Oregon's deed revived the prior mineral exception.[FN4]

> FN4. See *Ellis v. Waldrop*, 656 S.W.2d 902, 904 (Tex.1983), in which the court observed:
>
> In *A.H. Belo Corp. v. Sanders*, 632 S.W.2d 145 (Tex.1982), we reaffirmed the long-standing general rule in Texas that in order to recover damages for the disparagement of title, the plaintiff must allege the loss of a specific sale. Furthermore, this Court has established that a cause of action to recover damages for the failure to release a purported, though not actual, property interest is a cause of action for slander of title. No Texas case has ever awarded damages under the rubric "cloud on title." A suit to remove a cloud from title is a suit for a specific,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

978 S.W.2d 684, 142 Oil & Gas Rep. 217
**(Cite as: 978 S.W.2d 684)**

equitable remedy. (Citations omitted)

See *Sadler v. Duvall*, 815 S.W.2d 285, 293 n. 2 (Tex.App.—Texarkana 1991, writ den'd), in which the court stated:

Slander of title is defined as a false and malicious statement made in disparagement of a person's title to property which causes him special damage. A cloud on title exists when an outstanding claim or encumbrance is shown which, on its face, if valid, would affect or impair the title of the owner of the property. It is a suit for a specific equitable remedy. (Citations omitted)

Also see *Exploracion De La Estrella Soloataria Incorporacion v. Birdwell*, 858 S.W.2d 549, 553 (Tex.App.—Eastland 1993, no writ), in which this court said:

A suit to cancel an oil and gas lease has been described as a suit to quiet title. Although he must base his action on the strength of his own title, the plaintiff in a suit to quiet title does not have to prove superior right to the property by tracing his title to the sovereignty. (Citations omitted)

**\*687** In their first amended petition, the Wrights sued for a declaratory judgment to establish that they were the mineral owners and for damages arising from the slander of title (for executing and filing an affidavit of ownership and executing an agreement to allow seismic operations and options to grant oil and gas leases), from the unlawful subsurface trespass, and from the creation of a cloud on their title by negligently researching the title and leasing the minerals. The Wrights urged that these acts and omissions were done with such conscious indifference as to amount to gross negligence. Appellees filed a counterclaim asking for a declaratory judgment, for the removal of the cloud on their title, and for damages for slander of title.

[1] As this court observed in *Sun Exploration and Production Company v. Pitzer*, 822 S.W.2d 294 (Tex.App.—Eastland 1991, writ den'd), Texas does not recognize a cause of action for negligence in leasing. Consequently, without negligence, there can be no cause of action for gross negligence.[FN5]

FN5. See *Transportation Insurance Company v. Moriel*, 879 S.W.2d 10 (Tex.1994); *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322 (Tex.1993); *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570 (Tex.1985).

We note that the Wrights did not plead or seek reformation of any instrument and did not plead fraud, estoppel, mutual mistake, ambiguity,[FN6] or any cause of action that would allow the offer of extraneous evidence to explain the language in the Oregon deeds. Consequently, the trial court was called upon to interpret the Oregon deeds and determine as a matter of law the effect of their language and the estate they passed.[FN7]

FN6. Absent pleadings and allegations of ambiguity, the document will be construed based on the express language used within the four corners of the instrument and not on extraneous writings. *Henderson v. Parker*, 728 S.W.2d 768 (Tex.1987); *Odeneal v. Van Horn*, 678 S.W.2d 941 (Tex.1984); *Shriner's Hospital for Crippled Children of Texas v. Stahl*, 610 S.W.2d 147 (Tex.1980); and *Frost National Bank of San Antonio v. Newton*, 554 S.W.2d 149 (Tex.1977).

FN7. In *Patrick v. Barrett*, 734 S.W.2d 646 (Tex.1987), the court stated the distinctions between an exception and a reservation. It is manifest that an exception does not pass title itself; instead it operates to prevent the excepted interest from passing at all. *Pich v. Lankford*, 157 Tex. 335, 302 S.W.2d 645, 648 (Tex.1957). On the other hand, a reservation is made in favor of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

grantor, wherein he reserves unto himself royalty interest, mineral rights, and other rights. *Benge v. Scharbauer*, 152 Tex. 447, 259 S.W.2d 166, 167–68 (Tex.1953).

[2] In construing a deed, the court endeavors to carry into effect the intent of the parties as expressed therein. It is not the intent that the parties may have had but failed to express in the instrument, but it is the intent that is expressed by the instrument. *Pierson v. Sanger*, 93 Tex. 160, 53 S.W. 1012 (Tex.1899); *Harlan v. Vetter*, 732 S.W.2d 390 (Tex.App.—Eastland 1987, writ ref'd n.r.e.).[FN8]

> FN8. In *Alford v. Krum*, 671 S.W.2d 870 (Tex.1984), overruled on other grounds by *Luckel v. White*, 819 S.W.2d 459 (Tex.1991), the court recited the long-standing rules of interpretation and construction controlling the disposition of this cause:
>
>> The primary duty of the courts in interpreting a deed is to ascertain the intent of the parties. *Terrell v. Graham*, 576 S.W.2d 610, 612 (Tex.1979); *McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341, 344 (1957). This rule of construction, however, must be modified with the restriction that it is not the intention that the parties may have had but failed to express in the instrument, but it is the intention that is expressed by said instrument. That is, the question is not what the parties meant to say, but the meaning of what they did say. *Canter v. Lindsey*, 575 S.W.2d 331, 334 (Tex.Civ.App.—El Paso 1978, writ ref'd n.r.e.); *Davis v. Andrews*, 361 S.W.2d 419, 423 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.). Finally, "[w]e must construe this language as it is written and we have no right to alter it by interpolation or substitution." *Dahlberg v. Holden*, 150 Tex. 179, 238 S.W.2d 699, 701 (1951).

In seeking to ascertain the intention of the parties, the court must attempt to harmonize all parts of a deed, since the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement. *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617, 620 (1954). On the other hand, we realize that irreconcilable conflicts do exist; therefore, when it is impossible to harmonize internally inconsistent expressions of intent, the court must give effect to the "controlling language" of the deed and not allow ambiguities to "destroy the key expression of intent" included within the deed's terms. *Texas Pacific Coal & Oil Co. v. Masterson*, 160 Tex. 548, 334 S.W.2d 436, 439 (1960).

**\*688** [3] The Wrights urge that the language in the Oregon deeds to the individual appellees (referring by recital to the prior mineral reservation by the Wrights in their deed to the Olivers) had the effect, as a matter of law, of excluding the minerals from the conveyance. We disagree. The recitals purport to state why the exception was made, not to make an exception or reservation of the mineral interest. See *Pich v. Lankford*, 157 Tex. 335, 302 S.W.2d 645 (Tex.1957). The Wrights recognize that Mbank inadvertently foreclosed on their mineral interest. Consequently, Oregon was vested with full title to both the surface and mineral estates. The language stating that the conveyances were made *subject to any and all reservations presently of record including without limitation that property reserved by* the Wrights does not reserve any mineral interest in Oregon's predecessors in title, but rather recognizes that reservations have been made in the past and are in the chain of title. This language is more in the form of limiting the warranty than reserving an interest.

The Wrights argue that there is a material question of fact as to the parties' intent to convey the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

minerals. The Wrights would direct the court's attention to the other instruments of record as well as the deemed admissions and other evidence submitted for the purposes of summary judgment evidence. The affidavit of Mbank's vice president, who negotiated the sale, stated that each person with whom the bank negotiated a sale from Oregon was told that no mineral interest was to be conveyed. Subsequent conveyances by appellees recognized that no mineral interest was conveyed. The Wrights assert that, by deemed admissions, the summary judgment evidence shows that the grantees from Oregon were told that they would not receive any of the minerals. Yet, under the pleadings in this case, this court is constrained in its interpretation to review only the deed from Oregon. As a matter of law, a reference by recital to a mineral interest that has previously been foreclosed does not in effect reserve that interest from the conveyance. Although the parties did not intend to convey the minerals, we must ascertain what the language of the instrument says, not what the parties meant for it to say.

Appellees would have us read the words "valid and subsisting" in connection with the words "leases or reservations or severances." The Wrights would have us ignore these modifiers. We understand the plain meaning of these modifiers to be that, if there is an oil and gas lease in effect at the time of the conveyance, then the property conveyed is subject to the burden of that lease. Whether the adjectives "valid and subsisting" modify the words "severances" or "reservations" does not matter. Under either interpretation, clearly the recital is to a mineral estate that has been foreclosed, the titles have been merged, and the interest is no longer in existence. The Wrights next call the court's attention to the language "including without limitation." However, this is language of a limitation to warranty and does not create or convey any mineral interest.

As a matter of law, the deeds from Oregon to appellees did not reserve the mineral estate by reference to a mineral interest that was no longer in existence. Consequently, the quitclaim deed from Oregon was ineffective to transfer title to the minerals because Oregon did not own those minerals when the quitclaim deed was executed.

[4] Next, we address the Wrights claim that, by their subsequent actions, appellees have revived the mineral interest. The subsequent execution of a formal document, even to a third person, which expressly recognizes in clear language the validity of a lifeless mineral deed or lease has been held to give it life. The effect of invoking the "revivor" doctrine is the granting of a new estate in land. See *Loeffler v. King*, 149 Tex. 626, 236 S.W.2d 772 (Tex.1951).

[5] The Wrights urge that, by accepting Oregon's deeds excepting the mineral reservation that had previously been foreclosed, appellees have effectively revived the **\*689** Wrights' mineral interest. We disagree. The doctrine of revivor is not applicable in this case. In cases of revivor, there is an acceptance under an oil and gas lease (such as a lease royalty payment of a lease that has lapsed) in addition to an instrument in writing (such as a ratification of a unit or pooling agreement). As such, revivor has the attributes of estoppel and must be pleaded under TEX.R.CIV.P. 47 or 94. The doctrine of revivor was not pleaded by the Wrights. There were no fact issues presented by the summary judgment evidence to show that the subsequent grantees have made a formal recognition of the validity of the Wrights' prior mineral reservation.

In their final point of error, the Wrights urge that they should recover attorney's fees because they should have prevailed on their declaratory judgment action. Because the trial court did not err in granting judgment for appellees, this point is overruled. All of the Wrights' points have been considered, and they are overruled.

The judgment of the trial court is affirmed.

Tex.App.–Eastland,1998.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

978 S.W.2d 684, 142 Oil & Gas Rep. 217
**(Cite as: 978 S.W.2d 684)**

Wright v. E.P. Operating Ltd. Partnership
978 S.W.2d 684, 142 Oil & Gas Rep. 217

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.